Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, ) ) ) | |
| vs. ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., ) ) ) | **MOTION OF CABINET RESOURCE GROUP, et al., TO INTERVENE** |
| Defendants, ) ) | |
| and ) ) | |
| CABINET RESOURCE GROUP ) 71 ½  Four Corners South ) Heron, Montana  59844 ) | |

_____        )
                                                )
GREAT BEAR FOUNDATION                           )
802 E. Front Street                             )
Missoula, Montana  59802                        )
                                                )
IDAHO CONSERVATION LEAGUE                        )
710 N. 6th St.                                   )
Boise, Idaho  83702                             )
                                                )
SELKIRK CONSERVATION ALLIANCE                   )
100 South McKinley, Suite 204                   )
Priest River, Idaho  83856                      )
                                                )
NATURAL RESOURCES DEFENSE COUNCIL )
40 West 20th Street                             )
New York, New York  10011                       )
                                                )
DEFENDERS OF WILDLIFE                           )
1130 17th Street NW                             )
Washington, DC 20036                            )
                                                )
                    Proposed Defendant-Intervenors.)
_____

        The Cabinet Resource Group, Great Bear Foundation, Idaho Conservation

League, Selkirk Conservation Alliance, Natural Resources Defense Council and

Defenders of Wildlife (collectively, "Applicants") hereby move to intervene as of right as

defendants in this action under Federal Rule of Civil Procedure 24(a).  Applicants are

entitled to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) to

defend their interest in conservation of the Cabinet-Yaak and Selkirk grizzly bear

populations, and in preserving their opportunity to obtain meaningful relief in pending

Ninth Circuit litigation, on appeal from Cabinet Resource Group v. U.S. Fish and

Wildlife Serv., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006).  In the alternative,

Applicants request permissive intervention under Rule 24(b).

The reasons why this motion should be granted are set forth in the accompanying memorandum and supporting declarations and exhibits.  Pursuant to local rule 7(j), Applicants also submit a proposed answer to the complaint.

Pursuant to Local Rule 7(m), counsel for Applicants conferred with counsel for petitioner Communities for a Great Northwest, et al. and the federal defendants.  Counsel for plaintiffs advised on January 23, 2007 that they oppose this motion.  Counsel for the federal defendants advised on January 12, 2007 that they do not oppose this motion.

DATED this 23rd day of January, 2007.

Respectfully submitted,

_____/s/ Timothy J. Preso _____
Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-
Intervenors*

Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, et al., <br><br> Defendants, <br><br> and <br><br> CABINET RESOURCE GROUP <br> 71 ½ Four Corners South <br> Heron, Montana  59844 | ) <br> ) Case No. 1:06-CV-01842-RCL <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **MEMORANDUM OF POINTS AND** <br> ) **AUTHORITIES IN SUPPORT OF** <br> ) **MOTION OF CABINET RESOURCE** <br> ) **GROUP, et al., TO INTERVENE** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

GREAT BEAR FOUNDATION                )
802 E. Front Street                           )
Missoula, Montana  59802                )
                                                        )
IDAHO CONSERVATION LEAGUE      )
710 N. 6th St.                                    )
Boise, Idaho  83702                        )
                                                        )
SELKIRK CONSERVATION ALLIANCE  )
100 South McKinley, Suite 204          )
Priest River, Idaho  83856                )
                                                        )
NATURAL RESOURCES DEFENSE COUNCIL  )
40 West 20th Street                          )
New York, New York  10011              )
                                                        )
DEFENDERS OF WILDLIFE              )
1130 17th Street NW                         )
Washington, DC 20036                     )
                                                        )
                    Proposed Defendant-Intervenors. )

## INTRODUCTION

This case involves a challenge to a U.S. Fish and Wildlife Service ("FWS")

biological opinion under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.

The Cabinet Resource Group, Great Bear Foundation, Idaho Conservation League,

Selkirk Conservation Alliance, Natural Resources Defense Council and Defenders of

Wildlife (collectively, "Applicants") request leave to intervene as of right as defendants

under Federal Rule of Civil Procedure 24(a), or alternatively, to intervene permissively

under Rule 24(b).

All of the Applicant conservation organizations have a longstanding interest in the

conservation of the two grizzly bear populations addressed in the challenged biological

opinion.  In addition, five of the six Applicants are plaintiffs in a lawsuit filed in Montana

federal district court more than two years ago that challenges this same biological opinion

on the ground that it was insufficiently protective of grizzly bears.  These Applicants are now appealing the Montana court's decision in that lawsuit to the U.S. Court of Appeals for the Ninth Circuit.

The plaintiffs in this case, Communities for a Great Northwest and Mountain States Legal Foundation (collectively, "Plaintiffs"), claim that FWS lacks authority under the ESA to even consider whether the grizzly bear populations addressed in the challenged biological opinion were likely to be jeopardized by proposed federal agency action.  Plaintiffs' claims threaten to undermine a principal legal basis for Applicants' efforts to protect these grizzly bear populations.  Plaintiffs' claims further threaten to undermine Applicants' ability to obtain relief in the pending Ninth Circuit proceedings, because Applicants' effort to seek stronger protections for grizzly bears in the challenged biological opinion will be meaningless if, as Plaintiffs contend, FWS could not lawfully focus its biological opinion analysis on these grizzly bear populations at all.  Accordingly, Applicants' intervention motion should be granted.

## BACKGROUND

### 1.    The Grizzly Bear

The grizzly bear, *Ursus arctos horribilis*, once numbered more than 50,000 individuals in its North American range south of the Canadian border, which extended from mountainous areas throughout western North America eastward into the Great Plains.  See Biological Opinion for the Kootenai, Idaho Panhandle, and Lolo National Forests Land and Resource Management Plans Amendment for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones, FWS Ref. 1-9-02-F-148 (Feb. 9, 2004) ("BiOp.") at 9 (attached as Exhibit 1).  The advent of

Euro-American settlement in western North America in the late 19th century brought intensive persecution of the grizzly bear and destruction of its habitat, and the grizzly bear population plummeted to fewer than 1,000 individuals occupying less than two percent of the species' former range.  Id.

The FWS listed the grizzly bear as a threatened species pursuant to the ESA on July 28, 1975.  Id.  Under the ESA, a "threatened species" means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  An "endangered species," in turn, means "any species which is in danger of extinction throughout all or a significant portion of its range."  Id. § 1532(6).  The FWS determined that such listing was warranted due to threatened destruction of grizzly bear habitat, over-utilization of the species and other factors affecting the grizzly bear's continued existence.  See BiOp. at 9.

Today, grizzly bear populations are known to persist in only five areas in the lower-48 United States.  See id. at 10.  Two of these areas are the Cabinet-Yaak Grizzly Bear Ecosystem in northwest Montana and the neighboring Idaho panhandle and the Selkirk Grizzly Bear Ecosystem of northwest Idaho and northeast Washington.  See id. at 11-12.

## 2.    The Cabinet-Yaak and Selkirk Grizzly Bear Populations

The Cabinet-Yaak and Selkirk grizzly bear populations are two of the smallest grizzly populations in the lower-48 states, and are extremely imperiled. BiOp. at 35 (46 individuals in the Selkirk Recovery Zone); id. at 49 (30-40 individuals in the Cabinet-Yaak Recovery Zone).  In 1993, the FWS determined that the Cabinet-Yaak grizzly bear population should be reclassified as an endangered, rather than a threatened, species.  Id.

at 10-11.  The FWS reiterated this finding in 1999, and found further that the Selkirk

grizzly bear population should be reclassified as endangered.  Id.  Nevertheless, the FWS

deemed such reclassification to be precluded by the need to take higher-priority actions.

Id.; see also id. at 32, 46.

The federal government administers approximately 90 percent of the land in the

Cabinet-Yaak ecosystem, which ranges from the Yaak River area near the Canadian

border south to the Cabinet Mountains in northwestern Montana.  Id. at 47.  The federal

land is divided among the Kootenai, Lolo and Idaho Panhandle National Forests.  See id.

The Selkirk ecosystem straddles the U.S.-Canada Border in northern Idaho, northeast

Washington and southern British Columbia.  Id. at 32.  The U.S. portion accounts for

approximately 53 percent of the ecosystem, divided between the Idaho Panhandle and

Colville National Forests.  Id.

The remaining habitat for both of these populations is laced with thousands of

miles of old logging roads that allow humans to penetrate deep into the grizzly bears'

remaining habitat, where they encounter—and all too frequently kill—bears.  The FWS

has determined that "[r]oads probably pose the most imminent threat to grizzly habitat

today."  FWS, Grizzly Bear Recovery Plan 21 (September 10, 1993) (available at

http://ecos.fws.gov/docs/recovery_plans/2006/060224.pdf).  Indeed, 12 of 17 known

human-caused grizzly bear mortalities in the Cabinet-Yaak ecosystem occurred within

500 meters of an open road.  See Email from Wayne Kasworm (FWS) to Bryon Holt

(FWS) re: "Cabinet-Yaak Recovery Criteria 2002" (Apr. 7, 2003) (attached as Exhibit 2);

see also U.S. Forest Service, Final Environmental Impact Statement 3-6 ("FS FEIS")

(March 2002) (acknowledging that "the preponderance of human-caused grizzly bear

mortalities has occurred near open roads (<500m.)" in Cabinet-Yaak and Selkirk

ecosystems) (excerpts attached as Exhibit 3). For this reason, the Forest Service

determined that maintaining the existing, extensive road network in the Cabinet-Yaak and

Selkirk ecosystems as it currently exists would likely result in jeopardy to the grizzly

bear. See FS FEIS at 3-20 ("The likelihood that USFWS would find [the no-action

alternative] to jeopardize the continued existence of grizzly bears under ESA Section

7(a)(2) seems high.").

**3.      The Challenged Biological Opinion**

To address the problem of high road densities in grizzly bear habitat in the

Cabinet-Yaak and Selkirk ecosystems, the U.S. Forest Service in March 2001 began the

process of amending Land and Resource Management Plans (LRMPs) for the Kootenai,

Idaho Panhandle, and Lolo National Forests (collectively, "Forests") to include new road

density standards. BiOp. at 2. Pursuant to ESA section 7, 16 U.S.C. § 1536, the Forest

Service initiated formal consultation with FWS on the amendments in May 2002. Id. at

3. FWS prepared a biological opinion to determine, based on "the best scientific and

commercial data available": whether the proposed road density standards are likely to

jeopardize the species; if not, the amount and extent of any incidental "taking" of the

species that may result from the action; and whether to identify conservation measures to

promote the recovery of listed species. 16 U.S.C. § 1536(a)(2), (b)(3); 50 C.F.R. §

402.14(h)-(j).

FWS issued its biological opinion on February 9, 2004. See generally BiOp.

(attached as Exhibit 1). The 2004 biological opinion focused its jeopardy analysis on the

impact of the new road density standards on the Cabinet-Yaak and Selkirk grizzly bear

populations.  Id. at 125.  In the biological opinion, FWS authorized motorized access

standards that it admits will yield only "minor" changes that essentially preserve the

highly roaded status quo in the Cabinet-Yaak and Selkirk ecosystems.  Id. at 106.

Nevertheless, FWS determined that this level of motorized access in grizzly bear habitat

is "not likely to jeopardize the continued existence of the grizzly bear within the [Selkirk

and Cabinet-Yaak Recovery Zones]."  Id. at 125; see generally 16 U.S.C. § 1536(a)(2).

**4.      The Montana Litigation**

In the wake of FWS' issuance of this biological opinion, two separate lawsuits

challenged its "no jeopardy" finding in the District of Montana before Chief Judge Donald

W. Molloy.  In Alliance for the Wild Rockies v. U.S. Fish & Wildlife Service, No. CV

04-216-M-DWM (D. Mont.), the plaintiffs argued that the 2004 biological opinion

unlawfully failed to consider grizzly bear mortality and recovery potential, failed to

comply with Interagency Grizzly Bear Committee Guidelines, and failed to consider the

best available scientific information.  The Alliance plaintiffs also challenged the Forest

Service's failure under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §

4321 et seq., to adopt alternative road standards that would result in greater habitat

security for grizzly bears.

In a second lawsuit, plaintiffs Cabinet Resource Group, et al. (including five of

the Applicants for intervention here) challenged both the 2004 biological opinion, as well

as a separate FWS biological opinion addressing motorized access to grizzly bear habitat

in northeast Washington's Colville National Forest.  See Cabinet Resource Group v. U.S.

Fish & Wildlife Serv., No. 04-236-M-DWM (D. Mont.).  As to both biological opinions,

plaintiffs argued that FWS could not rationally conclude that the proposed motorized

access rules are "not likely to jeopardize the continued existence" of the Cabinet-Yaak and Selkirk grizzly bear populations, 16 U.S.C. § 1536(a)(2). Like the Alliance plaintiffs, the Cabinet Resources Group plaintiffs argued that the Forest Service violated NEPA by failing to consider any alternative embodying road standards that would be more protective of grizzly bears, and also alleged other deficiencies in the NEPA process.

The Montana district court rejected all of the plaintiffs' claims in the Alliance case. See Alliance for the Wild Rockies v. U.S. Fish & Wildlife Serv., No. CV 04-216-M-DWM (D. Mont. Aug. 29, 2006) (attached as Exhibit 4). In the Cabinet Resource Group case, the Montana court agreed with one of the plaintiffs' NEPA claims, but rejected all claims under the ESA. See Cabinet Resource Group v. U.S. Fish and Wildlife Serv., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006) (attached as Exhibit 5). In sum, the Montana court upheld the February 2004 biological opinion against all challenges, but rejected a portion of the Forest Service NEPA analysis in the Cabinet Resource Group case. Both cases are on appeal to the Ninth Circuit Court of Appeals. If the Cabinet Resource Group plaintiffs prevail in the appeal of their ESA claims, they intend to seek a remedial order that, among other things, vacates the 2004 biological opinion and remands the action to the FWS to perform a jeopardy analysis for the Cabinet-Yaak and Selkirk grizzly bear populations that adequately evaluates threats to these populations as required by the ESA.

5.    **The Present Litigation**

Just over one month after the Montana District Court ruled in the Alliance case, and before it ruled in the Cabinet Resource Group case, Plaintiffs filed the present case. Plaintiffs in this case do not challenge the 2004 biological opinion's conclusion that the

7

proposed road density standards will not jeopardize the continued existence of the grizzly

bear. Instead, Plaintiffs challenge the FWS' methodology of focusing its jeopardy analysis

on the impacts of the Forest Service's proposed road density standards to the Cabinet-Yaak

and Selkirk grizzly bear populations, rather than on the impacts to grizzly bears throughout

the lower-48 states. Plaintiffs also challenge a 1986 FWS memorandum that purportedly

established this methodology as agency policy. This case remains in its earliest stages, with

the federal defendants having filed their answer in December 2006 and the original parties

only now addressing scheduling of further proceedings.

## ARGUMENT

## I. APPLICANTS SATISFY ALL REQUIREMENTS FOR INTERVENTION AS OF RIGHT

The Court should grant Applicants' motion for intervention as of right under Rule

24(a). A motion to intervene as of right under Federal Rule of Civil Procedure 24(a)

"turns on four factors":

> (1) the timeliness of the motion; (2) whether the applicant
> "claims an interest relating to the property or transaction
> which is the subject of the action;" (3) whether "the
> applicant is so situated that the disposition of the action
> may as a practical matter impair or impede the applicant's
> ability to protect that interest;" and (4) whether "the
> applicant's interest is adequately represented by existing
> parties."

Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1074 (D.C. Cir. 1998) (quoting

Fed. R. Civ. P. 24(a)). Applicants meet the requirements of each factor in this case.

### A. Applicants' Motion For Intervention Is Timely

This motion, filed just one month after the government defendants filed their

answer to the Plaintiffs' complaint, is timely. In addition to "the amount of time which

has elapsed since the litigation began," timeliness depends upon "the related circumstances, including the purpose for which intervention is sought, the necessity for intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already parties in the case." Hodgson v. United Mine Workers, 473 F.2d 118, 129 (D.C. Cir. 1972).

In this case, Applicants seek intervention as the only means of protecting their interests against Plaintiffs' legal challenges, and no party will be prejudiced if intervention is granted. No substantive orders or rulings have been issued by this Court and no significant proceedings have been scheduled. Under these circumstances, Applicants' motion is "timely" within the meaning of Rule 24. See, e.g., Fund for Animals v. Norton, 322 F.3d 728, 735 (D.C. Cir. 2003) (intervention two months after filing of complaint timely); Admiral Ins. Co. v. National Cas. Co., 137 F.R.D. 176, 177 (D.D.C. 1991) (motion to intervene was timely where "[t]he major substantive issues … have not yet been argued or resolved, and the movants filed their motions promptly").

**B.    Applicants Have A Legally Protectable Interest In The Subject Matter Of This Action Sufficient to Demonstrate Applicants' Standing and Right to Intervene**

Applicants also satisfy Rule 24(a)'s interest requirement. Rule 24(a) requires that an applicant for intervention possess an interest relating to the property or transaction that is the subject matter of the litigation. See Fed. R. Civ. P. 24(a). The "interest test" provides a "practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." Foster v. Gueory, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (quoting Nuesse v. Camp, 385 F.2d 694, 700 (D.C. Cir. 1967)). The test requires demonstration of a "legally protectable" interest. City of

Cleveland v. Nuclear Regulatory Comm'n, 17 F.3d 1515, 1517 (D.C. Cir. 1994) (citation omitted).

Applicants have at least two legally protectable interests here. First, Applicants have demonstrated that members of all the Applicant groups have a cognizable aesthetic interest in observing grizzly bears and signs of grizzly bear presence in the Cabinet-Yaak and Selkirk ecosystems. Applicants' members and staff reside in Montana and Idaho, and seek to view grizzly bears and signs of their presence in the Cabinet-Yaak and Selkirk areas. See Hernandez Decl. ¶¶ 1, 4-6; Jonkel Decl., ¶¶ 1, 4, 6-7; Oppenheimer Decl., ¶¶ 1, 8-10; Sprengel Decl., ¶¶ 1, 4-6; Willcox Decl. ¶¶ 1, 4-6; Johnson Decl. ¶¶ 1, 4. As the Supreme Court has affirmed repeatedly, "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose[s] of standing." Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63 (1992); see also Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986) (conservation groups "alleged a sufficient 'injury in fact' in that the whale watching and studying of their members will be adversely affected by continued whale harvesting"); Sierra Club v. Morton, 405 U.S. 727, 734 (1972) (harm to "[a]esthetic and environmental well-being" may constitute "injury in fact" for standing purposes). Further, the conservation organizations applying for intervention have a long history of advocating for grizzly bear conservation efforts generally, and in the Cabinet-Yaak and Selkirk areas specifically. See Hernandez Decl. ¶ 2, 3; Jonkel Decl., ¶¶ 2-4; Oppenheimer Decl., ¶¶ 2-7; Sprengel Decl., ¶¶ 2-3; Willcox Decl. ¶¶ 2-3; Johnson Decl. ¶¶ 3, 6-10; see also San Juan County v. United States, 420 F.3d 1197, 1207 (10th Cir. 2005) (environmental

groups' prior litigation and administrative advocacy on a matter weigh in favor of intervention as of right).

Second, five of the six Applicants are plaintiffs in litigation pending in the Ninth Circuit Court of Appeals that is directly implicated by the instant litigation. See Cabinet Resource Group v. U.S. Fish and Wildlife Service, No. 04-236-M-DWM (D. Mont. Dec. 13, 2006). See Hernandez Decl. ¶ 8; Jonkel Decl., ¶ 9; Oppenheimer Decl., ¶ 12; Sprengel Decl., ¶ 8; Willcox Decl. ¶ 8. Applicants' opportunity to obtain meaningful relief in that pending litigation is threatened by plaintiffs' claims here. This interest too is sufficient to justify intervention as of right. See Adams v. Mathews, 536 F.2d 417, 418 (D.C. Cir. 1976) (where lawsuit could determine funds available for enforcement of Title IX of Civil Rights Act of 1964, plaintiffs in separate lawsuit to require agency to devote resources to Title IX enforcement are entitled to intervene); In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991) (Sierra Club entitled to intervene in constitutional challenge to hazardous waste permitting law, since enjoining provisions of that law "will impede Sierra Club's ability to protect its interest in" its ongoing administrative proceedings involving the same law). Accordingly, Applicants satisfy the interest requirement.

### C.    Applicants' Interests May Be Impaired As A Result Of This Litigation

Applicants' interest in the survival of the imperiled Cabinet-Yaak and Selkirk grizzly bear populations, and the grizzly bear in the lower-48 states, may be harmed by a decision in the Plaintiffs' favor in this litigation.

Specifically, Plaintiffs in this case suggest that the ESA does not permit FWS to consider whether a federal agency action jeopardizes the Cabinet-Yaak and Selkirk grizzly bear populations, but instead that FWS may focus its ESA jeopardy analysis

solely on the entire grizzly bear population in the lower-48 states.  If successful,

Plaintiffs' claim would permit the extermination of the Cabinet-Yaak and Selkirk grizzly

bear populations as long as the species was not jeopardized in the contiguous United

States.  Such a legal holding would dramatically impair Applicants' ability to view

grizzly bears and signs of their presence, and to ensure adequate protection for grizzly

bear populations, in the Cabinet-Yaak and Selkirk regions, because the ESA "safety net"

plays a large role in safeguarding these populations from extinction.  See Hernandez

Decl. ¶ 7; Jonkel Decl., ¶ 8; Oppenheimer Decl., ¶ 11; Sprengel Decl., ¶ 7; Willcox Decl.

¶ 7; Johnson Decl., ¶ 12; see also Friends of Animals v. Kempthorne, 452 F. Supp. 2d 64,

69 (D.D.C. 2006) (granting intervention request where wildlife advocates showed "that

they would suffer harm from an adverse decision on the merits") (quotations and citation

omitted).[1]

This litigation also impairs Applicants' ability to obtain their desired remedy in

existing litigation, since resolution of the instant case could potentially vitiate Applicants'

claims pending in the Ninth Circuit.  If Plaintiffs succeed in their claim that FWS could

not lawfully focus the jeopardy analysis in its February 2004 biological opinion on the

Cabinet-Yaak and Selkirk populations, then Applicants' claims in the separate Ninth

Circuit litigation that FWS's jeopardy analysis in this same biological opinion was

insufficiently protective of these populations would be effectively mooted.  Applicants'

---

[1] The Supreme Court has recognized that harm to "[a]esthetic and environmental well-being" may constitute legally cognizable injury for purposes of Article III standing. Sierra Club, 405 U.S. at 734. Applicants thus satisfy the D.C. Circuit's requirement that intervenor-applicants satisfy Article III standing criteria, to the extent that requirement applies to intervenor-defendant-applicants.  See Roeder v. Islamic Republic of Iran, 333 F.3d 228, 233 (D.C. Cir. 2003) (holding that application of standing requirement to defendant-intervenors is unclear, but "any person who satisfies Rule 24(a) will also meet Article III's standing requirement").

intervention in this case is therefore necessary to achieve the Applicants' litigation goals in their pre-existing Montana and Ninth Circuit litigation.  See Adams, 536 F.2d at 418 (where organization's objective in existing lawsuit was "squarely at issue" in present litigation, organization was entitled to intervene to protect that litigation interest).

###### D.    Applicants' Interests May Not Be Adequately Represented

Finally, the federal defendants in this action do not adequately represent Applicants' interest.  This requirement is satisfied if the applicant shows that the representation of its interests "may be" inadequate, and "[t]he burden of making this showing should be treated as minimal."  Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972).

The federal defendants cannot adequately represent Applicants' interest in the protection of Cabinet-Yaak and Selkirk grizzly bears, or Applicants' interest in their ability to obtain relief in an existing lawsuit challenging the same federal action.   First, the Applicants' conservation interests are not necessarily interests that are shared by the FWS in this case, which must represent the broader interests of the general public rather than the specific interests of the Applicants.  See Trbovich, 404 U.S. at 538-39.  In Trbovich, the U.S. Supreme Court concluded that intervention was appropriate because the government's duty to represent both the broad interests of the public and the narrower interests of the proposed intervenor were "related, but not identical."  Id.; see also Dimond v. District of Columbia, 792 F.2d 179, 192-93 (D.C. Cir. 1986) ("A government entity … is charged by law with representing the public interest of its citizens. [Intervenor-applicant] is seeking to protect a more narrow … interest ….  The District would be shirking its duty were it to advance this narrower interest at the expense of its

representation of the general public interest."). The same holds true here. See Friends of Animals, 452 F. Supp. 2d at 70 ("This Circuit has held that a federal agency's obligation is to represent the interests of the American people, while entities dedicated to hunting and conservation—like proposed intervenors—represent the interests of their members.") (quotations and citation omitted); see generally Fund for Animals v. Norton, 322 F.3d at 736 ("[W]e have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors.") (citing cases).

The divergence between Applicants' and the defendants' interests is most stark with regard to Applicants' interest in obtaining relief in their Ninth Circuit lawsuit. Defendants have no incentive to further Applicants' objectives in an action in which defendants and Applicants are adverse. Given the divergence of interests between Applicants and the federal defendants, defendants' representation of Applicants' interests "may be" inadequate, and intervention is proper. Dimond, 792 F.2d at 192-93.

## II.    ALTERNATIVELY, APPLICANTS SHOULD BE ALLOWED PERMISSIVE INTERVENTION

Even if intervention as of right were not warranted—which it is—Applicants should be allowed to intervene permissively. Rule 24(b) of the Federal Rules of Civil Procedure provides for permissive intervention at the Court's discretion where an applicant's claim or defense, in addition to being timely, possesses questions of law or fact in common with the existing action. This is a substantially lower burden than the test for intervention of right under Rule 24(a). See Equal Employment Opportunity Comm'n v. National Children's Center, Inc., 146 F.3d 1042, 1046 (D.C. Cir. 1998) (noting that "force of precedent … compels a flexible reading of Rule 24(b)").

As set out above, this application is timely and will not prejudice the rights of the existing parties.  Additionally, Applicants' defenses concerning the proper application of the ESA share substantial questions of law and fact with the main action, and fall well within this Court's federal question jurisdiction.  Finally, Applicants' significant interests in the subject matter of this action will be impaired if Plaintiffs prevail.  Because Applicants will represent interests in this litigation that may not otherwise be recognized by the parties, Applicants' participation will contribute to the equitable resolution of this conflict.  Accordingly, permissive intervention should be granted.

## CONCLUSION

For the foregoing reasons, Applicants respectfully request that their motion to intervene as defendants in this case be granted.

DATED this 23rd day of January, 2007.

Respectfully submitted,

_____/s/ Timothy J. Preso_____
Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331

*Attorneys for Proposed Defendant-Intervenors*

# Exhibit 1





# United States Department of the Interior

## FISH AND WILDLIFE SERVICE



*Upper Columbia Fish and Wildlife Office*
*11103 East Montgomery Drive*
*Spokane, Washington 99206*

February 9, 2004

Bob Castaneda, Forest Supervisor
Kootenai National Forest
1101 U.S. Highway 2 West
Libby, Montana 59923

Ranotta McNair, Forest Supervisor
Idaho Panhandle National Forests
3815 Schreiber Way
Coeur d'Alene, Idaho 83815-8363

Deborah Austin, Forest Supervisor
Lolo National Forest
Building 24, Fort Missoula
Missoula, Montana 59804

Subject:     Biological Opinion on the Proposed Forest Plan Amendments for Motorized
             Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery
             Zones for the Kootenai, Idaho Panhandle, and Lolo National Forests

Dear Mr. Castaneda, Ms. McNair, and Ms. Austin:

This letter transmits the U.S. Fish and Wildlife Service's biological opinion on the proposed
Forest Plan amendments, in accordance with section 7 of the Endangered Species Act of 1973, as
amended. The proposed amendments address motorized access management within the Selkirk
and Cabinet-Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo
National Forests.

This biological opinion determines that implementation of the proposed amendments are not
likely to jeopardize the continued existence of the grizzly bear (*Ursus arctos*), Canada lynx
(*Lynx canadensis*), and bull trout (*Salvelinus confluentus*). We have provided an incidental take
statement with reasonable and prudent measures and terms and conditions to minimize incidental
take of the grizzly bear.

We look forward to working with you on the implementation of this biological opinion during the course of individual project level consultation. If you have any questions regarding this biological opinion, please contact me, Bryon Holt of this office at (509) 891-6839, or Paul Hanna of our Kalispell Field Office, Kalispell, Montana at (406) 758-6868.

Sincerely,

*Susan B. Martin*

Supervisor

Enclosure

cc: FWS, Helena, Mt.
    FWS, Kalispell, Mt.

# Biological Opinion for the Kootenai, Idaho Panhandle, and Lolo National Forests Land and Resource Management Plans Amendment for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones
### FWS Ref. 1-9-02-F-148

Prepared by:

U.S. Fish and Wildlife Service
Upper Columbia Fish and Wildlife Office
Spokane, Washington

And

U.S. Fish and Wildlife Service
Montana Field Office
Kalispell, Montana

February 9, 2004

OPTIONAL FORM 99 (7–90)

**FAX TRANSMITTAL**  # of pages ► _3_

To _Ron Swan_   From _Bryon Holt_
Dept./Agency

Phone # _(509) 893-8014_

Fax # _503/231-2166_   Fax #

NSN 7540-01-317-7368     5099-101     GENERAL SERVICES ADMINISTRATION

000003

# TABLE OF CONTENTS

Introduction .......................................................................................... 1

Consultation History ........................................................................... 2

Description of the Proposed Action ................................................... 6

Status of the Species ........................................................................... 9
- Grizzly Bear .................................................................................. 9
- Canada Lynx ................................................................................ 13
- Bull Trout ..................................................................................... 22

Environmental Baseline ..................................................................... 32
- Status of the Species within the Action Area ............................ 32
  – Grizzly Bear ........................................................................... 32
  – Canada Lynx ........................................................................... 63
  – Bull Trout ................................................................................ 68

Effects of the Action ........................................................................ 100
- Effects of the Action on Grizzly Bear ...................................... 100
- Effects of the Action on Canada Lynx ...................................... 112
- Effects of the Action on Bull Trout .......................................... 113

Cumulative Effects ........................................................................... 122
- Grizzly Bear ................................................................................ 122
- Canada Lynx ............................................................................... 124
- Bull Trout ................................................................................... 124

Conclusion ........................................................................................ 125
- Grizzly Bear ................................................................................ 125
- Canada Lynx ............................................................................... 127
- Bull Trout ................................................................................... 127

Incidental Take Statement ............................................................... 128
- Amount or Extent of Take ......................................................... 128
  – Grizzly Bear ........................................................................... 128
  – Canada Lynx ........................................................................... 132
  – Bull Trout ................................................................................ 132

- Effect of the Take ...................................................................... 133
  – Grizzly Bear ........................................................................... 133

000004

- •   Reasonable and Prudent Measures                                     134
  –   Grizzly Bear                                                        134

- •   Terms and Conditions                                                134
  –   Grizzly Bear                                                        135

Conservation Recommendations                                              140

Reinitiation - Closing Statement                                         141

Literature Cited                                                         143

Appendix A:  Status of Lynx Analysis Units on Kootenai, Lolo, and Idaho Panhandle National
             Forests

Appendix B:  Bull Trout stream redd survey and road mileage information

Figures

Figure 1:  Current Grizzly Bear Distribution                             4

Figure 2:  Grizzly Bear Recovery Zones                                   10

Figure 3:  Grizzly Bear Analysis Areas Outside of SRZ and CYRZ           43

ii

**Introduction**

This document transmits the U.S. Fish and Wildlife Service's (Service) biological opinion based on the Service's review of the proposal to amend the Kootenai (KNF), Idaho Panhandle (IPNF), and Lolo National Forests (LNF) (hereafter collectively referred to as Forests) Land and Resource Management Plans (LRMP) for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones (Amendment) and its effects on the threatened grizzly bear (*Ursus arctos*), threatened Canada lynx (*Lynx canadensis*; lynx), threatened gray wolf (*Canis lupus*), endangered woodland caribou (*Rangifer tarandus caribou*), threatened bald eagle (*Haliaeetus leucocephalus*), and threatened bull trout (*Salvelinus confluentus*), in accordance with section 7 of the Endangered Species Act of 1973, as amended (Act), (16 U.S.C. 1531 et seq.). Your request for formal consultation was dated and received on June 27, 2002.

During the course of formal consultation, the Service received new information pertaining to the distribution and status of grizzly bear outside of the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones (collectively Recovery Zones). As the Service was unaware of grizzly bear residency in areas outside of the Recovery Zones, previously completed consultations for these forests do not adequately address the potential effects of current LRMP implementation upon grizzly bears in these areas. Therefore, pursuant to regulations at 50 CFR §402.16, we are reinitiating consultation on the Forests' LRMPs to address potential effects of these plans upon grizzly bears or their habitat located outside of, but adjacent to, the Recovery Zones. Thus, in addition to addressing the potential effects of the proposed Amendment on the grizzly bear, Canada lynx, and bull trout within the Recovery Zones, this biological opinion addresses the potential effects of the current implementation of the Forests' LRMPs on grizzly bears outside of the Recovery Zones.

The Service has reviewed the Forests' biological assessments (BA) prepared for the proposed Amendment and concurs with the Forests' determinations that the proposed Amendment "may affect but is not likely to adversely affect" the gray wolf, woodland caribou, and bald eagle. Concurrence by the Service is contingent upon implementation of the Amendment as described in the BAs.

Your letter requested our concurrence with your determination that this proposed Amendment "may affect, but is not likely to adversely affect" Canada lynx. As you may already know, the District Court for the District of Columbia issued an order on December 26, 2002, that enjoins the Service from issuing any "written concurrence[s]" that actions proposed by any Federal agencies "may affect, but are not likely to adversely affect" the Canada lynx. Until further notice, all consultations concerning effects to Canada lynx must be conducted in accordance with the direction of the Court. Specifically, any actions subject to consultation that may affect Canada lynx require formal consultation as described in 50 CFR 402.14 and preparation of a biological opinion that addresses how the proposed action is expected to affect Canada lynx in order to complete the procedural requirements of section 7.

000006

This biological opinion is based on information provided in the revised February 14, 2002, wildlife (grizzly bear, Canada lynx, gray wolf, bald eagle) biological assessment (BA), February 28, 2002, aquatic (Kootenai River white sturgeon, bull trout, redband trout) BA, the February 28, 2002 botanical (Ute ladies'-tresses, water howellia) BA, the March 2002 Final Environmental Impact Statement; Forest Plan Amendments for Motorized Access Management Within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones (FEIS), field investigations, and other sources of information. The IPNF provided the Service an amendment to the aquatic BA on January 22, 2003. A complete administrative record of this consultation is on file in the Service office in Spokane.

## Consultation History

Based on direction from the Interagency Grizzly Bear Committee (IGBC), and incorporating information from research conducted by Wakkinen and Kasworm (1997), in 1998 the Selkirk/Cabinet-Yaak Subcommittee (Subcommittee) of the IGBC approved an Interim Access Management Rule Set (Rule Set) to manage motorized access within the Selkirk and Cabinet-Yaak Recovery Zones (IGBC 1998b). The Rule Set was to be in place over the next three years, or until LRMPs were revised, or the Subcommittee determined a need to modify the direction. The Rule Set, rather than establishing standards for core habitat, and open and total road densities, as directed by the IGBC, merely outlines the following goals for each element: (1) there will be no net loss of core habitat, and the Forest Service will work to achieve 55 percent core habitat in Priority 1 Bear Management Units (BMUs); (2) there will be no net loss of core areas in the remainder of the BMUs (41 percent of all BMUs); (3) there will be no net increase in open and total road densities on National Forest System lands within these Ecosystems. The Rule Set also addressed the issue of administrative use on restricted roads, setting a standard of up to an average of one vehicle per day during the non-denning bear season (April 1st through November 15th), for a total of up to 115 round trips on restricted roads during the non-denning period. The Rule Set also allows for a 30-day public use period on one restricted road per BMU per year, without reducing habitat security calculations. This 30-day public use period can only occur, after coordination with the Service, in Priority 1 BMUs meeting 55 percent core habitat and in Priority 2 and 3 BMUs that meet 70 percent habitat security.

In the spring of 1999, the Alliance for the Wild Rockies filed a lawsuit challenging the KNF's and IPNF's implementation of the Rule Set without amending their LRMPs. The KNF and IPNF settled the lawsuit in March 2001 and agreed to amend their respective LRMPs to address grizzly bear management. The LNF was not included in the lawsuit; however, they requested to be included in the amendment process so as to update their LRMP to provide consistent direction within the Cabinet-Yaak Recovery Zone.

In March of 2001, the Forests established an Interdisciplinary Team (ID Team) to begin the process of amending their LRMPs. The Service was invited to participate on the ID Team and, thus, began informal consultation with the Forests through participation on this team.

2

000007

Subsequent to many meetings and conference calls with the ID Team, on May 10, 2002, the Forests submitted a letter requesting initiation of formal consultation for grizzly bears and bull trout. The letter was accompanied by biological assessments (BA) for these species.

Following receipt of the BAs, several informal meetings were held between our agencies to discuss the content and analysis contained in the BA pertaining to grizzly bears. These informal discussions resulted in a meeting on June 24, 2002, during which, the Service identified several points of clarification and additional information necessary to facilitate an analysis of the potential effects of the proposed Amendment upon grizzly bears. At this meeting, the Service also advised the Forests that we were still reviewing the bull trout BA to determine its completeness with regard to enabling an analysis of the proposed Amendment's potential effects upon bull trout. On July 22, 2002, we received the requested information pertaining to grizzly bears in a letter from the Forest Service, dated July 19, 2002.

Shortly after receiving the requested grizzly bear information, the Service began analyzing other preliminary information concerning the current distribution, and potential occupancy by grizzly bears of areas outside of, but adjacent to, the recovery zones within these Ecosystems. Through a coordinated effort involving the Service, Idaho Department of Fish and Game (IDFG), and Montana Fish, Wildlife, and Parks, the current distribution of grizzly bears was delineated on a map, which was finalized on October 2, 2002 (Figure 1). The current grizzly bear distribution map includes delineation of several areas outside of, but adjacent to the recovery zones. Through informal discussions and agreement, on November 19, 2002, the Forests provided an analysis of the implementation of their current LRMPs regarding their potential effects upon grizzly bears in these newly mapped areas of grizzly bear occupancy. To formalize and document the request for, and receipt of this information, on December 3, 2002, the Service requested additional information from the Forests regarding the potential effects of the current implementation of the LRMPs upon grizzly bears on the three forests within the newly mapped areas of grizzly bear occupancy outside of the recovery zones. To facilitate our analysis of the potential effects to grizzly bear within these areas, the Service requested additional information relative to total and open motorized road densities within these areas, and how the current LRMPs, or the LRMPs as modified by the proposed Amendment, would provide for the management of grizzly bears within these areas. On March 18, 2003, the Forests provided additional data supporting the analysis of the Amendment's potential effect upon grizzly bears within the newly mapped areas of grizzly bear occupancy.

On April 29, 2003, we advised the Forests that, because the information on road densities in the areas occupied by grizzly bears outside of the recovery zones, provided in the March 18, 2003, letter was generated using a linear road density analysis, we were unable to analyze the potential for incidental take of grizzly bears to occur within these areas. This was because the thresholds established for assessing incidental take are based on research using a Geographic Information System moving windows analysis technique. A moving window analysis is a spatial analysis of road density distribution, while a linear road density analysis is not. Therefore, to enable an Figure 1. Current Grizzly Bear Distribution

3



Figure 1: Grizzly Bear Distribution (USFS 2002a)

analysis of the potential for incidental take of grizzly bears in areas occupied by grizzly bears outside of the recovery zone, we requested information on linear road density information within BMUs of the recovery zones that could be compared with moving windows road density information within the same BMUs. This comparison could then be extrapolated to the areas of grizzly bear occupancy outside of the recovery zones to complete an analysis for the potential for incidental take of grizzly bears in these areas. We also requested additional information pertaining to the status of grizzly bears for those portions of the KNF and LNF that lie within the BMUs situated in the Northern Continental Divide Grizzly Bear Recovery Zone.

Relative to bull trout, on June 26, 2002, the Service advised the Forests we had completed review of the BA, and had determined there were several inadequacies pertaining to the status of the bull trout population on the IPNF. Specific details of information pertaining to the status of bull trout on the IPNF were developed in conjunction with the IPNF and KNF over the course of the 2002 summer. Thus, in the December 3, 2002, letter previously referenced, we requested additional information regarding the current status of the bull trout population on the IPNF that was necessary to facilitate the analysis of the proposed Amendment's potential effect to this species on the IPNF. At that time, we advised the Forests that the Service considered the information and analysis contained in the BA pertaining to bull trout populations on the KNF and LNF as sufficient to enable initiation of formal consultation on the proposed Amendment. On January 24, 2003, we received the requested information in a letter from the Forest Service, dated January 22, 2003.

Pursuant to further review of the bull trout BA and January 22, 2003 supplemental information, on March 20, 2003, the Service informed the IPNF of several additional inconsistencies and inaccuracies pertaining to the IPNF's bull trout population status information. In a April 1-2, 2003, meeting, the IPNF provided the necessary information to the Service clarifying the identified deficiencies.

As previously indicated, your June 27, 2002, letter requested our concurrence with your determination that the proposed Amendment "may affect, but is not likely to adversely affect" Canada lynx. On December 26, 2002, the U.S. District Court for the District of Columbia issued an order on Civil Action No. 00-2996 (*Defenders of Wildlife, et al. v. Gale Norton, et al.*), enjoining the Service from issuing any written concurrences for actions that may affect, but are not likely to adversely affect, the Canada lynx. Consequently, in a letter February 24, 2003, we advised the Forests that, pursuant to the court's decision, we were initiating formal consultation on Canada lynx, and were therefore, requesting additional information necessary to facilitate an analysis of the proposed Amendment's potential effect upon this species. On April 2, 2003, we received the requested information from the Forests in a letter dated March 29, 2003.

During an April 24, 2003, conference call we clarified with staff of the KNF and IPNF that, although the proposed Amendment does not specifically address road management directly related to lynx habitat maintenance, the Forests' intent is to abide by the Canada Lynx Conservation Agreement (CA), which was entered into between the Forest Service and the Service on February 7, 2000 (USFS and USFWS 2000). (Note: staff from the LNF were not

000010

present on the conference call). The intent of the CA is to conserve lynx and its habitat on federal lands administered by the Forest Service, and to reduce or eliminate adverse effects or risks to the species and its habitat. Furthermore, pursuant to the CA, the Forest Service agreed to defer all actions that are determined likely to adversely affect lynx, which are proposed by the Forest Service and do not involve third parties. The CA will remain in effect until such time as individual LRMPs are amended or revised, as appropriate, to incorporate information on lynx management. Such amendments or revisions will utilize the best currently available scientific information, including but not limited to the Lynx Conservation Assessment and Strategy (LCAS) (Rudiger et al. 2000) and the Lynx Science Report (Ruggerio et al. 2000a). Currently, the KNF, IPNF, and LNF are participating in a multi-forest amendment process involving 18 national forests in Montana, Wyoming, Idaho, and Utah to amend their respective LRMPs for lynx. Therefore, in a April 28, 2003, letter we requested written acknowledgment that the above discussion accurately reflected the April 24, 2003, conference call. Additionally, in our April 28, 2003, letter we requested additional information pertaining to the status of all Lynx Analysis Units (LAUs) on the LNF, because our February 24, 2003, letter incorrectly only requested information from the LNF for LAUs within the single BMU administered on its forest.

## BIOLOGICAL OPINION

### I.    Description of the Proposed Action

The Forests propose amending their respective LRMPs to address grizzly bear habitat management within the Recovery Zones by changing the objectives, standards, and guidelines related to open motorized route density (OMRD), total motorized route density (TMRD), and core habitat through implementation of Alternative E (preferred alternative) of the FEIS (Forest Service 2002c). The intent of Alternative E is to provide management flexibility in response to issues related to public and administrative access, economics, access to private inholdings, and increased grizzly bear security. Under Alternative E, the Forests propose to establish specific standards for the management of core habitat, OMRD, and TMRD for individual grizzly bear management units (BMUs) within the Recovery Zones (Table 1) reflecting the existing unique biological and social features (highways, high quality habitat, residential developments, linkage zones, etc.) within each individual BMU. Additionally, core habitat would be fixed in place for at least 10 years. The Forests anticipate that it may take five to nine years from the date of the decision to amend the LRMPs to achieve the proposed standards.

The Forests also propose to maintain administrative use of restricted roads within the Recovery Zones to less than or equal to ($\leq$) 57 round trips per active bear year (April 1 through November 15), divided seasonally. The seasonal apportionment of vehicle trips are as follows: $\leq$19 round trips in spring (April 1 thru June 15); $\leq$23 round trips in summer (June 16 through September 15); and $\leq$15 round trips in fall (September 16 through November 15). Restricted roads are defined as roads on which motorized vehicle use is restricted seasonally or year-long. The roads require effective physical obstructions (generally gates). Administrative use is defined as passenger vehicle access on a restricted road to conduct non-mechanized activities, such as planting, regeneration surveys, timber sale layout, etc, and may include contractors and

6

000011

Table 1. Bear management unit status and proposed standards (Forest Service 2002a).

| BMU | BMU Priorities | OMRD >1mi/mi² (%) | | TMRD >2mi/mi² (%) | | Percent Core | | Percent Federal Land |
|---|---|---|---|---|---|---|---|---|
| | | 2002 Status | Proposed Standard (max) | 2002 Status | Proposed Standard (max) | 2002 Status | Proposed Standard (min) | |
| 1 | 2 | 12.0 | 15.0 | 10.0 | 15.0 | 83.0 | 80.0 | 99 |
| 2 | 2 | 17.0 | 20.0 | 14.0 | 18.0 | 77.0 | 75.0 | 94 |
| 3 | 3 | 27.0 | 33.0 | 26.0 | 26.0 | 62.0 | 55.0 | 95 |
| 4 | 2 | 36.0 | 36.0 | 26.0 | 26.0 | 62.0 | 63.0 | 84 |
| 5 | 1 | 26.0 | 30.0 | 21.0 | 23.0 | 63.0 | 58.0 | 97 |
| 6 | 1 | 33.0 | 34.0 | 32.0 | 32.0 | 55.0 | 55.0 | 85 |
| 7 | 2 | 23.0 | 26.0 | 20.0 | 23.0 | 66.0 | 63.0 | 92 |
| 8 | 3 | 32.0 | 32.0 | 23.0 | 20.0 | 56.0 | 55.0 | 93 |
| 9 | 2 | 32.0 | 33.0 | 27.0 | 26.0 | 57.0 | 55.0 | 90 |
| 10 | 2 | 41.0 | 44.0 | 32.0 | 34.0 | 49.0 | 48.0 | 95 |
| 11 | 1 | 31.0 | 33.0 | 28.0 | 26.0 | 54.0 | 55.0 | 96 |
| 12 | 1 | 43.0 | 45.0 | 30.0 | 31.0 | 57.0 | 55.0 | 92 |
| 13 (Keno) | 1 | 28.0 | 33.0 | 24.0 | 26.0 | 62.0 | 55.0 | 99 |
| 14 (Northwest Peaks) | 1 | 28.0 | 33.0 | 26.0 | 26.0 | 56.0 | 55.0 | 99 |
| 15 | 1 | 31.0 | 33.0 | 30.0 | 26.0 | 50.0 | 55.0 | 94 |
| 16 | 1 | 29.0 | 33.0 | 38.0 | 26.0 | 45.0 | 55.0 | 96 |
| 17 | 2 | 31.0 | 33.0 | 26.0 | 26.0 | 50.0 | 55.0 | 99 |
| 18 (Boulder) | 3 | 29.0 | 33.0 | 35.0 | 29.0 | 49.0 | 55.0 | 92 |
| 19 (Grouse)[a,b] | 3 | 59.0 | 59.0 | 59.0 | 55.0 | 32.0 | 37.0 | 54 |
| 20 (N. Lightening) | 1 | 38.0 | 35.0 | 20.0 | 26.0 | 61.0 | 61.0 | 94 |
| 21 (Scotchman) | 2 | 35.0 | 35.0 | 27.0 | 26.0 | 63.0 | 62.0 | 81 |
| 22 | 3 | 39.0 | 33.0 | 42.0 | 35.0 | 49.0 | 55.0 | 89 |
| Blue-Grass | 1 | 27.0 | 33.0 | 29.0 | 26.0 | 50.0 | 55.0 | 96 |
| Long-Smith | 1 | 23.0 | 25.0 | 13.0 | 15.0 | 73.0 | 67.0 | 92 |
| Kalispell-Granite | 1 | 31.0 | 33.0 | 29.0 | 26.0 | 48.0 | 55.0 | 96 |
| Lakeshore | 3 | 78.0 | 82.0 | 50.0 | 56.0 | 20.0 | 20.0 | 86 |
| Salmo-Priest | 2 | 30.0 | 33.0 | 24.0 | 26.0 | 65.0 | 64.0 | 99 |
| Sullivan-Hughes | 1 | 23.0 | 23.0 | 20.0 | 18.0 | 59.0 | 61.0 | 99 |
| Myrtle | 2 | 30.0 | 33.0 | 19.0 | 22.0 | 60.0 | 56.0 | 85 |
| Ball-Trout | 2 | 18.0 | 20.0 | 9.0 | 13.0 | 72.0 | 69.0 | 94 |
| Le Clerc[a,c] | 3 | 38.0 | **** | 55.0 | **** | 30.0 | **** | 64 |
| IDL[d] | ? | ? | N/A | ? | N/A | ? | N/A | <2 |

[a] ≤ 75 percent Federal Lands
[b] Due to the high level of non-Federal lands within the Grouse BMU, existing conditions and standards are calculated assuming no contribution of secure habitat from private lands.
[c] LeClerc BMU is not addressed in this proposed Amendment as 90 percent of the acreage lies within the Colville National Forest.
[d] IDL BMU lands are not addressed in the proposed Amendment.

000012

permittees. Activities and/or use levels beyond those described above are subject to individual consultation.

The proposed Amendment will not prescribe site-specific access management decisions within the Recovery Zones. It will, however, establish various levels of human access within the Recovery Zones. The decision to change the status of a specific road or trail will be proposed through project-level analysis (USFS 2002a).

Planning for units of the National Forest System involves two levels of decision-making. The first level, often referred to as programmatic planning, is the development or amendment of LRMPs that provide management direction for resource programs, uses, and protection measures. The LRMPs and associated amendments are intended to set out Management Area prescriptions or decisions with goals, objectives, standards, and guidelines for future decision-making through site-specific planning. The environmental analysis accomplished at the plan amendment level guides resource management decisions and aids the next level of site-specific planning (USFS 2002a).

The second level of planning involves the analysis and implementation of management practices designed to achieve goals and objectives of the LRMP. This is commonly referred to as site-specific or project-level planning. It requires relatively detailed information that includes, for instance, the location, condition, and current uses of individual roads and trails, and the identification of when and where individual roads and trails will be open or closed to various types of use. This step is most often accomplished at the ranger district (local) level (USFS 2002a).

The Selkirk Recovery Zone (SRZ) contains 10 BMUs and the Cabinet-Yaak Recovery Zone (CYRZ) contains 22 BMUs. Table 1 depicts the current status of these BMUs, and the proposed standards for each, relative to core habitat, OMRD, and TMRD.

As stated previously, after formal consultation on the proposed Amendment was initiated on May 10, 2002, a map of grizzly bear occupancy outside of the Recovery Zones was finalized on October 2, 2002 (Figure 1). This map represents new information pertaining to the status of and potential effects to grizzly bears that was not previously analyzed relative to the implementation of the Forests current LRMPs. Therefore, this consultation serves two purposes: 1) to analyze potential effects to grizzly bears, Canada lynx, and bull trout resulting from implementation of the Forests proposed Amendment within the Recovery Zones; and 2) to reinitiate consultation on the Forests' LRMPs to address potential effects to grizzly bears occupying areas outside of, but adjacent to, the Recovery Zones within areas depicted on Figure 1 within these two Ecosystems.

It is also important to note that the Forests are currently beginning the process of revising their LRMPs, which they hope to have completed within the next three to five years. Thus, should new or additional information on grizzly bear behavior or habitat use become available in the intervening period, such new information could be incorporated into the revised LRMPS addressing grizzly bear management.

8

## II.    Status of the Species

### A.    Grizzly Bear

The grizzly bear is one of two subspecies of the brown bear (*Ursus arctos*) which occupy North America. Coloration varies from light brown to almost black. Grizzly bears are generally larger than black bears (*Ursus americanus*), ranging between 200 and 600 pounds (lbs), and can be distinguished from them by longer, curved claws, humped shoulders, and a more concave face. Although relatively long-lived (20-25 years in the wild), the grizzly bear has a low reproductive rate due to the late age of first reproduction (4-7 years), small litter size (two cubs), long intervals between litters (three years), and limited cub survival (less than 50 percent). Grizzly bears are a wide-ranging species with individualistic behavior, although there is little evidence that they are territorial. Home range sizes vary, and the home ranges of adult bears frequently overlap. Most areas currently inhabited by the species are represented by contiguous, relatively undisturbed mountainous habitat exhibiting high topographic and vegetative diversity. Availability of spring habitat is a concern throughout the current range of the species. A more complete discussion of the biology and ecology of this species may be found in the 1993 Grizzly Bear Recovery Plan (Recovery Plan) (USFWS 1993).

Originally distributed in various habitats throughout North America from central Mexico to the Arctic Ocean, grizzly bears were thought to number approximately 50,000 in the early 1800's.

However, westward human expansion and development in the 1800s led to a rapid distributional recession of grizzly bear populations. Bear numbers and distribution in the lower 48 States dropped precipitously during this period, due to a combination of habitat deterioration, commercial trapping, unregulated hunting, and livestock depredation control. On July 28, 1975, the grizzly bear was listed as threatened in the conterminous U.S., at which time the species occupied less than two percent of its former range south of Canada and was distributed in five small populations totaling an estimated 800-1,000 bears (USDI 1975). The five remaining self-perpetuating or remnant populations occur primarily in mountainous regions, national parks, and wilderness areas of Washington, Idaho, Montana, and Wyoming.

A Grizzly Bear Recovery Plan was approved on January 29, 1982, and a revised plan was completed on September 10, 1993 (USFWS 1993). Recovery needs for the grizzly bear are described in the Recovery Plan, which outlines a series of goals and objectives necessary to provide for conservation and recovery of the grizzly bear in selected areas of the conterminous 48 States. One of these objectives is to recover grizzly bear populations in all of the ecosystems known to have suitable space and habitat. The Recovery Plan identifies six separate recovery zones or ecosystems: 1) the Yellowstone (YRZ); 2) the Northern Continental Divide (NCDRZ); 3) the CYRZ; 4) the SRZ; 5) the North Cascades (NCRZ); and 6 ) the Bitterroot (BRZ) (Figure 2).

The Recovery Plan identifies three indicators of population status, based on reproduction, numbers, and distribution, to be used as the basis for recovery in each ecosystem: (1) sufficient

9



Figure 2. Present grizzly bear ecosystems in the conterminous 48 States, 1990 (the San Juan Mountains area of Colorado is not shown).

reproduction to offset the existing levels of human-caused mortality; (2) adequate distribution of breeding animals throughout the area; and (3) a limit on total human-caused mortality. Based on these indicators, three specific parameters have been developed to monitor the status of grizzlies in each ecosystem: (1) the number of unduplicated females with cubs seen annually; (2) the distribution of females with young or family groups throughout the ecosystem; and (3) the annual number of known human-caused mortalities. To facilitate population monitoring and habitat evaluation within each ecosystem, the recovery zones are divided into areas designated as BMUs. These BMUs, designed to approximate the average home range of a female grizzly (approximately 100 square miles), assist in characterizing grizzly bear numbers and distribution within each ecosystem and in tracking cumulative effects (Christensen and Madel 1982).

In 1991, the Service received petitions to reclassify the five existing grizzly bear populations (YRZ, NCDRZ, CYRZ, SRZ, and NCRZ) from threatened to endangered. On April 20, 1992, the Service issued a "not warranted for reclassification" finding for the YRZ and NCDRZ populations (USFWS 1992). On February 12, 1993 (USDI 1993), the Service found that reclassification of grizzly bears in the CYRZ from threatened to endangered was warranted but precluded by work on higher priority species, but determined that such reclassification was not warranted for the grizzly bear population in the SRZ. On May 17, 1999 (USDI 1999a), the Service found that reclassification of grizzly bears in the SRZ from threatened to endangered was

000015

warranted but precluded by work on higher priority species. Also, in its May 17, 1999 finding, the Service determined that preliminary information suggests that the CYRZ and SRZ grizzly bear populations may be connected through Canada. Therefore, the Service will consider formally recognizing a distinct population segment that would encompass both of these ecosystems. Until a final determination is made on a distinct population segment, the Service still considers the ecosystems to be separate.

The grizzly bear population within the YRZ continues to increase and expand its range. Currently, the population is estimated to range from 280 - 610 bears and occupy approximately 7,574,244 acres in the YZ (USFWS 2002a). All population recovery parameters were first achieved in 1994. However, for the next three years (1995-97) grizzly bear mortality limits were exceeded. Beginning in 1998 and continuing through 2001, all grizzly bear recovery parameters have been achieved (USFWS 2002a). Habitat based recovery criteria, a conservation strategy, and state management plans are currently in development.

The exact size of the grizzly bear population in the NCDRZ is unknown, but recent data from the northern one third of this ecosystem indicates that there are more bears than previously thought. Grizzly bears occupy approximately 6,128,129 acres within this ecosystem. Monitoring results indicate that through 1999 recovery criteria for several parameters were met, including: 1) numbers of females with cubs; 2) numbers of BMUs with family groups; 3) occupancy requirements for BMUs; and 4) total human-caused grizzly bear mortality. However, the female grizzly bear mortality recovery criterion was not met (USFWS 2001a).

The status of the NCRZ population is unknown, but bear numbers are suspected to be very low and probably less than 15 grizzly bears. The BRZ is not occupied by grizzly bears at this time, but the Service recently released a final environmental impact statement (FEIS) addressing the restoration of grizzly bears to this ecosystem (USFWS 2000a).

The CYRZ represents approximately eight percent of the total occupied grizzly bear range remaining within the conterminous 48 States. Grizzly bear numbers in this ecosystem are estimated at 30-40 animals. Until recently, the Service believed that this population was stable to increasing. This belief was based on perceptions of grizzly bear researchers familiar with this ecosystem, and population trend analyses. Grizzly bear biologists working in this ecosystem perceived that the population had increased due to more reported grizzly bear sightings, and sightings in areas not previously known to be used by grizzly bears in this ecosystem (Kasworm, pers. comm. 2000). Population trend analyses, using data from 1993 to 1998, although statistically inconclusive, indicated that the grizzly bear population was experiencing annual growth (USDI 1999a). To conduct population trend analyses, the Service utilizes the BOOTER computer model developed by Fred Hovey (Hovey and McLellan 1996, Mace and Waller 1998). The BOOTER program utilizes the survival and reproduction of female radio-collared bears to calculate population trend estimates and confidence intervals. In 1999 and 2000, an unusually high number of grizzly bear mortalities were sustained in this population; there were five grizzly bear mortalities in 1999 and four in 2000. Of the nine grizzly bear mortalities in 1999 and 2000, three were females and five were cubs. Thus, due to the mortalities of these females and cubs,

11

upon which the trend estimate is based, the point estimate, incorporating data from 1983 to 2000, was 0.984 (95 percent confidence interval = 0.857-1.092) (USFWS 2001b). Point estimates less than 1.0 indicate a declining population. However, due to wide confidence intervals surrounding the point estimate, the population trend is statistically inconclusive. Additionally, recovery plan criteria for grizzly bear numbers, reproduction, distribution, and mortality have not been met (USFWS 2001b).

The SRZ represents approximately six percent of the total occupied grizzly bear range remaining within the conterminous 48 States. The Selkirk grizzly bear population is contiguous with Canadian populations. This recovery zone is the only one that includes part of Canada because the habitat in the U.S. portion is not of sufficient size to support a minimum population. Approximately 47 percent of the recovery zone lies within British Columbia, where land ownership is 65 percent crown (public) land and 35 percent is private. Grizzly bear numbers in this ecosystem are estimated at 46 animals. Unlike the CYRZ population, the SRZ population is thought to be increasing, although a recent population trend analysis for the SRZ was also inconclusive. Additionally, recovery plan criteria for bear reproduction, distribution, and mortality have not been met (USFWS 2001b). Furthermore, population modeling indicated that one additional subadult female mortality in the sampled SRZ population could push the trend into a decline (USDI 1999a). In 2002, there were six grizzly bear mortalities, one of which was an adult female (Wakkinen and Johnson 2003).

Because a substantial portion of the SRZ lies within British Columbia, grizzly bear management measures and habitat management efforts in that province play a significant role in the status of grizzly bears in this ecosystem. The British Columbia portion of the SRZ is subjected to the same forestry, mining, recreation, and road construction pressures that exist in the U.S., all of which affect grizzly bear habitat. In 1995, the British Columbia provincial government developed a grizzly bear conservation strategy (Strategy) to ensure effective, enhanced protection and management of habitat through land use planning processes, new protected areas, and the Forest Practices Code. However, the government was recently criticized by a scientific advisory committee for its poor implementation of the Strategy (USDI 1999a). In 1998, this scientific advisory committee issued a report card on the government's implementation of the Strategy and gave the government a failing grade for most habitat protection measures. In response to these criticisms, the provincial government recently updated the Forest Practices Code to incorporate specific prescriptions for grizzly bear habitat. The government is also seeking to increase the percentage of the province that is set aside in parks and protected areas.

Unfortunately, the protective measures outlined above have not yet achieved the desired goals for habitat protection. Therefore, in its 1999 finding regarding reclassification of the Selkirk grizzly bear population to endangered status, the Service found that the lack of current habitat protection stemming from cumulative impacts related to access, mining, recreation, and forestry, both in the U.S. and Canada, poses a significant threat to the grizzly bear population, rendering the population warranted for endangered status (USDI 1999a).

12

## III.   Environmental Baseline

Regulations implementing the Act (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area. Also included in the environmental baseline are the anticipated impacts of all proposed Federal projects in the action area which have undergone section 7 consultation, and the impacts of State and private actions which are contemporaneous with the consultation in progress.

Action area, as defined by the Act, is the entire area to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action. For the purposes of this Biological Opinion, we have defined the action area of the proposed action to include the project area, previously described in the Description of the Proposed Action section. Additionally, for grizzly bears, the reinitiated consultation on the Forests LRMPs extends the action area and effects analysis to those recently mapped and delineated areas occupied by resident grizzly bears outside of but adjacent to the Recovery Zones.

### Status of the Species Within the Action Area

#### A.   Grizzly Bear

Selkirk Ecosystem

On May 17, 1999 (USDI 1999a), the Service found that reclassification of grizzly bears in the SRZ from threatened to endangered was warranted but precluded by work on higher priority species. The Service concluded that the lack of current habitat protection stemming from cumulative impacts related to access, mining, recreation, and forestry, both in the U.S. and Canada, poses a significant threat to the grizzly bear population, rendering the population warranted for endangered status (USDI 1999a).

The SRZ encompasses approximately 1,957 square miles ($mi^2$) in northeastern Washington, northern Idaho, and southern British Columbia. Approximately 47 percent is located within British Columbia. Land ownership in the U.S. portion of the Selkirk recovery zone is approximately 80 percent Federal, 15 percent State, and 5 percent private lands. Forty-two percent of the entire recovery zone is under Federal ownership and therefore could be subject to management for recovery under the Act. The environmental baseline discussion for this biological opinion will include that portion of the SRZ within the U.S. The condition of the SRZ in British Columbia was discussed previously under the "Species Status" section.

Approximately 53 percent (1,081 $mi^2$) of the recovery area lies within the U.S., and is administered by two national forests: the IPNF and the Colville National Forest (CNF). However, the CNF is not included in the proposed Amendment. Therefore, because 90 percent of the LeClerc BMU is administered by the CNF, it is not included in the proposed Amendment. The Salmo-Priest and Sullivan-Hughes BMUs are administered by both the IPNF and CNF.

32

000037

Significant acreages of these BMUs occur within the IPNF, therefore, they are included in the proposed Amendment. The standards proposed in the Amendment are quantified relative to the entire acreage within each of the Salmo-Priest and Sullivan-Hughes BMUs. However, site-specific implementation of the standards will be coordinated between the IPNF and CNF.

The U.S. portion of the Selkirk recovery zone is divided into 10 BMUs, ranging in size from approximately 30-160 mi$^2$. Eight of these BMUs are administered at least in part by the IPNF. Of the remaining areas, one is administered by the CNF (LeClerc BMU), and the second encompasses approximately 160 mi$^2$ (roughly 8 percent of the Recovery Zone) owned by Idaho Department of Lands (IDL) east of Priest Lake. The smallest 30 square mile BMU (Lakeshore) lies along the west side of Priest Lake. While providing important grizzly bear habitats regularly occupied by grizzlies, this BMU serves more as a buffer for development and high human activity associated with Priest Lake.

- Population Status

According to the Recovery Plan, the minimum population goal for the SRZ is 90 bears (USFWS 1993). Grizzly bears also occur in and use areas outside the SRZ, and therefore, population parameters include bears observed up to 10 miles outside the recovery zone boundary (USFWS 1993). This biological opinion will use the term SRZ to refer to the SRZ and the band of habitat up to 10 miles around the SRZ within which Recovery Plan parameters are reported.

The following recovery goals are established in the Recovery Plan (USFWS 1993):

1. Six unduplicated females with cubs over a running 6-year average both inside the recovery zone and within a 10-mile area immediately surrounding the recovery zone, including Canada;
2. Seven of the 10 BMUs on the U.S. side occupied by females with young on a running 6-year sum of observations; and
3. Known, human-caused mortality may not exceed four percent of the population estimate based on the most recent 3-year sum of females with cubs; furthermore, no more than 30 percent of this four percent mortality limit shall be females. These mortality limits cannot be exceeded during any two consecutive years for recovery to be achieved. Presently grizzly bear numbers are so small in this ecosystem that the mortality goal is zero known human-caused mortalities.

The most recent available information on the status of this population relative to the demographic recovery plan parameters is presented in Table 2 (Wakkinen, pers. comm. 2003). Based on this information, the SRZ is only meeting one of the recovery goals outlined in the Recovery Plan, that for female grizzly bear mortality.

33

000038

Table 2: Status of the SRZ as of 2002 in relation to the demographic recovery goals from the grizzly bear recovery plan (after Wakkinen 2003).

| Demographic Parameter | Recovery Plan Goals | Year 2002 |
|---|---|---|
| Females with cubs (6-year average) | 6.0 | 1.0 |
| Distribution of females with young | 7 of 10 BMUs | 5 of 10 BMUs |
| Female human-caused mortality limit (30% of the total mortality)[1] | 0.2 | 0.2 (6 year average) |
| Human-caused mortality limit (4% of the minimum population estimate)[1] | 0.6 | 2.0 (6 year average) |

[1]Presently grizzly bear numbers are so small in this ecosystem that the mortality goal is zero known human-caused mortalities.

In 2002, females with cubs of the year were not documented (Table 3). However, reliable sightings of females with family groups were reported in 5 of 10 BMUs (Wakkinen pers. comm. 2003). Female family groups were documented in Blue-Grass, Long-Smith, Myrtle, Kalispell-Granite, and the state lands BMUs. Over the six-year period from 1997-2002, females with young were recorded in 5 of 10 BMUs.

Table 3. Annual SRZ grizzly bear unduplicated counts of females with cubs, and known human-caused mortality (Wakkinen 2003).

| Year | Annual Females with cubs | Annual Human Caused Adult Female Mortality | Annual Human Caused All Female Mortality | Annual Human Caused Total Mortality | 4% Total Human Caused Mortality Limit[1] | 30% All Female Human Caused Mortality Limit[1] | Total Human Caused Mortality 6 Year Average | Female Human Caused Mortality 6 Year Average |
|---|---|---|---|---|---|---|---|---|
| 1988 | 0 | 0 | 1 | 2 | | | | |
| 1989 | 4 | 0 | 0 | 0 | | | | |
| 1990 | 1 | 0 | 1 | 2 | | | | |
| 1991 | 1 | 0 | 0 | 0 | | | | |
| 1992 | 1 | 1 | 1 | 2 | | | | |
| 1993 | 1 | 1 | 2 | 5 | 0.2 | 0.1 | 1.8 | 0.8 |
| 1994 | 1 | 0 | 0 | 1 | 0.2 | 0.1 | 1.7 | 0.7 |
| 1995 | 1 | 0 | 1 | 2 | 0.4 | 0.1 | 2.0 | 0.8 |
| 1996 | 1 | 0 | 0 | 1 | 0.6 | 0.2 | 1.8 | 0.7 |
| 1997 | 1 | 0 | 0 | 1 | 0.6 | 0.2 | 2.0 | 0.7 |
| 1998 | 1 | 0 | 0 | 1 | 0.6 | 0.2 | 1.8 | 0.5 |
| 1999 | 0 | 0 | 0 | 3 | 0.4 | 0.1 | 1.5 | 0.2 |
| 2000 | 2 | 0 | 0 | 0 | 0.6 | 0.2 | 1.3 | 0.2 |
| 2001 | 2 | 0 | 0 | 1 | 0.8 | 0.2 | 1.2 | 0 |
| 2002 | 0 | 1 | 1 | 6 | 0.6 | 0.2 | 2.0 | 0.2 |

[1]Presently grizzly bear numbers are so small in this ecosystem that the mortality goal is zero known human-caused mortalities.

000039

The mortality limit established by the Recovery Plan is based on a report by Harris (1985), who concluded that the maximum human-caused mortality rate that could be sustained by a grizzly bear population without population decline was six percent. However, to facilitate recovery, the Recovery Plan goal addressing mortality limits for the current population states that known human-caused mortalities may not exceed four percent of the population estimate, and that no more than 30 percent of this mortality shall be females. Using these limits, the annual mortality goals are calculated based on the minimum population estimate, which uses the most recent 3-year sum of females with cubs minus adult human-caused female mortality over the same 3-year period to estimate the minimum population. The actual annual mortality level is then derived by dividing the minimum population estimate by the most recent 6-year sum of human-caused grizzly bear mortalities (Table 3).

In its May 12, 1999, administrative finding on the status of the Selkirk population, the Service estimated the population at 46 grizzly bears (USDI 1999a). It should be noted that this estimate is not based on the same minimum population estimate technique described in the Recovery Plan, [and as further discussed in the Service's 2001 Amended Biological Opinion on the Continued Implementation of the IPNF's LRMP (2001 Biological Opinion)], but is rather a more liberal estimate based on previous research in the Ecosystem. Specifically, Wielgus et al. (1994), studying grizzly bears in an area encompassing approximately one third of the Ecosystem, estimated a population of 31 bears. This study area was believed to hold the highest densities of grizzly bears in the Ecosystem. The Service then conservatively estimated that bear densities in the remainder of the Ecosystem might be 25 percent of those densities within the study area, providing an additional 15 bears. Consequently, the total population estimate for the entire SRZ was 46 bears.

As indicated previously, grizzly bears are residing, at least seasonally, in areas outside of but adjacent to the SRZ (Figure 1). However, as portions of these bears' known movement patterns overlap the recovery zone, they have been included in the population estimate of 46 grizzly bears for the SRZ.

Population trend analyses in the SRZ have been inconclusive. Mortality information from 1983-1994 and 1983-1996 produced lambdas ($\lambda$s) (rate of change over time based on birth and death rates) of 0.976 and 0.994, respectively. In its 1999 administrative finding, using data up to and including 1998, the Service estimated $\lambda$ for the Selkirk population was 1.023 (95 percent confidence interval = 0.917-1.124). In 2000, preliminary trend calculations produced a $\lambda$ of 1.015 (95 percent confidence interval = 0.911 - 1.133) (Wakkinen pers. comm. 2003). In 2001, preliminary trend calculations produced a $\lambda$ of 1.003 (95 percent confidence interval = 0.894 - 1.123) (Wakkinen pers. comm. 2003). However, due to the wide confidence intervals obtained in 1999, 2000, and 2001, the trend for each year, and overall, is statistically inconclusive. Even though the trend is statistically inconclusive, it is interesting to note that the point estimate was 1.023 in 1999, 1.015 in 2000 and 1.003 in 2001. These point estimates equate to an annual rate of change in the population of 2.3 percent in 1999, 1.5 percent in 2000, and 0.3 percent in 2001. Thus, the point estimate of the rate of increase declined from 1999 to 2001. In 2002, there were

35

000040

an unusually high number of mortalities, including an adult female. Female mortalities weigh heavily in the population model.

While population trend analyses have been inconclusive, the general perception of some research biologists working in the SRZ is that, in recent years, there has been a population increase. This perception is primarily based on more reported grizzly bear sightings, and sightings in areas not previously known to be used by grizzly bears in the Ecosystem (Wakkinen, pers. comm., 2003).

- Factors Affecting the Status of the SRZ Grizzly Bear Population

The Service's 1999 finding concluded that grizzly bears in the SRZ were in danger of extinction due to: 1) habitat alteration and human intrusion into grizzly bear habitat; and 2) a small population facing potential isolation by activities across the border in Canada. The finding also concluded that cumulative impacts of recreation, timber harvest, mining and other forest uses with associated road construction had reduced the amount of effective habitat for grizzly bears. Further, the finding stated that access management plans had the potential to reduce this threat, but had not been fully implemented.

Mortality:

Table 4 reports the total known grizzly bear mortality associated with the SRZ from 1982 to 2002. Within the recovery zone or within 10 miles of it over this 21-year period, there were 42 known grizzly bear mortalities, 34 of which were human-caused (9 were radio-collared bears).

Based on a population estimate of 46 grizzly bears, the current annual known human-caused mortality rate is approximately 3.5 percent, or about 1.6 bears per year (34 grizzly bear mortalities over 21 years). The current female grizzly bear human-caused annual mortality rate is approximately 0.6 percent, or about 0.3 bears per year (7 known human-caused female mortalities over 21 years). However, actual mortality numbers are likely to be higher, given the remote habitats typically occupied by grizzlies and the low probability of finding a dead bear unless it was radio-collared. A review of known grizzly bear mortalities in British Columbia, Alberta, Idaho, Washington, and Montana concluded that of the studies reviewed, management agencies would have been unaware of about half of the deaths of radio-collared grizzly bears if not for the radio collars (McLellan et al. 1999). Adjusting for the unknown, unreported mortality by using methods in McLellan et al. (1999) results in a total estimate of 50 human-caused mortalities (known and unknown). Based on a population estimate of 46 grizzly bears, this equates an average annual known and unknown human-caused mortality rate of approximately 5.0 percent, or about 2.3 bears per year (50 grizzly bear mortalities over 21 years).

Over the most recent 6-year period (1997-2002), there were 11 total known human-caused grizzly bear mortalities within the recovery zone or within 10 miles of it; one of which was a female bear. The total known human-caused grizzly bear mortalities are reflected in the 2002 Recovery Plan goals for this population.

36

000041

Table 4. Known grizzly bear mortalities associated with the SRZ, 1982-2003 (after Wakkinen and Johnson 2003).

| Mortality Date | Tag # | Sex | Age | Location | Mortality Category and Cause |
|---|---|---|---|---|---|
| Spring 1982 | None | M | AD | Priest River, ID | Human, Poaching |
| Autumn 1982 | None | Unk | Unk | LeClerc Creek, WA | Human, Unknown |
| 1985 | 867-85a[1] | Unk | Cub | N/A | Natural |
| Summer 1985 | 949[1] | M | 4.5 | US/BC border | Human, Unknown |
| Autumn 1986 | 898[1] | F | 1.5 | Grass Creek, ID | Human, Unknown |
| 1986 | None | M | Unk | BC Unit 4-8 | Human, Management Removal |
| Spring 1987 | 1005[1] | M | 10.5 | Wall Mtn, BC | Human, Poaching |
| Autumn 1987 | 962[1] | M | 7.5 | Trapper Creek, ID | Human, Poaching |
| Autumn 1988 | 1085[1] | F | 3.5 | Cow Creek, ID | Human, Mistaken Identity |
| Autumn 1988 | 1050[1] | M | 1.5 | Porcupine Creek, BC | Natural |
| 1988 | None | M | Unk | BC Unit 4-7 | Human, Legal Hunt |
| Summer 1989 | 1044[1] | F | 20+ | Laib Creek, BC | Natural, Conspecific |
| Autumn 1990 | 1042 | F | 3.5 | Maryland, BC | Human, Malicious |
| 1990 | None | M | Unk | BC Unit 4-8 | Human, Management Removal |
| Summer 1991 | 1076[1] | F | 20+ | Next Creek, BC | Natural |
| 1991 | 876-92a[1] | Unk | 1.5 | N/A | Natural |
| 1992 | None | M | Unk | Lost Creek, BC | Human, Defense of Property |
| Summer 1992 | 1090[1] | M | 5.5 | Laib Creek, BC | Unknown |
| Autumn 1992 | 1015 | F | 12.5 | Monk Creek, BC | Human, Self Defense |
| Autumn 1993 | 867[1] | F | 15.5 | Willow Creek, WA | Human, Malicious[2] |
| Autumn 1993 | 867-93a[1] | Unk | 0.5 | Willow Creek, WA | Human, Malicious[2] |
| Autumn 1993 | 867-93b[1] | Unk | 0.5 | Willow Creek, WA | Human, Malicious[2] |
| 1993 | None | M | Unk | BC Unit 4-8 | Human, Management Removal |
| 1993 | None | M | Unk | BC Unit 4-7 | Human, Legal Hunt |
| 1994 | None | M | Unk | BC Unit 4-7 | Human, Legal Hunt |
| Spring 1994 | 13 | M | AD | BC Unit 4-20[3] | Human, Legal Hunt |
| Spring 1995 | None | F | 1.5 | Boundary Creek, ID | Human, Unknown |
| Autumn 1995 | 1100[1] | M | 2.5 | Granite Pass, WA | Human, Mistaken Identity |
| 1996 | 1027-96b[1] | Unk | Cub | N/A | Natural |
| Autumn 1996 | 1022 | M | 2.5 | Boswell, BC | Human, Management Removal |
| Autumn 1997 | None | M | 1.5 | Salmo, BC | Human, Management Removal |
| Spring 1998 | 1023 | M | 4.5 | BC Unit 4-26[3] | Human, Legal Hunt |
| Summer 1998 | None | M | 3.5 | Usk, WA | Human, Under Investigation |
| Autumn 1999 | None | M | 22 | Wyundel, BC | Human, Depredation |
| Autumn 1999 | 1032 | M | 19 | Procter, BC | Human, Depredation |
| Autumn 1999 | 9810 | M | 10 | Smith Creek, ID | Human, Under Investigation |
| Summer 2001 | 7 | F | 13 | Porcupine Creek, BC | Natural |
| Autumn 2001 | None | M | Unk | Cottonwood Creek, BC | Human, Management Removal |
| Spring 2002 | 17 | M | 3.5 | Nelway, BC | Human, Depredation |
| Autumn 2002 | None | F | AD | West of Nelson, BC | Human, Under Investigation |
| Autumn 2002 | None | Unk | 1 | West of Nelson, BC | Human, Under Investigation |
| Autumn 2002 | None | Unk | 1 | West of Nelson, BC | Human, Under Investigation |
| Autumn 2002 | None | Unk | 1 | West of Nelson, BC | Human, Under Investigation |
| Autumn 2002 | 19 | M | 3.5 | Lamb Creek, ID | Human, Under Investigation |

[1]Part of radio collar sample at time of mortality.
[2]Human caused mortality determined only because of the radio collar on the animal at the time of death.
[3]Mortality outside recovery zone more than 10 miles.

Attraction of grizzly bears to improperly stored food and garbage is identified by the Recovery Plan as one of the principal causes of grizzly bear mortality (USFWS 1993). In 1995, after becoming habituated and conditioned to improperly stored food in a campground, a male grizzly

000042

bear was collared and relocated. Soon after being relocated, the bear was illegally killed by a hunter near Granite Pass, Washington.

Habitat:

A number of factors influence the quality and availability of habitat for grizzly bear in the SRZ. However, the primary factors are: habitat effectiveness and access management. This section also summarizes other habitat factors influencing the SRZ grizzly bear population.

Habitat effectiveness is defined as the amount of secure grizzly bear habitat (habitat at least one quarter mile from open roads, developments, and high levels of human activity) remaining within BMUs after impacted areas are subtracted from the total habitat in the BMUs. Based on work conducted by Christensen and Madel (1982), the IPNF's LRMP requires maintenance of a minimum of 70 square miles ($mi^2$) of secure habitat in each BMU. The intent of this requirement is to provide the minimum viable habitat needed to avoid grizzly bear displacement.

Currently, 78 percent (seven of the nine BMUs primarily under Forest Service management) of the BMUs meet the 70 $mi^2$ standard (Table 5). Of the two BMUs that do not meet the standard, one is the 30 $mi^2$ Lakeshore BMU west of Priest Lake. The Lakeshore BMU, while being small and primarily serving as a buffer for development and high human activities along Priest Lake, does contain important seasonal grizzly bear habitats regularly occupied by grizzly bears. The BMU currently provides approximately 8 $mi^2$ of secure habitat. The other BMU not meeting the standard is the Blue Grass BMU, which encompasses 90 $mi^2$ immediately south of the U.S./Canada border. The Blue Grass BMU is a high priority BMU providing key, year-round habitat for the Selkirk grizzly bear population. Maintenance of adequate habitat conditions in this BMU is particularly essential because of its importance to the Selkirk grizzly bear population. The Blue Grass BMU currently provides approximately 69 $mi^2$ of secure habitat.

Information on the level of habitat security within the remainder of the SRZ is not available as non-Federal entities do not necessarily manage their lands to maintain secure habitat for grizzly bears. Within the 160 $mi^2$ area encompassed by IDL east of Priest Lake, there are approximately 34 $mi^2$ of identified Scenic Areas, managed primarily for recreational and aesthetic purposes. Depending on the quantity and type of recreational activities, these areas may provide some level of secure habitat. Additional secure habitat is likely to be available within the IDL owned area, because the agency does implement access management to a degree. However, quantitative information on the extent of this secure habitat is not available for this area.

Additional secure habitat is likely to occur within the British Columbia portion of the SRZ, particularly in the Stagleap Provincial Park, located just north of the border. In 1995, the British Columbia provincial government developed a grizzly bear conservation strategy with a stated goal of enhancing habitat protection through land use planning processes. However, many of

38

000043

Table 5: 2002 status of SRZ BMUs relative to open roads, total roads, security habitat, and core habitat (after USFS 2002a).

| BMU | Percent with Open Roads >1 mi./sq.mi. | Percent with Total Roads >2 mi./sq.mi. | Square Miles Security Habitat | Percent Core Habitat |
|---|---|---|---|---|
| Blue Grass | 27 | 29 | 69 | 50 |
| Long-Smith | 23 | 13 | 80 | 73 |
| Ball-Trout | 18 | 9 | 76 | 72 |
| Myrtle | 30 | 19 | 70 | 60 |
| Salmo-Priest | 30 | 24 | 102 | 65 |
| Sullivan-Hughes | 23 | 20 | 92 | 59 |
| LeClerc | 38 | 55 | 74 | 30 |
| Kalispell-Granite | 31 | 29 | 100 | 48 |
| Lakeshore | 78 | 50 | 8 | 20 |
| IDL | ? | ? | ? | ? |

these processes are ongoing and have not had the opportunity to achieve the stated goals of habitat protection. In 1998, a scientific advisory committee gave the provincial government a failing grade on its habitat protection measures (USDI 1999a). Quantitative information on the amount of secure habitat in the British Columbia portion of the SRZ is not currently available.

Habitat security is accomplished largely through the effective management of restricted roads, and the administrative use of such roads. However, while the IPNF's LRMP does not specifically address administrative use, pursuant to the Service's 2001 Biological Opinion, the IPNF is required to maintain administrative use on restricted roads at ≤ 57 round trips per active bear year (April 1 through November 15) per road, divided seasonally. The 2001 Biological Opinion states that such use shall be apportioned as follows: ≤19 round trips in spring (April 1 thru June 15); ≤23 round trips in summer (June 16 through September 15); and ≤15 round trips in fall (September 16 through November 15). Administrative use is defined as passenger vehicle access on a restricted road to conduct non-mechanized activities, such as planting, regeneration surveys, timber sale layout, etc.

Access management pertaining to maintenance of grizzly bear habitat within BMUs primarily involves the density of roads within roaded habitat, and the quantity and quality of unroaded habitat. The effect of roads on grizzly bear behavior (Aune and Stivers 1985, McLellan and Mace (1985 In IGBC 1987), Kasworm and Manley 1988, McLellan and Shackleton 1988, Aune and Kasworm 1989, and Frederick 1991), grizzly bear populations and patterns of habitat use [IGBC Grizzly Bear Compendium (IGBC 1987), Frederick 1991, Recovery Plan (USFWS 1993), Mace and Manley 1993, Mace et al. 1996, Wakkinen and Kasworm 1997, and Mace et al. 1999], and grizzly bear mortality risk [McLellan and Mace (1985 In IGBC 1987), Dood et al. (1986 [cited as Dood et al. 1985 in text] of IGBC 1987), Aune and Kasworm 1989] has been thoroughly documented in the scientific literature. This research has clearly indicated the importance of managing three primary elements to avoid bear displacement from important

39

000044

habitats and to reduce bear mortality risk: (1) open road density, (2) total road density, and (3) core habitat (areas free of motorized access and high levels of human use).

Recognizing the need to incorporate this new information into the management of grizzly bears, in July 1994, the IGBC issued a Task Force Report that directed the IGBC subcommittees from each recovery zone to develop recommended parameters for core habitat, open road densities, and total road densities using the best biological information and considering the social and economic impacts of implementing those parameters (IGBC 1994). Core habitat is defined as areas greater than or equal to 0.31 miles from any road (open or restricted), motorized trail, or high intensity use area. Core habitat may contain restricted roads, but such roads must be *effectively* (emphasis added) closed with devices, including but not limited to earthen berms or barriers, or naturally closed by vegetative growth (IGBC 1998a). Additionally, per IGBC direction, core habitat should incorporate all seasonal components of grizzly bear habitat.

Based on the IGBC's direction, research data from radio-collared grizzly bears in the Selkirk Ecosystem and Cabinet-Yaak Ecosystem (collectively Ecosystems) were used to determine appropriate levels of these three parameters for both Ecosystems.

The Selkirk and Cabinet-Yaak Recovery Zones are each subsumed within the larger Selkirk and Cabinet Yaak Ecosystems, respectively. Wakkinen and Kasworm (1997) found that grizzly bears in these two Ecosystems: (1) used areas having total road densities greater than two miles/square mile (mi/mi$^2$) less than expected; (2) used areas having open road densities greater than one mi/mi$^2$ less than expected; and (3) used core habitat more than expected, while non-core habitat was used less than expected. The researchers found that within six female grizzly bear home ranges: (1) the amount of area having a total road density greater than two mi/mi$^2$ averaged 26 percent; (2) the amount of area having an open road density greater than one mi/mi$^2$ averaged 33 percent; and (3) the home ranges were comprised of an average 55 percent (range = 40-71.5 percent) core habitat. This analysis indicates that at least 55 percent of a BMU should be in core habitat to avoid displacement of bears (Wakkinen and Kasworm 1997).

While the sample sizes obtained by Wakkinen and Kasworm (1997) were small, the results were consistent with those found in similar studies conducted in the Northern Continental Divide Ecosystem (NCDE), although road density numbers in that Ecosystem were lower (open and total road densities = 19 percent, each) and core habitat was higher (68 percent). The NCDE parameters were developed using composite home range information, rather than average multi-years home range information as used for the Selkirk and Cabinet-Yaak Ecosystems. These values provide the best available indication of the habitat conditions used by grizzly bears in the Selkirk and Cabinet-Yaak Ecosystems.

In their study, Wakkinen and Kasworm (1997) did not determine if bears selected home ranges with fewer roads relative to road densities across the entire ecosystem (i.e., second order selection) because a complete access route map for the entire ecosystem was not available during the study period. Instead, they determined bear use of areas greater or lesser than expected within existing home ranges relative to access route density (third order selection). The above

40

referenced orders are referred to as first and second order, respectively, in Wakkinen and Kasworm (1997). Therefore, we are unable to conclude whether the 26 percent and 33 percent for total and open road densities respectively, represents the optimal selection of habitat by bears, or if these numbers simply reflect the condition of the environment from which they have to choose (i.e., do grizzly bears in the Selkirk or Cabinet-Yaak Ecosystems have the opportunity to choose areas with less road density?). For example, Mace and Manley (1993) studied grizzly bears in the NCDE, which encompasses significant portions of a National Park and Wilderness Areas, and found that approximately 19 percent of their home ranges had a total road density exceeding 2 mi/mi$^2$, 19 percent of their home ranges had an open road density exceeding 1 mi/mi$^2$, and 67.5 percent of their home ranges was comprised of core habitat. It should also be emphasized that Mace and Manley (1993) generated their results using a composite of female home ranges while Wakkinen and Kasworm (1997) obtained their results from averaging multi-year individual female home ranges.

An important consideration when interpreting results of the study conducted by Wakkinen and Kasworm (1997), in light of the apparent differences in road densities and core habitats of grizzly bears between the NCDE and the Selkirk/Cabinet-Yaak Ecosystems, is the fact that two of the six female bears in the Selkirk/Cabinet-Yaak study were killed by humans immediately following the period of monitoring, and a third female was the subadult offspring of one of the females in the study. While this female did produce cubs during the last year of monitoring that went into the study, subadult female home ranges decline as they approach reproductive age and change as a result of learning (Wakkinen and Kasworm 1997). Even though this female only produced cubs during the last year of monitoring, all years of radio locations were used to generate her home range.

Most of the research (cited above) documenting the need for managing road densities and unroaded habitat within grizzly bear home ranges was published after the IPNF had developed their 1987 LRMP, and thus, is not specifically addressed in the LRMP. However, recognizing the importance of managing for these parameters, the IPNF has been working on a project-by-project basis towards achieving the habitat conditions identified by Wakkinen and Kasworm (1997) that are used by the average adult female grizzly bear in the SRZ and CYRZ. Further, pursuant to the 2001 Biological Opinion, the IPNF is required to achieve these parameters within a specified time frame such that each BMU: contains at least 55 percent core habitat; has no more than 26 percent total road density exceeding 2 mi/mi$^2$; and has no more than 33 percent open road density exceeding 1 mi/mi$^2$.

Currently, of the nine BMUs managed primarily by the Forest Service, five (55 percent) contain at least 55 percent core habitat, seven (78 percent) have open road densities exceeding 1 mi/mi$^2$ in 33 percent or less of the BMU, and five (55 percent) have total road densities exceeding 2 mi/mi$^2$ in 26 percent or less of the BMU (Table 5). The Lakeshore BMU and the LeClerc BMUs do not meet any of the standards. However, as discussed earlier, because of the Lakeshore's small size (30 square miles), achievement of the habitat parameters may not be possible. The LeClerc BMU is primarily managed by the CNF, and has a high degree of intermingled private land, which may make achieving all habitat parameters very difficult. Since 1999, total road

000046

density $\geq 2$ mi/mi$^2$ in this BMU has increased from 53 percent to 55 percent of the BMU, and open road density $\geq 1$mi/mi$^2$ has decreased from 39 percent to 38 percent of the BMU. However, core habitat has decreased from 32 percent to 30 percent of the BMU over this same period.

State and private forest management activities occur within the SRZ. As previously discussed, state lands are primarily encompassed within the 160 mi$^2$ IDL managed area. The IDL administers these lands primarily for timber production to provide funding for the State school system. This area contains a significant amount of important grizzly bear habitat, and bears are known to occur in this area. Approximately 34 mi$^2$ of this area fall within the Upper Priest Lake Scenic Area and the Selkirk Crest Scenic Area, managed primarily for recreational and aesthetic purposes. The remainder of the area is actively managed for timber production. The IDL implements road management with the use of gates to restrict access, however, the Service has no information regarding existing total and open road densities or amount of core habitat within this area. When information on habitat conditions is not available, the Service typically provides the benefit of the doubt to the species and assumes a conservative scenario to provide for protection of the species. Therefore, for purposes of characterizing baseline conditions in the IDL administered area, the Service assumes that, outside of the 34 mi$^2$ of Scenic Areas mentioned above, open and total road densities exceed those values previously described, and that available core habitat is less than 55 percent of the area.

Stimson Lumber Company (SLC) and Forest Capitals, Inc., the primary private forest managers in the SRZ, manage their ownerships primarily for timber production. The majority of SLC ownership within the SRZ occurs within the LeClerc BMU; approximately 27 percent (21,000 acres) of the land within the LeClerc BMU is owned by Stimson. Stimson Lumber Company has entered into a Conservation Agreement with the CNF and the Service to minimize adverse affects to grizzly bears resulting from implementation of activities on its ownership within the LeClerc BMU through road and vegetation management, including but not limited to ensuring: open road density on its ownership does not exceed 1 mi/mi$^2$ during the non-denning period of April 1 through November 15; no increase in roads open to public motorized use, except where such increase will result in additional available habitats for grizzly bear; administrative use levels on certain roads do not exceed 12 round trips during the spring period (April 1 through June 15); that their land contributes proportionally to the maintenance of a minimum of 40 percent vegetative cover; maintenance of vegetative screening adjacent to open roads; and the distance to cover from any point within harvest units does not exceed 600 feet by limiting the size of harvest units. Currently, Forest Capitals has not entered into an agreement with the Service for grizzly bear management on its ownership within the SRZ.

As identified above, grizzly bears are living in areas outside of but adjacent to the Recovery Zones. Relative to the SRZ, grizzly bear occupancy occurs in two separate mapped areas adjacent to the southwestern (Priest Area) and southeastern (Pack River Area) boundaries of the recovery zone (Figure 3). The Priest Area circumscribes an area of approximately 107 mi$^2$, and the Pack River Area circumscribes an area approximately 35 mi$^2$ (Table 6). Both areas contain a mixture of federal and non-federal land. Outside of the Recovery Zones, but within these areas identified as occupied by grizzly bears, the IPNF's LRMP does not contain specific standards

000047



Figure 3: Grizzly Bear Analysis Areas Outside of SRZ and CYRZ (USFS 2002a)

[1]Libby and Fisher Areas are outside of the projected grizzly distribution area in the short term, but are included in this analysis to complete the process for lands associated with the CYRZ, per verbal agreement with the Service (September 26, 2002).

43

000048

pertaining to the management of grizzly bears or the maintenance of their habitat. However, the IPNF's LRMP does contain standards pertaining to the management of other species and their habitats (such as elk, and sensitive and indicator species) which are beneficial to grizzly bears. Some of these standards control the type and intensity of activities, including road management, that may occur within these species habitats.

Science has shown that road management and the density of roads is probably one of the most important factors influencing grizzly bear habitat use and grizzly bear mortality. Currently, linear open road densities within the Priest and Pack River Areas are 2.2 mi/mi$^2$ and 0.8 mi/mi$^2$, respectively, and linear total road densities are 6.2 mi/mi$^2$ and 2.7 mi/mi$^2$, respectively. On National forest system lands only within the Priest and Pack River Areas, linear open road densities are 2.1 mi/mi$^2$ and 0.6 mi/mi$^2$, and linear total road densities are 6.2 mi/mi$^2$ and 2.6 mi/mi$^2$. We currently do not have any information regarding the quantity of unroaded habitat contained within these areas (Table 6).

The above linear road density information is not analogous to, and therefore may not be comparable with road density information derived using a moving windows analysis technique, upon which the road density standards for the Recovery Zones are based. A moving window analysis is a spatial analysis of road density distribution, while a linear road density analysis is not.

Table 6: Grizzly bear occupancy areas adjacent to the SRZ: size and road density status (USFS 2002a).

| Area | Size (mi$^2$) | Linear Total Road Density Across All Ownerships (mi/mi$^2$) | Linear Total Road Density on National Forest Lands Only (mi/mi$^2$) | Linear Open Road Density Across All Ownerships (mi/mi$^2$) | Linear Open Road Density on National Forest Lands Only (mi/mi$^2$) |
|---|---|---|---|---|---|
| Priest | 107 | 7.7 | 7.8 | 4.6 | 5.0 |
| Pack River | 35 | 2.7 | 2.6 | 0.8 | 0.6 |

Existing Management Direction:

The following goals, objectives, and standards, currently contained in the IPNF's LRMP (USFS 1987), may provide some benefits to grizzly bears and their habitat within these areas of mapped grizzly bear residency outside of the SRZ:

- ▸ The goals and objectives of the LRMP set the framework for minimizing take:

  - Roads will be developed and managed to the minimum standards and miles necessary to meet the objectives of the management area (MA).
  - Manage vertebrate wildlife habitat to maintain viable populations of all species.

44

000049

- Manage big game habitat toward achieving the goals of the Idaho Department of Fish and Game (IDFG).
- Grazing management will protect soil and water resources, riparian areas, and T&E plant and animal species. Grazing is permitted on less than two percent of the Forest with a majority of the forage use occurring on 7,500 acres.
- The needs of Threatened & Endangered (T&E), and sensitive plant and animal species have priority in managing existing range allotments. No new allotments will be established in areas where conflicts can be expected with T&E or sensitive species.
- Riparian resources will be managed to feature dependent resources (fish, water quality, natural channels, certain vegetation, and wildlife communities) while producing other resource outputs at levels compatible for the objective for dependent resources. (Also note, the IPNF amended the Forest Plan to incorporate the INFISH Guidelines that increase protection of riparian resources.)
- Management for elk habitat needs will emphasize road management to maintain adequate security and habitat potential on summer range.

► Specific management standards and guidelines in place to achieve the forest goals:

- Forest-wide standard- Management of habitat and security needs for T&E species will be given priority in identified habitat. Results of research regarding habitat of T&E species will be incorporated into management direction as it becomes available.
- IPNF Management Area (MA) 2 & 3- "Road and trail restrictions may be necessary to reduce human/bear conflicts.
- IPNF MA 4 & 5- Within critical habitat components motorized recreation use may be restricted to provide needed wildlife security.
- IPNF MA 6- Special emphasis will be given to the maintenance, protection and enhancement of key habitat components (including security).
- IPNF MA 9- Existing local roads will generally be closed to vehicles over 40" wide. No local road construction is planned.
- IPNF MA10- Parker and Long Canyons are closed to motorized use.
- IPNF MA 11- Salmo-Priest Wilderness is to be managed as non-motorized. Within grizzly bear and caribou habitat, recreation use and access may be restricted to provide needed wildlife security during use periods. (Includes proposed wilderness i.e., Scotchman Peak and Selkirk Crest areas)
- IPNF MA 11- Proposed Wilderness- Motorized use may be permitted ............, except within bounds of Mallard Larkins Pioneer Area, ......
- IPNF MA 12- No new roads will be allowed in the Wild River portion (St Joe River).
- IPNF MA12- Within the Upper Priest Wild River area, uses will be limited to non-motorized except on established roads.
- IPNF MA 16- Maintenance of natural channels and adequate streamside vegetation will have a high priority in range allotment plans and prescriptions. A specific

000050

objective for stream bank protection will be included in all allotment management plans where second order or larger streams are involved.

- IPNF MA 19 & 20- Motorized recreation activities will be allowed where they do not conflict with wildlife and other resource needs.
- IPNF is increasing information and education efforts in 2003 and 2004 as it relates to sanitation, prior to developing a food storage order. The "Pack-it-in Pack-it-out" policy is in place.
- IPNF is working on a forest-wide food storage order.

Other Factors:

The SRZ is one of the smallest grizzly bear recovery zones at approximately 1,957 mi$^2$, and only 53 percent is contained within the conterminous U.S. The remainder (47 percent) lies within British Columbia. The British Columbia portion of the SRZ is subjected to the same forestry, mining, recreation, and road construction pressures that exist in the U.S., all of which affect grizzly bear habitat. While the British Columbia provincial government has developed and implemented a grizzly bear conservation strategy (Strategy), it was recently criticized by a scientific advisory committee for its poor implementation of the Strategy.

In summary, the Service, in its 1999 administrative finding determined that the Selkirk grizzly bear population was warranted for listing as endangered (USDI 1999a). This determination was made in large part because of the small size of the SRZ, grizzly bear mortalities, small size of the grizzly bear population, and existing habitat conditions. Grizzly bear mortalities, particularly human-caused mortalities, have affected a significant portion of the grizzly bear population over the last 21 years, with mortalities remaining substantially higher than Recovery Plan goals. None of the Recovery Plan goals (relative to bear reproduction, distribution, and mortality) are being met. It is speculated that, in recent years, the Selkirk grizzly bear population may have experienced growth. However, as annual population trend modeling has been statistically inconclusive, the speculation of population growth is based on the perceptions of some researchers familiar with this Ecosystem. Given the foregoing discussion of grizzly bear mortality and habitat conditions within this Ecosystem, there is clearly a need for improved protection of grizzly bears and their habitat within this Ecosystem. Past and ongoing habitat management efforts have resulted in improved habitat conditions within the SRZ, although several BMUs still have unacceptably high road densities and insufficient core habitat.

Cabinet-Yaak Ecosystem

On February 12, 1993 (USDI 1993), the Service found that reclassification of grizzly bears in the CYRZ from threatened to endangered was warranted but precluded by work on higher priority species. In its May 17, 1999, finding, which reaffirmed the warranted but precluded finding originally made in 1993, the Service concluded that the lack of current habitat protection stemming from cumulative impacts related to access, mining, recreation, and forestry, both in the U.S. and Canada, poses a significant threat to the grizzly bear population (USDI 1999a).

46

000051

The CYRZ encompasses approximately 2,600 mi$^2$ (1,728,000 acres), is located in northwest Montana and northeast Idaho, and is administered by three forests: IPNF, KNF, and LNF. The CYRZ is bordered to the north by the Canadian border, to the south by the Clark Fork River, to the west by the towns of Moyie Springs and Clark Fork, and to the east by the town of Libby, and is bisected by the Kootenai River. Land ownership within the CYRZ is approximately 90 percent Federal (1,555,200 acres), 5 percent State (86,400 acres), and 5 percent private lands (86,400 acres).

The CYRZ is often described in terms of having two portions, the Cabinet Mountains portion forming the southern half of the CYRZ, and the Yaak portion forming the northern half of the CYRZ. The Cabinet Mountains portion covers approximately 978,000 acres, is topographically diverse with a steep mountain range up to 8,700 feet near the center and more definable seasonal habitats, and contains the Cabinet Mountains Wilderness area. The Cabinet Mountains Wilderness area is approximately 34 miles long, varies from 0.5 to 7 miles wide, and consists of 94,272 acres of higher elevation habitat. The Cabinet Mountains portion is connected to the Yaak portion by two relatively narrow corridors of habitat, approximately 7.5 miles wide, separated by a broad, privately owned valley where the town of Troy is located. The Yaak portion is 466,000 acres and has gentler topography and slightly lower elevations, up to 7,700 feet. Seasonal grizzly bear habitats are not as clearly definable in the Yaak portion. More grizzly bear research and telemetry work has occurred in the Yaak than in the Cabinet Mountains portion of the ecosystem.

As mentioned above, recovery zones are divided into BMUs to facilitate grizzly bear management. To this end, 22 BMUs averaging approximately 100 mi$^2$ have been established in the CYRZ. Fifteen BMUs are managed entirely by the KNF, 4 BMUs are managed entirely by the IPNF, 1 BMU is managed entirely by the LNF, and two BMUs are jointly managed by the KNF and IPNF.

- Population Status

According to the Recovery Plan, the minimum population goal for the CYRZ is 100 bears (USFWS 1993). Grizzly bears also occur in and use areas outside the CYRZ, and therefore, population parameters include bears observed up to 10 miles outside the recovery zone boundary (USFWS 1993). This biological opinion will use the term CYRZ to refer to the CYRZ and the band of habitat up to 10 miles around the CYRZ within which Recovery Plan parameters are reported.

The following recovery goals for the CYRZ have been established in the Recovery Plan (USFWS 1993):

1.    Six females with cubs over a running 6-year average both inside the recovery zone and within a 10 mile area immediately surrounding the recovery zone, excluding Canada;

47

000052

2.     Eighteen of 22 BMUs occupied by females with young from a running 6-year sum of verified evidence; and

3.     Known, human-caused mortality not to exceed 4 percent of the population estimate based on the most recent 3-year sum of females with cubs. Furthermore, no more than 30 percent of this 4 percent mortality limit shall be females. These mortality limits cannot be exceeded during any 2 consecutive years for recovery to be achieved. Presently, grizzly bear numbers are so small in this ecosystem that the mortality goal shall be zero known human-caused mortalities.

The most recent available information on the status of this population relative to the demographic recovery plan parameters are presented in Table 7 (Kasworm, pers. comm. 2003). Based on this information, the only recovery goal met in the CYRZ in 2002 was total human-caused mortality.

Table 7:   Status of the Cabinet-Yaak Ecosystem as of 2002 in relation to the demographic recovery goals from the grizzly bear recovery plan (after Kasworm 2003).

| Demographic Parameter | Recovery Plan Goals | Year 2002 |
|---|---|---|
| Females with cubs (6-year average) | 6.0 | 1.7 |
| Distribution of females with young | 18 of 22 BMUs | 13 of 22 BMUs |
| Female human-caused mortality limit (30% of the total mortality)[1] | 0.4 | 0.8 (6 year average) |
| Human-caused mortality limit (4% of the minimum population estimate)[1] | 1.4 | 1.0 (6 year average) |

[1]Presently grizzly bear numbers are so small in this ecosystem that the mortality goal is zero known human-caused mortalities.

In 2002, four females with cubs were documented (Table 8). Recorded sightings occurred in BMUs 11 - 17, and 21. From 1996 to 2001, family groups were recorded in BMUs 2, 4 - 7, 11 - 17, and 21 (13 of 22 BMUs) (Kasworm pers. comm. 2003). As discussed in the Service's 2001 Biological Opinion, the reported BMU occupancy by females with young must be viewed cautiously, as the same family group may account for several of the reported sightings in the separately occupied BMUs.

As described previously, the mortality goals established by the Service's Recovery Plan for the CYRZ are based on work conducted by Harris (1985), and are calculated using the annual minimum population estimate divided by the most recent 6-year sum of human-caused grizzly bear mortalities. Table 8 contains the data on which the annual mortality levels for the CYRZ are calculated.

In its May 17, 1999, administrative finding on the status of the CYRZ grizzly bear populations (USDI 1999a), the Service reported an estimate of 30-40 bears. As noted previously, this

000053

Table 8.   Annual CYRZ grizzly bear unduplicated counts of females with cubs, and known human-caused mortality (Kasworm 2003).

| Year | Annual Females with cubs | Annual Human Caused Adult Female Mortality | Annual Human Caused All Female Mortality | Annual Human Caused Total Mortality | 4% Total Human Caused Mortality Limit[1] | 30% All Female Human Caused Mortality Limit[1] | Total Human Caused Mortality 6 Year Averages | Female Human Caused Mortality 6 Year Averages |
|------|------|------|------|------|------|------|------|------|
| 1988 | 1 | 1 | 1 | 1 | | | | |
| 1989 | 0 | 0 | 1 | 1 | | | | |
| 1990 | 1 | 0 | 0 | 1 | | | | |
| 1991 | 1 | 0 | 0 | 0 | | | | |
| 1992 | 1 | 0 | 0 | 0 | | | | |
| 1993 | 2 | 0 | 0 | 1 | 0.9 | 0.3 | 0.7 | 0.3 |
| 1994 | 1 | 0 | 0 | 0 | 0.9 | 0.3 | 0.5 | 0.2 |
| 1995 | 1 | 0 | 0 | 0 | 0.9 | 0.3 | 0.3 | 0 |
| 1996 | 1 | 0 | 0 | 1 | 0.7 | 0.2 | 0.3 | 0 |
| 1997 | 3 | 0 | 0 | 0 | 1.2 | 0.4 | 0.3 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0.9 | 0.3 | 0.3 | 0 |
| 1999 | 0 | 0 | 1 | 2 | 0.7 | 0.2 | 0.5 | 0.2 |
| 2000 | 2 | 0 | 1 | 1 | 0.5 | 0.1 | 0.7 | 0.3 |
| 2001 | 1 | 1[2] | 2 | 2 | 0.5 | 0.1 | 1.0 | 0.8 |
| 2002 | 4 | 0 | 1 | 1 | 1.4 | 0.4 | 1.0 | 0.8 |

[1]Presently grizzly bear numbers are so small in this ecosystem that the mortality goal is zero known human-caused mortalities.

[2]Mortality discovered in 2002 and assumed to be an adult female, pending DNA verification.

estimate is not based on the same minimum population estimate technique described in the Recovery Plan, upon which the annual mortality limits are calculated. Rather the Service's 1999 finding used a combination of population estimates derived separately for the Cabinet Mountains and Yaak River drainage. The population in the Cabinet Mountains was estimated at 15 or fewer grizzly bears in 1988 (Kasworm and Manley 1988). Although 4 female grizzly bears were transplanted into the Cabinet Mountains from 1990 through 1994 (Kasworm et al. 1998), in 2001, the Service concluded that there is insufficient data to change the 1988 Cabinet Mountains population estimate (USDI 2001). In the Yaak River drainage, an estimate of a minimum of 20 grizzly bears was generated using unduplicated counts of all bears over 3-year intervals from 1989-1999 (USDI 1999a). A total of 27 different bears were identified from 1989-1998; four of which are known or suspected to have died (Kasworm, unpub. report 1999). Combining the estimates from the Cabinet Mountains with the Yaak River drainage resulted in a total population conservatively estimated at 30-40 individuals in the CYRZ.

As indicated previously, grizzly bears are residing in areas outside of but adjacent to the CYRZ (Figure 3). Some of these bears have home ranges partially overlapping the CYRZ to varying

000054

degrees, others reside entirely outside of the recovery zone, and outside of the 10-mile buffer. Grizzly bear mortalities that occur within a 10 mile band around the CYRZ are factored into the recovery goals for the CYRZ. However, grizzly bear mortalities that occur outside of the 10 mile buffer surrounding the CYRZ, but within the recently delineated areas of the Cabinet-Yaak Ecosystem (as noted previously, the CYRZ is contained within the larger Cabinet-Yaak Ecosystem), are not accounted for in the recovery parameters, and do not contribute to the population estimates for this ecosystem.

Population trend analyses in the CYRZ have been inconclusive. Grizzly bear population trend analyses were conducted in the early 1990s for the CYRZ (Servheen et al.1994), but data were insufficient to determine population trends. In 1999, the Service analyzed mortality information from 1983 to 1998 and reported a $\lambda$ of 1.100 (95 percent confidence interval = 0.971 - 1.177), which indicates an increasing population. However, due to the wide confidence interval, the trend was statistically inconclusive. Preliminary calculations (Kasworm pers.comm 2001) incorporating mortality data for 2000 indicate a $\lambda$ of 0.984 (95 percent confidence interval = 0.857 - 1.092). Because the point estimate was less than 1.0, it indicates a declining population. Once again, however, because the confidence intervals were wide, the trend was statistically inconclusive. Even though the trend is statistically inconclusive, it is interesting to note that the point estimate was 1.100 in 1999, 1.000 in 2000 (Kasworm pers. comm. 2000), and 0.984 in 2001. These point estimates equate to an annual rate of change in the population of 9.5 percent in 1999, 2.6 percent in 2000, and -1.6 percent in 2001. Even though the trend estimates are inconclusive, due primarily to recent high levels of grizzly bear mortalities, the Service is concerned about the status of this population (Kasworm pers. comm. 2003)

- Factors Affecting the Status of the CYRZ Grizzly Bear Population

The Service's 1999 finding concluded that grizzly bears in the CYRZ were in danger of extinction due to: 1) habitat alteration and human intrusion into grizzly bear habitat; and 2) a small population facing potential isolation by activities across the border in Canada. The finding also concluded that cumulative impacts of recreation, timber harvest, mining and other forest uses with associated road construction had reduced the amount of effective habitat for grizzly bears. Further, the finding stated that access management plans had the potential to reduce this threat, but had not been fully implemented.

Potential isolation from grizzly bears in the Canada portion of the greater CYRZ is identified as a potential threat to grizzly bears in the U.S. portion of the ecosystem. Conditions in Canada and along the international boundary currently allow movement of grizzly bears between Canada and the Yaak portion of the CYRZ, but grizzly bear habitat is being impacted by highways and associated development in Canada. Additionally, U.S. Highway 2 bisects the ecosystem between the Yaak and Cabinet Mountains portions. To date, the Service has no information documenting movement of grizzly bears across Highway 2 between the Yaak and Cabinet Mountains (W. Kasworm, pers. comm. 2002). The combination of the highway, river, railroad and associated

50

development may be or may become a substantive barrier to movement of grizzly bears in the ecosystem.

Mortality:

Table 9 reports the total known grizzly bear mortality associated with the CYRZ from 1982 to 2002. Within the recovery zone or within 10 miles of it over this 21-year period there were 28 known grizzly bear mortalities, 15 of which were human-caused (5 were radio-collared bears). Using the more conservative population estimate of 30 grizzly bears, the current annual known human-caused mortality rate is approximately 2.3 percent, or about 0.7 bears per year (15 grizzly bear mortalities over 21 years). The current female grizzly bear human-caused annual mortality rate is approximately 1.0 percent, or about 0.3 bears per year (7 known human-caused female mortalities over 21 years). However, as discussed earlier, actual mortality numbers are likely to be higher. Thus, adjusting for the unknown, unreported mortality by using methods in McLellan et al. (1999) results in a total estimate of 24 human-caused mortalities (known and unknown). Again using the lower population estimate of 30 grizzly bears, this equates to an average annual known and unknown human-caused mortality rate of approximately 3.7 percent, or about 1.1 bears per year (24 grizzly bear mortalities over 21 years).

Over the most recent 6-year period (1997-2002), there were six total known human-caused grizzly bear mortalities within the recovery zone or within 10 mile of it; four of which were female bears. The total known human-caused grizzly bear mortalities are reflected in the 2002 Recovery Plan goals for this population.

Until recently, grizzly bear mortalities, especially human-caused mortalities of female grizzly bears, had been declining. In 1999, at least five grizzly bears are known to have died, including 2 females (Kasworm, pers. comm., 1999). Two of the five known grizzly bear mortalities were human-caused. A subadult female was tagged in the U.S., but was killed by a hunter in Canada who claimed self-defense. An adult male grizzly bear was euthanized as a result of an agency management control action because of adverse interactions with humans, in which lax sanitation was a contributing factor. An adult female and 2 cubs of unknown sex died of natural causes. They are thought to have been killed by another bear, possibly a male grizzly bear. In 2000, four grizzly bears were known to have died. One female subadult was killed illegally, and three grizzly bears died of natural causes. In 2001, four grizzly bears were known to have died. A subadult female was killed due to mistaken identity by a hunter, one grizzly bear was apparently hit by a train, and two cubs died of natural causes. In 2002, two bears were known to have died. One yearling female grizzly bear, presumably orphaned, died of natural causes several weeks after being preemptively moved. Another subadult female grizzly bear died in the Porcupine Creek area of the Yaak. This mortality was apparently human-caused and is under investigation.

As indicated previously, the improper storage of attractants, such as food items and garbage, may lead to habituation of grizzly bears. Such food conditioning of grizzly bears may require management control actions, consisting of capture and relocation, to reduce the potential for

000056

Table 9. Known grizzly bear mortalities associated with the CYRZ, 1982-2002 (after Kasworm 2003).

| Mortality Date | Tag # | Sex | Age | Location | Mortality Category and Cause |
|---|---|---|---|---|---|
| Autumn 1982 | None | M | AD | Grouse Creek, ID | Human, Malicious |
| 1984 | None | Unk | Unk | Harvey Creek, ID | Human, Mistaken Identity |
| Autumn 1985 | 14[1] | M | AD | Lyons Gulch, MT | Human, Self Defense |
| Summer 1986 | 106[1] | Unk | Cub | Burnt Creek, MT | Natural |
| Autumn 1987 | None | F | Cub | Flattail Creek, MT | Human, Mistaken Identity |
| Spring 1988 | 134[1] | M | AD | BC Unit 4-5[2] | Human, Legal Hunt |
| Autumn 1988 | None | F | AD | Seventeen Mile Creek, MT | Human, Self Defense |
| Summer 1989 | 129[1] | F | 3.5 | Burnt Creek, MT | Human, Research |
| 1990 | None | M | Unk | Poverty Creek, MT | Human, Malicious |
| 1992 | None | Unk | Unk | Trail Creek, MT | Unknown |
| Summer 1993 | 258[1] | F | 7.5 | Libby Creek, MT | Natural |
| Summer 1993 | 258[1] | Unk | 0.5 | Libby Creek, MT | Natural |
| 1993 | None | M | AD | Libby Creek, MT | Human, Malicious |
| Spring 1996 | 302[1] | M | 3.5 | Dodge Creek, MT | Human, Unknown[3] |
| Autumn 1997 | 355[1] | M | AD | Gold Creek, BC[2] | Human, Unknown[3] |
| Spring 1999 | 106[1] | F | 21 | Seventeen Mile Creek, MT | Natural, Predation |
| Spring 1999 | 106[1] | Unk | 0.5 | Seventeen Mile Creek, MT | Natural, Predation |
| Spring 1999 | 106[1] | Unk | 0.5 | Seventeen Mile Creek, MT | Natural, Predation |
| Autumn 1999 | 596[1] | F | 2.5 | Hart Creek, BC | Human, Self Defense |
| Autumn 1999 | 358 | M | 15 | Yaak River, MT | Human, Management Removal |
| Spring 2000 | 538[1] | Unk | 0.5 | Hawkins Creek, BC | Natural |
| Spring 2000 | 538[1] | Unk | 0.5 | Hawkins Creek, BC | Natural |
| Summer 2000 | 303[1] | Unk | 0.5 | Fowler Creek, MT | Natural |
| Autumn 2000 | 592[1] | F | 3 | Pete Creek MT | Human, Under Investigation[3] |
| 2001 | 538 | Unk | Cub | Cold Creek, BC | Unknown (natural) |
| 2001 | 538 | Unk | Cub | Cold Creek, BC | Unknown (natural) |
| 2001 | Unk | F | Sub | Spread Creek MT | Human- mistaken identity |
| 2001 | Unk | Unk | AD | Elk Creek, MT | Human, train collision |
| 2002 | Unk | F | 1 | Marten Creek, MT | Natural |
| 2002 | Unk | F | Sub | Porcupine Creek, MT | Human, Under Investigation |

[1] Part of radio collar sample at time of mortality.

[2] Mortality outside recovery zone more than 10 miles.

[3] Human caused mortality determined only because of the radio collar on the animal at the time of death.

adverse encounters between people and bears. In many instances, however, the ultimate fate of food habituated grizzly bears is mortality due to their increased vulnerability to illegal shooting or legal defense of life or management control actions. In 1999, a male grizzly bear was

52

000057

euthanized because of adverse interactions with humans precipitated by lax sanitation procedures. More recently, in May 2003, a subadult male grizzly bear in the CYRZ had to be captured and relocated due to repeated entrances into a dumpster that was not resistant to grizzly bears.

Within the CYRZ, only two grizzly bear management control actions have been implemented from 1982-2003 as a result of sanitation related problems, which might imply that lax sanitation is not an issue. However, lax sanitation in the CYRZ is a concern. The infrequent need to implement grizzly bear control actions may simply reflect the low density of grizzly bears throughout this ecosystem, rather than indicating sanitation practices are not leading to grizzly bear habituation. For example, black bears are substantially more numerous in this ecosystem and, each year, many must be captured, and removed or destroyed because they have become habituated to human food and/or garbage. Therefore, unless this potential for habituation is removed, it can be expected that grizzly bear problems related to sanitation will increase as grizzly bear numbers increase in this ecosystem.

Habitat:

Parts of three national forests are contained within the CYRZ: IPNF, KNF, and LNF. Each of the Forests developed and implemented LRMPs in the 1980's, incorporating measures addressing management of grizzly bears. The Service completed section 7 consultation on the IPNF, KNF, and LNF LRMPs and issued biological opinions to each of the forests in 1986 (USFWS 1986), 1985 (USFWS 1985), and 1982 (USFWS 1982), respectively. The Service concluded that implementation of the LRMPs, with measures addressing grizzly bear management, would not be likely to jeopardize the continued existence of the grizzly bear. The measures implemented by the Forests were based upon the existing scientific information available at the time relative to grizzly bear management and behavior. The Forests developed standards and guidelines related to grizzly bear management to: 1) avoid the likelihood of jeopardizing the continued existence of grizzlies in the Selkirk and Cabinet-Yaak Ecosystems; 2) contribute toward grizzly bear conservation; and 3) coordinate Forest activities with the biological needs of the grizzly. However, while the objectives of grizzly bear Management were the same across all three forests, the actual standards adopted and implemented under each of the individual forest's LRMPs were slightly different.

The LRMPs for the KNF and IPNF require management of security habitat (effective grizzly bear habitat), while the LNF LRMP contains no such requirement. The IPNF LRMP requires maintaining effective grizzly bear habitat of at least 70 $mi^2$ within each BMU, and the KNF LRMP requires maintaining effective grizzly bear habitat of at least 70 percent within each BMU. However, because BMUs are approximately 100 $mi^2$ in the CYRZ, the KNF requirement to manage for 70 percent security habitat essentially equates to the maintenance of 70 $mi^2$ of effective grizzly bear habitat within each BMU, which is similar to the IPNF. While the LNF LRMP does not require management for security habitat, pursuant to its LRMP, in the early

53

1990s the LNF adopted a requirement for management of displacement habitat within Bear Management Analysis Areas (BMAA; subunits within a BMU that are delineated for cumulative effects analysis).

Currently, 73 percent (16 of 22) of BMUs in the CYRZ provide at least 70 percent or 70 mi$^2$ effective grizzly bear habitat (Table 10). Two of the BMUs that currently do not provide 70 percent security habitat are BMUs 10 and 12, which contain 65 and 60 percent security habitat, respectively. As described previously, the northern and southern portions of the CYRZ are connected by 2 relatively narrow corridors of habitat. This area of connectivity is contained entirely within the boundaries of BMUs 10 and 12. Thus, these two BMUs may play a particularly important role in providing for grizzly bear movement between the Yaak portion (northern) and the Cabinet Mountain portion (southern) of the CYRZ. This may also have implications for maintaining the demographic and genetic stability, and thus overall population sustainability of grizzly bears within the CYRZ. The Grouse BMU also does not currently provide 70 mi$^2$; it currently contains 59 mi$^2$ of security habitat. However, federal lands comprise less than 75 percent of this BMU. The BMU managed by the LNF (BMU 22) currently provides 64 percent security habitat.

Additionally, while the LNF LRMP does not require management of security habitat, it does require the LNF to manage for displacement habitat within BMAAs. Seventeen BMAAs have been delineated within BMU 22.

To better manage human access into grizzly bear habitat, the KNF LRMP requires management for grizzly bears within Management Situation 1 (MS 1) grizzly bear habitat. Management Situation 1 grizzly bear habitat is defined as those lands that contain grizzly population centers and/or habitat that is needed for the survival and recovery of the species. In those areas, the needs of the grizzly bear will be given priority over other management considerations. Land uses which can affect grizzly bears and/or their habitat will be made compatible with grizzly needs or such uses will be disallowed or eliminated (IGBC 1987). Within MS 1 habitat, the KNF is required to maintain an average linear open road density at $\leq 0.75$ mi/mi$^2$. The LNF, pursuant to the changes adopted in the early 1990s (referenced above), is required to manage for grizzly bears within MS 1 habitat as well. Within MS 1 habitat, the LNF is required to: 1) maintain an average linear open road density $\leq 1$ mi/mi$^2$ within BMAAs; and 2) maintain an average linear open road density of $< 0.75$ mi/mi$^2$ within BMAAs with known (a) movement corridors, (b) concentrations of spring/fall feeding components, and/or (c) protein concentrations. The IPNF LRMP does not require management of open road density.

Pursuant to revised regulations governing section 7 consultation procedures under the Act, the Service administratively amended the biological opinions for the KNF, LNF, and IPNF in 1995 (USFWS 1995), 1996 (USFWS 1996), and 2001 (USFWS 2001b), respectively. The Service amended the biological opinions to provide the Forests with an analysis of incidental take, which incorporated new scientific information on the effects of roads on grizzly bear behavior and habitat use. The 1995 and 1996 biological opinions require the KNF and LNF, respectively, to

000059

incorporate IGBC recommendations relative to the management of open and total roads densities and core habitat.

Table 10: 2002 status of Cabinet-Yaak BMUs relative to open roads, total roads, security habitat, and core habitat (Forest Service 2002a).

| BMU | Percent with Open Roads >1 mi./sq.mi. | Percent with Total Roads >2 mi./sq.mi. | Percent Security Habitat (sq. mi.) | Percent Core Habitat |
|---|---|---|---|---|
| 1[a] | 12 | 10 | 89 | 83 |
| 2[a] | 17 | 14 | 83 | 77 |
| 3[a] | 27 | 26 | 70 | 62 |
| 4[a] | 36 | 26 | 65 | 62 |
| 5[a] | 26 | 21 | 76 | 63 |
| 6[a] | 33 | 32 | 70 | 55 |
| 7[a] | 23 | 20 | 80 | 66 |
| 8[a] | 32 | 23 | 77 | 56 |
| 9[a] | 32 | 27 | 72 | 57 |
| 10[a] | 41 | 32 | 65 | 49 |
| 11[a] | 31 | 28 | 71 | 54 |
| 12[a] | 43 | 30 | 60 | 57 |
| 13[b] (Keno) | 28 | 24 | 72 (69) | 62 |
| 14[b] (Northwest Peaks) | 28 | 26 | 75 (82) | 56 |
| 15[a] | 31 | 30 | 70 | 50 |
| 16[a] | 29 | 38 | 72 | 45 |
| 17[a] | 31 | 26 | 74 | 50 |
| 18[c] (Boulder) | 29 | 35 | 77 (75) | 49 |
| 19[c] (Grouse) | 59 | 59 | 60 (59) | 32 |
| 20[c] (N. Lightening) | 38 | 20 | 69 (74) | 61 |
| 21[c] (Scotchman) | 35 | 27 | 70 (67) | 63 |
| 22[d] | 39 | 42 | 64 | 49 |

[a]Managed solely by the KNF
[b]Management is shared between the KNF and IPNF
[c]Managed solely by the IPNF; [d]Managed solely by the LNF

55

As previously discussed, in 1998 the Selkirk/Cabinet-Yaak Subcommittee of the IGBC approved implementation of the Rule Set addressing management of motorized access within the Recovery Zones. To briefly restate, the Rule Set outlines the following goals: 1) no net loss of core habitat and the Forest Service will work to achieve 55 percent core habitat in Priority 1 BMUs; 2) no net loss of core areas in the remainder of the BMUs; and 3) no net increase in OMRD and TMRD on National Forest System lands within these Ecosystems. The Rule Set specifically did not establish new standards for OMRD or TMRD, but did require commitment to standards contained in existing LRMPs and existing incidental take statements from the Service. Thus, pursuant to their LRMPs, and the 1995 and 1996 biological opinions, the KNF and LNF, respectively, are required to manage for OMRD and TMRD, as well as core habitat.

Regarding the IPNF, however, their existing LRMP, and the Service's 1986 biological opinion did not require management for core habitat, or OMRD or TMRD. Thus the Rule Set's only requirement applicable to the IPNF was the parameter addressing management and maintenance of core habitat. The Service's 2001 Biological Opinion analyzed the current LRMP's potential for causing incidental take of grizzly bears, and provided the IPNF with an incidental take statement to minimize such take. The incidental take statement requires the forest to manage grizzly bear habitat so that each BMU contains: at least 55 percent core habitat; no more than 26 percent total road density exceeding 2 mi/mi$^2$; and no more than 33 percent open road density exceeding 1 mi/mi$^2$. The 2001 Biological Opinion requires each BMU to achieve these habitat parameters within a specified time frame.

The Rule Set has not been formally adopted as management direction by the Forests. However, recognizing the importance of managing for the access levels recommended by Wakkinen and Kasworm (1997) the Forests have been working on a project-by-project basis towards their achievement.

Currently, within the CYRZ, 7 of 22 BMUs (64 percent) have open motorized route densities exceeding 1 mi/mi$^2$ in 33 percent or less of the BMU, and 11 of 22 BMUs (50 percent) have total motorized route densities exceeding 2 miles/mi$^2$ in 26 percent or less of the BMU (Table 10).

The Rule Set also addressed administrative use of restricted roads. The Rule Set established a standard of up to an average of one vehicle per day during the non-denning bear season, for a total of up to 115 round trips on restricted roads during the non-denning period. However, it should be noted that, based primarily on critical evaluations and comments by Metzgar (1998), Mace (pers. comm. 1999), and Wakkinen and Kasworm (pers. comm. 1999), the Subcommittee has directed the Access Task Force for these two Ecosystems to revisit the issue of administrative use to determine if the guidance outlined in the Rule Set should be modified.

None of the Forests LRMPs specifically address administrative use. However, each forest has incorporated guidance governing administrative use on restricted roads within grizzly bear habitat. Currently, the KNF limits administrative use to 121 trips per year per restricted road. The LNF limits administrative use to 14 days per year per restricted road. The IPNF, pursuant to the 2001 Biological Opinion, is required to limit administrative use to 57 vehicle round trips per

56

000061

active bear year per road, apportioned as follows: ≤19 round trips in spring (April 1 thru June 15); ≤23 round trips in summer (June 16 through September 15); and ≤15 round trips in fall (September 16 through November 15). Further, IPNF administrative use is defined as passenger vehicle access on a restricted road to conduct non-mechanized activities, such as planting, regeneration surveys, timber sale layout, etc.

Private forest management activities occur within the CYRZ. Plum Creek Timber Company and Forest Capital, Inc. are the primary private forest managers in the CYRZ. Activities on Plum Creek lands that are solely on Plum Creek, but occur within MS-1 habitat, are conducted according to Plum Creek grizzly bear habitat standards which involve a linear open road density standard of 1 mi/mi$^2$, maintenance of cover for bears, and protection of seasonal habitats (USFWS 2003).

Areas of resident grizzly bears occupancy outside of but adjacent to the CYRZ are depicted in Figure 3. The size (in square miles) of these areas, and their status relative to linear open and total road densities are described in Table 11.

Table 11: Grizzly Bear Occupancy Areas adjacent to the CYRZ; size and road density status (Forest Service 2002a).

| Area | Size (mi$^2$) | Linear Total Road Density Across All Ownerships (mi/mi$^2$) | Linear Total Road Density on National Forest Lands Only (mi/mi$^2$) | Linear Open Road Density Across All Ownerships (mi/mi$^2$) | Linear Open Road Density on National Forest Lands Only (mi/mi$^2$) |
|---|---|---|---|---|---|
| Troy | 68 | 4.7 | 2.6 | 4.6 | 1.2 |
| Clark Fork | 442 | 2.6 | 2.6 | 1.3 | 0.9 |
| Cabinet Face | 150 | 4.7 | 3.9 | 3.2 | 2.2 |
| West Kootenai | 326 | 3.3 | 3.0 | 1.7 | 1.3 |
| Tobacco | 802 | 3.9 | 3.3 | 3.0 | 1.8 |
| Libby[1] | 290 | 4.1 | 3.4 | 1.5 | 1.9 |
| Fisher | 559 | 3.9 | 2.7 | 3.3 | 1.0 |
| Deer Ridge | 64 | 4.6 | 4.2 | 2.3 | 1.6 |

[1]Libby and Fisher Areas are outside the projected grizzly distribution area in the short term, but are included in this analysis to complete the process for lands associated with the CYRZ, per verbal agreement with the Service (September 26, 2002).

Similar to the IPNF, outside of the Recovery Zones, the LRMPs for KNF and LNF do not specifically require management for grizzly bears or their habitat. However, as with the IPNF's LRMP, the KNF and LNF LRMPs contain standards pertaining to the management of other species and their habitats (such as elk, and sensitive and indicator species) which are beneficial

000062

to grizzly bears. Some of these standards control the type and intensity of activities, including road management, that may occur within these species habitats.

Existing Management Direction:

Pertinent elements of the IPNF LRMP that may provide benefits for grizzly bears and their habitat outside of the Cabinet-Yaak Recovery Zone were previously described. The following goals, objectives, and standards, currently contained in the KNF and LNF LRMPs (Forest Service 2002a), may provide some benefits to grizzly bears and their habitat within these areas of mapped grizzly bear residency outside of the this recovery zone:

Kootenai National Forest

- The goals and objectives of the LRMP set the framework for minimizing take:

  - Maintain diverse age classes of vegetation for viable populations of all existing native, vertebrate wildlife species (FP p. II-1 #7) (provides habitat diversity needed by grizzly).
  - Protect the wilderness character of designated and recommended wilderness (FP p II-2 # 10) (provides security habitat).
  - Maintain a natural appearing landscape adjacent to major travel corridors, around local communities, and around popular destinations such as campgrounds (FP p. II-2 #14) (provides connectivity for movement).
  - Attempt to stop the spread and suppress the existing levels of noxious weeds through land management and weed suppression activities. (Maintains and restores native bear foods).
  - Grazing management will insure protection of soil and water resources and riparian areas (FP- II-7, Range) (protects potential grizzly use areas – riparian).

- Specific management standards and guidelines in place to achieve the forest goals:

  - Riparian Area standards (FP II pp. 30-33): In addition to the LRMP standards, the Kootenai amended the FP (1995) to incorporate the "INFISH" guidelines that increased protection of riparian habitat.
  - MA 2, 6-9, 13, 18-21, 24, 29 and 30- Livestock grazing is not permitted. This is more than half the MAs on the Forest. MA 5 allows only recreational pack stock. MA 13 allows grazing but, due to limited available forage, use is not anticipated.
  - MA 14- Grazing opportunities for domestic livestock will be available unless there is a site-specific conflict with grizzly bear management…
  - MA 3- Fencing for domestic livestock control may be allowed to prevent overuse in an area, eliminate competition for forage, or reduce conflicts with grizzly management" (FP p. III-9 – Range #3).

58

- MA 10-12, and 15-17 - Fencing may be constructed to control livestock unless it interferes with the natural movement patterns of wildlife.
- MA 12 and 14 - Establishes an open road density standard of 0.75 miles/sq.mile
- MA 15 - 18 - Establishes an open road density standard of 3.0 miles/sq.mile
- KNF plan standards and guidelines provide quality big game habitat conditions (including cover/forage ratio requirements, opening size limitations, maintaining movement corridors between openings) and hunting season security by using seasonal road closures.
- MA 23 - Any activity in the MA will be required to leave no trash or other grizzly attractant.

▶ Off-highway vehicle restrictions (Jan. 2001) – limits OHV use to designated routes or areas. Prohibits motorized cross-country travel on the remainder of the Forest.

Lolo National Forest

▶ Forest wide standard: Motorized vehicles will be limited to system roads and trails which are designated open in the Lolo Forest Travel Plan. (p. II-17 #48)
▶ Roads will be the minimum number and meet the minimum design standards possible while still meeting safety, user, and resource needs. (p. II-17 #49)
▶ Manage Forest roads to provide for resource protection, wildlife needs, commodity removal, and a wide range of recreation opportunities. In most areas on the forest, this will involve closing some roads seasonally, and closing other roads on a permanent basis. (p. II-18 # 52)
▶ Plan (p. II-18 # 52-c) sets an open road density standard of 1.1 miles per square mile on highly productive big game summer range. All new roads, except arterials, will be closed year-round. In addition new roads will be closed to the public year-round in areas of moderate big game summer range.
▶ Plan (p. II-19 #52-d) in areas with high potential for walk-in hunting or fishing experiences will consider road closures. Open road density during the hunting season will remain the same as that now existing. (1984 Travel Plan)
▶ MA 20 - Road densities will be minimized using maximum spacing whenever possible. (p. III-97 2-a)
▶ MA 20a - Existing roads will be managed to minimize human-caused grizzly bear mortality. (p. III-101 C-5)
▶ MA 18 - 19, and 26 - Road densities will be minimized...

Other Factors:

The CYRZ is long and narrow (see Figure 2). An area of predominantly private land of mixed ownerships, approximately 22 miles long and up to 5 miles wide, occurs near the middle of the recovery zone. It includes the town site of Troy, Montana, the Kootenai River corridor just east and west of Troy, and the private lands along the Highway 56 corridor. With the exception of

000064

the town of Troy, which is not included within the boundaries of the CRYZ, this area is classified as MS-3 habitat, or habitat with permanent human developments where grizzly bear use is discouraged. In the event of human-bear conflicts, the conflicts are resolved in favor of humans. This area encompasses primarily low elevation spring habitat rendered mostly unsuitable for grizzly bears as a result of the high density of people. As grizzly bear numbers slowly increase in the ecosystem, the area presents a higher risk of grizzly bear mortality due to potential human-bear conflicts. Risks to grizzly bears increase as concentrations of residences, roads, unsecured human-food attractants such as garbage cans, dumpsters, and pet foods, hunting and other recreation increase in and around this area. It also presents an area that likely displaces some bears, particularly some females and females with cubs, away from low-elevation habitat that might be important for their continued survival and development.

The Highway 2 corridor runs east-west across the CYRZ, and includes a major state highway, railroad, the Kootenai River, and private land development and roads. The corridor bisects the ecosystem between the Yaak and Cabinet Mountains portions. Although the impacts of this corridor on grizzly bear movements within the CYRZ have not specifically been investigated, the Service has no information documenting movement of grizzly bears between the Yaak and Cabinet Mountains. The Highway 2 corridor could be or may eventually become a significant barrier to grizzly bear movement between the Yaak and Cabinet Mountains. A total barrier to movement would present a substantive impediment to grizzly bear recovery in the CYRZ, affecting the distribution and demographic and genetic health of CYRZ grizzly bears. Impacts would especially affect those grizzly bears in the Cabinet Mountains, as connectivity with grizzly bear populations in Canada would essentially be severed. Further, the small number of grizzly bears in the Cabinet Mountains amplifies the demographic and genetic concerns related to such a barrier.

The Genesis Troy copper/silver mine occurs in BMU 3. The mine has been in operation for over 20 years and affects approximately 50 acres of disturbed area at the mine site on national forest system lands and an additional 400 acres of private lands (USFWS 2003). The mine is currently shut down due to market conditions. Ongoing maintenance, primarily pumping water from the underground cavities, continues with a skeleton crew, and roads will remain gated. Approximately 4 years of additional operation is possible on this ore body (USFWS 2003). The Sterling Mining Company owns the Troy Mine, and intends to complete the unit while the permitting, evaluation adits and development adits are completed at the Rock Creek Mine. Impacts from current activities at the Troy mine are not known to substantially impact bears in the southern portion of the CYRZ. Impacts during additional operation would primarily be associated with additional workers living in the area. However, most of these employees would also work at the Rock Creek Mine. A large ingress of people into the area associated with the Troy Mine in addition to that associated with the Rock Creek mine is not expected (USFWS 2003).

The Rock Creek copper/silver mine would be located in the southern Cabinet Mountains in BMUs 4, 5, and 6. The mine's permit boundary would encompass 1,560 acres; 483 acres would

000065

be directly impacted by mining activity, including 3.5 miles of road construction and 5.4 miles of road reconstruction; 1,078 acres would remain undisturbed. Of the 483 acres directly impacted by mining activity, 323 acres are national forest and 160 acres are privately owned. However, due to the level of activity around the mine facilities, grizzly bears could be displaced from at least another 6,420 acres surrounding the mine site (USFWS 2003). The number of people employed by the mine could range between 450 to 770 employees during the various phases of the project from construction to operation. Construction and operation of the mine could increase mortality risk to grizzly bears, and further exacerbate existing fragmentation problems within the CYRZ. However, the owners of the mine have agreed to incorporate measures to mitigate or reduce potential impacts associated with mine construction and operation. Additionally, the Service has issued a biological opinion and incidental take statement with accompanying reasonable and prudent measures and terms and conditions to further reduce the effects of the proposed mine upon grizzly bears and/or their habitat (USFWS 2003).

Several patented mining claims occur along the borders of the Cabinet Mountains Wilderness. Large scale mineral development is unlikely on many of these small patents (USFWS 2003) due to their size and the nature of the mineral deposits. However, as patented (private) land inholdings, these scattered small parcels increase the risk of adverse grizzly bear-human interactions due to increased potential for contact with people, food and other attractants. The Forest is required to provide reasonable access under current laws and regulations and can influence access across national forest system lands, but has no jurisdiction over activity on private lands. Potential uses of these private lands include timber harvest, residences, cabins or other facilities, and hunting camps. All properties can legally be accessed by foot or horseback, and some have motorized access rights.

Major projects that have affected grizzly bears in the CYRZ include the Bull Lake Estates Subdivision Project in BMU 3 (Subdivision Project), and the Idaho Transportation Department's (ITD) Junction State Highway-1, Northeast Boundary County Project (ITD Highway Project). Regarding the Subdivision Project, the Forest requested consultation on issuance of an access permit across national forest system lands. The Service issued a biological opinion and an incidental take statement on the Subdivision Project in 2000 (USFWS 2000b). The ITD Highway Project is located in eastern Idaho, between the Yaak portion of the CYRZ and the Selkirks ecosystem (USFWS 2002a). The project will upgrade 16 miles of roadway on United States Highway 95 from the State Highway 1 junction to the Canadian border in Boundary County, Idaho. The purpose of this project is to upgrade the roadway to current engineering and safety standards, increase public safety, replace deteriorating bridges across the Moyie River, and accommodate increasing commercial traffic flow. Design features include wildlife crossing structures. The Service issued a biological opinion and an incidental take statement on the ITD Highway Project in 2002. (USFWS 2002a).

000066

Northern Continental Divide Ecosystem

Although the Forests' proposed Amendment will affect access within the SRZ and CYRZ only, because we are reinitiating consultation on the Forests' LRMPs, and the KNF's and LNF's forest boundaries extend into the NCDE, the status of grizzly bears within the portion of the NCDE administered within the boundaries of these two forests is pertinent to establishing the status of grizzly bears for this action. However, because the KNF and LNF only manage a very small portion of the NCDE, a detailed discussion of the status of the entire NCDE is not required for this biological opinion, and therefore, the status of only those BMUs managed by these forests within the NCDE will be discussed.

Similar to the SRZ and CYRZ, the NCDE established BMUs to facilitate the management of grizzly bears and their habitat. The KNF administers two BMUs and the LNF administers seven BMUs within the NCDE (Table 12). Pursuant to the Service's 1995 biological opinion to the KNF, and the Service's 1996 biological opinion to the LNF, these forests are required to manage for the following parameters within BMUs of the NCDE: 1) no more than 19 percent of a BMU subunit will have an open road density exceeding 1 mi/mi$^2$; 2) no more than 19 percent of a BMU subunit will have a total road density exceeding 2 mi/mi$^2$; and 3) a minimum of 68 percent of each BMU subunit will contain core habitat. Currently, 67 percent (6 of the 9 BMU subunits managed by either the KNF or LNF) of the BMU subunits have less than 19 percent of the BMU subunit exceeding 1 mi/mi$^2$ of open road density, 55 (5 of the 9 BMU subunits managed by either the KNF or LNF) percent of the BMU subunits have less than 19 percent of the BMU

Table 12: 2002 status of NCDE BMUs managed by the KNF and LNF relative to open roads, total roads, and core habitat (Forest Service 2002a).

| BMU | Percent with Open Roads >1 mi./sq.mi. | Percent with Total Roads >2 mi./sq.mi. | Percent Core Habitat |
|---|---|---|---|
| NC-1A[1] | 22 | 5 | 72 |
| NC-1B[1] | 18 | 8 | 72 |
| Rattlesnake[2] | 5 | 14 | 75 |
| Mission[2,3] | 22 | 59 | ?? |
| Swan[2] | 32 | 28 | 50 |
| Mor-Dun[2] | 15 | 21 | 68 |
| Monture[2] | 4 | 4 | 91 |
| North Scape[2] | 0 | 0 | 100 |
| South Scape[2] | 7 | 15 | 71 |

[1]Managed by the KNF;  [2]Managed by the LNF;

[3]Mission BMU is mostly Plum Creek Ownership and managed under a "no net loss rule".

subunit exceeding 2 mi/mi$^2$ total road density, and 100 percent (all 9 of the BMU subunits managed by either the KNF or LNF) of the BMU subunits primarily under federal management contain at least 68 percent core habitat (excluding the Mission BMU, which is owned primarily by Plum Creek and managed under a "no net loss rule") (Table 12).

In 1993 the Service determined that reclassification of the Cabinet-Yaak grizzly bear population from threatened to endangered was warranted but precluded by work on higher priority species (USDI 1993). The finding was based on the small size of the population, and increasing human demands related to logging, recreation, and road building. The 1993 finding was reaffirmed in the Service's 1999 finding (USDI 1999a), which determined that many of the same factors that were adversely affecting this population in 1993 were still affecting it in 1999. Specifically, the 1999 finding determined that the following factors are affecting the status of this population: habitat alteration and human intrusion into grizzly bear habitat; small population size and potential isolation from Canada; and cumulative effects related to recreation, timber harvest, mining, and road construction. The only Recovery Plan goal that was met in 2002 was total human-caused mortality. The Recovery Plan goal for female grizzly bear human-caused mortality has not been met since 1999. At least one human-caused female grizzly bear mortality has been documented each year since 1999; two human-caused female grizzly bear mortalities were documented in 2001. Moreover, even though annual population trend modeling has been statistically inconclusive, due to recent grizzly bear mortalities in the CYRZ, grizzly bear familiar are concerned with the status of this population due to the recent grizzly bear mortalities. Additionally, while past and ongoing habitat management efforts have resulted in improved habitat conditions, a substantial number of the BMUs within the CYRZ have unacceptably high road densities and insufficient core habitat. The recent grizzly bear mortalities, combined with the existing habitat conditions, demonstrates a continuing need for improved protection of grizzly bears and their habitat within this ecosystem.

### B.    Canada lynx

In the contiguous United States, the distribution of lynx is associated with the boreal, sub-boreal, and western montane forests, and is nearly coincident with that of snowshoe hares. Within the action area in northwestern Montana, northern Idaho, and northeastern Washington these forests are generally represented by Engelmann spruce (*Picea engelmanii*) and subalpine fir (*Abies lasiocarpa*) forests between 4,000 - 7000 feet in elevation. In extreme northwestern Idaho, western red cedar (*Thuja plicata*) and western hemlock (*Tsuga heterophylla*) forests extending down to 3,000 feet elevation in the Priest Lake Subbasin, and portions of the Kootenai and Pend Oreille Subbasins. Cover types within these forests may be mixed species composition [Engelmann spruce, subalpine fir, western red cedar, western hemlock, Douglas-fir (*Pseudotsuga menziesii*), grand fir (*Abies grandis*), western larch (*Larch occidentalis*), lodgepole pine (*Pinus contorta*), and hardwoods]. In the subalpine fir forests of eastern Washington lodgepole pine (*Pinus contorta*) is a major seral species. Also, similar to extreme northwestern Idaho, the cedar/hemlock habitat types comprise lynx habitat in the Selkirk Mountains of extreme northeastern Washington. Throughout all these areas (northwestern Montana, northern Idaho,

000068

available habitat types with riffle habitat making up the remainder. Road density is high at 2.9 mi/mi$^2$ and the ECA is moderate at 12 percent. Sediment ratios were unavailable; however, the Forest Service determined that sediment indicators were FA and not a limiting factor (meeting notes April 1-2, 2003).

Kalispell Creek also has a high road density level of 3.5 mi/mi$^2$ and a moderate ECA of 11 percent. A habitat survey in 2002 found no signs of mass-wasting areas or failed culverts. Additionally, the survey determined that the overall dominant substrate was gravel. Fish habitat was "good" and unidentified fish were observed in the middle portion of. Fish surveys failed to find any bull trout in Kalispell Creek but did find brook trout. (Weidich 2002, meeting notes April 1-2, 2003).

Bull trout presence in this watershed is known to occur due to limited bull trout migration from the UPL (Fredericks et al. 2000). Due to lack of sufficient surveys within the tributaries and the lake itself, coupled with an anticipated very low level of bull trout, population dynamics are difficult to develop. More information is necessary for this watershed to adequately characterize the bull trout status.

## IV.    Effects of the action

Under section 7(a)(2) of the Act, "effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, with the effects of other activities interrelated or interdependent with that action. Indirect effects are those caused by the proposed action and are later in time, but still are reasonably certain to occur (50 CFR 402.02). The effects of the action are added to the environmental baseline to determine the future baseline and to form the basis for the determination in this opinion. Should the Federal action result in a jeopardy situation and/or adverse modification conclusion, the Service may propose reasonable and prudent alternatives that the Federal agency can take to avoid violation of section 7(a)(2). The impacts discussed below are the result of direct and indirect impacts of implementing the proposed project.

### A.    Grizzly Bear

As previously referenced, the effect of roads upon grizzly bear behavior and habitat use has been well documented in the scientific literature. Several authors have documented grizzly bear avoidance of roads and the resulting displacement from adjacent habitat (Aune and Stivers 1985, McLellan and Mace 1985, Kasworm and Manley 1988, McLellan and Shackleton 1988, Aune and Kasworm 1989, Frederick 1991, and Wakkinen and Kasworm 1997). Research indicates that grizzly bears tend to avoid closed roads as well as open roads (Mace et al. 1999, Mace et al. 1996, and Mace and Manley 1993, Wakkinen and Kasworm 1997). Mace and Manley (1993) documented displacement of grizzly bears from closed roads, and found that grizzly bear use of areas declined as total road densities (open and closed roads) exceeded 2 mi/mi$^2$ and open road densities exceeded 1 mi/mi$^2$. Mace et al. (1996) found that grizzly bears are able to utilize roaded habitats, but that spatial avoidance increases and survival decreases as traffic levels and road densities increase. Wakkinen and Kasworm (1997) found that areas with total road

100

densities greater than 2 mi/mi$^2$ and/or open road densities greater than 1 mi/mi$^2$ were used less than expected (avoided) by grizzly bears. A number of studies have indicated that female grizzlies with cubs tend to avoid roads (Mace et al. 1996, and Zager 1980 In: USFWS 1993). The occurrence of roads and the associated human disturbance within high quality bear habitats can also influence indirect mortality risk by disrupting efficient foraging strategies resulting in nutritional stress, restricting reproduction and dispersal, and potentially reducing carrying capacity (Mattson et al. 1987 In: Frederick 1991, and Aune and Stivers 1985 In: Frederick 1991). Nutritional demands of female bears with cubs is triple that of other bears, making their access to nutritional food sources and uninterrupted feeding essential during spring and fall (Jonkel 1982 In: Frederick 1991).

The current LRMPs for each of the Forests do not specifically require the Forests to manage for core habitat, or open or total motorized route densities within individual BMUs of the SRZ and CYRZ. However, pursuant to the aforementioned biological opinions issued to each of the Forests, the Forests manage for grizzly bear habitat parameters, which were identified through research conducted within these Ecosystems pursuant to IGBC direction. Based on this research, thresholds (standards) for core habitat, and open and total motorized route densities were established. Within individual BMUs with ≥75 percent federal ownership, the Forests are to: 1) attain 55 percent core habitat; 2) have ≤ 33 percent of each BMU with open motorized route densities exceeding 1 mi/mi$^2$; and 3) have ≤ 26 percent of each BMU with total motorized route densities exceeding 2 mi/mi$^2$. These standards are to be applied and achieved universally throughout each Recovery Zone within each individual BMU. However, with current land ownership constraints (e.g., quantity of nonfederal land base within each BMU, and public, county, and private roads) within some BMUs of these Ecosystems, achieving one, some, or all of the universally applied standards within each individual BMU is not pragmatically possible. Also, some BMUs that are comprised of a mix of nonfederal and federal ownerships currently exceed (are better than) the standards. But absent an independent long-term management agreement with the nonfederal landowners, maintaining the current levels of core habitat, and densities of open and total motorized routes solely on federal land within the BMUs would be impossible.

Given the reality of these constraints, the Forests, in conjunction with grizzly bear researchers familiar with each Ecosystem and the Service, analyzed the inherent capability for individual BMUs to achieve or maintain maximum levels of core habitat, and the lowest open and total motorized route densities. Constraints accounted and deducted for, as they were considered to affect an individual BMUs ability to achieve specific levels of core habitat, and total and open motorized route densities included: 1) non-federal land, including corporate timber land, and private land contained within towns and municipalities; 2) public, county, and private roads; 3) some forest roads that function as "through" roads, and therefore, could not be closed without significantly increasing public travel distances between destination points, and popular recreational destinations; and 4) historically and culturally popular recreational destinations (e.g., campgrounds, concentrated fishing locations, etc.) with high human use.

101

Pursuant to IGBC recommendation, all Forests containing lands within ecosystems with grizzly bear populations classified their lands into management situations (IGBC 1987). Management situation designations are intended to distinguish areas where differing grizzly bear habitat and human use conditions occur and define appropriate management strategies for each. Many of the above identified constraints are located within areas identified as Management Situation (MS)-3. The guidelines for MS-1, MS-2, and MS-3 are as follows (from IGBC Guidelines):

1.    The MS-1 lands are those that contain grizzly population centers and/or habitat that is needed for the survival and recovery of the species. In those areas, the needs of the grizzly bear will be given priority over other management considerations. Land uses which can affect grizzly bears and/or their habitat will be made compatible with grizzly bear needs, or such uses will be disallowed or eliminated. Grizzly bear/human conflicts will be resolved in favor of grizzly bears unless the bear involved is determined to be a nuisance.

2.    The MS-2 lands are those areas that lack distinct grizzly population centers. Highly suitable habitat generally does not occur, but grizzly bears may occasionally be present, and the need for this habitat for survival of the grizzly bear is more uncertain. The status of such areas is subject to review. Management will at least maintain those habitat conditions that resulted in the area being classified as MS-2.

3.    The MS-3 lands are where grizzly bears may occur infrequently, and human developments such as campgrounds or resorts may result in conditions that make grizzly bear presence untenable for humans and/or grizzly bears. Management focus is on human-bear conflict minimization rather than habitat maintenance and protection, and grizzly bear presence will be actively discouraged.

Additionally, to allow the Forest Service greater flexibility to implement vegetation management activities within the Recovery Zones, some BMUs that currently have ≥55 percent core habitat are proposed for establishment of core habitat standards lower (percentage quantity) than the existing conditions within those BMUs, after deducting for the above discussed constraints. Vegetation management activities consisting of silvicultural prescriptions (commercial timber harvests, commercial and non-commercial thinning, etc.) that open up the forest canopy and/or understory can be beneficial to grizzly bears by improving foraging opportunities through increasing the distribution and quantity of berry-producing shrubs. The additional flexibility and proposed decreases in core habitat are based on the degree to which an individual BMU currently exceeds 55 percent core habitat, but range between 1 to 7 percent. The proposed decrease would also not result in any BMU, currently exceeding 55 percent core habitat, having a core habitat standard established at less than 55 percent.

The Forests also propose to implement a standard requiring core habitat to remain or be fixed in place for at least 10 years. This requirement is based on the premise that it takes about 10 years for a female grizzly bear to replace herself (i.e., generation time). Assuming a female grizzly

102

000107

bear initially breeds at approximately 4.5 years of age, and produces litters with a 50:50 sex ratio with 50 percent survival of young, she would be able to produce 2 litters in a 10 year period with one female surviving to reproductive age (USFWS 1993). Additionally, maintaining undisturbed and secure habitat in place for this length of time provides an area of known security to grizzly bears, which they can utilize for foraging, breeding, and sheltering, should activities within other areas of their home range disrupt their normal activities. Disruption of normal grizzly bear behavior can result in displacement of grizzly bears from preferred habitat, such as wet low elevation meadows in the spring. Providing areas that grizzly bears are familiar with and can rely on to be free of disturbance minimizes the effects of displacement from other areas of their home range that may occur as a result of human activities.

It is important that core areas contain all seasonal habitats to the extent possible and available within each BMU. Within the Recovery Zones, even though rigorous seasonal habitat analysis has not been completed, it is generally believed that spring habitats are not as abundant or widely distributed and available to grizzly bears as are habitats providing summer and fall foraging opportunities. For this reason, it is particularly important to ensure that spring habitats are, to the extent possible, proportionally represented within core areas. Unfortunately, while spring habitats are distributed throughout the Recovery Zones, they generally occur in low-lying valley areas within proximity to human developments and activities. Consequently, spring habitats are often unavailable to grizzly bears and, thus are generally not currently well represented proportionally within core habitat areas.

Currently, 14 of 22 BMUs (64 percent) within the CYRZ contain ≥55 percent core habitat. Core habitat within the CYRZ overall currently equates to about 932,343 acres (56 percent) (Table 10). The proposed Amendment will eventually result in 20 of 22 (91 percent) BMUs with ≥55 percent core habitat, increasing core habitat overall within the CYRZ by 11,170 acres to 943, 513 acres (57 percent of the CYRZ in core habitat). Within the SRZ, currently 5 of 10 BMUs (50 percent) contain ≥55 percent core habitat, and core habitat overall within the SRZ currently equates to 326,930 acres (64 percent) (Table 5). The proposed Amendment will eventually result in 7 of 10 BMUs (70 percent) with ≥55 percent core habitat, increasing core habitat overall within the SRZ by 1,184 acres to 328,114 acres (64 percent of the SRZ in core habitat).

As identified previously, the intent of this strategy, and hence the Forests' proposed Amendment, is to identify and establish the highest reasonable grizzly bear habitat standards for management within each individual BMU, while providing the Forests some flexibility for vegetation management. Also, as noted previously, this amendment does not identify specific roads to close to achieve these standards. Therefore, to establish the amount of core habitat achievable in each individual BMU, the Forests ran various scenarios using the constraints identified above to estimate the potential for achieving core habitat within each individual BMU. Thus, the proposed standards for core habitat were based on these "what if" scenarios. However, subsequent to publishing the FEIS, and pursuant to additional review and discussions between the Service and the KNF, the KNF ran additional scenarios taking into consideration the intent of

000108

Alternative E of the FEIS (the Forests preferred alternative and the action under consultation) and recent land management changes in BMUs 3, 5, 10, and 13.

The Forest's proposed standard for core habitat in BMU 3 is 55 percent. Currently, BMU 3 is at 62 percent core habitat (Table 10). The KNF agreed that all necessary management flexibility could be provided by establishing the core habitat standard for BMU 3 at 59 percent. The proposed standard for core habitat in BMU 5 is 58 percent. Currently, BMU 5 is at 63 percent core habitat (Table 10). The KNF agreed that all necessary management flexibility could be provided by establishing the core habitat standard for BMU 5 at 60 percent. The proposed standard for core habitat in BMU 13 is 55 percent. Currently, BMU 13 is at 62 percent core habitat (Table 10). The KNF and IPNF agreed that all necessary management flexibility could be provided by establishing the core habitat standard for BMU 13 at 60 percent.

Relative to BMU 10, currently core habitat is at 49 percent, but the proposed standard is 48 percent. Pursuant to the scenarios, the KNF determined that the maximum core habitat that could be achieved in this BMU was 48 percent. However, due to recent land management changes within the BMU, core habitat has been raised to 49 percent. Additionally, new scenarios indicate that a maximum of 54 percent core habitat can be achieved in this BMU. Thus, the KNF proposes to establish core habitat at 51 percent in this BMU, providing the Forest with approximately 3 percent management flexibility. However, the Service advised the KNF that, given the importance of this BMU at maintaining connectivity between the Yaak (northern portion of the CYRZ) and the Cabinets (southern portion of the CYRZ), and the fact that it may not be able to achieve the quantity of core habitat required to support the average female grizzly bear, we believe that the KNF's management flexibility should be limited to the lower portion of the range at 2 percent. Additionally, because this BMU has 95 percent federal ownership, establishing core habitat at 52 percent should allow the KNF to create additional opportunities for flexibility if necessary. Thus, the minimum core habitat standard for BMU 10 would be established at 52 percent. However, as long as this BMU remains below 55 percent core habitat, its functional effectiveness with regard to providing all seasonal habitat components and habitat security for grizzly bears will be compromised.

Through these modifications to the proposed Amendment, the number of BMUs within the CYRZ eventually containing ≥55 percent core habitat will not increase over that which was proposed in Alternative E of the FEIS (i.e., 20 of 22 BMUs). However, overall the amount of core habitat within the CYRZ will be increased to 954,854 acres (58 percent of the CYRZ in core habitat).

The Amendment also addresses the rather unique situation in two BMUs (Grouse and Lakeshore), and proposes to establish core habitat standards, on federal land only, below 55 percent. The Grouse BMU, within the CYRZ, is managed by the IPNF and currently has approximately 32 percent core habitat. However, the BMU is only comprised of about 54 percent federal ownership; the other majority landowners are IDL and Forest Capital. Therefore, it would be impossible for the IPNF to achieve 55 percent core on its ownership

104

000109

alone. Accounting for the constraints identified earlier, the IPNF estimated that the maximum core habitat that could be achieved in this BMU on federal lands only was 39 percent. However, this would give the IPNF no flexibility to implement vegetation management activities within the BMU. Thus, the decision was made to establish the standard at 37 percent core habitat, providing the IPNF reasonable flexibility to conduct vegetation management activities, if necessary. Similar to BMU #10 on the KNF, the functional effectiveness of the Grouse BMU will continue to be compromised as long as it remains below 55 percent core habitat.

The Lakeshore BMU, within the SRZ, is also managed by the IPNF. As previously discussed, this BMU is extremely small (approximately 30 mi$^2$ and has only 86 percent federal ownership). Due to these factors, the Service recognizes that the full range of management opportunities provided by other BMUs of larger size is not available within this BMU, and that achieving 55 percent core habitat would be very difficult, if not impossible. While the Lakeshore BMU was established primarily to provide a buffer between high human use areas along Priest Lake and adjacent BMUs to the west (primarily the Kalispell-Granite BMU), it contains very important seasonal grizzly bear habitats, such as wet meadows (e.g., the 900 acre Bismark Meadows), riparian stream bottoms, blue huckleberry (*Vaccinium globulare*) and big huckleberry (*Vaccinium membranaceum*) shrubfields, and graminoid parks. Therefore, it is an important part of the SRZ. Relative to the Bismark Meadows area, grizzly bears are routinely documented using this area for foraging annually each spring from May through July. The area also provides summer and fall foraging opportunities for grizzly bears. Given the small size of this BMU and the important grizzly bear habitat it contains, the Service has recommended that its boundaries be realigned in the future with other BMUs to achieve a BMU that more closely approximates the average home range of female grizzly bears in the SRZ (i.e., approximately 100 mi$^2$).

The Recovery Plan established BMUs to, among other things, provide for grizzly bear population expansion and adequate grizzly bear distribution throughout these Recovery Zones. Adequate distribution of grizzly bears, especially family groups, throughout the Recovery Zones is an indicator of the quality and effectiveness of habitat, and is important for the stability and recovery of grizzly bears. Adequately distributed reproductive females are important due to the tendency of female offspring to occupy habitat within or near their mother's homerange. Therefore, any permanent losses of core habitat within individual BMUs of the SRZ and CYRZ may compromise these Recovery Zones' overall ability to support an expanding, adequately distributed grizzly bear population.

The proposed Amendment would allow some decreases in core habitat over existing conditions within some BMUs that currently contain greater than 55 percent core habitat. Research conducted by Wakkinen and Kasworm (1997) indicated that the average adult female grizzly bear's home range was comprised of 55 percent core habitat. However, as noted previously, this research is based on a very limited data set, incorporated habitat use of a subadult female grizzly bear, and one of the research females was killed immediately following the study period. Additionally, several BMUs within the SRZ (IDL, LeClerc, Lakeshore) and the CYRZ (Grouse, #10) may never achieve 55 percent core habitat. The IDL area is managed entirely by the IDL

000110

(approximately 8 percent of the SRZ), which, other than the prohibitions against causing incidental take of grizzly bears, currently has no legal requirements to manage for core habitat. The LeClerc BMU, managed by the CNF, contains less than 75 percent federal ownership, and is managed pursuant to a Conservation Agreement between the Service, Stimson Lumber Company, and the CNF (USFWS 2001c). The Conservation Agreement does not require the attainment of 55 percent core habitat within the LeClerc BMU. Similar to the Lakeshore and Grouse BMUs, described previously, achieving 55 percent core habitat within these BMUs would be extremely difficult. Therefore, due to the limitations of the research data, and because several BMUs may never achieve the minimum habitat conditions suggested by the research as necessary to support the average female grizzly bear's home range within these ecosystems, any permanent losses of core habitat within any BMU may have serious ramifications on the ultimate recovery of the grizzly bear populations within the Recovery Zones. However, it is reasonable to allow the Forests some flexibility to implement vegetation management activities through temporary and peripheral incursions into grizzly bear core habitat. Such temporary incursions are reasonable, provided they do not reduce core habitat below the established standards, and occur only once per 10-year time-frame per each individual BMU.

The proposed Amendment (including the changes discussed above for BMUs 3, 5, 10, and 13) will result in minor overall increases in core habitat within these Recovery Zones. Overall the quantity of core habitat within each of the Recovery Zones will eventually equate to approximately 58 percent in the CYRZ and 64 percent in the SRZ. However, not all BMUs within these Recovery Zones will individually achieve or provide 55 percent core grizzly bear habitat. Adequate quantities of core habitat located within and distributed amongst each BMU is essential to ensure the ability of family groups to fully occupy and be distributed throughout each Recovery Zone.

A similar assessment as that discussed above for core habitat was conducted for open and total motorized route densities within individual BMUs. Currently, within the CYRZ, 7 of 22 BMUs (32 percent) have open motorized route densities exceeding 1 mi/mi$^2$ in greater than 33 percent of the BMU, and 10 of 22 BMUs (45 percent) have total motorized route densities exceeding 2 miles/mi$^2$ in greater than 26 percent of the BMU (Table 10). Under the proposed Amendment, the number of BMUs exceeding 33 percent of the BMU with an open motorized route density > 1 mi/mi$^2$ will not change (i.e., 7 of 22 BMUs), while the number of BMUs exceeding 26 percent of the BMU with a total motorized route density >2 mi/mi$^2$ will decrease to 6 of 22 BMUs (27 percent) (Table 10).

A total of nine different BMUs will not meet either the OMRD and/or TMRD that research has suggested is acceptable (i.e., ≤ 33 percent of the BMU with an OMRD exceeding 1 mi/mi$^2$, ≤ 26 percent of the BMU with a TMRD exceeding 2 mi/mi$^2$) (Wakkinen and Kasworm 1997). However, 7 of the 9 BMUs currently have or are proposed to achieve ≥ 55 percent core habitat. Three of the 9 BMUs currently contain substantially more than 55 percent core habitat. Maintenance of good quality core grizzly bear habitat within these BMUs helps to ameliorate the relatively high OMRD and TMRD that may continue impacting the habitat conditions and

106

000111

grizzly bears within these BMUs. One of the BMUs that will not meet either the OMRD or TMRD research numbers is the Grouse BMU. Conditions within the Grouse BMU, which make it extremely difficult to manage for grizzly bear habitat, have been previously described.

Two BMUs (North Lightening and Scotchman) in the CYRZ are proposed for an open road density standard allowing up to 35 percent of the BMU to exceed an open road density of $>1\,\mathrm{mi/mi}^2$, but the standard for total road density will be established at the research levels requiring less than 26 percent of the BMU to exceed total road densities of 2 mi/mi². Both these BMUs are on the southern periphery of the CYRZ and have large blocks of core habitat (greater than 60 percent of the BMUs) that is connected to core habitat in adjacent BMUs to the east. Also, with regard to the Scotchman BMU, most of the roads are located in the southern quarter of the BMU and are associated with non-federal lands. Thus, grizzly bears would most likely avoid the area of concentrated roads, and utilize the large blocks of core habitat during the course of their home range movements. Relative to the North Lightening BMU, the open road density is due primarily to two major public routes (North Lightening and Trestle Creek Roads) and the configuration and topography of the BMU, which requires a winding road course across the BMU. Similar to the Scotchman BMU, this BMU also has large blocks of core habitat that grizzly bears would most likely utilize during home range movements while minimizing potential encounters with humans. The Service believes the open road density standards within these BMUs would support a grizzly bear's home range needs, and are therefore, acceptable.

Currently within the SRZ, 2 of 10 BMUs (20 percent) have open motorized route densities exceeding 1 mi/mi² in greater than 33 of the BMU, and 4 of 10 BMUs (40 percent) have total road densities exceeding 2 mi/mi² in greater than 26 of the BMU (Table 5). The proposed Amendment will result in only the Lakeshore BMU exceeding the research-based open and total road densities (except for the LeClerc BMU which is not part of the Amendment). As discussed previously, due to its small size, achieving 33 percent and 26 percent open and total road densities, respectively, within the Lakeshore BMU may not be possible.

Similar to the discussions with the KNF regarding core habitat, the Service had discussions with the IPNF regarding the Amendment's proposed OMRD standard for the Blue-Grass BMU and the intent of Alternative E of the FEIS. The Forests' proposed OMRD standard for the Blue-Grass BMU is 33 percent. Currently the OMRD is at 27 percent (Table 5). Thus, subsequent to publishing the FEIS, and pursuant to additional review by the Service, the IPNF reanalyzed the open road density status within the Blue-Grass BMU. Upon reassessment, the Service and IPNF agreed to establish the OMRD standard for the Blue-Grass BMU at 31 percent (Martin, pers. comm. 2004).

Additionally, subsequent to publishing the FEIS, the IPNF obtained new information pertaining to the TMRD status within the Myrtle BMU. In the FEIS, based upon mapping information existing at the time, the extent of the BMU with TMRD exceeding 2 mi/mi² was thought to be 19 percent. Thus, to provide the IPNF with management flexibility, while maintaining the TMRD well below research thresholds, the standard was proposed to be established at 22 percent (Table

107

000112

1). However, based on data obtained from more recent and accurate mapping information, the extent of the BMU with the TMRD exceeding 2 mi/mi$^2$ is actually currently at 21 percent (Lyndaker, pers. comm. 2004). Therefore, the IPNF requested to establish the TMRD standard at 24 percent, retaining the same range of 3 percent management flexibility above existing conditions. The Service and IPNF agreed to establish the TMRD standard for the Myrtle BMU at 24 percent, providing the IPNF with 3 percent management flexibility above existing conditions, while maintaining TMRD levels below the research threshold of 26 percent (Martin, pers. Comm. 2004).

Several BMUs will require reductions in currently open and restricted roads to achieve the proposed standards for OMRD, TMRD, and core habitat. The proposed Amendment does not specify which roads within individual BMUs will be further restricted or closed to achieve the standards, and neither does it indicate by what method the roads will be restricted or closed. For example, under the current IGBC definition of core habitat, it is acceptable to have a road within core habitat, as long as access to the road is effectively prevented by a barrier, earthen berm, vegetation, etc. (IGBC 1998a). The IGBC guidelines do not require the hydrologic stabilization of a road upon closure. Consequently, several roads on the Forests have been either closed with earthen berms or barriers, or restricted with gates, and have now vegetated in. Thus, these roads are considered to provide core habitat for grizzly bears. However, the roads are not hydrologically stable (e.g., culverts have not been pulled and, thus, represent potential road failure and erosional points). Therefore, to prevent degradation of the watershed, the Forests may need to reaccess these roads within core habitat to put them into a hydrologically stable condition for long-term storage or decommission them entirely. This access, while important and necessary to prevent erosional impacts to watersheds, does represent a potential source of short term disturbance to grizzly bears in areas which they may have learned to rely on as secure and free of disturbance. Thus, re-entering closed roads in core habitat to perform hydrologic stabilization work on the road prism may reduce the ability of the area to function as core habitat for grizzly bears. As stated previously, secure areas free of disturbance are important for minimizing the potential effects of displacing grizzly bears from other portions of their home range/BMU that are impacted by human activities. Therefore, to provide functional core grizzly bear habitat and prevent the need for reaccess at a later date, roads should be hydrologically stabilized immediately upon closure.

In addition to controlling access into grizzly bear habitat, providing sufficient levels of effective grizzly bear habitat is an important element affecting grizzly bear protection and recovery. Currently, based on work conducted by Christensen and Madel (1982), within each individual BMU, the IPNF and KNF LRMP's require management for secure habitat (i.e., effective grizzly bear habitat) at 70 mi$^2$ and 70 percent, respectively. While the LNF's LRMP does not specifically require management for secure habitat, it does require management for displacement habitat (essentially defined in the LNF's LRMP as areas free of disturbance within BMUs in which grizzly bears can seek to avoid other areas within the BMUs impacted by human activities). Habitat effectiveness (security) is defined as the amount of secure grizzly bear habitat (habitat at least one quarter mile from open roads, developments, and high levels of

000113

human activity) remaining within BMUs after impacted areas are subtracted from the total habitat in the BMUs.

The proposed Amendment will not contain language specifically providing for or addressing grizzly bear habitat effectiveness in the Forests' individual LRMPs. In lieu of specific requirements for providing effective grizzly bear habitat, the Amendment proposes to establish standards addressing total and open motorized route densities. Motorized access routes are one of the factors affecting grizzly bear habitat security (probably one of the most important), and motorized access route management is, therefore, a very effective tool to achieve grizzly bear habitat security. Thus, establishing standards controlling the densities of open and total motorized routes within BMUs will contribute to providing effective grizzly bear habitat, partially off-setting the proposed Amendment's lack of specifically requiring management for effective grizzly bear habitat.

Other factors beyond motorized access management, such as mining, livestock grazing, logging, and recreation can affect the effectiveness of grizzly bear habitat as well. The Service's 1999 finding concluded that human intrusion into grizzly bear habitat is one of the factors contributing to the risk of grizzly bear extinction in the SRZ and CYRZ (USDI 1999a). Christensen and Madel (1982) determined that grizzly bears can be displaced from habitat impacted by high levels of human activity, such as mining, sustained helicopter flights, and high use recreational areas (i.e., campgrounds), and therefore, activities of this type must be considered when managing for effective grizzly bear habitat. A 1987 compendium of scientific research on grizzly bears documented that the bears avoid, and can be displaced from, areas impacted by point-source disturbances including, but not limited to, mining, hydrocarbon exploration and development, helicopter flights, and recreational developments and activity (IGBC 1987). Thus, without addressing and controlling the impacts of point source disturbances (e.g., mining, helicopter logging, etc.) within BMUs of these Recovery Zones, the proposed Amendment could allow the occurrence of adverse effects, and potentially take of grizzly bears to occur through displacement, and habitat loss and alteration.

As identified previously, grizzly bears currently occupy several areas outside of, but adjacent to the Recovery Zones within these Ecosystems (Figure 1), and the current Forests' LRMPs do not specifically require management for grizzly bears or their habitat that are located outside of the Recovery Zones. Additionally, the Forests' proposed Amendment only addresses grizzly bear habitat access management within the Recovery Zones. This is primarily due to the fact that when the Forests began the process of re-assessing grizzly bear management within the Recovery Zones, they were unaware of grizzly bear occupancy in areas adjacent to the Recovery Zones. However, the Forests' LRMPs may provide some benefits to grizzly bears occurring outside the Recovery Zones through standards pertaining to the management for other species and their habitats (such as elk, and sensitive and indicator species). Some of these standards control the type and intensity of activities, including road management, that may occur within these species habitats. However, standards addressing management for these other species, while providing some benefits to grizzly bears occurring outside the Recovery Zones, may not be

000114

directly translatable to providing the type of habitat that research has suggested grizzly bears require to support their home ranges, and to reduce the occurrence of human-related mortality because they do not require roads to be managed in a manner conducive to grizzly bear habitat needs.

Current access management standards, relative to the effects of activities upon grizzly bears and the potential for causing incidental take of grizzly bears within the Recovery Zones, are based on research using a Geographic Information System moving windows analysis technique. A moving windows analysis is a spatial analysis of road density distribution, and research has suggested that increasing densities of both open and restricted roads have corresponding increased effects upon grizzly bear behavior and habitat use within their home range. Due to computer data limitations, the Forests are currently unable to conduct a moving windows analysis in the areas of grizzly bear occupancy outside of the Recovery Zones. The Forests did provide an analysis of linear road densities within these areas (Tables 6 and 11).

Linear open and total road densities within the areas occupied by grizzly bears outside of the Recovery Zones appear to be well above the thresholds, established pursuant to moving windows analysis, at which adverse affects to bears are likely to occur. However, linear road density information is not comparable to moving windows analysis, and as such, it is inappropriate to infer that the referenced linear road densities equate to moving windows road densities, through which thresholds for adverse affects have been established. Therefore, in addition to linear road density information submitted for areas outside of the Recovery Zones, the Forests also provided linear road density road information for BMUs within the Recovery Zones. This information was provided to determine if there was a correlation between linear and moving windows analyses within the Recovery Zones for extrapolation to the areas of grizzly bear occupancy outside of the Recovery Zones. We were unable to establish a relationship between linear road densities and moving windows road densities. Therefore, relative to the current moving window standards upon which thresholds for "adverse effect" and incidental take have been established, the Service is unable to definitively analyze the potential effects of the proposed Amendment upon grizzly bears residing in the areas outside of but adjacent to the Recovery Zones.

Within these areas, however, grizzly bears, including females, have been frequently documented. Some of these grizzly bears may have home ranges located entirely outside of the Recovery Zones, while others may utilize habitats both within and outside of the Recovery Zones. Female grizzly bears with young have been documented within these areas, however, the fate of the offspring and whether or not they have been recruited into the breeding population is not known. There have been no known or reported human-related grizzly bear mortalities within these areas. Thus, the presence of grizzly bears in these areas indicates that some bears have apparently acclimated to the conditions within them, and at least in the short-term, seem able to find and secure the resources necessary for their needs while avoiding human encounters resulting in mortality.

110

Without a moving windows analysis, it cannot be definitively demonstrated that adverse effects to grizzly bears may be occurring under the existing conditions in the identified areas of grizzly bear occupancy outside of the Recovery Zones within these Ecosystems. Notwithstanding the above, it is reasonable to conclude that adverse effects to grizzly bears are likely for the following reasons. Research indicates that increasing road densities and the use of roads affects grizzly bear behavior and habitat use, resulting in displacement or habituation of grizzly bears (McLellan and Shackleton 1988, Mace and Manley 1993, Service 1993, Mace et al. 1996, Mace et al. 1999, Service 1993, Wakkinen and Kasworm 1997). Increasing road densities and road use are also likely to increase the chance of grizzly bear encounters with humans, leading to increased stress levels of the animal (USFWS 1993). Displacement from habitat and/or increased stress levels may be especially problematic for female grizzly bears attempting to reproduce by causing decreased nutritional status, which may result in reabsorption of fetuses, etc. (Mattson et al. 1987 In: Frederick 1991, and Aune and Stivers 1985 In: Frederick 1991). Thus, given the fact that the Forests have not specifically managed for grizzly bear habitat relative to road densities outside of the Recovery Zones, and recognizing the considerable difficulty in managing for and achieving grizzly bear habitat parameters relative to road densities within the Recovery Zones, road densities in many areas outside of the Recovery Zones are most likely high, and are likely to be causing adverse effects to grizzly bears. The available research information referenced above suggests that these adverse effects due to road density are most likely to cause significant habitat modification or degradation that results in the injury (increased stress levels) of grizzly bears. The research also suggests the potential for these adverse affects due to road densities to result in significant habitat modification or degradation that results in the death (reabsorption of fetuses) of grizzly bears.

Finally, the Forests' LRMPs do not currently contain standards specifically addressing proper food storage in grizzly bear habitat to help reduce the potential for human-bear conflicts. Although sanitation is outside the scope of the proposed Amendment, and as such is not addressed by it, due to reinitiation of consultation on the Forests' LRMPs to address effects to bears occurring outside the Recovery Zones, the Service considers the issue of sanitation and its effect upon grizzly bears relevant to this biological opinion. Sanitation was also previously addressed in the Service's 2001 Biological Opinion. Attraction of grizzly bears to improperly stored food and garbage is identified by the Recovery Plan as one of the principal causes of grizzly bear mortality. At least one bear mortality in the CYRZ can be directly attributed to bear attraction/habituation by improper food storage. Additionally, a grizzly bear in the Selkirks had to be relocated as a result of attraction to improperly stored food (this bear was subsequently illegally killed by a hunter). Most recently, in May of 2003, a subadult male grizzly bear in the CYRZ had to be captured and relocated due to repeated entrances into a non-bear resistant dumpster located on federal land. Numerous black bears in both Ecosystems have been removed or killed as a result of human conflicts stemming from improper food storage.

Currently, however, the Forests are developing sanitation programs. In 2002, pursuant to guidance from the IGBC, the KNF and IPNF convened an Information and Education Workgroup to begin developing a comprehensive sanitation program that will include a food

000116

storage order on public land. The IGBC has recommended that all Forests within grizzly bear recovery areas implement food storage orders to help reduce bear habituation to humans and to minimize the potential for bear/human conflicts. These programs will include, among other things, public education, and the development and implementation of food storage orders on national forest system lands within the Recovery Zones. The Service is participating in the development of these sanitation programs, and believes appropriate progress is being made to address sanitation related issues on the Forests.

### B.    Canada Lynx

Several LAUs coincide within the boundaries of the SRZ and CYRZ. The activities proposed to be undertaken by the Amendment are essentially to reduce open and total road densities, primarily forest roads, within the SRZ and CYRZ. The proposed Amendment will not result in increases of temporary unsuitable lynx habitat, or affect the quantity, composition, or distribution of lynx habitat within LAUs, including foraging and denning habitat.

Currently, there is little information on the effect of forest roads on lynx or its prey (Apps 2000, McKelvey et al. 2000c). Preliminary information suggests that lynx do not avoid roads, (Ruggiero et al. 2000a), except at high traffic volumes (Apps 2000). High traffic volumes are normally associated with highways. Forest roads typically do not receive use levels that would be considered high (i.e., >2,000 vehicle per day). Forest roads may reduce lynx habitat and increase fragmentation through the removal of cover. On the other hand, however, these roads may provide good snowshoe hare habitat where they are well vegetated along the roadside, and lynx may use the roadbed for travel and foraging (Koehler and Brittell 1990). However, reducing the overall availability and density of forest roads may result in net, long-term benefits to lynx through decreasing habitat fragmentation and disturbance, especially related to winter snow-compacting activities.

Forest roads may also be used by winter recreationists (e.g., snowmobilers, etc.), resulting in compacted snowtrails. Compacted snowtrails may facilitate access of competing carnivores, such as mountain lions (*Felis concolor*), coyotes (*Canis latrans*), and bobcats (*Lynx rufus*) into lynx habitat. The LCAS addresses the role that the compaction of snow trails, for recreational activities, may play in facilitating interspecific competition of these species with lynx, at least during the winter. For example, it is speculated that bobcats (*Lynx rufus*) and coyotes (*Canis latrans*) may utilize compacted snow trails during the winter to access high elevation lynx habitat that would normally be inaccessible to them during this time, and compete with lynx for an already naturally fragmented and limited preybase of snowshoe hares. However, the information indicating to what extent these species utilize these avenues to access lynx habitat during the winter, and to what degree such access enables them to exploit snowshoe hares and compete with lynx is purely anecdotal at this point.

Preliminary research information suggests that these compacted snow trails may facilitate access by other species into higher elevation habitats during some portions of the winter when they would normally be excluded due to snow conditions. However, these potential competitors

000117

Summary of Direct and Indirect Effects Analysis

Short-term adverse effects may occur during road reclamation/obliteration activities on both perennial and intermittent streams. Sediment disturbing activities such as culvert removal and the associated streambank recontouring, along with the disturbance of the road prism itself, may result in adverse effects to both spawning and rearing bull trout from both direct mortality as well as loss of habitat. Migratory bull trout may become disoriented should they encounter a large pulse of sediment. Additionally, feeding rates may be retarded due to sediment inputs into rearing habitat. Short-term impacts are estimated to last between 3-5 years. This duration is related to the period of successful re-establishment of vegetation. State and Federal BMP's call for re-vegetation efforts for streambed restoration projects associated with road crossings. These short-term effects may occur throughout the action area in those BMU's not currently meeting TMRD and/or core habitat standards. Effects associated with gating or berming a road to restrict but not eliminate vehicular traffic have already been analyzed as part of the consultation on the Forest LRMP's, and are not considered effects for this proposed action.

It is anticipated that the implementation of proposed standards may result in positive impacts for bull trout after project completion over the long-term. This project should reduce the long-term sediment input by restoring the stream channel to a naturally functioning condition, and potentially providing additional bull trout habitat availability, as well as re-vegetating the streambank and establishing a healthy riparian zone. Additionally, by reducing the road densities in key bull trout watersheds, threats posed by road failures will be removed. By removing the culverts, the risk of a road failure, resulting in a large volume of substrate material (amount varies with conditions) entering the systems, is greatly reduced.

## V.    Cumulative effects

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

### A.    Grizzly Bear

Selkirk Ecosystem

Approximately 56 percent of the SRZ is outside of Federal ownership; 47 percent lies within British Columbia, and nine percent is under State or private land ownership within the U.S. State or private lands comprise 20 percent of the U.S. portion of the Selkirk Ecosystem. Most of the State (IDL) and private land within the SRZ is managed for timber production and is therefore subject to ongoing road construction and periodically high levels of human activity. The same is true for much of the British Columbia portion of the SRZ. These lands are not subject to the same management standards as Federal lands within the SRZ. Ongoing land management activities and associated road construction are reasonably certain to occur

000127

throughout these lands for the foreseeable future, resulting in increasing road densities and habitat fragmentation in a significant portion of the SRZ. For example, Stimson Lumber Company is proposing to access several sections of their land within the LeClerc BMU to harvest timber. This access will include the construction of approximately 17 miles of new roads, resulting in a decrease in core habitat and an increase in total road densities; open road densities will remain the same. Additionally, the IDL owns and manages a significant portion of the land base within the SRZ (approximately 8 percent), and as indicated above, much of it is managed for timber production. Road construction and management of the existing road base, associated with timber management, is likely to continue on IDL lands within this ecosystem. However, recently the IDL has begun the process of developing a Habitat Conservation Plan, which will incorporate measures to ensure adequate protection and maintenance of grizzly bear habitat through addressing the effects of its land management activities upon this species.

Since 1982 there have been a total of 40 known grizzly bear mortalities in the SRZ. Of the total mortalities, 20 (50 percent) were related to guns. Of the gun related mortalities, 11 (55 percent) were hunting related (mistaken identities, self-defense, etc.). Six of the gun-related mortalities are currently under investigation. Hunting is expected to continue in this Ecosystem.

Additionally, human population growth is expected to occur in or near the areas of identified grizzly bear occupancy within the Selkirk Ecosystem adjacent to the SRZ. Human population growth may result in various levels of effects to grizzly bears and their habitat, which can be mitigated, depending on: where and how such growth occurs; implementation of proper sanitation measures; dissemination of adequate materials providing public education information on living in grizzly bear habitat and support for dealing with nuisance bears; and adequate hunter and recreational education information regarding grizzly bear conservation needs.

Cabinet-Yaak Ecosystem

The majority (90 percent) of the CYRZ is under Federal ownership, with only 10 percent comprised of State and private lands. Activities occurring on State and private lands in the CYRZ would be similar to those described above for the Selkirk Ecosystem. Similar to the Selkirk Ecosystem, mortality, especially recent mortality, is impacting the recovery of this population. Since 1982 there have been a total of 28 known grizzly bear mortalities. Of the total mortalities, 11 (39 percent) were related to guns. Of the gun related mortalities, nine (82 percent) were hunting related ( mistaken identities, self-defense, etc.). Two of the gun-related mortalities are currently under investigation. Hunting is expected to continue in this ecosystem.

Human population growth is expected to continue within this Recovery Zone, as well as in or near the areas of identified grizzly bear occupancy adjacent to the Recovery Zone. Human population growth may result in various levels of effects to grizzly bears and their habitat, which can be mitigated, depending on: where and how such growth occurs; implementation of proper sanitation measures; dissemination of adequate materials providing public education information

123

on living in grizzly bear habitat and support for dealing with nuisance bears; and adequate hunter and recreational education information regarding grizzly bear conservation needs.

### B.    Canada lynx

State owned lands, corporate timber lands, and private inholdings within the boundaries of these Forests will continue to be developed. Thus, impacts to Canada lynx resulting from road management (including, but not limited to, construction, reconstruction, and maintenance), timber harvest, recreation, etc. are likely to continue. All forms of recreational pressures are increasing on these Forests, and could result in fragmentation, degradation, and loss of lynx habitat. However, increasing winter recreation (snowmobiling, helicopter and cross-country skiing), may be particularly problematic in that it may not only cause harassment and displacement of lynx, but may also facilitate access into higher elevation habitats by predators of, and competitors with lynx. Road construction, which facilitates increased winter recreational access into lynx habitat, will exacerbate the recreational pressures on lynx and its habitat. However, when building temporary roads within lynx habitat, not allowing or designating such roads as new winter recreational routes would minimize the effects of human use and activities associated with these roads in lynx habitat.

### C.    Bull Trout

Cumulative effects on bull trout range from illegal harvest activities to development on private lands. Commercial and residential development may further lead to fragmentation of bull trout habitat and sub-populations, degrade water quality and degrade fish habitat. Development is reasonably certain to occur along the major rivers and lakes in this analysis area, particularly the Pend Oreille and Priest Lakes. Timber harvest and the associated activities on Idaho State lands bordering the upper and lower Priest Lakes will impact the water quality and fish habitat of those watersheds on the east side of the upper and lower Priest Lakes. Additionally, timber harvest and the associated activities can occur on private lands within the analysis area. The Plum Creek Timber Company HCP activities are currently being implemented to provide minimization measures to protect and conserve bull trout, predominantly in the Thompson River watershed and the Middle Kootenai River subbasin. The Montana Department of Natural Resources and Conservation is currently developing an HCP with the intention of minimizing impacts to listed species from their land management actions. Their activities are predominantly located in the lower Clark Fork River subbasin. Stimson Lumber Company has developed and is implementing an HCP on their lands in the vicinity of Troy, Montana. Their minimization measures and implementing conditions mirror those of the Plum Creek Timber Company HCP.

Additionally, the seven watershed councils in Montana, and the Pack River watershed council in Idaho may be implementing restoration plans in their respective watersheds which may result in short-term effects to bull trout with the long-term goal of watershed stabilization. Avista is currently pursuing a program which is restoring fisheries habitat as well as acquiring key riparian lands with the intention of protecting the habitat values. Additionally, they are implementing a plan to provide for both upstream and downstream bull trout passage. Their activities are limited

000129

to the lower Clark Fork River and Lake Pend Oreille. Pennsylvania Power and Lighting is currently analyzing the feasibility of upgrading their existing fish ladder at the Thompson Falls Hydroelectric Dam, with the intention of improving and restoring fish passage past that dam. Both MFWP and IDFG conduct bull trout surveys and limited restoration projects throughout the action area, which may result in additional impacts to the species.

## VI.    Conclusion

### A.    Grizzly Bear

After reviewing: the current status of the grizzly bear, environmental baseline, effects of the proposed Amendment, effects of the implementation of the current LRMPs, and cumulative effects; it is the Service's biological opinion that implementing the proposed Amendment (within the Recovery Zones) and current LRMPs (outside the Recovery Zones) are not likely to jeopardize the continued existence of the grizzly bear within the SRZ and CYRZ. No critical habitat has been designated for this species, therefore, none will be affected.

We base our conclusion on the fact that overall core grizzly bear habitat within these Recovery Zones will increase, and will be provided at quantities sufficient to support the average female grizzly bear's home range needs, as indicated by research in these Recovery Zones. By 2013, within the SRZ, 70 percent of the BMUs (7 of 10 BMUs) will equal or exceed 55 percent core habitat, and overall core habitat within the SRZ will equate to about 64 percent of the landbase within the SRZ. By 2013, within the CYRZ, 91 percent of the BMUs (20 of 22 BMUs) will equal or exceed 55 percent core habitat, and overall core habitat within the CYRZ will equate to about 58 percent of the landbase within the CYRZ. Additionally, several BMUs within these Recovery Zones will provide substantially more than 55 percent core habitat. Those BMUs that will not achieve 55 percent core habitat are either very small in size (i.e., Lakeshore BMU), or contain less than 75 percent federal ownership (i.e., LeClerc, Grouse, and IDL BMUs), with the exception of BMU 10, which has 95 percent federal ownership. Additionally, within the SRZ, of the BMUs affected by the proposed Amendment, all but one (Lakeshore BMU) will achieve OMRD and TMRD standards that research, conducted within these Recovery Zones, suggests the average female grizzly bear can tolerate within her home range. Within the CYRZ, 68 percent of the BMUs will achieve OMRD standards and TMRD standards suggested necessary by research. Similar to core habitat, several BMUs within the SRZ and CYRZ will substantially exceed (be better than) the research thresholds for OMRD and TMRD.

Relative to grizzly bears that may be occupying areas adjacent to these Recovery Zones within these Ecosystems, the Service is unaware of any human-related grizzly bear mortalities, including subadult or adult females, that have occurred in these areas. The proposed Amendment, or the continued implementation of the Forests' LRMPs, is not expected to increase the risk of grizzly bear mortality within these areas. However, it is not known if adult grizzly bears, which may exist in these areas, are able to successfully recruit offspring into the breeding population, or if such offspring are able to establish home ranges within these areas.

000130

Furthermore, grizzly bear densities are low within the Recovery Zones, and are likely lower in the delineated areas adjacent to them. Thus, grizzly bears, especially females with young, have opportunities to find areas and avoid direct competition or confrontations with other grizzly bears, including large, dominant male grizzly bears. The ability to avoid confrontations with other grizzly bears reduces the possibility that large dominant male grizzly bears may encounter and kill either young subadult females or females with young.

Some level of indirect take, in the form of displacement effects, may be occurring within the areas of identified grizzly bear occupancy outside of the Recovery Zones due to the existing road densities. Existing road densities may translate to incidental take of grizzly bears through habitat impacts and stress, which, for example, may lead to reduced reproductive fitness of adult female grizzly bears through reabsorption of fetuses and mortality of offspring. However, it is very difficult to document or establish whether this type of incidental take is occurring or what the level might be, and therefore, the effect upon the grizzly bear population is largely unknown.

In its May 12, 1999 administrative finding, the Service concluded that the SRZ and CYRZ are not discrete from one another, but are discrete from the NCDE (USDI 1999a). However, the Service is currently analyzing new genetic information collected from grizzly bears located between the NCDE and CYRZ to better determine how interrelated and connected these populations are (Servheen pers.comm. 2003). Results of this analysis may shed additional light on the discreteness, or lack thereof, between the NCDE and CYRZ. Until a more thorough analysis of the SRZ, CYRZ, and NCDE is completed relative to habitat quality and size, the importance of the grizzly bears and/or adjacent areas of delineated grizzly bear occupancy to the ultimate stability and recovery of the grizzly bear populations within the Recovery Zones will not be fully understood. In the short-term, retaining the reproductive potential of adult female grizzly bears within these adjacent areas by maintaining the existing environmental conditions, which some bears seem able to tolerate, may enable them to contribute demographically and genetically to the CYRZ and SRZ grizzly bear populations in the long-term. If it is ultimately determined that these areas and/or grizzly bears within them are important for the recovery of the grizzly bear populations within these Recovery Zones, appropriate management strategies can be incorporated into LRMPs.

In conclusion, within the Recovery Zones, core habitat will increase and road densities will decrease with implementation of the proposed Amendment. Thus, displacement and mortality effects upon grizzly bears resulting from roads and road densities will likewise decrease within the Recovery Zones, which may result in increased grizzly bear numbers and distribution within the Recovery Zones. Relative to the areas of identified grizzly bear occupancy outside the Recovery Zones, due primarily to the higher total and open road densities that will be allowed for in these areas, they are not expected to support the number or densities of grizzly bears that it is possible to achieve within the Recovery Zones. However, mortality risk to grizzly bears residing within the areas of identified grizzly bear occupancy outside of the Recovery Zones is also not expected to increase. Additionally, habitat improvements resulting in increased grizzly bear numbers and distribution that will be gained within the Recovery Zones through

000131

implementation of the proposed Amendment are sufficient to preclude jeopardy to the SRZ and CYRZ grizzly bear populations. Furthermore, if new information dictating a change in management philosophy either within or outside the Recovery Zones arises, such new information could be incorporated into grizzly bear habitat management through a variety of mechanisms, including LRMP amendment and/or future section 7 consultation.

### B.     Canada Lynx

After reviewing the current status of the Canada lynx, environmental baseline, effects of the proposed Amendment, and cumulative effects, it is the Service's biological opinion that the proposed Amendment is not likely to jeopardize the continued existence of the Canada lynx. No critical habitat has been designated for this species, therefore, none will be affected.

Our conclusion is based upon the fact that the quantity, composition, and distribution of lynx habitat, including denning and foraging habitat, within LAUs will not be decreased as a result of activities implemented under the proposed Amendment. The proposed Amendment will not result in an increase in designated or groomed over-the-snow routes or snowmobile play areas within LAUs. It will, however, result in reduced density and availability of forest roads for snow-compacting activities. Additionally, reducing the density and availability of roads within lynx habitat should serve somewhat to reduce the fragmentation of lynx habitat and disturbance to lynx. Finally, pursuant to the CA and LCAS, the Forests have mapped all designated and groomed over-the-snow routes within LAUs, and must evaluate the extent to which all snow compacting activities, such as snowmobiling, snowshoeing, cross-country skiing, and dog sledding within LAUs affect lynx.

### C.     Bull Trout

After reviewing the current status of the species, the environmental baseline for the action area, the effects of the proposed action and the cumulative effects, it is the Service's biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of bull trout in the Columbia River DPS.  No critical habitat has been designated for this species, therefore, none will be affected.

We base our conclusions primarily on the fact that within many occupied bull trout watersheds within several BMUs of the Recovery Zones, low levels of road reclamation activities will occur due to the low levels of roads within the watersheds. Also, pursuant to the Forests current LRMPs, they are required to implement best management practices that are designed to reduce the potential for both short- and long-terms adverse effects to occur to bull trout as a result of conducting road related actions. Additionally, prior to implementing individual road related actions, which have the potential to affect bull trout in watersheds occupied by the species, the Forests will be required to consult with the Service. During such consultations, additional measures, such as timing constraints, can be incorporated into the proposed action to further minimize the potential for short-term adverse effects to occur to bull trout. Finally, removing road prisms and/or reducing road densities within bull trout occupied watersheds should result in

000132

long-term beneficial effects to the species through the stabilizing effects of such actions. Thus, the proposed Amendment should reduce the long-term threat to bull trout from culverts and roads by removing/reducing the risk of road prism failures, and restoring the natural hydrology patterns to road crossings.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act, and Federal regulations pursuant to section 4(d) of the Act, prohibit the take of endangered and threatened species, respectively without special exemption. Take is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by the Service as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this Incidental Take Statement.

The measures described below are non-discretionary upon the agency, and must also be undertaken by the agency so that they become binding conditions of any grant or permit issued by the Forests, as appropriate, for the exemption in section 7(o)(2) to apply. The Forests have a continuing duty to regulate the activity covered by this incidental take statement. If the Forests (1) fail to assume and implement the terms and conditions; (2) fail to require any entity or individual, contracted to implement the action or any part of the action, to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit, grant, or contract document; and/or (3) fail to retain oversight to ensure compliance with these terms and conditions, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, the Forests must report the progress of implementing the action and mitigation measures to the Service as specified in the incidental take statement [50 CFR, Part 402.14(i)(3)].

## I.    Amount or Extent of Take

### A.    Grizzly Bear

The proposed Amendment will establish grizzly bear habitat management standards for all 22 BMUs in the CYRZ and 8 of 10 BMUs in the SRZ. Of the two BMUs in the SRZ not addressed by the proposed Amendment, one is managed entirely by the IDL and the other (i.e., LeClerc) is primarily managed by the CNF. The proposed standards for 7 of 10 BMUs in the SRZ and 20 of 22 BMUs in the CYRZ will meet or exceed (be better than) the parameters for core habitat, OMRD, and TMRD that research, conducted within these Recovery Zones, suggests provide

128

000133

conditions necessary to support the home range use and habitat needs (except for seasonal habitat considerations) of an average adult female grizzly bear. The grizzly bear habitat parameters identified through research specific to these Ecosystems are as follows: 1) the home ranges were comprised of an average 55 percent core habitat; 2) the amount of area having a TMRD greater than 2 mi/mi$^2$ averaged 26 percent; and 3) the amount of area having an OMRD greater than 1 mi/mi$^2$ averaged 33 percent.

As previously described in the accompanying Biological Opinion, the effect of roads upon grizzly bear behavior and habitat use has been well documented in the scientific literature. Several authors have documented grizzly bear avoidance of roads and the resulting displacement from adjacent habitat (Aune and Stivers 1985, McLellan and Mace 1985, Kasworm and Manley 1988, McLellan and Shackleton 1988, Aune and Kasworm 1989, Frederick 1991, and Wakkinen and Kasworm 1997). Research indicates that grizzly bears tend to avoid closed roads as well as open roads (Mace et al. 1999, Mace et al. 1996, and Mace and Manley 1993, Wakkinen and Kasworm 1997). Mace and Manley (1993) documented displacement of grizzly bears from closed roads, and found that grizzly bear use of areas declined as total road densities (open and closed roads) exceeded 2 mi/mi$^2$ and open road densities exceeded 1 mi/mi$^2$. Mace et al. (1996) found that grizzly bears are able to utilize roaded habitats, but that spatial avoidance increases and survival decreases as traffic levels and road densities increase. Wakkinen and Kasworm (1997) found that areas with total road densities greater than 2 mi/mi$^2$ and/or open road densities greater than 1 mi/mi$^2$ were used less than expected (avoided) by grizzly bears. A number of studies have indicated that female grizzlies with cubs tend to avoid roads (Mace et al. 1996, and Zager 1980 In: USFWS 1993). The occurrence of roads and the associated human disturbance within high quality bear habitats can also influence indirect mortality risk by disrupting efficient foraging strategies resulting in nutritional stress, restricting reproduction and dispersal, and potentially reducing carrying capacity (Mattson et al. 1987 In: Frederick 1991, and Aune and Stivers 1985 In: Frederick 1991). Nutritional demands of female bears with cubs is triple that of other bears, making their access to nutritional food sources and uninterrupted feeding essential during spring and fall (Jonkel 1982 In: Frederick 1991).

It is the Service's opinion that, within those BMUs achieving the research parameters, incidental take of grizzly bears is unlikely to occur. Conversely, it is also the Service's opinion that incidental take of grizzly bears is likely to occur within individual BMUs when one or more of the parameters established through the research addressing core habitat, OMRD, or TMRD are not achieved. Additionally, it is the Service's opinion that incidental take of grizzly bears is likely to occur through any permanent loss of core habitat from existing conditions within any individual BMU currently exceeding (being better than) the research parameters. It is also the Service's opinion that repeated point source disturbances, such as helicopter logging within core habitat, mining operations, etc., may result in incidental take of grizzly bears (Christensen and Madel 1982, USFWS 1993). Currently several BMUs within both the SRZ and CYRZ do not provide the above referenced habitat conditions suggested by research as necessary to support an average adult female grizzly bear's home range. Further, 2 of 10 BMUs in the SRZ (LeClerc and Lakeshore) and 2 of 22 BMUs (Grouse and #10) in the CYRZ may never be capable of

129

providing the conditions that research has suggested the average adult female grizzly bear requires to support her home range. Therefore, for three of the BMUs the proposed Amendment will establish grizzly bear habitat management standards at levels that may not be capable of providing the full suite of home range needs of the average adult female grizzly bear (standards are not proposed for the LeClerc BMU as it is primarily managed by the CNF). Thus, for these three BMUs, incidental take may be a persistent long-term condition. It is the Service's opinion that incidental take of grizzly bears is likely to occur in the form of harm (displacement) through significant habitat modification or degradation which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering.

Additionally, it is our opinion that some level of incidental take of grizzly bears is occurring in the identified areas of grizzly bear occupancy outside of but adjacent to the SRZ and CYRZ. We base our opinion on the fact that: 1) linear open road densities exceed 1 mi/mi$^2$ in these areas; and 2) the Forests have not specifically managed for grizzly bear habitat relative to road densities outside of the Recovery Zones. Thus, given these facts, in conjunction with the above cited research pertaining to the effects of roads on grizzly bear behavior and habitat use, we believe road densities are most likely high in these areas, and are likely to be causing incidental take of grizzly bears. Similar to the incidental take likely occurring within BMUs, the Service anticipates that the incidental take of grizzly bears in the occupied areas outside of the Recovery Zones will be in the form of harm (displacement) through significant habitat modification or degradation which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering.

Therefore, it is the Service's opinion that the existing high road densities and insufficient core habitat within several BMUs of SRZ and CYRZ, and the adjacently occupied areas outside of the Recovery Zones result in significant habitat modification or degradation, which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering. Further, it is the Service's biological judgment that incidental take of grizzly bears, in the form of harm (displacement), will continue to occur within individual BMUs as long as: 1) open road densities exceed one mi/mi$^2$ in over 33 percent of a BMU; 2) total road densities exceed two mi/mi$^2$ in over 26 percent of a BMU, and/or 3) core habitat makes up less than 55 percent of a BMU.

However, the Service anticipates that the level of incidental take of grizzly bears will be low and will primarily occur indirectly as a result of displacement due to high road densities within some BMUs and areas of adjacent occupancy. We expect this incidental take to occur as impairment of the normal breeding and feeding behavior of grizzly bears, which would impair potential levels of reproductive success. We do not expect adult or subadult grizzly bear mortality as a result of the displacement.

Currently, the Service is unaware of scientific or commercial information that could be used to quantify the exact level of incidental take of grizzly bears as a result of such impacts to or degradation of their habitat, disturbance, or displacement. Reduced reproductive success of

130

females as a result of displacement effects could include grizzly bear cub mortality and/or reabsorption of fetuses. However, this type of mortality usually cannot be documented. Grizzly bear offspring (cubs, sub-adults) also have naturally high mortality rates. Therefore, the anticipated level of incidental take of grizzly bears as a result of the implementation of the proposed Amendment, or the continued implementation of the Forests LRMPs, is numerically 'unquantifiable'. In these instances, we use the surrogate parameters addressing levels of core habitat, OMRD, and TMRD within individual BMUs as measures of incidental take of grizzly bears.

It is also the Service's opinion that, within the Recovery Zones, decreasing core habitat and/or increasing TMRD or OMRD beyond the standards contained in Table 16 will exceed the amount of incidental take analyzed and exempted by this biological opinion. Further, it is also the Service's opinion that, for the adjacent areas of grizzly bear occupancy outside of the Recovery Zones, increases in linear open road densities and/or permanent increases in linear total road densities beyond the standards contained in Table 17 will exceed the amount of incidental take analyzed and exempted by this biological opinion.

Furthermore, it is the Service's biological opinion that the lack of sanitation requirements within the CYRZ and SRZ may contribute to mortality of grizzly bears through management removal and other human-caused mortality. In at least one case, past management action consisting of capturing and relocating a food-conditioned grizzly bear occurred as a result of improper storage of attractants on federal land within Recovery Zones. Until a comprehensive sanitation program is implemented on the Forests within the CYRZ and SRZ, the potential for grizzly bears to have access and become habituated to improperly stored food items on federal land will persist. Thus, the potential for incidental take of grizzly bears through management actions as a result of habituated and food conditioned bears will remain.

The Service anticipates that up to one grizzly bear may be incidentally taken due to sanitation related issues. The incidental take may occur in the form of harassment through capture and relocation. Currently, however, the Forests are developing sanitation programs. In 2002, pursuant to guidance from the IGBC, the KNF and IPNF convened an Information and Education Workgroup to begin developing a comprehensive sanitation program that will include a food storage order on public land. The IGBC has recommended that all Forests within grizzly bear recovery areas implement food storage orders to help reduce bear habituation to humans and to minimize the potential for bear/human conflicts. These programs will include, among other things, public education, and the development and implementation of food storage orders on national forest system lands within the Recovery Zones. The Service is participating in the development of these sanitation programs, and believes appropriate progress is being made to address sanitation related issues on the Forests.

Informing the public, agency personnel, contractors, and permittees about the importance of proper food storage is imperative to minimize the potential for such conflicts and ensure human safety. The KNF and IPNF have been active in this effort. Education, combined with

131

implementation and enforcement of a food storage order, is an effective way to minimize the potential for grizzly bear mortalities resulting from such attractants.

### B.    Canada Lynx

No incidental take is anticipated. Therefore, no reasonable and prudent measures or terms and conditions are required to minimize take.

### C.    Bull Trout

This incidental take statement addresses impacts to the Columbia River DPS from the establishment of road density standards within the Recovery Zones on the KNF, IPNF, and LNF. The Service is unable to anticipate all possible circumstances related to the implementation of activities necessary to meet the standards, including programmatic actions or individual actions which may be developed in the future. Therefore, the Service is unable to issue an all-encompassing incidental take statement or a comprehensive list of reasonable and prudent measures. Even though the Service anticipates a low amount of take will occur due to these activities, the best scientific and commercial data available are not sufficient to allow the Service to estimate a specific amount of incidental take of bull trout. While the Service has determined that the level of anticipated take associated with the activities necessary to meet the road density standards are not likely to jeopardize the Columbia River DPS, the Service is not authorizing through this biological opinion incidental take of bull trout for any specific actions carried out by the Forests to meet these road density standards.

The Service is able, however, to offer technical assistance measures that the Forests may utilize when implementing future actions to meet road density standards within the BMUs. These measures should reduce the overall level of incidental take, which may result from the implementation of such future actions. Two key elements of the future evaluation of proposed actions are: 1) suitable measures to minimize the level of incidental take are developed integral to the proposed action; and 2) the necessary information is presented that the Service will need to identify specific measures and their associated terms and conditions for the individual actions and the watershed scale activities implemented by the Forests to meet road density standards.

Incidental take, if any, will be authorized at the site specific action level. Site-specific biological opinions may tier to, and incorporate by reference, the analysis and technical assistance contained in this biological opinion. The following measures may become mandatory when and where determined appropriate through formal consultation, and prescribed by the Service in a site-specific biological opinion.

1.    The Forests should assure consistent implementation of measures and standards specified in the Aquatic Conservation strategies as indicated in the *1998 Biological Opinion for the Effects to Bull Trout from the Continued Implementation of Land and Resource Management Plans and Resource Management Plans as Amended by the Interim Strategies for Managing Fish-producing Watersheds in Eastern Oregon and Washington,*

000137

*Idaho, Western Montana and portions of Nevada (INFISH), and the Interim Strategy for Managing Anadromous Fish-producing Watershed in Eastern Oregon and Washington, Idaho and portions of California (PACFISH).*

2.     The Forests should ensure that the "Section 7" watershed baselines are updated according to the INFISH Biological Opinion's Reasonable and Prudent Measure #2 (USFWS 1998). These baselines should be updated after every project requiring consultation which may affect them until the LRMP for each Forest is revised, or another analysis methodology is developed in conjunction with the Service.

3.     The Forests should assume bull trout are present in a given watershed, unless site-specific information indicates otherwise. The Forests should informally consult with the Service to: determine the effects of proposed actions upon bull trout prior to initiating formal consultation; and ensure that the necessary site specific information and technical data is adequate and provided to the Service in the baseline and effects analysis for individual project biological assessments.

4.     The Forests should ensure that all road features, particularly stream crossings on roads, in newly created grizzly bear core habitat be hydrologically neutral (as defined in subsequent project level consultations with the Service) and capable of passing at least a 100-year flood event with minimal erosion. Should the Forests decide to leave a culvert on a road in newly created core habitat, then that crossing should be capable of passing a 100-year event.

5.     The Forests should minimize sediment input to the maximum extent practicable from culvert removals and subsequent streambed and streambank restoration activities by following all appropriate best management practices.

6.     The Forests should, where practicable, time any culvert removals to coincide with low flow on perennial streams or no flow on intermittent streams to minimize sediment impacts to bull trout spawning activities and bull trout spawning and rearing habitat.

## II.     Effect of the Take

### A.     Grizzly Bear

In the accompanying biological opinion, the Service determined that this level of anticipated incidental take is not likely to result in jeopardy to the grizzly bear. Some low level of indirect incidental take may occur as a result of displacement of grizzly bears from essential habitat. Such take is unquantifiable. In cases where the amount of take is unquantifiable, the Service uses surrogate parameters to measure the impact of the take on the species, and provide the threshold at which the anticipated level of incidental take is likely to occur. Based on research related to the displacement of grizzly bears from roads and roaded habitat (Mace and Manley 1993, Mace et al. 1996, Wakkinen and Kasworm 1997), the Service uses surrogate measures of

133

000138

core habitat, OMRD, and TMRD to establish the levels of incidental take, and the thresholds at which incidental take is likely to occur. Currently, several BMUs within the SRZ and CYRZ contain substantially more core habitat than research indicates is required to support an average adult female grizzly bear home range. Similarly, several BMUs within the SRZ and CYRZ contain substantially lower OMRDs and TMRDs than research indicates the average adult female grizzly bear can tolerate within her home range. Given the current grizzly bear population levels and distribution, BMUs providing conditions substantially better than the research parameters offer ample opportunities and areas for grizzly bear displacement, moderating the displacement effects of those BMUs with low levels of core habitat and/or high road densities. Additionally, the proposed Amendment will result in several BMUs of the SRZ and CYRZ that substantially exceed (are better than) the research parameters for core habitat, OMRD, and TMRD, which are indicated as necessary habitat conditions to support the home range of an average adult female grizzly bear.

The areas of grizzly bear occupancy located outside of the Recovery Zones will most likely support fewer numbers and densities of grizzly bears. However, there is an increased possibility of achieving higher grizzly bear densities within the Recovery Zones through increases in core habitat and reductions in road densities resulting from implementation of the proposed Amendment. This will offset the lower densities of grizzly bears that may occur in areas outside the Recovery Zones.

## III.    Reasonable and Prudent Measures

The Service believes the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of grizzly bears:

### A.    Grizzly Bear

1.    Ensure that management activities and the associated transportation network maintain or create sufficient core area, maintain or reduce OMRD to acceptable levels, and maintain or reduce TMRD to acceptable levels within individual BMUs of the SRZ and CYRZ.

2.    Reduce the potential for mortality and displacement of grizzly bears from occupied habitat in the mapped areas of grizzly bear occupancy outside of but adjacent to the CYRZ and SRZ (Figure 3).

## IV.    Terms and Conditions

In order to be exempt from the prohibitions of section 9 of the Act, the Forests must comply with the following terms and conditions, which implement the reasonable and prudent measures (RPM) described above and outline the required reporting/monitoring requirements. These terms and conditions are non-discretionary.

000139

A.    **Grizzly Bear**

1.    The following terms and conditions implement RPM A.1:

A.    Table 16 contains the standards for all BMUs. Since funding or unplanned circumstances may affect completion by the dates identified below, the Forests shall meet with the Service annually to discuss progress made towards achieving the established standards for each BMU. For those individual BMUs currently deficient in core habitat, or exceeding (being worse than) the OMRD or TMRD standard, all standards as contained in Table 16 will be achieved in 35 percent of the BMUs by 12/31/2009, in 70 percent of the BMUs by 12/31/2011, and by 12/31/2013, all BMUs must equal or be better than the standards. While this provides some flexibility for the Forests to decide when and in which BMUs to improve conditions, emphasis should be given to achieving the identified standards by order of BMU importance (i.e., Priority 1 BMUs, followed by Priority 2 BMUs, followed by Priority 3 BMUs).

Table 16: Bear management unit standards.

| BMU | BMU Priority | Maximum Percent OMRD $>1mi/mi^2$ | Maximum Percent TMRD $>2mi/mi^2$ | Minimum Percent Core |
|---|---|---|---|---|
| 1 | 2 | 15 | 15 | 80 |
| 2 | 2 | 20 | 18 | 75 |
| 3 | 3 | 33 | 26 | 59 |
| 4 | 2 | 36 | 26 | 63 |
| 5 | 1 | 30 | 23 | 60 |
| 6 | 1 | 34 | 32 | 55 |
| 7 | 2 | 26 | 23 | 63 |
| 8 | 3 | 32 | 20 | 55 |
| 9 | 2 | 33 | 26 | 55 |
| 10 | 2 | 44 | 34 | 52 |
| 11 | 1 | 33 | 26 | 55 |
| 12 | 1 | 45 | 31 | 55 |
| 13 (Keno) | 1 | 33 | 26 | 60 |
| 14 (Northwest Peaks) | 1 | 33 | 26 | 55 |
| 15 | 1 | 33 | 26 | 55 |
| 16 | 1 | 33 | 26 | 55 |
| 17 | 2 | 33 | 26 | 55 |

135

Table 16 (cont.): Bear management unit standards.

| BMU | BMU Priority | Maximum Percent OMRD >1mi/mi$^2$ | Maximum Percent TMRD >2mi/mi$^2$ | Minimum Percent Core |
|---|---|---|---|---|
| 18 (Boulder) | 3 | 33 | 29 | 55 |
| 19 (Grouse) | 3 | 59 | 55 | 37 |
| 20 (N. Lightening) | 1 | 35 | 26 | 61 |
| 21 (Scotchman) | 2 | 35 | 26 | 62 |
| 22 | 3 | 33 | 35 | 55 |
| Blue-Grass | 1 | 31 | 26 | 55 |
| Long-Smith | 1 | 25 | 15 | 67 |
| Kalispell-Granite | 1 | 33 | 26 | 55 |
| Lakeshore | 3 | 82 | 56 | 20 |
| Salmo-Priest | 2 | 33 | 26 | 64 |
| Sullivan-Hughes | 1 | 23 | 18 | 61 |
| Myrtle | 2 | 33 | 22 | 56 |
| Ball-Trout | 2 | 20 | 13 | 69 |

B.     For all BMUs:

   i.     Core habitat must remain in place for at least 10 years to be functionally effective for grizzly bears. Therefore, except for emergencies or other unforeseen circumstances consulted on with the Service, newly created core habitat shall not be entered for at least 10 years after creation.

   ii.    Core habitat within BMUs shall not be impacted (i.e., shifted, moved, etc.) by activities more frequently than once every 10 years, unless the activity is to decommission/stabilize an existing closed road (as described in 1.B.iii).

   iii.   The Forest Service may enter core habitat within a BMU more frequently than once per 10-year time frame for the sole purpose of completing road decommissioning/stabilization activities resulting in long term improvements in core habitat. However, the effects of such additional entries will be analyzed pursuant to project level consultation and additional measures to minimize potential effects to grizzly bears may be required. Furthermore, such activities may only impact individual blocks

136

000141

of core habitat within a BMU once per 10-year time-frame per individual BMU.

    iv.    Except as described under 1.B.iii. and 1.C., impacts to or losses of existing core habitat within individual BMUs shall be compensated for with in-kind replacement of core habitat concurrently with or prior to incurring the impacts to or loss of the existing core habitat. Such in-kind replacement of core habitat will be created within the BMU in which the impact to or loss of core habitat will occur, and will remain in place for at least 10 years.

C.    For those BMUs exceeding the standards for core habitat (being better than):

    i.    No permanent net losses of core habitat shall occur within any individual BMU.

    ii.    Temporary reductions of core habitat may only occur under the following conditions:

        a.    Temporary reductions of core habitat within individual BMUs shall not decrease core habitat below the minimum core habitat standard within any individual BMU, without compensation as described in 1.B.iv.

        b.    Activities resulting in temporary reductions of core habitat shall be compressed in time so that no more than 3 consecutive years of the 10-year time-span are impacted within individual BMUs. However, the effects of such activities will be analyzed pursuant to project level consultation and additional measures to minimize potential effects to grizzly bears may be required.

        c.    Temporary reductions of core habitat shall only occur once (i.e., one action/project) per 10-year time-frame per individual BMU, unless the activity is to decommission/stabilize an existing closed road (as described in 1.C.ii.d).

        d.    The Forests may enter core habitat within a BMU more frequently than once per 10-year time frame for the sole purpose of completing road decommissioning/stabilization activities resulting in long term improvements in core habitat. However, the effects of such additional entries will be analyzed pursuant to project level consultation and additional measures to minimize potential effects to grizzly bears may be required. Furthermore, such activities may only impact individual

137

000142

blocks of core habitat within a BMU once per 10-year time-frame per individual BMU.

D.   Roads closed to create core habitat will be put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years. Until such closed roads are placed in the above described condition, they will not be considered as contributing to core habitat.

E.   Road use associated with completing administrative activities shall not exceed 57 vehicle round trips per active bear year per road, and shall be apportioned as follows: ≤19 round trips in spring (April 1 thru June 15); ≤23 round trips in summer (June 16 thru September 15); and ≤15 round trips in fall (September 16 thru November 15).

F.   The Forests shall submit annual reports to the Service, due January 15 each year, detailing the progress made toward achieving and maintaining the standards for core habitat, and OMRD and TMRD within the Recovery Zones.

2.   The following terms and conditions implement RPM A.2:

A.   The Forests shall ensure no increases in linear open road (i.e., non-gated roads open to public use) densities on National Forest System Lands in any individual area of grizzly bear occupancy, above the baseline conditions identified in Table 17 (below). However, roads created, opened or reconstructed to facilitate land management activities may be opened to the public, immediately following completion of all harvest activities requiring use of the road, to allow personal firewood gathering for 30 consecutive days during either the month of July or August.

B.   The Forests shall ensure no permanent increases in linear total road densities, above the baseline conditions identified in Table 17 (below). Temporary increases in linear total road densities are acceptable under the following conditions:

i.   Newly constructed roads will be effectively gated and will be restricted with a CFR closure clarifying they are not open for public use.

ii.  Roads closed to meet the no net increase in linear total road densities shall: 1) be closed immediately upon completion of activities requiring use of the road; 2) be effectively closed with a berm, guardrail or other effective measure; and 3) put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

138

000143

iii.    Upon completion of a land management project, linear total road densities will return to the baseline levels contained in Table 17.

Table 17: Grizzly Bear Occupancy Areas adjacent to the CYRZ and SRZ; size and 2002 road density status.

| Area | Total Size (mi²) | Area on National Forest Lands Only (mi²) | Linear Total Road Density on National Forest Lands Only (mi/mi²) | Linear Open Road Density on National Forest Lands Only (mi/mi²) |
|---|---|---|---|---|
| Priest | 107 | 101 | 7.8 | 5.0 |
| Pack River | 35 | 32 | 2.6 | 0.6 |
| Troy | 68 | 8 | 2.6 | 1.2 |
| Clark Fork | 442 | 317 | 2.6 | 0.9 |
| Cabinet | 150 | 84 | 3.9 | 2.2 |
| West | 326 | 299 | 3.0 | 1.3 |
| Tobacco | 802 | 503 | 3.3 | 1.8 |
| Libby[1] | 290 | 144 | 3.4 | 1.9 |
| Fisher | 559 | 196 | 2.7 | 1.0 |
| Deer Ridge | 64 | 57 | 4.2 | 1.6 |

[1]Libby and Fisher Areas are outside the projected grizzly distribution area in the short term, but are included in this analysis to complete the process for lands associated with the CYRZ, per verbal agreement with the Service (September 26, 2002).

D.    Timber harvest activities that will occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities will be determined pursuant to project level consultation.

E.    The Forests shall submit annual reports to the Service, due January 15 each year, summarizing actions taken to comply with terms and conditions implementing RPM A.2.

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed Amendment, and continued implementation of the LRMPs. If the terms and conditions implementing the RPMs are not adhered to, this may indicate that the level of exempted take has been exceeded. The Service retains the discretion to determine whether this is the case and

139

000144

reinitiation of consultation is required. The Forests must immediately provide and explanation of the causes of the taking and review with the Service the need for possible modification of the RPMs.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. The Service recommends that:

1.  The Forests continue working with the IGBC to develop and implement a Food Storage Order, by December 31, 2005, to reduce the potential for grizzly bear/human conflicts. It would be prudent to implement such an order within the administrative boundaries of each Forest. Improperly stored food and garbage leads to food conditioned and habituated grizzly bears that generally result in their direct mortality or management removal. Attraction of grizzly bears to improperly stored food and garbage is identified by the Recovery Plan as one of the principal causes of grizzly bear mortality, and has been the ultimate reason for several mortalities of grizzly bears within the CYRZ and SRZ.

2.  The Forests install grizzly bear information signs at major access points advising the public of grizzly bear presence, proper sanitation/food storage techniques, and providing information on distinguishing characteristics between grizzly bears and black bears.

3.  The IPNF, in coordination with the Service and the Colville NF, evaluate for reconfiguration the BMUs that border the two Forests. Specifically, evaluate the appropriateness of reconfiguring the Salmo Priest, Sullivan-Hughes, Kalispell-Granite, and Lakeshore BMUs to more closely approximate the home range size of female grizzly bears within this Ecosystem (i.e., approximately 100 mi$^2$).

4.  The Forests develop, in coordination with the Service and the IGBC, a strategy addressing point source disturbances (e.g., helicopter logging, mining, etc.).

5.  The Forests work cooperatively with the Service to identify linkage areas that may be important in providing landscape connectivity within and between geographic areas, across all land ownerships for grizzly bears and Canada lynx.

6.  The Forests conduct a moving windows analysis in the areas of grizzly bear occupancy outside of but adjacent to the Recovery Zones to better assess the potential effects of road densities upon grizzly bears in these areas.

000145

7. Within linkage areas, the Forests provide for landscape connectivity by participating in the development and implementation of a management plan to protect and restore habitat connectivity within these areas on federal lands.

8. The Forests plan recreational development, and manage recreational and operational uses to provide for grizzly bear and Canada lynx movement, and to maintain effectiveness of grizzly bear and Canada lynx habitat.

9. The Forests identify and prioritize roads for reclamation or seasonal restrictions within watersheds exceeding > 2 mi/mi$^2$ of open road density to improve habitat quality and/or security for grizzly bears, Canada lynx, and bull trout, as well as other listed and non-listed fish and wildlife species.

10. The Forests continue to monitor, inventory, investigate and document the bull trout populations and spawning activities throughout the entire action area.

11. The Forests continue to reduce sediment inputs from roads and reduce road density throughout the action area to further minimize risk and impacts from sedimentation to bull trout.

12. The Forests identify those watersheds containing bull trout where the road density exceeds the "Functioning Appropriately" standards set forth in the Framework and attempt to bring those watersheds into agreement with that standard.

13. The Forests rip the road base within the RHCA for all decommissioned roads to facilitate water infiltration rates and reduce surface flow and erosion within watersheds containing bull trout habitat, wherever appropriate.

14. Upon finalization of the Bull Trout Recovery Plan, the Forests review and implement all necessary and appropriate recovery objectives that pertain to meeting road density standards or other relevant standards.

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the proposed Amendment, and the reinitiated formal consultation on the continued implementation of the LRMPs for grizzly bears outside of the Recovery Zones. As provided in 50 CFR, Part 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical

141

habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

142

000147

# Exhibit 2



**"Wayne Kasworm"**
**<kasworm@libby.org>**

04/07/2003 11:52 AM

To: "Holt, Bryon" <bryon_holt@fws.gov>
cc:
Subject: Cabinet-Yaak Recovery Criteria 2002

Bryon,

Attached are the CYE recovery criteria for 2002 and the CY and Selkirk mortality table.

Wayne Kasworm
U.S. Fish and Wildlife Service
475 Fish Hatchery Road
Libby, MT  59923
TEL (406) 293-4161  xt 105
FAX (406) 293-6338

kasworm@libby.org    cysmmort02.xlscyefemcubpr2002nofigure.w

**Grizzly Bear Observations**

Grizzly bear observations were recorded from public and agency sightings during 2002 and appended to a sighting database. The file includes over 900 credible instances of sightings, tracks, scats, digs, and hair dating from 1960 (Fig. 3) and 89 mortalities dating from 1950 (Table 1).

Thirty-four grizzly bear sightings were reported to this study that rated 4 or 5 (most credible) on a 5 point scale for credibility during 2002. Twenty-two of these sightings occurred in the Yaak portion of the recovery zone and 10 sightings occurred in the Cabinet Mountains portion of the recovery zone. One sighting came from east of Koocanusa Reservoir and one sighting occurred south of the Clark Fork River. Thirty-two credible sighting reports received by this study were distributed among Bear Management Units (BMUs) 2, 3, 5, 6, 10, 11, 12, 13, 14, 15, 16, and 17 (Fig. 4).

Sightings of females with cubs indicate offspring in their first 12 months of life. Yearlings are offspring in their second 12 months of life. Female with young is used to indicate offspring of indeterminate age. Six credible sightings of 4 unduplicated females with cubs occurred during 2002. Credible sightings of females with cubs occurred in BMUs 11, 12, 13, 14, 15, and 17. One credible sighting of a female with yearlings occurred in BMU 2. Unduplicated sightings of females with cubs varied from 0-4 per year and averaged 1.7 per year from 1996-01 (Tables 2 and 3). Recovery plan criteria indicate the need for an average of 6.0 females with cubs per year.

Thirteen of 22 BMUs in the recovery zone had sightings of females with young during 1996-01 (Fig. 4). Occupied BMUs were: 2, 4, 5, 6, 7, 11, 12, 13, 14, 15, 16, 17, and 21. Recovery plan criteria indicate the need for 18 of 22 BMUs to be occupied. A sighting of a female with 3 yearlings in BMU 2 during 2002, a subadult in BMU 5 during 2001, a female with a yearling in BMU 5 during 2000, and a subadult grizzly bear track observed in BMU 5 of the Cabinet Mountains in 1999, were indicative of recent reproduction.

Six known human caused mortalities of grizzly bears have occurred in the CYGBRZ or within 10 miles during 1997-02 (Tables 1). Human caused mortalities were an adult male (management removal), an adult bear believed to be a female (train collision) and 4 subadult females (1 self defense, 2 illegal under investigation, and a black bear mistaken identity). An adult female with 2 cubs died of natural causes in 1999, 5 cubs and 1 yearling died of assumed natural causes in 2000, 2001, and 2002. Population levels were calculated by dividing observed females with cubs (7) from 2000-02 by 0.6 (sightability) then dividing by 0.284 (adult female proportion of population) as specified in the recovery plan (USFWS 1993). This resulted in a minimum population of 41 individuals. The recovery plan states; "any attempt to use this parameter to indicate trends or precise population size would be an invalid use of these data". Applying the mortality limit of 4% to the minimum calculated population resulted in a total mortality limit of 1.6 bears per year. The female limit is 0.5 females per year (30% of 1.6). Average annual human caused mortality for 1997-02 was 1.0 grizzly bears and 0.8 females. None of the recovery plan demographic goals were achieved during 2001. Remains of a grizzly bear were located on the railroad tracks east of Heron, Montana during spring of 2002. The bear appeared to have died during the autumn of 2001 and was assumed to be a female pending confirmation by genetic analysis. The presence of 3 orphaned yearlings in the vicinity contributed to this assumption. Recovery criteria involving this 2001 mortality were updated.

Table 2. Annual Cabinet-Yaak recovery zone grizzly bear population and known human-caused mortality, minimum unduplicated counts of females with cubs, and distribution of females with young, 1988-2002.

| YEAR | ANNUAL FWC'S | ANNUAL HUMAN CAUSED ADULT FEMALE MORTALITY | ANNUAL HUMAN CAUSED ALL FEMALE MORTALITY | ANNUAL HUMAN CAUSED TOTAL MORTALITY | 4% TOTAL HUMAN CAUSED MORTALITY LIMIT[1] | 30% ALL FEMALE HUMAN CAUSED MORTALITY LIMIT[1] | TOTAL HUMAN CAUSED MORTALITY 6 YEAR AVERAGE | FEMALE HUMAN CAUSED MORTALITY 6 YEAR AVERAGE |
|---|---|---|---|---|---|---|---|---|
| 1988 | 1 | 1 | 1 | 1 | 0 | 0 | | |
| 1989 | 0 | 0 | 1 | 1 | 0 | 0 | | |
| 1990 | 1 | 0 | 0 | 1 | 0 | 0 | | |
| 1991 | 1 | 0 | 0 | 0 | 0 | 0 | | |
| 1992 | 1 | 0 | 0 | 0 | 0 | 0 | | |
| 1993 | 2 | 0 | 0 | 1 | 0.9 | 0.3 | 0.7 | 0.3 |
| 1994 | 1 | 0 | 0 | 0 | 0.9 | 0.3 | 0.5 | 0.2 |
| 1995 | 1 | 0 | 0 | 0 | 0.9 | 0.3 | 0.3 | 0 |
| 1996 | 1 | 0 | 0 | 1 | 0.7 | 0.2 | 0.3 | 0 |
| 1997 | 3 | 0 | 0 | 0 | 1.2 | 0.4 | 0.3 | 0 |
| 1998 | 0 | 0 | 0 | 0 | 0.9 | 0.3 | 0.3 | 0 |
| 1999 | 0 | 0 | 1 | 2 | 0.7 | 0.2 | 0.5 | 0.2 |
| 2000 | 2 | 0 | 1 | 1 | 0.5 | 0.1 | 0.7 | 0.3 |
| 2001 | 1 | 1[2] | 2 | 2 | 0.5 | 0.1 | 1.0 | 0.8 |
| 2002 | 4 | 0 | 1 | 1 | 1.4 | 0.4 | 1.0 | 0.8 |

[1] Presently grizzly bear numbers are so small in this ecosystem that the mortality goal shall be zero known human-caused mortalities.
[2] Mortality discovered in 2002 and assumed to be an adult female, pending DNA verification.

Table 3. Status of the Cabinet-Yaak recovery zone during 2002 in relation to the demographic recovery targets from the grizzly bear recovery plan (USFWS 1993).

| | TARGET NUMBER | 2002 NUMBER |
|---|---|---|
| Females w/cubs (6-yr avg) | 6.0 | 1.7 (10/6) |
| Human Caused Mortality limit (4% of minimum estimate) | 1.4 | 1.0 (6 yr avg) |
| Female Human Caused mortality limit (30% of total mortality) | 0.4 | 0.8 (6 yr avg) |
| Distribution of females w/young | 18 of 22 | 13 of 22 |

| Mortality Year | Mortality Season | Tag # | Sex | Age | Zone | Location | Mortality Cause |
|---|---|---|---|---|---|---|---|
| 1982 | Autumn | None | M | AD | Cabinet-Yaak | Grouse Creek, ID | Human, Poaching |
| 1984 | Unknown | None | Unk | Unk | Cabinet-Yaak | Harvey Creek, ID | Human, Mistaken Identity |
| 1985 | Autumn | 141 | M | AD | Cabinet-Yaak | Lyons Gulch, MT | Human, Self Defense |
| 1986 | Summer | 106-cub[1] | Unk | 0.5 | Cabinet-Yaak | Burnt Creek, MT | Natural |
| 1987 | Autumn | None | F | 0.5 | Cabinet-Yaak | Flattail Creek, MT | Human, Mistaken Identity |
| 1988 | Autumn | None | F | AD | Cabinet-Yaak | Seventeen Mile Creek, MT | Human, Self Defense |
| 1988 | Spring | 1341 | M | AD | Cabinet-Yaak | Moyie River, BC[2] | Human, Hunting |
| 1989 | Summer | 1291 | F | 3.5 | Cabinet-Yaak | Burnt Creek, MT | Human, Research |
| 1990 | Unknown | None | M | SA | Cabinet-Yaak | Poverty Creek, MT | Human, Poaching |
| 1992 | Unknown | None | Unk | Unk | Cabinet-Yaak | Trail Creek, MT | Unknown |
| 1993 | Unknown | None | M | AD | Cabinet-Yaak | Libby Creek, MT | Human, Poaching |
| 1993 | Summer | 2581 | F | 7.5 | Cabinet-Yaak | Libby Creek, MT | Natural |
| 1993 | Summer | 258-cub[1] | Unk | 0.5 | Cabinet-Yaak | Libby Creek, MT | Natural |
| 1996 | Spring | 3021 | M | 3.5 | Cabinet-Yaak | Dodge Creek, MT | Human, Unknown[3] |
| 1997 | Autumn | 3551 | M | AD | Cabinet-Yaak | Gold Creek, BC[2] | Human, Unknown[3] |
| 1999 | Autumn | 5961 | F | 2.5 | Cabinet-Yaak | Hart Creek, BC | Human, Self Defense |
| 1999 | Autumn | 358 | M | 15 | Cabinet-Yaak | Yaak River, MT | Human, Management |
| 1999 | Spring | 1061 | F | 21 | Cabinet-Yaak | Seventeen Mile Creek, MT | Natural, Conspecific |
| 1999 | Spring | 106-cub[1] | Unk | 0.5 | Cabinet-Yaak | Seventeen Mile Creek, MT | Natural, Conspecific |
| 1999 | Spring | 106-cub[1] | Unk | 0.5 | Cabinet-Yaak | Seventeen Mile Creek, MT | Natural, Conspecific |
| 2000 | Autumn | 5921 | F | 3 | Cabinet-Yaak | Pete Creek MT | Human, Under Investigation[3] |
| 2000 | Spring | 538-cub[1] | Unk | 0.5 | Cabinet-Yaak | Hawkins Creek, BC | Natural |
| 2000 | Spring | 538-cub[1] | Unk | 0.5 | Cabinet-Yaak | Hawkins Creek, BC | Natural |
| 2000 | Summer | 303-cub[1] | Unk | 0.5 | Cabinet-Yaak | Fowler Creek, MT | Natural |
| 2001 | Autumn | None | Unk | Ad | Cabinet-Yaak | Elk Creek, MT | Human, Train collision |
| 2001 | Spring | None | F | 1.5 | Cabinet-Yaak | Spread Creek, MT | Human, Mistaken Identity |
| 2001 | Spring | 538-cub[1] | Unk | 0.5 | Cabinet-Yaak | Cold Creek, BC | Natural |
| 2001 | Spring | 538-cub[1] | Unk | 0.5 | Cabinet-Yaak | Cold Creek, BC | Natural |
| 2002 | Autumn | None | F | 4 | Cabinet-Yaak | Porcupine Creek, MT | Human, Under Investigation |
| 2002 | Summer | 577 | F | 1.5 | Cabinet-Yaak | Marten Creek, MT | Natural |
| 1982 | Autumn | None | M | Unk | Selkirk | LeClerc Creek, WA | Human, Unknown |
| 1982 | Spring | None | M | AD | Selkirk | Priest River, ID | Human, Poaching |
| 1985 | Unknown | 867-85a[1] | Unk | 0.5 | Selkirk | N/A | Natural |
| 1985 | Summer | 9491 | M | 4.5 | Selkirk | Selkirk Mtns., US/BC border | Human, Unknown[3] |
| 1986 | Unknown | None | M | Unk | Selkirk | Non-hunting mortality BC Unit 4-8 | Human, Management |
| 1986 | Autumn | 8981 | F | 1.5 | Selkirk | Grass Creek, ID | Human, Unknown[3] |
| 1987 | Autumn | 9621 | M | 7.5 | Selkirk | Trapper Creek, ID | Human, Poaching |
| 1987 | Spring | 10051 | M | 10.5 | Selkirk | Wall Mtn, BC | Human, Poaching |
| 1988 | Autumn | 10851 | F | 3.5 | Selkirk | Cow Creek, ID | Human, Mistaken Identity |
| 1988 | Autumn | 10501 | M | 1.5 | Selkirk | Porcupine Creek, BC | Natural |
| 1988 | Spring | None | M | Unk | Selkirk | Hunting mortality BC Unit 4-7 | Human, Hunting |
| 1989 | Summer | 10441 | F | 20+ | Selkirk | Laib Creek, BC | Natural, Conspecific |
| 1990 | Unknown | None | M | Unk | Selkirk | Non-hunting mortality BC Unit 4-8 | Human, Management |
| 1990 | Autumn | 1042 | F | 3.5 | Selkirk | Maryland Creek, BC | Human, Poaching |
| 1991 | Unknown | 876-92a[1] | Unk | 1.5 | Selkirk | Unknown | Natural |
| 1991 | Summer | 10761 | F | 20+ | Selkirk | Next Creek, BC | Natural |
| 1992 | Autumn | 1015 | F | 12.5 | Selkirk | Monk Creek, BC | Human, Self Defense |

| Year | Season | ID | Sex | Age | Population | Location | Cause |
|---|---|---|---|---|---|---|---|
| 1992 | Summer | 10901 | M | 5.5 | Selkirk | Laib Creek, BC | Unknown |
| 1992 | Summer | None | M | Unk | Selkirk | Lost Creek, BC | Human, Management |
| 1993 | Unknown | None | M | Unk | Selkirk | Non-hunting mortality BC Unit 4-8 | Human, Management |
| 1993 | Autumn | 8671 | F | 15.5 | Selkirk | Willow Creek, WA | Human, Poaching[3] |
| 1993 | Autumn | 867-93a[1] | Unk | 0.5 | Selkirk | Willow Creek, WA | Human, Poaching[3] |
| 1993 | Autumn | 867-93b[1] | Unk | 0.5 | Selkirk | Willow Creek, WA | Human, Poaching[3] |
| 1993 | Spring | None | M | Unk | Selkirk | Hunting mortality BC Unit 4-7 | Human, Hunting |
| 1994 | Spring | 13 | M | AD | Selkirk | Hunting mortality BC Unit 4-20[2] | Human, Hunting |
| 1994 | Spring | None | M | Unk | Selkirk | Hunting mortality BC Unit 4-7 | Human, Hunting |
| 1995 | Autumn | 11001 | M | 2.5 | Selkirk | Granite Pass, WA | Human, Mistaken Identity |
| 1995 | Spring | None | F | 1.5 | Selkirk | Boundary Creek, ID | Human, Unknown |
| 1996 | Unknown | 1027-96b[1] | Unk | 0.5 | Selkirk | Unknown | Natural |
| 1996 | Autumn | 1022 | M | 2.5 | Selkirk | Boswell, BC | Human, Management |
| 1997 | Autumn | None | M | 1.5 | Selkirk | Salmo, BC | Human, Management |
| 1998 | Spring | 1023 | M | 4.5 | Selkirk | Hunting mortality BC Unit 4-26[2] | Human, Hunting |
| 1998 | Summer | None | M | 3.5 | Selkirk | Usk, WA | Human, Under investigation |
| 1999 | Autumn | 9810 | M | 10 | Selkirk | Smith Creek, ID | Human, Under Investigation |
| 1999 | Autumn | 1032 | M | 18 | Selkirk | Procter, BC | Human, Management |
| 1999 | Autumn | None | M | 22 | Selkirk | Wyndell, BC | Human, Management |
| 2001 | Autumn | None | M | Unk | Selkirk | Cottonwood Creek, BC | Human, Management |
| 2001 | Summer | 7 | F | 13 | Selkirk | Porcupine Creek, BC | Natural |
| 2002 | Autumn | 19 | M | 3 | Selkirk | Lamb Creek, ID | Human, Under Investigation |
| 2002 | Autumn | None | F | AD | Selkirk | West of Nelson, BC | Human, Under Investigation |
| 2002 | Autumn | None | Unk | 1.5 | Selkirk | West of Nelson, BC | Human, Under Investigation |
| 2002 | Autumn | None | Unk | 1.5 | Selkirk | West of Nelson, BC | Human, Under Investigation |
| 2002 | Autumn | None | Unk | 1.5 | Selkirk | West of Nelson, BC | Human, Under Investigation |

| <500 m from Open Road | Public Reported |
|---|---|
| No | Yes |
| Yes | Yes |
| No | Yes |
| Unk | No |
| No | Yes |
| No | Yes |
| Yes | Yes |
| Yes | No |
| Yes | Yes |
| No | Yes |
| Unk | Yes |
| No | No |
| No | No |
| Yes | No |
| Yes | No |
| Yes | Yes |
| Yes | No |
| No | No |
| No | No |
| No | No |
| Yes | No |
| Unk | No |
| Unk | No |
| Unk | No |
| Yes | Yes |
| Yes | Yes |
| Unk | No |
| Unk | No |
| Yes | Yes |
| Yes | No |
| Yes | |
| Yes | |
| Unk | |
| Unk | |
| Yes | |
| Unk | |
| No | |
| Unk | |
| No | |
| No | |
| Unk | |
| No | |
| Yes | |
| Yes | |
| Unk | |
| No | |
| No | |

# Exhibit 3

# FINAL ENVIRONMENTAL IMPACT STATEMENT
## FOREST PLAN AMENDMENTS
### *FOR*
### MOTORIZED ACCESS MANAGEMENT WITHIN THE
### SELKIRK AND CABINET-YAAK GRIZZLY BEAR RECOVERY ZONES

KOOTENAI, LOLO and
IDAHO PANHANDLE
NATIONAL FORESTS

March, 2002



The United States Department of Agriculture (USDA), Forest Service, is a diverse organization committed to equal opportunity in employment and program delivery.  USDA prohibits discrimination on the basis of race, color, national origin, sex, religion, age, disability, political affiliation, and familial status.  Persons believing they have been discriminated against should contact the Secretary, US Department of Agriculture, Washington, DC  20250, or call 1-800-245-6340 (voice) or 202-720-1127 (TDD).

Artwork created by Frank Kujawa, Fortine Ranger District.

Kootenai National Forest    Lolo National Forest    Idaho Panhandle National Forests

### Final EIS for Access Management within the
### Selkirk and Cabinet/Yaak Grizzly Bear Recovery Zones
### March 2002

Lead Agency:                                    USDA Forest Service

**Responsible Officials:**

Bob Castaneda, Forest Supervisor            Ranotta K. McNair, Forest Supervisor
Kootenai National Forest                    Idaho Panhandle National Forests
1101 U.S. Highway 2 West                    3815 Schreiber Way
Libby, MT 59923                             Coeur d'Alene, ID 83814-8363

Deborah L.R. Austin, Forest Supervisor
Lolo National Forest
Building 24, Fort Missoula
Missoula, MT 59805

For Further Information Contact:        Kirsten Kaiser – Assistant Team Leader
Access Management EIS
1101 U.S. Hwy 2 West
Libby, MT. 59923

---

## ABSTRACT

The Kootenai, Idaho Panhandle, and Lolo National Forests have prepared a programmatic Final Environmental Impact Statement (FEIS) to document proposed changes to their National Forest Land and Resource Management Plans by amending objectives, standards, and guidelines addressing access management in the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. The purpose and need for action for Forest Plan amendments originates from several directives to update objectives and standards for access management within grizzly bear recovery zones.

The FEIS displays the actions proposed by the three National Forests and provides a comparison of potential access management under each alternative. It addresses public concerns, the social and economic environment, existing access management on the Forests and environmental effects that could occur under each alternative. It also displays public involvement in the amendment process and includes responses to substantive comments received during the Draft EIS (DEIS) comment period.

Seven alternatives were developed in response to the major issues; three were dropped from detailed analysis. **Alternative A** represents access management on each Forest prior to the Interim Access Rule Set of December 1, 1998. **Alternative B** (Proposed Action) would implement the Access Rule Set issued by the Selkirk/Cabinet-Yaak Subcommittee of the Interagency Grizzly Bear Committee on December 1, 1998. **Alternative C** would set the same numeric standards for core habitat, open motorized route density and total motorized route density for all Bear Management Units (BMU) within the analysis area. **Alternative E** would set different levels of open and total route densities and core habitat for each individual BMU reflecting the unique biological and social features in specific BMUs. **Alternative E is the Forest Service's preferred alternative.**

Copies of this FEIS are available from the Kootenai National Forest Supervisor's Office at 1101 U.S. Hwy 2 West; Libby, MT. 59923. It is anticipated the Notice of Availability will be published in the Federal Register on March 15, 2002. The Record of Decision is expected to be released in May 2002.

Case 1:06-cv-01842-RCL    Document 16-7    Filed 01/23/2007    Page 5 of 21

Chapter 3    Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

# Wildlife

## Analysis Area

The analysis area for wildlife resources consists of those portions of the Cabinet Yaak Recovery Zone (CYRZ) and Selkirk Recovery Zone (SRZ) lying within the boundaries of the Kootenai (KNF), Lolo (LNF) and Idaho Panhandle (IPNF) National Forests (see Figure 1-1). These boundaries include not only National Forest lands but also lesser amounts of State and private lands.

## Affected Environment and Disclosure of Effects

### Threatened, Endangered and Proposed Species

Threatened, endangered and proposed species are managed under the authority of the Federal Endangered Species Act of 1973 (PL 93-205 as amended), which requires that Federal agencies: 1) carry out programs for the conservation of listed species [Sec. 7(a)(1)] and 2) insure that any agency action is not likely to jeopardize the continued existence of listed species [Sec. 7(a)(2)].

The U.S. Fish and Wildlife Service (USFWS) provided a list of threatened, endangered and proposed wildlife species that are known or expected to occur within the influence area of the proposed action. (This list is filed in the project file.) Table 3-1 shows the legal status of these species and their occurrence within the IPNF, KNF, and LNF. Note that the woodland caribou is listed as endangered only on the IPNF. It is administratively designated as a sensitive species on the KNF and is absent from the LNF.

**Table 3-1.  Threatened, Endangered and Proposed Wildlife Species.**

| Legal Status | Species | IPNF | KNF | LNF |
|---|---|---|---|---|
| Threatened | Grizzly Bear | X | X | X |
|  | Bald Eagle | X | X | X |
|  | Canada Lynx | X | X | X |
| Endangered | Woodland Caribou | X | Sensitive Species |  |
|  | Gray Wolf | X | X | X |
| Proposed | None |  |  |  |

The following sections identify the existing condition of the affected environment and the potential effects to each of the above species. A Biological Assessment (BA) for Endangered Species Act compliance will be prepared for the preferred alternative and will be reviewed by USFWS.

The narrow scope of the decision to be made (access management in grizzly bear habitat) limits the potential effects to wildlife to those that involve human motorized access and the disturbance/security effects that result from such activities. An exception is snag habitat for cavity-dependent wildlife, where snag availability is influenced by human access to firewood cutting areas.

## Grizzly Bear

### Habitat and Populations

Grizzly bears *(Ursus arctos horribilus)* are habitat generalists, using a variety of habitats including the coniferous forests of northwest Montana and north Idaho. Habitat is generally dictated by food availability and distribution, as well as security from human disturbance and mortality. Because grizzly bears have large home ranges, large areas of secure habitat are required. Grizzlies occupy low-elevation riparian areas, snow chutes, and meadows in the spring and late fall, and move up to higher sub-alpine forests in the summer, early fall and winter. Natural caves or excavated dens, often above 6,000 feet, are entered after the first snowfall and occupied for four to five months. A majority of their diet is composed of vegetation (forbs, sedges, grasses, roots, berries, pine nuts) but also includes fish, rodents, ungulates and insects.

The grizzly bear population in the CYRZ is estimated conservatively at 30 to 40 bears (Kasworm et al., 2000). From the 1980s through 1999, the population slowly increased. However, mortalities during 1999 through 2001 apparently put the population on a slightly declining trend, though the confidence interval makes this conclusion statistically uncertain (Kasworm et al., 2000). Wakkinen and Kasworm (1997) estimate about 45 to 55 bears in the SRZ, with a slowly increasing population. Because of these low populations and existing threats to recovery, the USFWS determined that both populations warrant uplisting to endangered status. However, this action is precluded by higher priority listing actions (64 CFR 26725).

### Mortalities

Habitat security is an important element of grizzly bear habitat, helping to minimize human-caused bear mortalities. Grizzly bear mortalities, both natural and human-caused, are important factors limiting the growth of bear populations in the CYRZ and SRZ (USFWS 1993). The mortality goal for both recovery zones is zero human-caused mortalities (USFWS 1993). This goal has been exceeded during most years since research began in the recovery zones in the early 1980s. Table 3-2 lists mortalities and their causes for the past 20 years (W. Kasworm and W. Wakkinen, pers. comm. 2002). Figure 3-1 graphically displays mortalities during the same period.

More than two-thirds of the historical (past 20 years) grizzly bear mortalities in the CYRZ and SRZ have been human-caused. Figure 3-2 provides a percentage breakout of natural, human-caused, and unknown mortalities.

The relationship between grizzly bears and roads has been extensively studied (Mace and Manley 1993, Mace and Waller 1997, Wakkinen and Kasworm 1997, among others). Roads can have several effects on grizzly bears, including contributing to direct mortality (see Direct and Indirect Effects discussion later in this section). Historically within the CYRZ and SRZ, the preponderance of human-caused grizzly bear mortalities has occurred near open roads (<500m.) while natural mortalities tend to occur further from open roads (>500m.). This relationship is displayed in Figure 3-3.

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

Since most grizzly bear mortalities are human-caused, and most human-caused mortalities are within 500m of open roads, the management of roads is one of the most powerful tools available to balance the security needs of grizzly bears with the activities of humans (USFWS 1993). However, it is important to note that tighter access restrictions on National Forest lands would not have prevented all of the past mortalities in the CYRZ and SRZ. Of 15 human-caused mortalities within 500m of open roads in or near the SRZ in the past 20 years, 10 have been in British Columbia and one was outside the recovery zone in Washington. The remaining 4 (27 percent) were on National Forest lands within the analysis area and potentially may have been prevented by tighter access controls. In the CYRZ, 2 of the mortalities within 500m of open roads over the past 20 years were in British Columbia, one was a management removal on private land, one was a research mortality, and one was outside the recovery zone. The remaining 5 (50 percent) were on National Forest lands within the analysis area and may potentially have been prevented by tighter access controls.

**Table 3-2.  Number of grizzly bear mortalities by cause from 1982 to 2001.**

| Mortality Cause | Selkirk | Cabinet-Yaak | Total |
|---|---|---|---|
| Natural – conspecific predation | 1 | 3 | 4 |
| Natural - other | 6 | 8 | 14 |
| *Subtotal (natural)* | *7* | *11* | *18* |
| Human -- poaching | 7 | 3 | 10 |
| Human – mistaken identity | 2 | 3 | 5 |
| Human – self defense | 1 | 3 | 4 |
| Human – management removal | 9 | 1 | 10 |
| Human – legal hunting (BC) | 5 | 1 | 6 |
| Human – research | 0 | 1 | 1 |
| Human -- unknown | 6 | 3 | 9 |
| *Subtotal (human)* | *30* | *15* | *45* |
| Unknown | 1 | 1 | 2 |
| Total | 38 | 27 | 65 |

Chapter 3    Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Figure 3-1. Grizzly bear mortalities by cause and year in the CYRZ and SRZ.**



**Figure 3-2. Percent natural, human-caused and unknown mortality in the CYRZ and SRZ, 1982 to present.**



Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Figure 3-3.  Distance to open roads for natural, human-caused and all mortalities.**



In addition to access management, other steps can be important in limiting grizzly bear mortalities. While these other steps are beyond the scope of this project, a brief discussion may be informative.

Grizzly bears are sometimes shot by hunters pursuing black bears or other game animals. Montana has now instituted a mandatory black bear hunter testing and certification program to help educate hunters in distinguishing species and reducing mistaken identity mortalities of grizzly bears. Black bear hunting seasons have also been shortened in recent years, reducing the potential for mistaken grizzly bear kills.

In many cases, management removals of grizzly bears are the result of bears becoming habituated to unnatural food sources such as human foods or garbage. In 2001, the Kootenai National Forest initiated voluntary food storage guidelines for forest visitors. Discussions are underway throughout the remainder of the recovery zones concerning the need for food storage requirements.

Table 3-2 indicates that 10 grizzly bears have been poached since 1982. An active law enforcement program can be a deterrent against this form of illegal grizzly bear mortality. The Forest Service actively cooperates with State and federal law enforcement officials concerning any illegal killings of grizzly bears.

Public education is an important element of any program designed to reduce grizzly bear mortalities. Through education, people can learn to live in a way that is more compatible with the needs and behaviors of bears. Properly designed education programs can reduce bear mortalities in instances of self-defense, habituation to unnatural foods, and by hunters. The Forest Service

Case 1:06-cv-01842-RCL    Document 16-7    Filed 01/23/2007    Page 10 of 21

Chapter 3    Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

and cooperating agencies maintain a regular program of public information and education within the CYRZ and SRZ.

As discussed above, a comprehensive program to minimize human-caused grizzly bear mortalities involves many elements, including access management, regulation of hunting, sanitation, law enforcement, and education. This document focuses on access management, but at the same time, the Forest Service and other agencies are also pursuing the other elements essential to preventing unnecessary mortalities of the threatened grizzly bear.

**Habitat Delineation and Management**

USFWS delineated recovery zones for grizzly bears in the Grizzly Bear Recovery Plan (USFWS 1993). The CYRZ includes portions of the KNF, LNF, and IPNF. The SRZ includes portions of the IPNF and Colville National Forests (CNF). State and private lands are also included within both recovery zones. The SRZ also extends into British Columbia, Canada.

To facilitate management, each recovery zone is divided into Bear Management Units (BMUs), each of which is approximately the home range size of an adult female grizzly bear (average size about 100 square miles). Twenty-two BMUs are contained within the CYRZ, including 15 BMUs on the KNF, one BMU on the LNF, four BMUs on the IPNF, and two BMUs shared between the KNF and IPNF. One of these BMUs (BMU 19 on IPNF) is less than 75 percent Federal ownership.

The SRZ has to date been comprised of nine BMUs, including five on the IPNF and four shared between the IPNF and CNF. One of these BMUs (LeClerc, which is primarily on the CNF with a minor portion on the IPNF) is less than 75 percent Federal ownership. Since LeClerc is mostly outside the analysis area, it is not within the scope of this decision.

This document proposes to combine the Kalispell-Granite and Lakeshore BMUs into a new BMU called Kalispell-Lakeshore for all alternatives except Alternative E. This would reduce the number of BMUs in the SRZ to eight, and those on the IPNF to four. In Alternative E, the Kalispell-Granite and Lakeshore BMUs would remain separate. Recovery Zone and BMU boundaries are shown in Figure 1-2.

Lakeshore BMU is somewhat of an anomaly in that it is small (about 30 square miles) and contains a higher percentage of developed lands than most BMUs. It was created at a later date than other BMUs to acknowledge spring bear use that was found to be occurring there. The Lakeshore BMU has been designated as a combination of management situation 2 and 3 habitats (refer to glossary for definitions of management situations). Management situation 3 designation is used when developments such as campgrounds, resorts, or other high use human facilities or human presence results in conditions which make grizzly bear presence untenable. The area mapped as management situation 3 in Lakeshore BMU totals approximately 5, 900 acres and is located along the eastern edge of the unit. The remainder of the BMU is designated management situation 2. Management situation designations within the Lakeshore BMU would not change as a result of implementation of any of the proposed alternatives.

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

Security is a critical element of grizzly bear habitat. Habitat security is influenced by motorized use of forest roads and trails. Current scientifically accepted measures of security in grizzly bear habitat include Open Motorized Route Density (OMRD), Total motorized Route Density (TMRD), and core. (Refer to the glossary for definitions of these terms.) These measures were developed after Forest Plans were approved and, therefore, are not incorporated into current Forest Plans for the IPNF, KNF or LNF. However, Wakkinen and Kasworm (1997) recommended the minimum levels for these measures, based on local bear research, believed needed to maintain grizzly bear populations in the CYRZ and SRZ (i.e. OMRD 33 percent, TMRD 26 percent, Core 55 percent). Table 3-3 displays the current status of these measures in each BMU.

**Table 3-3.  Existing Open Motorized Route Density, Total Motorized Route Density, and Core by Bear Management Unit.**

| BMU | National Forest | Federal Land (%) | OMRD >1mi/sq.mi (%) | TMRD >2 mi/sq.mi (%) | Core (%) |
|---|---|---|---|---|---|
| Cabinet-Yaak Recovery Zone | | | | | |
| 1 | KNF | 99 | 12 | 11 | 83 |
| 2 | KNF | 94 | 17 | 14 | 78 |
| 3 | KNF | 95 | 24 | 30 | 58 |
| 4 | KNF | 84 | 36 | 26 | 63 |
| 5 | KNF | 97 | 27 | 21 | 62 |
| 6 | KNF | 85 | 33 | 31 | 55 |
| 7 | KNF | 92 | 23 | 20 | 66 |
| 8 | KNF | 93 | 32 | 21 | 57 |
| 9 | KNF | 90 | 32 | 28 | 56 |
| 10 | KNF | 95 | 45 | 34 | 48 |
| 11 | KNF | 96 | 29 | 27 | 55 |
| 12 | KNF | 92 | 45 | 31 | 56 |
| 13 | KNF/IPNF | 99 | 34 | 24 | 59 |
| 14 | KNF/IPNF | 99 | 28 | 26 | 56 |
| 15 | KNF | 94 | 31 | 32 | 48 |
| 16 | KNF | 96 | 31 | 38 | 45 |
| 17 | KNF | 99 | 32 | 27 | 49 |
| 18 | IPNF | 92 | 37 | 35 | 48 |
| 19 | IPNF | 54 | 59 | 59 | 32 |
| 20 | IPNF | 94 | 38 | 20 | 61 |
| 21 | IPNF | 81 | 35 | 27 | 63 |
| 22 | LNF | 89 | 37 | 41 | 47 |
| Selkirk Recovery Zone | | | | | |
| Blue-Grass | IPNF | 96 | 30 | 29 | 49 |
| Long-Smith | IPNF | 92 | 21 | 13 | 73 |
| Kalispell-Lakeshore** | IPNF | 94 | 37 | 30 | 41 |
| Kalispell-Granite** | IPNF | 96 | 31 | 29 | 46 |
| Lakeshore** | IPNF | 86 | 82 | 56 | 16 |
| Salmo-Priest | IPNF/CNF | 99 | 30 | 24 | 64 |
| Sullivan-Hughes | IPNF/CNF | 99 | 20 | 23 | 55 |
| Myrtle | IPNF | 85 | 31 | 19 | 60 |
| Ball-Trout | IPNF | 94 | 16 | 9 | 74 |
| Le Clerc* | IPNF/CNF | 64 | 39 | 53 | 32 |

CNF = Colville National Forest          KNF = Kootenai National Forest    All numbers current as of the end of year 2000.
IPNF = Idaho Panhandle National Forest          LNF = Lolo National Forest
*Not included in proposed action because mostly outside analysis area on CNF.   ** Kalispell-Granite and Lakeshore
are separate in Alternative E and combined into Kalispell-Lakeshore in all other alternatives.

Other measures of habitat security were incorporated into Forest Plans or were applied as a result of consultation with USFWS subsequent to Forest Plans. These measures include linear open road density, habitat effectiveness, and limitations on administrative use of restricted roads. (Refer to the glossary for definitions of these terms.  Linear open road density is applied on a Bear Analysis Area (BAA, called BMAA on LNF – see glossary) and BMU basis.  BAAs and BMAAs are subdivisions of a BMU and are used in calculations of linear open road density. Habitat effectiveness is applied on a BMU basis, and administrative use limitations are applied on individual roads. Table 3-4 shows how these measures currently apply on each National Forest in the analysis area.

**Table 3-4.  Other Current Measures of Habitat Security**

| Measure | IPNF | KNF | LNF |
|---|---|---|---|
| Linear Open Road Density | Does not apply | ≤0.75 mi/sq mi in each BMU and BAA | ≤1.00 mi/sq mi in each BMAA |
| Habitat Effectiveness | ≥70 sq mi by BMU | ≥70% by BMU | Does not apply |
| Administrative Use Allowed | 15 days per bear year | 121 trips per bear year | 14 days per bear year |

Table 3-5 displays the existing linear open road density and habitat effectiveness within the analysis area.

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Table 3-5.  Existing Linear Open Road Density and Habitat Effectiveness.**

| BMU | BAA or BMAA | Linear Open Road Density | Habitat Effectiveness |
|-----|-----|-----|-----|
| **Cabinet-Yaak Recovery Zone** | | | |
| 1 | 1 | 0.07 | 88 |
| | 2 | 0.00 | |
| | 3 | 0.30 | |
| | 4 | 0.00 | |
| | 5 | 0.02 | |
| | 6 | 0.67 | |
| | BMU total | 0.21 | |
| 2 | 1 | 0.24 | 84 |
| | 2 | 0.00 | |
| | 3 | 0.00 | |
| | 4 | 0.00 | |
| | 5 | 0.00 | |
| | 6 | 0.75 | |
| | 7 | 0.91 | |
| | BMU total | 0.34 | |
| 3 | 1 | 0.75 | 76 |
| | 2 | 0.51 | |
| | 3 | 0.00 | |
| | 4 | 1.05 | |
| | 5 | 0.55 | |
| | 6 | 0.10 | |
| | BMU total | 0.51 | |
| 4 | 1 | 0.08 | 65 |
| | 2 | 0.32 | |
| | 3 | 0.66 | |
| | 4 | 0.00 | |
| | 5 | 0.00 | |
| | 6 | 0.00 | |
| | 7 | 0.59 | |
| | BMU total | 0.27 | |
| 5 | 1 | 0.58 | 75 |
| | 2 | 0.85 | |
| | 3 | 0.00 | |
| | 4 | 0.00 | |
| | 5 | 1.02 | |
| | 6 | 0.85 | |
| | BMU total | 0.60 | |
| 6 | 1 | 0.82 | 69 |
| | 2 | 0.00 | |
| | 3 | 0.00 | |
| | 4 | 0.00 | |
| | 5 | 0.56 | |
| | 6 | 1.24 | |
| | 7 | 0.80 | |
| | BMU total | 0.62 | |
| 7 | 1 | 0.00 | 80 |
| | 2 | 0.61 | |
| | 3 | 0.78 | |
| | 4 | 1.02 | |
| | 5 | 0.04 | |
| | 6 | 0.23 | |
| | BMU total | 0.45 | |
| 8 | 1 | 0.40 | 77 |
| | 2 | 0.19 | |
| | 3 | 0.57 | |
| | 4 | 0.69 | |
| | 5 | 0/74 | |
| | 6 | 0.80 | |

| BMU | BAA or BMAA | Linear Open Road Density | Habitat Effectiveness |
|-----|-----|-----|-----|
| 8 cont. | BMU total | 0.54 | 77 |
| 9 | 1 | 0.93 | 72 |
| | 2 | 2.21 | |
| | 3 | 0.25 | |
| | 4 | 0.65 | |
| | 5 | 0.61 | |
| | BMU total | 0.89 | |
| 10 | 1 | 1.81 | 65 |
| | 2 | 0.54 | |
| | 3 | 0.39 | |
| | 4 | 0.00 | |
| | 5 | 0.74 | |
| | 6 | 1.35 | |
| | 7 | 1.24 | |
| | 8 | 1.09 | |
| | 9 | 0.92 | |
| | BMU total | 0.91 | |
| 11 | 1 | 0.42 | 73 |
| | 2 | 0.70 | |
| | 3 | 0.40 | |
| | 4 | 0.51 | |
| | 5 | 0.16 | |
| | 6 | 0.85 | |
| | BMU total | 0.47 | |
| 12 | 1 | 0.48 | 60 |
| | 2 | 0.00 | |
| | 3 | 0.00 | |
| | 4 | 0.68 | |
| | 5 | 1.58 | |
| | 6 | 2.10 | |
| | BMU total | 0.84 | |
| 13 | 1 | 0.66 | 72 |
| | 2 | 0.79 | |
| | BMU total | 0.73 | |
| 14 | 1 | 0.54 | 75 |
| | 2 | 0.53 | |
| | 3 | 0.72 | |
| | 4 | 0.82 | |
| | BMU total | 0.63 | |
| 15 | 1 | 0.35 | 70 |
| | 2 | 0.42 | |
| | 3 | 0.57 | |
| | 4 | 0.08 | |
| | 5 | 0.06 | |
| | 6 | 0.52 | |
| | 7 | 1.37 | |
| | BMU total | 0.44 | |
| 16 | 1 | 0.01 | 70 |
| | 2 | 0.13 | |
| | 3 | 0.62 | |
| | 4 | 0.22 | |
| | 5 | 0.66 | |
| | 6 | 1.02 | |
| | 7 | 1.10 | |
| | 8 | 0.15 | |
| | 9 | 0.17 | |
| | 10 | 0.32 | |
| | BMU total | 0.54 | |
| 17 | 1 | 0.74 | 73 |

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Table 3-5.  Continued.**

| BMU | BAA or BMAA | Linear Open Road Density | Habitat Effectiveness |
|---|---|---|---|
| 17 cont. | 2 | 0.89 | 73 |
| | 3 | 0.22 | |
| | 4 | 0.51 | |
| | 5 | 0.73 | |
| | 6 | 0/59 | |
| | 7 | 0.00 | |
| | 8 | 0.00 | |
| | BMU total | 0.57 | |
| 18 | NA | | 70 |
| 19 | | | 60 |
| 20 | | | 69 |
| 21 | | | 70 |
| 22 | 1 | 0.90 | NA |
| | 2 | 0.50 | |
| | 3 | 0.20 | |
| | 4 | 0.00 | |
| | 5 | 0.10 | |
| | 6 | 1.00 | |
| | 7 | 0.00 | |
| | 8 | 0.90 | |
| | 9 | 0.00 | |
| | 10 | 0.90 | |
| | 11 | 1.50 | |
| | 12 | 0.60 | |
| | 13 | 0.70 | |
| | 14 | 0.00 | |
| | 15 | 0.00 | |
| | 16 | 3.10 | |
| | 17 | 1.00 | |
| | BMU total | 0.67 | |
| **Selkirk Recovery Zone** | | | |
| Blue-Grass | NA | | 71 |
| Long-Smith | | | 82 |
| Kalispell-Lakeshore* | | | 63 |
| Kalispell-Granite* | | | 71 |
| Lakeshore* | | | 27 |
| Salmo-Priest | | | 74 |
| Sullivan-Hughes | | | 80 |
| Myrtle | | | 71 |
| Ball-Trout | | | 85 |
| Le Clerc | | | 62 |

NA = Not Applicable    All numbers current as of the end of year 2000.
Habitat Effectiveness is shown in square miles for the IPNF and as percent of BMU for the KNF and LNF.
*Kalispell-Granite and Lakeshore are separate in Alternative E and combined into Kalispell-Lakeshore in all other alternatives.

Case 1:06-cv-01842-RCL    Document 16-7    Filed 01/23/2007    Page 16 of 21

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Direct and Indirect Effects**

The terms direct, indirect and cumulative effects are defined in the glossary. The proposed action and alternatives represent programmatic decisions, and therefore, they will have no **direct effects** on grizzly bears or their habitats. Any direct effects would occur later at the project level when site-specific decisions are made about road and trail use restrictions. Most of the effects identified in this analysis would be **indirect effects** in that they would occur later in time as a result of this programmatic decision.

Human use of motorized roads and trails within occupied grizzly bear habitat may produce or facilitate several kinds of adverse effects to grizzly bears, including the following:

- Direct shooting mortality may occur through mistaken identity for black bears or other game animals, through defense of life actions, through poaching for trophy animals, and through malicious killings.
- Attractants (human and animal foods and garbage) that arrive in grizzly bear habitat in motorized vehicles may result in habituated bears that must eventually be destroyed.
- Some bears may become conditioned to the presence of vehicles and humans on roads and thus become more vulnerable to direct mortality through the means identified above.
- Other bears may be displaced from preferred habitat by the human disturbance associated with road use, with a resultant reduction in habitat availability and quality and potential effects on nutrition and reproduction.

In general, alternatives that place greater limitations on human use of motorized roads and trails would tend to minimize the above potential effects, while those alternatives that place lesser limitations on such use would tend to provide less mitigation for the potential effects.

Several effects indicators were used to estimate the effects of the alternatives on grizzly bears. These included both numerical and non-numerical indicators, which are discussed below.

**Numerical Indicators**

The numerical indicators include various ways of considering how the alternatives meet the parameters of OMRD, TMRD, Core and administrative use. These include looking at how many BMUs in each recovery zone meet the recommended minimum levels for these parameters individually ($\leq$33% OMRD, $\leq$26%TMRD, $\geq$55% Core), how many meet all three parameters, what the average values for the parameters are for all BMUs in a recovery zone, and what the average proposed or allowed change from year 2000 status is for each BMU. It is important to note that some allowed changes (i.e. increases in road densities or decreases in core in BMUs that are currently better than standards), though allowed to occur by the standards, are unlikely to ever occur. In contrast, proposed changes needed to bring deficient BMUs up to standard would be mandatory. Limitations on administrative use of restricted roads are also displayed. This information is summarized in Table 3-6.

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife – Threatened, Endangered, and Proposed Species**

**Table 3-6.   Rating of Alternatives by Numerical Effects Indicators**

| Effects Indicator | Alternatives | | | |
|---|---|---|---|---|
| | **A** | **B** | **C** | **E** |
| Cabinet-Yaak Recovery Zone (22 BMUs) | | | | |
| # BMUs meeting ≤33% OMRD | NA | 13 | **21** | 15 |
| # BMUs meeting ≤26% TMRD | 8 | 9 | **21** | 16 |
| # BMUs meeting ≥55% Core | 13 | 17 | **21** | 20 |
| # BMUs meeting 33%-26%-55% (all three) | 0 | 6 | **21** | 13 |
| Average OMRD (all BMUs) (%) | NA | **33** | 34 | 34 |
| Average OMRD change per BMU** (%) | NA | **0** | +1 | **<+1** |
| Average TMRD (all BMUs) (%) | 27* | 28 | **27** | **27** |
| Average TMRD change per BMU** (%) | 0* | 0 | **≤-1** | **≤-1** |
| Average Core (all BMUs) (%) | 58* | **58** | 54 | 57 |
| Net Core change for CYRZ** (acres) | 0* | +13,877 | -20,037 | **+22,655** |
| Allowable administrative use per road | 121 trips KNF<br>15 days IPNF<br>14 days LNF | 115 trips | **57 trips** | **57 trips** |
| Selkirk Recovery Zone (7 BMUs in Alts A, B, C; 8 BMUs in Alt E) | | | | |
| # BMUs meeting ≤33% OMRD | NA | 6 | **7** | **7** |
| # BMUs meeting ≤26% TMRD | NA | 5 | **7** | **7** |
| # BMUs meeting ≥55% Core | NA | **7** | **7** | **7** |
| # BMUs meeting 33%-26%-55% (all three) | NA | 5 | **7** | **7** |
| Average OMRD (all BMUs) (%) | NA | **27** | 33 | 35 |
| Average OMRD change per BMU** (%) | NA | **0** | +6 | +2 |
| Average TMRD (all BMUs) (%) | NA | **21** | 26 | 25 |
| Average TMRD change per BMU**(%) | NA | **0** | +5 | **<+1** |
| Average Core (all BMUs) (%) | NA | **62** | 55 | 56 |
| Net Core change for SRZ** (acres) | NA | **+18,011** | -9,019 | +9,572 |
| Allowable administrative use per road | **15 days IPNF** | 115 trips | 57 trips | 57 trips |

\*KNF and LNF only (NA on IPNF).   LeClerc BMU not included (<75% federal and mostly on CNF).

\*\*Change proposed or allowed from 2000 status.

**Bold underlined** = best for bears

**Bold** = second best. Where there is a tie for best, no second best is identified.

Case 1:06-cv-01842-RCL    Document 16-7    Filed 01/23/2007    Page 18 of 21

Chapter 3    Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Non-numerical Indicators**

The following non-numerical indicators were used to assess potential effects to grizzly bears.

1. Contributes to achieving Grizzly Bear Recovery Plan Objectives and Consistent with Interagency Grizzly Bear Committee (IGBC) Access Direction. This indicator determines whether the alternatives are consistent with administrative direction for recovery of grizzly bears, including the Grizzly Bear Recovery Plan (USFWS 1993) and Interagency Grizzly Bear Committee (IGBC) access management direction (IGBC 1998). The Grizzly Bear Recovery Plan identifies recovery goals, objectives and tasks necessary for recovery of the species. Many of these items relate to reducing human-caused mortality. Human access by motorized roads and trails is often a contributing factor to human-caused mortality of bears. IGBC provided direction for developing consistent management standards related to management of motorized access within grizzly bear recovery zones.

Alternatives that were found to contribute strongly to Recovery Plan objectives and be highly consistent with IGBC direction were rated YES (Y). Those alternatives that partially met these sources of direction were rated PARTIAL (P).

**Alternative A** somewhat achieves Recovery Plan objectives in that it contains measures such as linear open road density and habitat effectiveness that provide a level of habitat security for bears, thereby providing some protection from human-caused mortality. However, mortality while managing under these measures did not meet the Grizzly Bear Recovery Plan goal of zero human caused mortality. Alternative A is inconsistent with IGBC direction in that it does not establish numerical OMRD, TMRD or Core requirements within grizzly bear habitat. This alternative is rated P.

**Alternative B** incorporates all the protective measures of Alternative A plus the Interim Access Management Strategy and Rule Set. Goals for Core are established in priority 1 BMUs (see glossary), and no increases in OMRD or TMRD are allowed, but no numerical standards are established for these measures. Thus, this alternative shows an improvement in meeting direction compared to Alternative A, but is not fully consistent with IGBC and Recovery Plan direction. This alternative is also rated P.

**Alternative C** reflects direction established by USFWS in their recent Biological Opinion on the IPNF Forest Plan, and subsequent informal consultation during preparation of this EIS. It is therefore deemed to be consistent with Recovery Plan objectives. It is also consistent with IGBC access direction by incorporating standards for OMRD, TMRD and Core. With one exception, these standards are the same as those recommended by research scientists based on studies of local grizzly bears (Wakkinen and Kasworm 1997). The exception is BMU 19 in the CYRZ where a high percentage of non-federal land in the BMU precludes meeting the research recommendations. In this case the standards were set as high as they could be, taking into account land ownership. This alternative is rated Y.

**Alternative E** also incorporates direction for OMRD, TMRD and Core, and goes beyond minimum recommended levels for these measures in many BMUs. In a few BMUs,

Case 1:06-cv-01842-RCL    Document 16-7    Filed 01/23/2007    Page 19 of 21

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

recommended levels of either OMRD, TMRD, or Core are not met due to the lack of legal authority to close highways and county roads, the high percentage of non-federal lands, or the social consequences of closing certain important forest roads. However, considering all BMUs, this Alternative may provide an even higher level of habitat security for bears than Alternative C. This alternative is rated Y.

2. Consistent with ESA Section 7(a)(1) requirement to conserve listed species. Section 7(a)(1) requires federal agencies to carry out programs for the conservation of listed species. While all alternatives contain elements of programs for managing human access in grizzly bear habitat, the question is, to what level do the alternatives contribute to conserving grizzly bears? Alternatives that include conservation measures that are less than the current state of the art (i.e. based on current research) were found to only partially contribute to the conservation of bears and were rated P. Alternatives judged to include higher levels of conservation for bears in a manner consistent with current scientific research were rated Y.

**Alternative A** contains access management measures such as linear open road density and habitat effectiveness, but human-caused grizzly bear mortality has continued with these measures in place. The certainty of this alternative conserving grizzly bears is low, but if conservation and recovery were to occur, it would be over a very long timeframe. This alternative is rated P.

**Alternative B** provides some additional measures for conserving habitat security for bears compared to Alternative A. However, during the past two years in the CYRZ, while these measures were in place, human caused mortality has increased and the bear population has likely turned from an increasing to a decreasing trend (Kasworm et. al. 2000). This alternative is also rated a P.

**Alternative C**, with one exception, incorporates the minimum level of habitat security measures (OMRD, TMRD and Core) recommended by grizzly bear researchers based on their study of local bears. The exception is BMU 19 in the CYRZ where a high amount of non-federal land precludes meeting the research recommendations. The numerical levels of security in this alternative represent the average values within the home ranges of local bears; therefore, conserving bears at the lowest level considered to have reasonable potential for success. This alternative is rated Y.

**Alternative E** provides habitat security as measured by OMRD, TMRD and Core at levels similar to Alternative C in many BMUs, higher than Alternative C in several BMUs, and lower than Alternative C in a few BMUs. Overall, across both recovery zones, the level of security is higher than in Alternative C. This alternative is also rated Y.

3. Consistent with ESA Section 7(a)(2) requirement to avoid jeopardizing continued existence of listed species. In addition to the affirmative obligation to conserve listed species, ESA requires federal agencies to insure that any agency action does not jeopardize the continued existence of the species. The determination of jeopardy or non-jeopardy is made in consultation with USFWS through the ESA Section 7 consultation process. Based on ongoing informal consultations and an estimate of how well the alternatives would provide for habitat security of bears and the expected results in terms of human-caused mortality, it is possible to rate the alternatives as to their probable risk of jeopardizing the populations.

Chapter 3    Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

Alternatives that are believed to be inconsistent with the jeopardy criteria of Section 7(a)(2) are rated NO (N) while those that are believed to avoid jeopardizing the grizzly bear populations are rated Y.

**Alternative A** coincided with levels of human-caused mortality that exceeded Recovery Plan goals during the timeframe when it was in place. While bear habitat was being managed in a manner consistent with this alternative, USFWS determined that the populations warranted uplisting from threatened to endangered. The likelihood that USFWS would find this alternative to jeopardize the continued existence of grizzly bears under ESA Section 7(a)(2) seems high. The alternative is rated N.

**Alternative B** contains all the security measures of Alternative A plus additional ones contained in the Interim Access Management Strategy and Rule Set. An important feature of this alternative is a provision for no net loss in OMRD, TMRD, and Core. Because of this feature and the fact that many BMUs currently meet standards for OMRD, TMRD and Core, this alternative is rated Y.

**Alternative C**, with one exception, sets security standards for OMRD, TMRD and Core at the average level of known female bears within the CYRZ and SRZ. This is the minimum level recommended by researchers needed to maintain bear populations in the recovery zones. . The exception is BMU 19 in the CYRZ where a high amount of non-federal land precludes meeting the research recommendations. Though at the minimum levels, it is believed that this alternative would avoid the jeopardy criteria of Section 7(a)(2). This alternative is rated Y.

**Alternative E** provides an overall higher level of habitat security than Alternative C and therefore should go farther towards insuring that the species will not be jeopardized. The alternative is rated Y.

4. Utilizes best available scientific information.  The best available scientific information regarding access management in grizzly bear habitat is considered to include two sources. One of these is the research from the South Fork of the Flathead River regarding how road access affects grizzly bears (Mace and Manley 1993, Mace and Waller 1997). This research resulted in development of OMRD, TMRD and Core as management measures for insuring grizzly bear habitat security. It also resulted in development of the moving windows computer technique for assessing OMRD and TMRD. The second source is research from local bear populations that applies the South Fork technology to the Selkirk and Cabinet-Yaak recovery zones (Wakkinen and Kasworm 1997). Alternatives that apply this scientific information are rated Y. Alternatives that partially apply the information are rated P.

**Alternative A** includes a requirement for no net increase in TMRD and no net decrease in Core in BMUs on the KNF and LNF. It is therefore rated P.

**Alternative B** includes a goal of working towards 55 percent core in priority 1 BMUs, and includes a requirement for no net increase in OMRD and TMRD and no net decrease in Core in all BMUs. Therefore this alternative partially addresses the latest information but fails to establish specific standards for the measures. It is rated P.

Case 1:06-cv-01842-RCL    Document 16-7    Filed 01/23/2007    Page 21 of 21

Chapter 3   Affected Environment and Environmental Consequences
**Wildlife - Threatened, Endangered, and Proposed Species**

**Alternative C**, with one exception, includes numerical standards in all BMUS, of 33, 26, and 55 for OMRD, TMRD and Core, respectively. The exception is BMU 19 in the CYRZ where a high amount of non-federal land necessitates setting different standards. The standards in this BMU are 59, 54, and 39 for OMRD, TMRD, and Core. Because this alternative utilizes OMRD, TMRD and Core standards and sets them at the levels of research recommendations where it is possible to do so, it is rated Y.

**Alternative E** includes BMU-specific standards for OMRD, TMRD and Core in all BMUs. It is therefore rated Y.

5. Level of mitigation for grizzly bear mortality risk. The greater the level of security provided by an alternative, the greater the resulting mitigation for mortality risk. The alternatives were rated as either high (H), medium (M), or low (L) in mitigating mortality risk. It should be noted that some past mortalities have no relationship to forest roads. These include, for example, natural mortalities, some management removals, and one research mortality. Nevertheless, most (69 percent) mortalities are human-caused, and most human-caused mortalities occur within 500m meters of open roads.

**Alternative A** includes measures such as linear open road density, habitat effectiveness, no net increase in TMRD and no net decrease in Core which apply to only portions of the analysis area (see Tables 3-3 and 3-5). This alternative is rated M.

**Alternative B** contains one of the best conditions for OMRD, TMRD and Core on average for all BMUs due to the no net loss provision of the alternative (see Table 3-3). Therefore, this alternative is rated H.

**Alternative C** includes numerical standards for OMRD, TMRD and Core, but the standards are set at the minimum recommended levels (33, 26, and 55 respectively), or in one case below the recommended level (BMU 19) for bear security, and therefore this alternative is rated M.

**Alternative E** also contains one of the best conditions for OMRD, TMRD and Core, on average, for all BMUs since these standards are set individually by BMU and many are set well above the minimums (see Table 2-4). This alternative is rated H.

6. Level of mitigation for grizzly bear displacement potential. This indicator parallels indicator 5 very closely. Like the mortality indicator, the greater the level of security provided by an alternative, the greater the mitigation for potential displacement of bears from preferred habitat. Therefore, the alternatives are rated exactly the same as for indicator 5.

7. Provides for future development of habitat-based access management approach. Not all habitat is of equal value to bears. From a bear management standpoint, it makes sense to place access restrictions in habitat that has the greatest biological value. New techniques are becoming available for this habitat-based approach to access management, but the techniques are not currently available in the CYRZ and SRZ. Therefore, this indicator assesses whether the alternatives are expected to promote application of this approach as new information becomes available in the future.

# Exhibit 4

FILED
MISSOULA, MT

2007 AUG 29 PM 5 16

PATRICK E. DUFFY
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES and THE LANDS COUNCIL, | ) CV 04-216-M-DWM<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | ) ORDER<br>) |
| UNITED STATES FISH AND WILDLIFE SERVICE, an agency of the U.S. Dept. of Interior, and UNITED STATES FOREST SERVICE, an agency of the U.S. Dept. of Agriculture, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

## I. Introduction and Factual Background

In 1999, the Alliance for the Wild Rockies filed a lawsuit against the Kootenai and Idaho Panhandle National Forests over their use of interim rules for managing motorized access on the Cabinet-Yaak and Selkirk Ecosystems without amending their Land and Resource Management Plans. The case settled in 2001 with the Forests agreeing to amend their Plans to include motorized access rules. The Final Environmental Impact Statement (FEIS) and Biological Opinion (BiOp) at issue in this case are the result of

-1-

the Forests' attempts to amend their Forest Plans.

The Forest Plan Amendments address grizzly bear habitat management within the Cabinet-Yaak and Selkirk Recovery Zones[1] by changing the objectives, standards, and guidelines related to open motorized route density (OMRD), total motorized route density (TMRD), and core habitat through implementation of Alternative E from the Forest Service's 2002 FEIS.  FWS AR 1:6. Alternative E establishes specific standards for the management of core habit, OMRD, and TMRD for individual bear management units (BMUs), taking into consideration the unique biological and social features[2] within each BMU.  The amendments also limit administrative travel on restricted[3] roads in the BMUs. The amendments are programmatic; modification to any specific road or its use will be subject to project-level analysis.  FS AR 19-9 at 1-1.

The amendments do not make radical changes in motorized access standards.  The standards on which the rules are based require maximum TMRD of 26%, total OMRD of 33%, and core habitat of 55%.  In the Cabinet-Yaak Recovery Zone, twenty of twenty-two

---

[1]The Fish and Wildlife Service's Grizzly Bear Recovery Plan identifies six separate recovery zones or ecosystems, including Yellowstone, the Northern Continental Divide, the North Cascades, the Bitterroot, and the two at issue here, the Cabinet-Yaak and Selkirk.

[2]Social features include, among other things, highways, topography, and residential developments.

[3]A road is considered "restricted" if it is gated or otherwise obstructed.

BMUs will exceed the research-identified level for core habitat of 55%, while currently only fourteen do. FWS AR 1:12. Seventeen of the twenty-two will beat the OMRD and/or TMRD levels. Id. In addition, the overall core habitat throughout the Cabinet-Yaak will increase slightly from 56% to 58%. FWS AR 1:108-109. In the Selkirk Recovery Zone, seven of nineteen BMUs will better the core and OMRD/TMRD levels.[4] FWS AR 1:12. In addition, the terms of the biological opinion require that there be no permanent reduction in core area in any BMU, and that temporary losses of core occur in no more than three of each ten years. FWS AR 1:141-42.

Plaintiffs challenge the Forest Service's March 2004 Record of Decision regarding the Forest Plan Amendments for Motorized Access Management in the Cabinet-Yaak and Selkirk Ecosystems; the Forest Service's March 2002 Final Environmental Impact Statement for those Plan Amendments; FWS's February 9, 2004 Biological Opinion on those amendments; and FWS's decision to concur in the Forest Service's "not likely to adversely affect" determinations for grizzly bears affected by the White Pine, Lower Big Creek, and West Troy Projects on the Kootenai National Forest and the Mission Brush Project on the Idaho Panhandle National Forest.

---

[4]The FEIS states that the Selkirk Recovery Zone has 9 BMUs. That number does not include the Canadian ones. FS AR 19-9 at 3-10. Ten Selkirk BMUs are in the United States; eight are managed by the Idaho Panhandle National Forest, one by the Colville National Forest, and one by Idaho state lands (over which the Plan Amendments have no control). FWS AR 1:33.

Compl. ¶ 2.

Plaintiffs' Complaint states eight claims for relief:

1.  FWS's 2004 BiOp for the "Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones" arbitrarily fails to consider grizzly mortality rates, contrary to 16 U.S.C. § 1536(a)(2) and in violation of 5 U.S.C. §§ 701-706.

2.  The BiOp also arbitrarily fails to consider the best scientific and commercial data available regarding likely levels of take of grizzly bears, in violation of 16 U.S.C. § 1536(a)(2) & (b)(4), and 5 U.S.C. §§ 701-706.

3.  The BiOp also arbitrarily fails to assess the potential for grizzly bear recovery, contrary to 16 U.S.C. § 1536(a)(2) and in violation of 5 U.S.C. §§ 701-706.

4.  The BiOp arbitrarily fails to consider conflicts with the Interagency Grizzly Bear Committee Guidelines for grizzly habitat management, contrary to 16 U.S.C. § 1536(a)(2) and in violation of 5 U.S.C. §§ 701-706.

5.  The BiOp also fails to use the best scientific evidence available, contrary to 16 U.S.C. § 1536(a)(2) and in violation of 5 U.S.C. §§ 701-706.

6.  The FWS "Letters of Concurrence" for the White Pine, Lower Big Creek, West Troy, and Mission Brush Timber Sales are arbitrary, capricious, and in violation of the Endangered Species Act (ESA).

-4-

7. The Forest Service's March 2002 EIS is arbitrary, capricious, and in violation of the National Environmental Policy Act (NEPA).

8. The March 2004 Record of Decision, including the decision to implement Alternative E from the 2002 EIS, is arbitrary, capricious, and in violation of National Forest Management Act (NFMA). 5 U.S.C. § 706(2)(A), (D).

For the reasons set forth below, I find the Defendants are entitled to summary judgment. The Plaintiffs are not, and no injunction will be issued.

## II. Analysis

Plaintiffs have three major contentions: the BiOp issued for the "Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones" is arbitrary and capricious, FWS's letters of concurrence for timber sales within the area are arbitrary and capricious, and the Forest Service's 2002 EIS for the Forest Plan Amendments violates NEPA. Plaintiffs request summary judgment and injunctive relief. The Government also moves for summary judgment.

## A. BiOp for the "Forest plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones"

### 1. Analytical Framework

Both parties have moved for summary judgment on all counts: ESA, NEPA, and NFMA. Because these statutes do not provide an

independent basis for review, the action is governed by the
Administrative Procedure Act (APA), which permits judicial review
of final agency action. 5 U.S.C. § 706. Judicial review under
the APA is limited to the question of whether the Forest Service
or FWS acted arbitrarily, capriciously, or otherwise not in
accordance with the law. 5 U.S.C. § 706. In making this
determination, the Court must consider whether the agency's
decisions were based on a consideration of the relevant factors
and determine whether the agency made "a clear error of
judgment." Marsh v. Oregon Natural Res. Council, 490 U.S. 360,
378 (1989). The Court's review is limited to the information
that was before the agency at the time it made its decision.
Friends of the Earth v. Hintz, 800 F.2d 822, 828-29 (9th Cir.
1986). The basis for the decision must be articulated by the
agency in the record. Arizona Cattle Growers' Ass'n v. U.S. Fish
& Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001); Camp v.
Pitts, 411 U.S. 138, 142 (1973).

ESA § 7(a)(2) provides the standard by which to consider
FWS's and the Forest Service's actions.

> Each federal agency shall, in consultation with and
> with the assistance of the Secretary, insure that any
> action authorized, funded, or carried out by such
> agency (hereinafter in this section referred to as an
> "agency action") is not likely to jeopardize the
> continued existence of any endangered species or
> threatened species or result in the destruction or
> adverse modification of habitat of such species which
> is determined by the Secretary, after consultation as
> appropriate with affected States, to be critical,
> unless such agency has been granted an exemption for

-6-

> such action by the Committee pursuant to subsection (h)
> of this section. In fulfilling the requirements of
> this paragraph each agency shall use the best
> scientific and commercial data available.

16 U.S.C. § 1536(a)(2). Counsel for the Government put his
finger on the crux of this dispute at oral argument, when he
pointed out that Plaintiffs appear to be demanding that Fish and
Wildlife and the Forest Service in particular actually save the
grizzly bear from extinction, rather than, as ESA § 7(a)(2)
requires, ensure that the actions taken by the Forest Service do
not "jeopardize the continued existence" of the grizzlies.

Plaintiffs have reason to be concerned about the fate of the
grizzlies in the Cabinet-Yaak and Selkirk Ecosystems.   The
populations are paltry and would qualify as endangered but for
FWS's policy about priority.[5]   However, a § 7(a)(2) consultation
is not a mechanism by which all harms to the grizzlies can be
erased.   The question here is narrow:   Do the Forest Service
amendments jeopardize grizzlies?   Plaintiffs maintain that the
status quo is unacceptable and the amendments only barely improve
on the status quo.   Thus, according to Plaintiffs, the amendments
jeopardize grizzlies by failing to sufficiently improve on the
status quo.   Conversely, Defendants maintain that because the
chosen alternative would improve upon current conditions, if only
slightly, the Amendments do not jeopardize the bears.

---

[5]FWS has found that reclassification of grizzly bears in the
Cabinet-Yaak and Selkirk from threatened to endangered species is
"warranted but precluded by work on higher priority species." FWS AR
1:10-11.

In Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation, 143 F.3d 515 (9th Cir. 1998), the Ninth Circuit discussed the Secretary's decision to adopt a biological opinion, reasonable and prudent alternative, and incidental take statement. Plaintiffs in that case alleged various violations of the ESA. The Court wrote:

> [U]nder the ESA, the Secretary was not required to pick the first reasonable alternative the FWS came up with in formulating the RPA. The Secretary was not even required to pick the best alternative or the one that would most effectively protect the Flycatcher from jeopardy. The Secretary need only have adopted a final RPA which complied with the jeopardy standard and which could be implemented by the agency.

Id. at 523 (internal citation omitted). The Court went on to say:

> The district court correctly held that the only relevant question before it for review was whether the Secretary acted arbitrarily and capriciously or abused his discretion in adopting the final RPA. In answering this question, the court had only to determine if the final RPA met the standards and the requirements of the ESA. The court was not in a position to determine if the draft RPA should have been adopted or if it would have afforded the Flycatcher better protection.

Id. This framework is useful in evaluating Plaintiffs' persuasive, but legally unavailing, claims.

## 2. Grizzly Bear Mortality

Plaintiffs' first argument, which is a theme throughout much of their Complaint, is that FWS's various decisions in this matter are not supported by sufficient science. Plaintiffs argue that FWS did not adequately consider grizzly mortality rates and

that the BiOp's baseline artificially excludes other simultaneous
projects with effects on grizzlies.  Plaintiffs cite this Court's
opinion in <u>Rock Creek Alliance v. U.S. Fish and Wildlife Service</u>,
390 F.Supp.2d 993 (D. Mont. 2005), for the idea that improper
reliance on poor science takes a decision out of the realm of
FWS's discretion and into a violation of the law.  Plaintiffs
point to the BiOp's opinion that sanitation issues remain
problematic in the recovery zones and "up to one bear" is likely
to die as a result, yet the Amendments do nothing to improve
sanitation.  FWS AR 1: 136.  Plaintiffs also argue that FWS
should have done a <u>Rock Creek Alliance</u>-type analysis and estimate
the mortality that the population can withstand.

Defendants' view is that their scientific information is
credible, and Plaintiffs must defer to the agency's scientific
expertise.  Specifically on mortality rates, Defendants contend
the BiOp sufficiently addresses mortality in the Selkirk and
Cabinet-Yaak Ecosystems, citing FWS AR 1:38-43, 53-58, 130, 135,
& 139.  Defendants characterize these discussions as considering
mortality, the mechanisms affecting mortality, and the effects of
the proposed action on mortality.  That, they argue, is
sufficient to meet their ESA burden.

It is important to clarify the distinction between this
situation and the situation this Court considered in the <u>Rock
Creek Alliance</u> case.  In <u>Rock Creek Alliance</u>, FWS issued a
biological opinion and Incidental Take Statement that allowed a

-9-

mine to go forward in the Rock Creek area of the Cabinet-Yaak,
despite the fact that additional bear mortality was expected due
to the mine.  390 F.Supp.2d at 997-98.  Unlike the BiOp here,
which involved programmatic amendments, the Rock Creek BiOp
considered a site-specific project.  Id.  The Court concluded it
was arbitrary to allow a project (especially a private mining
project) go forward that would result in further deaths in a
threatened (and, but for bureaucratic restrictions) population
that was quite possibly in decline.  Id. at 1009.

     Unlike in Rock Creek Alliance, here the amendments will,
however slightly, *improve* the situation for bears in the Cabinet-
Yaak and Selkirk Recovery Zones.  The only predicted take
identified by the FWS relates to sanitation, which, since it was
not part of the modification of access management, occurs at the
same level or is not expected to increase as a result of the
Amendments.  In addition, the Rock Creek Alliance BiOp relied on
the disputed Harris Report, which explicitly stated that its
analysis was not applicable to small populations.  This Court
determined that it was arbitrary and capricious to rely on a
predictive model that, by its own plain terms, was not applicable
to a population as small as the Cabinet-Yaak.  Id.  In this case,
the agencies are not relying on a model like Harris' that
predicts population status, but rather a collection of data about
a few bears in the very ecosystem at issue in this case.  Whether
the science is sufficient is a separate question, but as a

-10-

preliminary matter, the problems with the science in the <u>Rock
Creek Alliance</u> case are not the same issues presented here. <u>Rock
Creek Alliance</u> does not decide this case.

The BiOp is candid about the mortality challenges facing
these bears. In the "Status of the Grizzly" section of the BiOp,
FWS states that neither population is statistically increasing,
though the Selkirk population appears to be in better shape. The
BiOp also states the modeling in 1999 suggested that one more
subadult death in the Selkirk could "push the trend into a
decline." FWS AR 1:17. In the Selkirk Recovery Zone, only one
of the four grizzly recovery goals is being met, and the present
mortality goal is zero bears due to the small population. FWS AR
1:38-39. The BiOp reports that mortality was unusually high in
2002. FWS AR 1:41-43. The FWS's general conclusion is that,
although the numbers are inconclusive and there is a lot of
habitat improvement to make, based on the experience and
perception of the researchers and field personnel, the situation
in the Selkirk is slightly improving for bears. FWS AR 1:51.

The picture in the Cabinet-Yaak Ecosystem is worse. The
Cabinet-Yaak population appears to be decreasing, especially due
to high mortalities in 1999 and 2000. FWS AR 1:16-17. The
population is slightly smaller (estimated 30-40 bears) and
"[e]ven though the trend estimates are inconclusive, due
primarily to recent high levels of grizzly bear mortalities, the
Service is concerned about the status of this population." <u>Id.</u>

-11-

at 55.  Mortality has not been as high in the Cabinet-Yaak as in the Selkirk in the last twenty-five years or so.  Id. at 56.

Plaintiffs contend this statistical information is useless, because telling us how many bears have died does not tell us how many more can die before the population fails to recover and goes extinct. However, the law requires FWS to use the best scientific and commercial information available.  It is clear from the record in this case that there is not an abundance of firm information about how much mortality grizzly bears can withstand. Further, there is no suggestion from the Plaintiffs that the information they want is available.  Fish and Wildlife made its decision based on the best scientific information available.  In conjunction with FWS's determination that bears will not die as a result of the Plan Amendments, it is not arbitrary and capricious not to calculate the effects of additional (unlikely) mortality. Additionally, under the standard set forth in ESA § 7(a)(2), the question is whether the Plan Amendments will jeopardize the bears.  The bears' current situation is bad, but over time their habitat will improve as the BMUs conform to the Amendments.  FWS sufficiently considered grizzly bear mortality in its biological opinion.

### 3.  Grizzly Bear Recovery

Plaintiffs contend that the record raises substantial doubt about whether grizzly bears will recover.  Plaintiffs state that FWS must specifically find that grizzlies affected by the Plan

Amendments still have the potential to recover.  Plaintiffs draw this requirement from the ESA's implementing CFRs, which define "jeopardize the continued existence of" as actions that would "reduce appreciably the likelihood of both the survival and recovery of the listed species."  50 C.F.R. § 402.02.  Plaintiffs claim that the record "raises substantial doubt as to whether there remains a realistic possibility that grizzly bears in the CYE and SE will eventually recover."  Plaintiffs also argue that linkages between habitat areas are crucial for recovery and entirely ignored in the BiOp.  Even if there are enough bears, without linkages, bears still may not recover over time.

The Government points to the increased core areas across the Cabinet-Yaak and Selkirk Recovery Zones, the decreased linear densities outside of the recovery areas, and restrictions on further losses of core habitat, and cites the BiOp's conclusion that "overall core grizzly bear habitat within these Recovery Zones will increase, and will be provided at quantities sufficient to support the average female grizzly bear's home range needs, as indicated by research in these Recovery Zones."  FWS AR 1:130.  From FWS's perspective, the improved conditions support the conclusion that bears will probably do better under the Amendments.  But FWS does express some uncertainty in this conclusion.  "[D]isplacement and mortality effects upon grizzly bears resulting from roads and road densities will likewise decrease with the Recovery Zones, which *may result* in increased

-13-

grizzly bear numbers and distribution within the Recovery Zones."
FWS AR 1:131 (emphasis added).

Again, the question is does the agency action "reduce
appreciably the likelihood of both the survival and recovery" of
the grizzly? 50 C.F.R. § 402.02. The Ninth Circuit has held
that the FWS's duty is to assess a project's potential to
adversely modify critical habitat's ability to support both
survival *and* recovery. See Gifford Pinchot Task Force v. U.S.
Fish and Wildlife, 378 F.3d 1059, 1069 (9th Cir. 2004). However,
this Court is unaware of any BiOps that have been held arbitrary
and capricious for failing to discuss recovery adequately where
the FWS made a finding of no jeopardy. As seen through the lens
of ESA § 7(a)(2), the amendments proposed do slightly more for
recovery and survival than the status quo. Consequently, the FWS
saatisfied its legal obligation in concluding that the Amendments
do not reduce the likelihood of the survival and recovery of the
grizzly.

### 4. Interagency Grizzly Bear Committee Guidelines

Plaintiffs argue that the projects do not comply with the
Interagency Grizzly Bear Committee Guidelines ("Guidelines") and
that compliance with the Guidelines is considered necessary to
prevent jeopardy to grizzlies. The diversions from the
Guidelines pointed out by Plaintiffs stem from the Forest
Service's goal of flexibility in the Recovery Zones. The
Guidelines state that "[m]anagement decisions will favor the

-14-

needs of the grizzly bear when grizzly habitat and other land use values compete," and incompatible uses with grizzly needs should be "disallowed or eliminated." FS AR 30:14 at 3. FWS acknowledges in its Incidental Take Statement that take of, or impacts to, grizzlies may occur because of repeated activities such as mining and helicopter logging. FWS AR 1:134-35.

Defendants dispute that they have ignored the Guidelines by emphasizing the degree to which their information and guidance is a localized result of prior IGBC directives. The Wakkinen standards were developed in response to IGBC's direction to its subcommittees in each recovery zone to develop road density and core habitat standards. The IGBC Selkirk/Cabinet-Yaak subcommittee developed a set of interim rules governing motorized access management in Recovery Zones in January 1999 based on the Wakkinen Report. The Forest Plan Amendments standards are more restrictive than this interim rule set, the Government argues, and because they derive from the Wakkinen Report, Defendants claim they meet the Guidelines.

This claim reveals the philosophical divergence between the Plaintiffs and Defendants in this case. Plaintiffs disagree with the Forest Service's emphasis on "management flexibility," because, in their view, management flexibility prioritizes activities such as logging, with its known detrimental impacts on grizzlies.

The Guidelines themselves do not have legal force, except to

-15-

the extent that an agency decision could become arbitrary or capricious because of its expressed adherence to and later contradiction with the Guidelines.[6] Plaintiffs point to the Implementation Schedule of the Recovery Plan, which is "a guide for meeting the objections elaborated under the recovery section of this plan." FWS 398:4797. The Schedule says that adherence to the Guidelines is a priority one task, i.e., "must be taken to prevent extinction." FWS AR 398: 4797. Plaintiffs maintain that this makes the Guidelines mandatory. However, the Recovery Plan itself states that "[t]his recovery plan is not intended to provide precise details on all aspects of grizzly bear management. . . . The recovery plan is not a "decision document" as defined by the National Environmental Policy Act (NEPA)." FWS AR 398:4690.

Plaintiffs also point out that the forest plans have expressly adopted the Guidelines. The Idaho Panhandle National Forest Forest Plan says the Forest should "manage grizzly bear

---

[6]In Ecology Center, Inc. v. Austin, 430 F.3d 1057, 1069-70 (9th Cir. 2005), the Ninth Circuit indicated that even when a standard like the Guidelines "does not have the independent force and effect of law" with respect to a particular forest, "it would nonetheless be arbitrary and capricious for the Forest Service to ignore it" if the EIS discusses the standard as if it was binding and claims that the project was prepared in compliance with its provisions. The court cited Resources Ltd. v. Robertson, 35 F.3d 1300, 1304 n.3 (9th Cir. 1994), the only Ninth Circuit case to discuss the Guidelines, in which the court rejected the argument that the Forest Service could treat the Guidelines as optional where the FWS had made a "no jeopardy" conclusion contingent on the Forest Service's continued adherence to the Guidelines. Neither case states a legal conclusion that the Guidelines are legally binding direction from which the Forest Service and FWS must never deviate.

-16-

habitat according to the IGBC guidelines." 1987 IPNF Forest
Plan, II-27. The Lolo Forest Plan refers to activities in
Management Situation 1 and then states that MS-1 is defined by
the IGBC. It also speaks more generally about moving toward
recovery and cooperating with any future interagency efforts
toward that goal. 1986 Lolo Forest Plan, II-13, 14. Contrary to
Plaintiffs' interpretation, neither plan mandates compliance with
IGBC. The Kootenai Forest Plan expressly allows for deviation
from the IGBC, though it requires Forest Supervisor approval for
such deviation. This case would fall within the exception based
on Forest Supervisor approval.

Even if the Guidelines were mandatory, Plaintiffs have not
established a clear violation of their standards. Plaintiffs
emphasize one sentence of the Guidelines: "Land uses which can
affect grizzlies and/or their habitat will be made compatible
with grizzly needs or such uses will be disallowed or
eliminated." FS AR 30:14 at 3. Plaintiffs contend that this
sentence mandates elimination of the land use in this case.
However, an alternative interpretation to Plaintiffs' is that FWS
considers the land use in this case, i.e., road density, to have
been made compatible with grizzly needs, at least as far as this
revision of the plans goes, and thus allowable under the
Guidelines.

The Amendments do not clearly fail to comply with the
Guidelines, since the standards used to develop the Amendments

-17-

were developed at the direction of the IGBC. Additionally, the Guidelines are not binding direction to the Forests, even as adopted in the Forest Plans. Therefore, it was not arbitrary and capricious for FWS not to expressly consider consistency of the Plan Amendments with the Guidelines in its jeopardy determination.

## 5. **Best Scientific Data Available**

Plaintiffs argue that FWS and the Forest Service failed in their 16 U.S.C. § 1536(a)(2) duties because they did not "use the best scientific and commercial data available." Plaintiffs dispute FWS's and the Forest Service's reliance on the "Wakkinen Report," which is the grizzly habitat study for the Cabinet-Yaak and Selkirk ecosystems relied on by the Government. Plaintiffs question the validity of this study because it is based on only six bears in what they consider "a highly degraded ecosystem." Plaintiffs argue that "the record in this case simply does not support the agencies' finding that the Wakkinen report's road density and core parameters represent the most scientifically defensible standards for management." Even assuming the Report is the best science available, Plaintiffs contend that the Plan Amendment does not meet the Report's standards. Plaintiffs point out that the agencies have established 2400 acres (about 4 square miles) as the minimum core habitat block size, when Wakinnen found that ninety per cent of habitat use in the CYE occurred in areas of at least 8 sqare miles. Plaintiffs also dispute the

-18-

lack of strict road guidelines outside the recovery zones.

Defendants respond by pointing out that Plaintiffs have not identified any information they ignored or that was available and better than the information they used. Defendants emphasize the fact that Wakinnen's study is the only one specifically dealing with the Cabinet-Yaak and Selkirk Ecosystems and was subject to peer review. FWS AR 277:2826-28; 333:3210-15; 334:3216-18; 332:3206-08; 133:1483; FS AR 26:9 at 5.

The ESA requires that the biological opinion and agency action be based on "the best scientific and commercial information available." 16 U.S.C. § 1536(a)(2). This court "cannot substitute [its] judgment for that of the Forest Service and Fish & Wildlife but instead must uphold the agency decisions so long as the agencies have considered the relevant factors and articulated a rational connection between the facts found and the choice made." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944 (9th Cir. 2003)(internal quotation marks and citations omitted). The standard does not require the agency to rely on indisputable or unequivocal evidence. The Court may conclude that"[w]hile another decisionmaker might have reached a contrary result, the agencies conducted a reasonable evaluation of the relevant information and reached a conclusion that, although disputable, was not arbitrary and capricious." Id. at 956.

As for the first step of this analysis, FWS's reliance on the Wakkinen Report cannot be assailed. There are problems with

-19-

the study, and it might have been better to have higher
population numbers from which to work. These shortcomings are
acknowledged by FWS. FWS AR 277:2826-28; 333:3210-15; 334:3216-
18; 332:3206-08. However, FWS's preference for a study in the
ecosystem at issue is reasonable and should be left to FWS's
discretion. While other studies might consider higher numbers of
bears, the record shows that this ecosystem has an unusually high
road density. There is a rational and articulated reason in the
record for basing the Amendment on research in the area to be
managed.

Fish and Wildlife, and the Forest Service, considered other
sources of information, including the Mace and Manley study of
grizzlies in the South Fork of the Flathead River. FS AR 26:9 at
5; FWS 1:44. Plaintiffs do not show which other information
would have been more appropriate, but rather attempt to poke
holes in the Government's choices. The Court does not have
grounds to conclude FWS's information was not the best
information available.

Plaintiffs alternatively contend that if Wakinnen is the
best science available, then Defendants' choice to authorize BMUs
with less habitat than Wakinnen recommends cannot have been based
on the best information. However, FWS and the Forest Service
both explain why some units do not meet the standards required by
Wakinnen. FWS 1:43, 46-47; FS AR 15-43 at 3-10. The Amendments
require no permanent loss of core habitat. FWS AR 1:107-11.

This dovetails with the reasons for a programmatic amendment.
The BMUs have widely diverse characteristics.  While most BMUs
are 100 square miles, there are smaller ones, such as the thirty
square mile Lakeshore BMU on Priest Lake.  FS AR 15-43 at 3-10.
There are BMUs that consist of wilderness areas, BMUs that abut
towns or highly used recreational areas, and BMUs with highways
and railroad tracks.  FWS AR 1:61.  There are BMUs, such as the
two slender ones that connect the Cabinet and Yaak portions of
the CYE that might be particularly crucial for genetic and
population purposes.  FWS AR 1:54.  The programmatic amendments
set standards for across the forest, but their effects on and
implementation in particular BMUs will vary.  This was the reason
the Forest Service chose to design the amendments the way it did.

Based on review of the administrative record and discussions
within it of the shortcomings of the scientific information and
the lack of availability of alternate site-specific information,
it was not arbitrary and capricious for Defendants to rely on the
scientific information included in the record.

**B.    The Letters of Concurrence for the White Pine, Lower Big
       Creek, West Troy, and Mission Brush Timber Sales**

Plaintiffs contend that since FWS relied on what they
consider the faulty 2004 biological opinion as the basis for its
letters of concurrence on these sales, the letters themselves are
arbitrary and capricious and contrary to the ESA.

Defendants reject this argument on two grounds.  First,

Defendants disagree with the underlying premise that the BiOp is faulty. Second, Defendants dispute the conclusion that a faulty BiOp would necessarily invalidate letters of concurrence. For example, the Mission Brush Timber Sale occurs outside of the Cabinet-Yaak Recovery Zone. If the BiOp were invalidated, the amendments would be withdrawn, but the project could still go ahead because it would not have somehow also become arbitrary.

As a preliminary matter, there is the issue of The Flathead and Kootenai National Forest Rehabilitation Act of 2003, P.L. 108-108 § 407, which reads:

> IMPLEMENTATION OF RECORDS OF DECISION. The Secretary of Agriculture shall publish new information regarding forest wide estimates of old growth from volume 103 of the administrative record in the case captioned Ecology Center v. Castaneda, CV-02-200-M-DWM (D. Mont.) for public comment for a 30-day period. The Secretary shall review any comments received during the comment period and decide whether to modify the Records of Decision (hereinafter referred to as the "ROD's") for the Pinkham, White Pine, Kelsey-Beaver, Gold/Boulder/Sullivan, and Pink Stone projects on the Kootenai National Forest. The ROD's, whether modified or not, shall not be deemed arbitrary and capricious under the NFMA, NEPA or other applicable law as long as each project area retains 10 percent designated old growth below 5,500 feet elevation in third order watersheds in which the project is located as specified in the forest plan. This Act may be cited as the 'Department of the Interior and Related Agencies Appropriations Act, 2004'.

At oral argument, Plaintiffs attempted to distinguish their claims from those addressed in the above section, arguing that Congress did not intend to write the Forest Service a blank check to violate any environmental laws in its actions. The Government

responded that by the terms of the law, the ROD for the White
Pine project shall not be deemed arbitrary and capricious under
"applicable law." Congress, the Government argues, wanted these
projects to go ahead.

> It is well settled that, in a statutory construction
> case, analysis must begin with the language of the
> statute itself; when the statute is clear, judicial
> inquiry into [its] meaning, in all but the most
> extraordinary circumstance, is finished. Another
> fundamental canon of statutory construction is that,
> unless otherwise defined, words will be interpreted as
> taking their ordinary, contemporary, common meaning.

U.S. v. Carter, 421 F.3d 909, 911 (9th Cir. 2005) (internal
quotation marks and citations omitted). Given the language of
the statute, the Government has the more persuasive argument.
Congress evinced a clear intent to free these projects from
litigation and get them done. Thus, this Court lacks subject
matter jurisdiction over Plaintiffs' claim regarding the White
Pine project.

As to the other three projects, the Government also has the
better of the argument but on other grounds. As the Government
explained at oral argument, if the amendments are determined to
be contrary to law, the agencies go back to the drawing board.
That decision on its own has no effect on these projects.

Plaintiffs argue that since the Letters of Concurrence rely
on the BiOp, they are undermined by a determination that the BiOp
itself is flawed. Letters of concurrence are regulated by 50
C.F.R. 402.13, which reads:

Informal consultation. (a) Informal consultation is an
optional process that includes all discussions,
correspondence, etc., between the Service and the
Federal agency or the designated non-Federal
representative, designed to assist the Federal agency
in determining whether formal consultation or a
conference is required. If during informal consultation
it is determined by the Federal agency, with the
written concurrence of the Service, that the action is
not likely to adversely affect listed species or
critical habitat, the consultation process is
terminated, and no further action is necessary.

The specific letters in this instance vary in their language but
none relies solely on the 2004 BiOp. The Lower Big Creek Project
letter, for instance, says: "Our concurrence is based on
information and analysis from a variety of sources including, but
not limited to, the BA, our files, discussions with the Forest
during regular consultations visits, . . . the Incidental Take
Analysis for Grizzly Bears That Occur Outside Recovery Zones on
the Kootenai and Idaho Panhandle National forests and a Portion
of Lolo National Forest [and the 2004 Biop]." FWS AR 470. The
West Troy letter does not mention the BiOp at all. FWS AR 472.
The Mission Brush letter mentions the BiOp, but also explains
exactly how the road densities will improve upon completion of
the project, in addition to being outside of the Recovery Zone
and not subject to the Plan Amendments, as pointed out by the
Government. FWS AR 467:2. None of these Letters of Concurrence
is so dependent on the Biological Opinion that its conclusions
would be undermined or become arbitrary and capricious if the
BiOp itself was found to be faulty.

## C.    The 2002 EIS

NEPA aims to promote environmentally sensitive governmental
decision-making, without prescribing substantive standards.
Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 353
(1989); Tillamook County v. U.S. Army Corps of Eng'rs, 288 F.3d
1140, 1143 (9th Cir. 2002).  To fulfill their NEPA obligations,
agencies must consider the environmental impact of their actions.

The adequacy of an Environmental Impact Statement (EIS) is
judged by whether it constitutes a "detailed statement" that took
a "hard look" at the potentially significant environmental
consequences of the proposed action and reasonable alternatives
thereto, considering all relevant matters of environmental
concern.  42 U.S.C. § 4332(2)(a); 40 C.F.R. § 1502.1; Kleppe v.
Sierra Club, 427 U.S. 390, 410 n.21 (1976).  The critical
question is whether the EIS contains a "reasonably thorough
discussion of the significant aspects of the probable
environmental consequences" of the proposed action as well as a
range of alternatives to that action.  California v. Block, 690
F.2d 753, 761 (9th Cir. 1982) (quoting Trout Unlimited, Inc. v.
Morton, 509 F.2d 1276, 1283 (9th Cir. 1974)).  The review is
essentially the same as a review for abuse of discretion.
Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372,
1376 (9th Cir. 1998).

### 1.    Scientific Integrity of EIS Analysis

40 C.F.R. § 1502.24 directs agencies to insure the

scientific integrity of their EIS analyses, identify any
methodologies used, and make explicit reference to sources relied
upon.  Plaintiffs argue that the EIS must point out incomplete or
weak sources of information, citing Lands Council v. Powell, 395
F.3d 1019, 1031 (9th Cir. 2005).  The Wakkinen report, in
Plaintiffs' view, is just such a weak source, and Plaintiffs
believe the EIS should more fully discuss the report's
shortcomings.  Plaintiffs' argument and quotations of criticisms
of the Wakkinen Report emphasize that Wakkinen's figures reflect
the degraded status quo, with the implication that since the
bears are not doing well now, maintenance of the status quo is
not an improvement.  Defendants reject Plaintiffs' reliance on
Lands Council, arguing that the Wakkinen Report is not a model,
like the WATSED model at issue in Lands Council, but rather a
collection of data regarding grizzly habitat use in the very area
the agencies are trying to manage through the Plan Amendments.

The objective, "to insure the scientific integrity of the
analysis," is vague, and the case law does not provide much
guidance about what it means.  Generally, courts have interpreted
this phrase to mean that analysis cannot be based on faulty
information or flawed models.  See, e.g., Native Ecosystems
Council v. U.S. Forest Serv., 418 F.3d 953 (9th Cir. 2005).

As a preliminary matter, Defendants are incorrect that Lands
Council does not apply in a case that involves a collection of
data rather than a model.  Lands Council reiterated the NEPA

-26-

requirement of "up-front disclosures of relevant shortcomings in the *data* or models." 395 F.3d at 1032 (emphasis added). Thus, the <u>Lands Council</u> reasoning is applicable in this case.

Nevertheless, <u>Lands Council</u> does not dictate a finding in Plaintiffs' favor on this issue. In <u>Lands Council</u>, the Forest Service's WATSED model was inadequate because it did not include some variables determined to be crucial. <u>Id.</u> at 1031. The bottom line of that case, however, is that if the agency knows something is wrong with its model or data, it must disclose that fact.

Similar to <u>Lands Council</u>, in <u>Earth Island Institute v. U.S. Forest Service</u>, 351 F.3d 1291 (9th Cir. 2003), the Ninth Circuit emphasized how important it is for an agency to disclose the scientific information upon which it has relied so that the public may challenge its reliance on that information:

> Failure to provide [scientific] information either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions. However, an agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints. Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies. When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive. At the same time, courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence.

Id. at 1301 (internal quotation marks and citations omitted).

In the end, the FEIS in this case provides enough information about the shortcomings of the Wakkinen study to allow someone to perceive its weaknesses and to challenge the agency's action.   The record also includes information about various criticism's of the Wakkinen information, such that an interested member of the public would be able to analyze the study knowingly.   At the same time, the Forest Service articulated a reasonable explanation for why it relied on the information.   The Forest Service sufficiently maintained the scientific integrity of the EIS by making a reasonable decision about the Wakkinen study and providing the public with sufficient information in the EIS to understand that there is a deficit of local grizzly information available to them.

## 2.    **Exclusion of the Colville National Forest**

The Forest Service must specify the underlying purpose and need that leads to the publication of the EIS.   40 C.F.R. § 1502.13.   In this case, that purpose was defined as amending "Forest Plans to include a set of motorized access and security guidelines to meet our responsibilities under the Endangered Species Act to conserve and contribute to recovery of grizzly bears."   FS AR 19:9 at 1-4. The Colville and Idaho Panhandle Forests make up the Selkirk Recovery Zone, yet the Colville's

Forest Plan is not included in this amendment.[7]  Plaintiffs
consider the Forest Service's choice to exclude the Colville from
its analysis arbitrary.

Defendants contend that NEPA does not require the Forest
Service to include the Colville National Forest in this EIS's
analysis.  According to Defendants, the Forest Service has the
discretion to determine the scope and purpose of its EIS.  In
addition, the Colville had already consulted with FWS about
motorized access in its existing Forest Plan and therefore it had
already satisfied its ESA obligations.  FWS AR 417:6339.

Several cases consider the geographic scope of an EIS,
usually in the context of determining whether the Forest Service
has properly considered the cumulative effects of its proposed
action.  For example, the Supreme Court in Kleppe v. Sierra Club,
427 U.S. 390, 412 (1976), discussed an agency's decision in
determining the area it must include in its analysis:

> The determination of the region, if any, with respect
> to which a comprehensive statement is necessary
> requires the weighing of a number of relevant factors,
> including the extent of the interrelationship among
> proposed actions and practical considerations of
> feasibility.  Resolving these issues requires a high
> level of technical expertise and is properly left to
> the informed discretion of the responsible federal
> agency.

If Plaintiffs are unable to produce evidence of arbitrary action,

---

[7]Three Colville BMUs are shared with the Idaho Panhandle National
Forest.  One of these shared BMUs, LeClerc, has only 64% federal
ownership and is 90% on the Colville, so it is not subject to these
Plan Amendments.

-29-

this Court must conclude that the Forest Service exercised its wide discretion appropriately.  Id.

Plaintiffs have not shown that the Forest Service's choice to exclude the Colville National Forest from its analysis was arbitrary.  The Plan Amendments affect only the plans of the Lolo, Kootenai, and Idaho Panhandle Forests.  The Colville had already consulted with FWS on its motorized access plan.  Though the Colville includes BMUs in the Selkirk Recovery Zone, an improvement of access in the Selkirk region would not have deleterious effects on bears in the Colville.  The Forest Service properly limited its consideration to the geographic areas the plans of which were being amended.  This type of amendment is different from a timber sale, for example, where clearly deleterious effects will occur in a limited area and the Forest Service must consider its effects on nearby areas.  For a programmatic amendment that should improve conditions locally, it makes less sense to question the Forest Service's choice of the scope of its EIS.  The Forest Service did not unreasonably or arbitrarily exclude the Colville National Forest from its EIS analysis in this case.

### 3.   **Reasonable Range of Alternatives**

NEPA requires agencies to study, develop, and describe appropriate alternatives to the proposed action.  42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1502.14.  Plaintiffs allege the Forest Service failed to include an alternative that would

"improve habitat conditions to protect and recover these populations."

All alternatives were based on the Wakkinen Report's standards of 55% core habitat, 33% open road density, and 26% total road density. The most protective of the original proposals, Alternative D, was eventually removed from the final version. Alternative D would have cleaved to the Wakkinen Report's maximum habitat security figures, rather than its averages. Standards would be set at 72% core habitat, 17% open road density, and 14% total road density. Plaintiffs consider this alternative "reasonable" and contend it should have been considered.

Defendants respond that their NEPA obligation is only to consider reasonable choices, and that Plaintiffs failed to provide a reasonable option that was not considered by the Forest Service. Defendants claim Alternative E would be more protective in fourteen of thirty BMUs than the Wakkinen Report would require. In addition, Defendants argue that Alternative D was impossible because it required the closing of all roads under Forest Service jurisdiction, and even then, several of the BMUs could not reach the proposed standard. Finally, citing Department of Transportation v. Public Citizen, 541 U.S. 752, 764-65 (2004), Defendants contend that plaintiffs who fail to raise specific alternatives during the NEPA process forfeit the objection that the NEPA analysis failed to consider potential

-31-

alternatives.

"The existence of a viable but unexamined alternative
renders an environmental impact statement inadequate." <u>Morongo
Band of Mission Indians v. Fed. Aviation Admin.</u>, 161 F.3d 569,
575 (9th Cir. 1998) (quoting <u>Robertson</u>, 35 F.3d at 1307)
(internal quotation marks omitted).  However, the EIS need only
consider reasonable alternatives, not every conceivable
alternative.  <u>See</u> 40 C.F.R. § 1502.14(a).  "The touchstone for
our inquiry is whether an EIS's selection and discussion of
alternatives fosters informed decision-making and informed public
participation." <u>California v. Block</u>, 690 F.2d 753, 767 (9th Cir.
1982).  The Ninth Circuit applies a "rule of reason" to this
review, asking "whether an EIS contains a reasonably thorough
discussion of the significant aspects of the probable
environmental consequences." <u>Natural Res. Def. Council v. U.S.
Forest Serv.</u>, 421 F.3d 797, 810 n.27 (9th Cir. 2005) (quoting
<u>Churchill County v. Norton</u>, 276 F.3d 1060, 1071 (9th Cir. 2001)).

The issue here is whether the former Alternative D was a
reasonable choice that should have been considered in the FEIS.
The Forest Service ran a model to determine whether Alternative D
was feasible and concluded that there were not enough roads to
close in federal jurisdiction to make Alternative D possible.  FS
AR 19-9 at 4-177-78, 4-180.  The FEIS responds to extensive
public comment lobbying for a stricter standard and for
Alternative D.  The FEIS explains why Alternative D was not

-32-

feasible and why Alternative E was a reasonable compromise. The
record demonstrates that the Forest Service engaged in a
reasonably thorough discussion of Alternative D during the public
comment period and reasonably concluded that Alternative E was a
better selection. Its choice was not arbitrary and capricious.

## 4. Linkage Zones

Plaintiffs allege that linkage zones are "relevant factors"
in the environmental analysis and therefore should have been
considered. Defendants argue that agencies have considerable
discretion to define the purpose and need of a project, citing
Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066
(9th Cir. 1998). Defendants contend that, although linkage zones
might be important to bear recovery, this project was not
designed to accomplish every task important to recovery.

The Forest Service's stated purpose of the amendments is to
"to include [in the Forest Plans] a set of motorized access and
security guidelines to meet our responsibilities under the
Endangered Species Act to conserve and contribute to recovery of
grizzly bears." FS AR 19-9 at 1-4. Though "an agency cannot
define its objectives in unreasonably narrow terms," "when the
purpose is to accomplish one thing, it makes no sense to consider
the alternative ways by which another thing might be achieved."
Friends of Southeast's, 153 F.3d at 1066 (quoting City of Angoon
v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986)). Plaintiffs would
rewrite the Forest Service's statement of purpose as generally to

conserve grizzly bears without acknowledging the logistics required to accomplish amending the Forest Plans to include a set of motorized access and security guidelines. Although linkage zones might be important to the recovery of the bears, the Forest Service is not required to use linkage zones to effect its purpose for these amendments.

### 5. Risk and Uncertainty of the Chosen Alternative

Plaintiffs contend that the EIS fails to disclose the high risk of extinction of the grizzly bears and the scientific uncertainty about whether the chosen alternative will alleviate this risk. The small population of bears may face as high as an 85% chance of extinction. Plaintiffs believe the EIS should have made this clear to the public, who may then have demanded greater protection for the bears. Also, Plaintiffs point to what they consider increasing grizzly mortality in recent years, since thirteen bears died in the Cabinet-Yaak in the three years leading up to the 2002 EIS, yet none of those deaths were mentioned in the EIS. FS AR 90:14. Plaintiffs believe the EIS should have disclosed that bear biologists believed that other alternatives were better than Alternative E for bears. FS AR 19:11 at 12; FWS AR 231 & 225.

Defendants point to discussions of these issues in the EIS at FS AR 19:9 at 3-6, Figure 3-1, 3-8, 1-4, 3-10, 3-18- 3-21, and generally to the proposition that "in determining whether the EIS contains a reasonably thorough discussion, we may not fly-speck

-34-

the document and hold it insufficient on the basis of inconsequential, technical deficiencies." <u>Friends of Southeast's</u>, 153 F.3d at 1063. Defendants reiterate their goal of contributing to the conservation of grizzly bears and state that road management is only one factor in the process. Defendants also argue that the Forest Service has never represented to the public that Alternative E would lead to grizzly recovery.

This last point is crucial. The FEIS explains that grizzly bears are in trouble and explains that the Plan Amendments will slightly improve their habitat conditions. The FEIS does not state that all problems for the bears will be solved by these Amendments. The FEIS's purpose, to establish road standards, does not encompass doing everything possible to prevent harm to grizzlies. The Forest Service's choice in the FEIS is not arbitrary, given that FWS determined the Amendments do not jeopardize the continued existence of the bears. Having said this, it will be a sad day indeed if these bears become extinct because of a "Grover Norquist" thought processes invading the agency decision-making process.[8]

### III. Conclusion

Based on the foregoing, I find that Defendants' various decisions related to the "Forest Plan Amendments for Motorized

---

[8]"I don't want to abolish government. I simply want to reduce it to the size where I can drag it into the bathroom and drown it in the bathtub." <u>See</u> FN 5 supra.

-35-

Access Management within the Selkirk and Cabinet-Yaak Grizzly
Bear Recovery Zones" were not arbitrary and capricious.
Plaintiffs' claims fail.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion for Summary Judgment and Injunctive
Relief (**dkt #20**) is DENIED.

2. Defendants' Motion for Summary Judgment (**dkt #30**) is
GRANTED.

3. Plaintiffs' Motion for Preliminary Injunction (**dkt #37**) is
DENIED.

DATED this 20 day of August, 2006.

DONALD W. MOLLOY, CHIEF JUDGE
UNITED STATES DISTRICT COURT

# Exhibit 5

FILED
MISSOULA, MT

2006 DEC 13 AM 8 37

PATRICK E. DUFFY
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| CABINET RESOURCE GROUP, GREAT BEAR )<br>FOUNDATION, IDAHO CONSERVATION )<br>LEAGUE, NATURAL RESOURCES DEFENSE )<br>COUNCIL, and SELKIRK CONSERVATION )<br>ALLIANCE, )<br> )<br>        Plaintiffs, )<br> )<br>   vs. )<br> )<br>UNITED STATES FISH AND WILDLIFE )<br>SERVICE and UNITED STATES FOREST )<br>SERVICE, )<br> )<br>        Defendants. )<br>_____ ) | CV 04-236-M-DWM<br><br><br><br><br><br><br><br>ORDER |

## I.   Introduction

Cabinet Resource Group, et al., ("Plaintiffs") bring this
action seeking judicial review under the Administrative Procedure
Act ("APA"), 5 U.S.C. §§ 701-706, of agency actions by the United
States Forest Service and the United States Fish & Wildlife
Service concerning road management decisions in the Cabinet-Yaak
and Selkirk Grizzly Bear Ecosystems in northwest Montana,
northern Idaho and northeast Washington.  The First Amended

-1-

Complaint alleges that the agencies acted in violation of the
Endangered Species Act ("ESA"), 16 U.S.C. § 1533 et seq., and the
National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et
seq.

There are cross-motions for summary judgment on all claims.
Some of the issues raised here were addressed in this Court's
recent ruling in <u>Alliance for the Wild Rockies v. U.S. Fish &
Wildlife Service and U.S. Forest Service</u>, CV 04-216-M-DWM, issued
August 29, 2006.  In the <u>Alliance</u> opinion, the Court granted
summary judgment in favor of the Federal Defendants on all
claims.  The part of that opinion that is relevant to this case
is the Court's consideration the ESA and NEPA claims.  The claims
were pled in Counts I, V, and VII of the <u>Alliance</u> Complaint.
These <u>Alliance</u> claims generally cover the same ecosystems,
planning documents and issues raised here but the Plaintiffs in
this case raise arguments that were not advanced by the <u>Alliance</u>
plaintiffs.  The Cabinet Resource Plaintiffs also try to identify
factual errors in the <u>Alliance</u> opinion and ask the Court to
revisit certain factual findings made in the opinion.

In light of the <u>Alliance</u> ruling, I ordered the parties to
re-submit their summary judgment briefing, tailoring their
arguments to the new post-<u>Alliance</u> legal landscape.  Not
surprisingly, the Federal Defendants contend that the reasoning
employed in <u>Alliance</u> disposes of the claims in this case while
the Plaintiffs urge the Court to set aside the documents it
upheld against similar challenges in <u>Alliance</u> on the basis of

-2-

arguments not raised in the <u>Alliance</u> briefing.

Despite the overlap between the claims in <u>Alliance</u> and the claims at issue here, I have given fresh consideration to all issues and arguments presented in this case. Nonetheless, to provide context, and in order to highlight both points of commonality and distinctions between the two cases, the relevant excerpt of the <u>Alliance</u> analysis is reproduced at the outset of each section of the discussion of the claims in this opinion.

<center>II.  Factual Background</center>

**A.  Grizzly Bear Management in the Cabinet-Yaak and Selkirk Ecosystems**

The grizzly bear was listed as a threatened species under the ESA in 1975. 40 Fed. Reg. 31736. Pursuant to the ESA, the Fish & Wildlife Service approved a Grizzly Bear Recovery Plan in 1982 and revised the Plan in 1993. FWS AR 398 at 4468.[1] The Recovery Plan as revised establishes four recovery zones, including the Cabinet-Yaak Ecosystem and Selkirk Ecosystem Zones. <u>Id.</u> at 4825.[2] The Selkirk and Cabinet-Yaak Zones are located in northwestern Montana, northern Idaho, northeastern Washington, and British Columbia, Canada, and contain 4,560 square miles of habitat on portions of the Kootenai, Lolo, Idaho Panhandle, and

---

[1] Citations to the Fish & Wildlife Service administrative record are presented in the following format: FWS AR (document number) at (page number).

[2] The other two recovery zones are the Yellowstone Ecosystem Zone and the Northern Continental Divide Ecosystem Zone. At the time of the revisions to the Recovery Plan, the North Cascades and Bitterroot Ecosystems were undergoing evaluation and had yet to be delineated as recovery zones. FWS AR 398 at 4825.

Colville National Forests and the Kootenay Lakes Forest District
in British Columbia. FS AR 19-9 at S-1.[3] The Cabinet-Yaak and
Selkirk Ecosystems are divided into bear management units, each
of which approximates the size of a female grizzly's home range
and should include representations of all available habitat
components. Id. at 2-3.

### 1. The Selkirk Ecosystem Recovery Zone

The Selkirk Ecosystem Recovery Zone is located in
northeastern Washington, northern Idaho and southern British
Columbia. FWS AR 1 at 32. Only fifty-three percent of the land
comprising the Selkirk Ecosystem is located in the United States.
Id. Of that amount, eighty (80) percent is federally owned,
meaning forty-two (42) percent of the Selkirk Recovery Zone is
subject to the management decisions at issue here. Id. These
federal lands are administered by the Colville and Idaho
Panhandle National Forests and contain ten bear management units.
Id. at 32-33. One of the units is located almost entirely in the
Colville National Forest and is administered by that Forest. Two
units straddle the Colville and Idaho Panhandle Forests and are
administered jointly. Six units are located solely in the Idaho
Panhandle National Forest and one unit is located on Idaho state
land and is not subject to federal control. Id.

---

[3]Citations to Discs 1 though 4 of the the Forest Service
administrative record are presented in the following format: FS AR
(volume number)-(document number) at (page number). Citations to Disc
5 are presented in the following format: FS AR CD 5-(document number)
at (page number).

The Selkirk population is estimated at forty-six (46) bears, well below the Recovery Plan's goal of ninety (90) bears. FWS AR 1 at 33, 35. In 1999, the Fish & Wildlife Service determined that the status of the grizzly in the Selkirk warrants reclassification of the bear from threatened to endangered. Id. at 32. The agency has yet to take action on this determination, however, claiming the reclassification is "precluded by work on higher priority species." Id. The Fish & Wildlife Service believes the Selkirk population is slightly increasing, but concedes that recent population trend analysis is inconclusive. Id. at 12, 36. Population modeling in 1999 indicated that "one additional subadult female mortality in the sampled [Selkirk Recovery Zone] population could push the trend into a decline." Id. at 12.

There were six grizzly bear mortalities in the Selkirk in 2002, one of which was an adult female. Id. The small size of the Selkirk population has led the Fish & Wildlife Service to establish a mortality goal of zero known human-caused grizzly bear deaths. Id. at 34. Despite acknowledging that the Selkirk Recovery Zone is meeting none of its Recovery Plan goals relative to reproduction, distribution and mortality and that there is a clear need to improve protection of grizzlies and their habitat in the Selkirk Ecosystem, the Fish & Wildlife Service speculates, based on the perceptions of researchers familiar with the Selkirk, that the Selkirk population has experienced modest growth in recent years. Id. at 46.

## 2. The Cabinet-Yaak Ecosystem Recovery Zone

The Cabinet-Yaak Recovery Zone is located in northwest Montana and northeast Idaho and spans the Idaho Panhandle, Kootenai and Lolo National Forests. FWS AR 1 at 47. Land ownership within the Cabinet-Yaak Recovery Zone is ninety (90) percent Federal, with the remaining ten percent divided between state and private ownership. Id. This zone is made up of two distinct portions, the Yaak portion in the south and the Cabinet Mountains portion in the north, which are connected by two narrow corridors of habitat. Id. The Cabinet-Yaak consists of twenty-two (22) bear management units. Fifteen (15) are managed by the Kootenai National Forest, four (4) are managed by the Idaho Panhandle National Forest, one (1) is managed by the Lolo National Forest, and two (2) are jointly administered by the Kootenai and Idaho Panhandle Forests. Id.

The Cabinet-Yaak population is smaller than the Selkirk population, estimated at thirty (30) to forty (40) bears. FWS AR 1 at 11. The Recovery Plan goal for the Cabinet-Yaak is one hundred (100) bears. Id. at 47. The Cabinet-Yaak Recovery Zone also fails to meet Recovery Plan criteria for reproduction, distribution and mortality. Id. at 12. The Fish & Wildlife Service determined that the Cabinet-Yaak grizzly population was low enough to warrant reclassification from threatened to endangered in 1993 and reaffirmed its finding in 1999. Again, no action has been taken on these findings due to work on "higher priority" species. Id. at 46. Although the Fish & Wildlife

-6-

Service characterizes population trend statistics as inconclusive, that conclusion is at odds with record as there appears to be a reasonable likelihood that the population is decreasing due to heavy grizzly bear mortalities in 1999 and 2000.  Id. at 11-12, 50.[4]  The most recent population trend analysis demonstrates a seventy-five (75) percent likelihood that the population is in decline.  FS AR CD 5-12a at 71.

**B.    The Wakkinen Study**

In 1997, Idaho Fish and Game Department Biologist Wayne Wakkinen and Fish & Wildlife Service biologist Wayne Kasworm published a study using research data from radio-collared grizzly bears in the Selkirk and Cabinet-Yaak Ecosystems to determine open and total road density and core habitat levels necessary to support the grizzly bear population (the "Wakkinen study").  FWS AR 413.  The Wakkinen study is based on data derived from observation of six female grizzlies in their home ranges, each of which produced young during or prior to the five-year study period from 1989 to 1994.  Id. at 23; FS AR 19-9 at 4-29.  From this information the authors drew an inference to support their conclusion that on average a female grizzly's home range in the Cabinet-Yaak and Selkirk Ecosystems has open motorized road

---

[4]There were five (5) known grizzly bear mortalities in 1999 and four (4) in 2000.  FWS AR 1 at 11.  Two (2) human-caused female grizzly bear deaths were documented in 2001.  Id. at 63.  These deaths prompted the Fish & Wildlife Service to state that "[e]ven though the trend estimates are inconclusive, due primarily to high levels of grizzly bear mortalities, the Service is concerned about the status of this population."  Id. at 50.

density exceeding one mile per square mile on thirty-three (33) percent of the area, total motorized road density exceeding two miles per square mile on twenty-six (26) percent of the area, and core habitat in fifty-five (55) percent of the area.  FWS AR 413 at 1.[5,6]

The Wakkinen study found that about ninety (90) percent of the habitat use by bears in the Cabinet-Yaak and Selkirk Recovery Zones occurred in core areas measuring ten (10) square miles or greater and ninety-five (95) percent of habitat use occurred in areas of four (4) square miles or greater.  FWS AR 413 at 22; FWS AR 331 at 3200.  While the study's authors found that small sample sizes prevented them from identifying a useful minimum core habitat patch size, they noted that "larger blocks of core are likely beneficial to bears" and "if a minimum core size occurs, it is likely between [two (2) square miles and eight (8) square miles]."  FWS AR 413 at 25-26.

## C.   The 2001 Colville Biological Opinion

In 2001, ESA consultation between the Forest Service and Fish & Wildlife Service culminated in the issuance of a

───────────────

[5]Grizzly bear habitat parameters based on percentages of open motorized road density, total motorized road density and core habitat are referred to hereafter in the following format: (open motorized road density)/(total motorized road density)/(core habitat).  The Wakkinen standard for habitat parameters, for example, is 33/26/55.

[6]A 1993 study of ten grizzlies in the South Fork area of the Flathead National Forest, located in the Northern Continental Divide Ecosystem Recovery Zone, yielded open road, total road and core values of 19/19/68, which are significantly more protective of grizzly habitat than the 33/26/55 values found in the Wakkinen Study.  FWS AR 380.

Biological Opinion on the continued implementation of the
Colville National Forest Plan (the "2001 Biological Opinion").[7]
FWS AR 417. The 2001 Biological Opinion did not assess the
impact on listed species of any new action, but rather sought to
re-assess, in light of intervening events and new information,
the impact on grizzly bears of the continued implementation of
the Coville National Forest Plan, including motorized access
management decisions. Id. at 1, 6.

The Fish & Wildlife Service concluded in the 2001 Biological
Opinion that "the [Colville] Forest Plan, as currently
implemented, is not likely to jeopardize the continued existence
of the grizzly bear within the Selkirk Ecosystem." FWS AR 417 at
41. In reaching its conclusion the Fish & Wildlife Service noted
that two of the three Colville bear management units already met
the Wakkinen 33/26/55 standard, and federal management was
unlikely to bring the third into compliance with the standard
because it is comprised of less than seventy-five (75) percent
federal land. Id. at 36.

The "no jeopardy" finding was accompanied by an incidental
take statement indicating that take of grizzlies will occur in
any bear management unit failing to meet any part of the 33/26/55

---

[7]The Colville National Forest contains the Salmo-Priest,
Sullivan-Hughes, and LeClerc Bear Management Units. FS AR 19-9 at 2-
5.

-9-

standard.[8] Id. at 43. The Opinion included reasonable and
prudent measures to limit the impacts of take and terms and
conditions for implementation of those measures that the Forest
Service is required to follow to be exempt from Section 9 of the
ESA. Id. at 46. The terms and conditions require the Forest to
maintain minimum core area of fifty-five (55) percent in bear
management units containing at least seventy-five (75) percent
federal land and, if a seasonal core approach is deemed
inappropriate for the area, the Forest must not exceed the
Wakkinen road densities of thirty-three (33) open and twenty-six
(26) total in the same units. Id. at 46-48. The relevant bear
management units already met the 33/26/55 standard, meaning the
terms and conditions required the Colville Forest only to
maintain the status quo. Id. The 2001 Biological Opinion does
not establish a minimum patch size for core habitat.

D. **The 2004 Kootenai/Lolo/Idaho Panhandle Forest Plan
Amendments**

In response to a directive from the Interagency Grizzly Bear
Committee, the Selkirk/Cabinet-Yaak Subcommittee in 1998 issued
interim rules to govern motorized access in the Selkirk and
Cabinet-Yaak Recover Zones. The interim rules were designed to
remain in effect for three years or until the applicable Forest
Plans were revised. FWS AR 1 at 2. The following year, the

---

[8]Section 9 of the ESA prohibits the "taking" of any endangered
species. 16 U.S.C. § 1538(a)(1)(B). To "take" under the statute is
to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or
collect, or to attempt to engage in any such conduct." 16 U.S.C. §
1532(19).

-10-

Alliance for the Wild Rockies sued the Kootenai and Idaho
Panhandle National Forests for implementing the interim access
rules without amending their Forest Plans. Id. The Forests
settled the lawsuit in 2001 by agreeing to amend their Forest
Plans to address grizzly bear habitat management. Id. The Lolo
National Forest, though not named in the lawsuit, asked to be
included in the planning process so it could make conforming
amendments to its own Forest Plan to provide consistent
management direction throughout the Cabinet-Yaak Recovery Zone.
Id.

The Forests initiated a planning process with a purpose to
"[a]mend Forest Plans to include a set of motorized access and
security guidelines to meet our responsibilities under the
Endangered Species Act to conserve and contribute to recovery of
grizzly bears." FS AR 19-9 at S-1. In March of 2002 the Forest
Service issued a Final Environmental Impact Statement analyzing
the potential impacts of various alternatives and identifying
Alternative E as the preferred alternative. FS AR 19-9 at 2-15.[9]

Alternative E prescribed individual habitat security
standards for each bear management unit. Id. In any bear
management unit not meeting the standard set for that unit,

---

[9]The alternatives considered in detail were Alternatives A (no
action), B (continued adherence to the Subcommittee's interim rules),
C (33/26/55 standard for every unit made up of at least seventy-five
[75] percent federal land) and the preferred Alternative E. FS AR 19-
9 at 2-6 to 2-17. Three alternatives not given detailed study were
Alternatives D (increased security habitat achieved by implementing a
17/14/72 standard for all units comprised of at least seventy-five
[75] percent federal land), F (maintenance of current access levels) G
(maximum access). Id. at 2-18.

-11-

future actions effecting habitat parameters would have to result in movement toward compliance with the standard.  Id.  However, in any unit exceeding the standard set for that unit, Alternative E allowed for decreases in habitat parameters to facilitate management flexibility, provided the decreases would not bring the unit below the standard with respect to any of the habitat parameters.  Id.[10]

The Forest Service requested formal ESA consultation with the Fish & Wildlife Service on Alternative E on June 27, 2002. On February 9, 2004, the Fish & Wildlife Service issued a Biological Opinion on the proposed amendments to the Kootenai, Idaho Panhandle and Lolo Forest Plans finding that the implementation of the proposed amendments is not likely to jeopardize the continued existence of the grizzly bear within the Cabinet-Yaak and Selkirk Ecosystem Recovery Zones (the "2004 Biological Opinion").  FWS AR 1 at 125.  The Service based its view on "the fact that overall grizzly core habitat within these Recovery Zones will increase, and will be provided at quantities

---

[10]The management flexibility gained by allowing decreases in habitat parameters in overperforming bear management units was designed to allow the Forests to address "issues related to public and administrative access, economics, access to private inholdings, and increased grizzly bear habitat security."  FS AR 19-9 at 2-15.  It is not clear how this "management flexibility" would lead to increased grizzly bear habitat security in light of the Forest Service's statement that "[a]n important design feature providing management flexibility in Alternative E allows increases in route densities in core habitat within individual [bear management units] that exceed the standards for these parameters."  Id.  While increases in road densities and invasion of core habitat may facilitate logging, public access and access to private inholdings, such increases do not appear to offer any benefit to the grizzlies or their habitat.

sufficient to support the average female grizzly bear's home range needs, as indicated by research in these Recovery Zones." Id. The research upon which the Fish & Wildlife Service relied is the Wakkinen study and its 33/26/55 habitat parameters. Id. at 40-42; 125. The Service found that "habitat improvements resulting in increased grizzly bear numbers and distribution that will be gained within the Recovery Zones through implementation of the proposed Amendment are sufficient to preclude jeopardy to the [Selkirk] and [Cabinet-Yaak] grizzly bear populations." Id. at 126-127.

The view expressed was not pristine; the Fish & Wildlife Service also included an incidental take statement observing that some take of grizzly bears is expected to occur within bear management units that continue to fail to meet the Wakkinen 33/26/55 standard, though the amount of expected take could not be precisely quantified. FWS AR 1 at 130. The Service also anticipated the take of up to one grizzly bear due to sanitation issues. Id. at 131.

The incidental take statement is accompanied by mandatory terms and conditions governing the implementation of reasonable and prudent measures designed to minimize the impacts of incidental take of grizzly bears. Id. at 134-140. Among other things, the terms and conditions require the following:

- All bear management units must be brought into compliance with their respective habitat

-13-

parameters standards by December 31, 2013.[11]  Id. at 135.

- Newly created core habitat must not be entered for at least ten years after its creation, and core habitat within each bear management unit must not be disturbed more frequently than once every ten years.  Id. at 136.

- No permanent net loss of core habitat may occur within any bear management unit currently exceeding its habitat standards, and temporary reductions in habitat must be limited to no more than three of every ten years and may not result in core habitat levels below the standard set for that bear management unit.  Id. at 137.

- The habitat parameter standards for Bear Management Units 3, 5, 10 and 13, and the Blue-Grass Bear Management Unit must be more protective of grizzly habitat than the standards proposed for Alternative E in the Final Environmental Impact Statement.  Id. at 135-136; FS AR 19-11 at 3, 9.

- The Forests must submit annual reports to the Fish & Wildlife Service setting forth the progress made toward the achievement of the standards set for bear management units within the Recovery Zones. Id. at 138.

The 2004 Biological Opinion does not establish a minimum core patch size.

In March of 2004 the Forest Service issued a Record of Decision adopting Alternative E as modified by the incorporation of the terms and conditions imposed by the 2004 Biological Opinion.  FS AR 19-11 at 3.  The amendments implemented as a result of the Record of Decision are programmatic; they do not

---

[11]Most of the habitat parameter standards set for the thirty (30) bear management units covered by the amendments are at or near the 33/26/55 Wakkinen standard.  The most secure standard is 15/15/80 for Bear Management Unit 1 in the Kootenai National Forest, while the least secure is 82/56/20 for the Lakeshore Bear Management Unit in the Idaho Panhandle National Forest.  FWS AR 1 at 135-136.

authorize any site-specific projects or involve site-specific access management decisions. Id. at 1. Modification of any individual roads or trails or their use will be subject to project-specific planning and analysis. Id.

Once fully implemented, the amendments will increase the number of bear management units meeting or exceeding the Wakkinen study core habitat standard of fifty-five (55) percent from fourteen (14) to twenty (20) (of twenty-two (22) total) in the Cabinet-Yaak and from five (5) to seven (7) (of eight [8] total) in the Selkirk.[12] FWS AR 1 at 7. Compliance with the Wakkinen study's total motorized access density limit of twenty-six (26) percent will increase from eleven (11) to sixteen (16) units in the Cabinet-Yaak and from five (5) to seven (7) units in the Selkirk. Id. With regard to open motorized access density, the Forests' adherence to the Wakkinen study's limit of thirty-three (33) percent will remain steady at fifteen (15) units in the Cabinet-Yaak and seven (7) units in the Selkirk. Id. Twenty (20) of the thirty (30) bear management units affected by the amendments will meet or exceed the 33/26/55 standard, while eight (8) currently do. Id.; FS AR 19-11 at 23. Overall core habitat will increase from fifty-six (56) percent to fifty-eight (58) percent in the Cabinet-Yaak and will remain steady at sixty-four (64) percent in the Selkirk. FWS AR 1 at 103-104. The amendments do not establish a minimum core patch size.

---

[12]Only eight (8) of the Selkirk Recovery Zone's bear management units are subject to these amendments. FS AR 19-11 at 22.

**E.    The Plaintiffs' Claims**

The Amended Complaint alleges three claims for relief.
Under Count I, Plaintiffs assert that the Fish & Wildlife
Service's 2001 Biological Opinion on continued implementation of
the Colville National Forest Plan violated the ESA because it
relied on inadequate scientific information in the form of the
Wakkinen study.  The Plaintiffs also allege that the agency
failed to consider other available scientific information
concerning the status of the Selkirk Recovery Zone grizzly
population and the requirements for the grizzlies' survival and
recovery.  For these reasons, Plaintiffs contend that the "no
jeopardy" finding in the 2001 Biological Opinion is not supported
by the best available science and is arbitrary, capricious, an
abuse of discretion and not in accordance with the ESA.

Count II is an ESA challenge to the 2004 Biological Opinion
on motorized access amendments to the Kootenai, Lolo, and Idaho
Panhandle Forest Plans.  Plaintiffs again assail the Fish &
Wildlife Service's reliance on the Wakkinen study and accuse the
agency of ignoring other available information about the habitat
needs of the Cabinet-Yaak and Selkirk grizzly bear populations.
Plaintiffs contend that the "no jeopardy" finding in the 2004
Biological Opinion is not supported by the best available science
and is arbitrary, capricious, an abuse of discretion and not in
accordance with the ESA.

Count III is a NEPA claim alleging that the Forest Service,
in issuing its March 2002 Final Environmental Impact and

-16-

Statement and March 2004 Record of Decision on the motorized access amendments to the Kootenai, Lolo, and Idaho Panhandle Forest Plans, arbitrarily failed to rigorously explore all alternatives to the proposed action and failed to adequately address the deficiencies in the Wakkinen study.   Plaintiffs also contend that the Forest Service shirked its duty to prepare a supplemental environmental analysis in light of new information (learned after the issuance of the Record of Decision) regarding grizzly bear deaths in the Cabinet-Yaak Ecosystem.

   The parties have filed cross-motions for summary judgment on all claims.  While the Government has the upper hand on the first two claims, in my view the Plaintiffs prevail on their NEPA claim.  My reasoning is set forth below.

### III.  Analysis

**A.   Standard of Review Applicable to All Claims**

   **1.   Standard of APA Review**

   Agency decisions can only be set aside under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971) (quoting 5 U.S.C. §706(2)(A), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).  Agency action can be set aside  "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

-17-

evidence before the agency, or is so implausible that it could
not be ascribed to a difference in view or the product of agency
expertise." <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.
Auto. Ins. Co.</u>, 463 U.S. 29 (1983); <u>Alvarado Community Hospital
v. Shalala</u>, 155 F.3d 1115, 1122 (9th Cir. 1998). The court must
ask "whether the [agency's] decision was based on a consideration
of the relevant factors and whether there has been a clear error
of judgment ... [The court] also must determine whether the
[agency] articulated a rational connection between the facts
found and the choice made. [The] review must not rubber-stamp
... administrative decisions that [the court deems] inconsistent
with a statutory mandate or that frustrate the congressional
policy underlying a statute." <u>Ocean Advocates v. U.S. Army Corps
of Engineers</u>, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal
citations and quotations omitted).

### 2.   Summary Judgment Standard

Summary judgment is appropriate where there are no genuine
issues of material fact and the moving party is entitled to
judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>see also</u>,
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Summary
judgment is particularly applicable to cases involving judicial
review of final agency action. <u>Occidental Engineering Co. v.
INS</u>, 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted).
Summary judgment is appropriate in this case because the issues
presented address the legality of the Federal Defendants' actions
based on the administrative record and do not require resolution

of factual disputes.

## B.    ESA Claims (Counts I and II)

### 1.    Legal Standard

Section 7(a)(2) of the Endangered Species Act requires
federal agencies to consult with the Fish & Wildlife Service or
the National Marine Fisheries Services[13] to ensure that any
action authorized, funded or carried out by the agency is not
likely to jeopardize the continued existence of any endangered
species or threatened species or result in destruction or adverse
modification of critical habitat for such species.  16 U.S.C. §
1536(a)(2).  Agencies involved in this process must use the best
scientific and commercial data available.  <u>Id.</u>  The statute and
its implementing regulations establish a framework for assessing
the impacts of a proposed activity on listed species.  16 U.S.C.
§ 1536; 50 C.F.R. Part 402.

An agency proposing an action must first determine whether
the action "may affect" species listed as endangered or
threatened under the ESA.  50 C.F.R. § 402.14(a).  If the agency
determines that the proposed action may affect listed species,
formal consultation with the Fish & Wildlife Service is required
except in certain instances.  <u>Id.</u>

Formal consultation requires the Fish & Wildlife Service to
prepare a biological opinion in which the Service advises a
federal agency as to whether the proposed action, either alone or

---

[13]The ESA consulting agency at issue in this case is the Fish &
Wildlife Service.

cumulatively with other actions, is likely to jeopardize the
continued existence of any listed species or is likely to result
in the destruction or adverse modification of any critical
habitat.   50 C.F.R. § 402.14(h)(3).   If the Fish & Wildlife
Service determines that a proposed action is likely to result in
jeopardy or loss of critical habitat, the Service must set forth
reasonable and prudent alternatives to the action, if any.   16
U.S.C. § 1536(b)(3)(A).   If the Service determines that a
proposed action will result in incidental take of listed species
but that the action and associated incidental take will not
violate the ESA Section 7 jeopardy standard, the Service must
attach an incidental take statement to the biological opinion.
16 U.S.C. § 1536(b)(4); 50 C.F.R. 402.14(i)(1).   The incidental
take statement sets forth the predicted impact to listed species,
the reasonable and prudent measures that are necessary to
minimize take, and the terms and conditions for the
implementation of those measures.   Id.   If the action agency
complies with the terms and conditions of the incidental take
statement, the expected take is exempted from the take
prohibition set forth in ESA Section 9 (16 U.S.C. §
1538(a)(1)(b)).   16 U.S.C. § 1536(o)(2).

### 2.   Relevant Excerpt of the Alliance Opinion

The Plaintiffs in the Alliance case raised an ESA challenge
to the 2004 Biological Opinion similar to the one alleged in

-20-

Count II here.[14]  The relevant excerpt of the <u>Alliance</u> opinion states:

> Counsel for the Government put his finger on the crux of this dispute at oral argument, when he pointed out that Plaintiffs appear to be demanding that Fish and Wildlife and the Forest Service in particular actually save the grizzly bear from extinction, rather than, as ESA § 7(a)(2) requires, ensure that the actions taken by the Forest Service do not "jeopardize the continued existence" of the grizzlies.
>
> Plaintiffs have reason to be concerned about the fate of the grizzlies in the Cabinet-Yaak and Selkirk Ecosystems.  The populations are paltry and would qualify as endangered but for FWS's policy about priority.  However, a § 7(a)(2) consultation is not a mechanism by which all harms to the grizzlies can be erased.  The question here is narrow:  Do the Forest Service amendments jeopardize grizzlies?  Plaintiffs maintain that the status quo is unacceptable and the amendments only barely improve on the status quo.  Thus, according to Plaintiffs, the amendments jeopardize grizzlies by failing to sufficiently improve on the status quo.  Conversely, Defendants maintain that because the chosen alternative would improve upon current conditions, if only slightly, the Amendments do not jeopardize the bears.
>
> In <u>Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation</u>, 143 F.3d 515 (9th Cir. 1998), the Ninth Circuit discussed the Secretary's decision to adopt a biological opinion, reasonable and prudent alternative, and incidental take statement.  Plaintiffs in that case alleged various violations of

---

[14]The parties do not differentiate between the 2001 Biological Opinion (Count I) and the 2004 Biological Opinion (Count II) in their briefing and arguments, but rather focus on the Plaintiffs' allegations regarding the deficiencies in the Wakkinen study and the Fish & Wildlife Service's alleged failure in both instances to consider other available scientific information.  Accordingly, the discussion of these two claims is combined into a single ESA analysis, and the Court's reasoning in the <u>Alliance</u> opinion regarding the 2004 Biological Opinion is relevant to both the 2001 and 2004 Biological Opinions at issue in this case.

the ESA.  The Court wrote:

> [U]nder the ESA, the Secretary was not
> required to pick the first reasonable
> alternative the FWS came up with in
> formulating the RPA.  The Secretary was not
> even required to pick the best alternative or
> the one that would most effectively protect
> the Flycatcher from jeopardy.  The Secretary
> need only have adopted a final RPA which
> complied with the jeopardy standard and which
> could be implemented by the agency.

Id. at 523 (internal citation omitted).  The Court went
on to say:

> The district court correctly held that the
> only relevant question before it for review
> was whether the Secretary acted arbitrarily
> and capriciously or abused his discretion in
> adopting the final RPA.  In answering this
> question, the court had only to determine if
> the final RPA met the standards and the
> requirements of the ESA.  The court was not
> in a position to determine if the draft RPA
> should have been adopted or if it would have
> afforded the Flycatcher better protection.

Id.  This framework is useful in evaluating Plaintiffs'
persuasive, but legally unavailing, claims.

    2.  Grizzly Bear Mortality

Plaintiffs' first argument, which is a theme
throughout much of their Complaint, is that FWS's
various decisions in this matter are not supported by
sufficient science.  Plaintiffs argue that FWS did not
adequately consider grizzly mortality rates and that
the BiOp's baseline artificially excludes other
simultaneous projects with effects on grizzlies.
Plaintiffs cite this Court's opinion in Rock Creek
Alliance v. U.S. Fish and Wildlife Service, 390
F.Supp.2d 993 (D. Mont. 2005), for the idea that
improper reliance on poor science takes a decision out
of the realm of FWS's discretion and into a violation
of the law.  Plaintiffs point to the BiOp's opinion

that sanitation issues remain problematic in the
recovery zones and "up to one bear" is likely to die as
a result, yet the Amendments do nothing to improve
sanitation.  FWS AR 1: 136.  Plaintiffs also argue that
FWS should have done a <u>Rock Creek Alliance</u>-type
analysis and estimate the mortality that the population
can withstand.

Defendants' view is that their scientific
information is credible, and Plaintiffs must defer to
the agency's scientific expertise.  Specifically on
mortality rates, Defendants contend the BiOp
sufficiently addresses mortality in the Selkirk and
Cabinet-Yaak Ecosystems, citing FWS AR 1:38-43, 53-58,
130, 135, & 139.  Defendants characterize these
discussions as considering mortality, the mechanisms
affecting mortality, and the effects of the proposed
action on mortality.  That, they argue, is sufficient
to meet their ESA burden.

It is important to clarify the distinction between
this situation and the situation this Court considered
in the <u>Rock Creek Alliance</u> case.  In <u>Rock Creek
Alliance</u>, FWS issued a biological opinion and
Incidental Take Statement that allowed a mine to go
forward in the Rock Creek area of the Cabinet-Yaak,
despite the fact that additional bear mortality was
expected due to the mine.  390 F.Supp.2d at 997-98.
Unlike the BiOp here, which involved programmatic
amendments, the Rock Creek BiOp considered a site-
specific project.  <u>Id.</u>  The Court concluded it was
arbitrary to allow a project (especially a private
mining project) go forward that would result in further
deaths in a threatened (and, but for bureaucratic
restrictions) population that was quite possibly in
decline.  <u>Id.</u> at 1009.

Unlike in <u>Rock Creek Alliance</u>, here the amendments
will, however slightly, *improve* the situation for bears
in the Cabinet-Yaak and Selkirk Recovery Zones.  The
only predicted take identified by the FWS relates to
sanitation, which, since it was not part of the
modification of access management, occurs at the same
level or is not expected to increase as a result of the
Amendments.  In addition, the <u>Rock Creek Alliance</u> BiOp
relied on the disputed Harris Report, which explicitly

-23-

stated that its analysis was not applicable to small populations.  This Court determined that it was arbitrary and capricious to rely on a predictive model that, by its own plain terms, was not applicable to a population as small as the Cabinet-Yaak.  Id.  In this case, the agencies are not relying on a model like Harris' that predicts population status, but rather a collection of data about a few bears in the very ecosystem at issue in this case.  Whether the science is sufficient is a separate question, but as a preliminary matter, the problems with the science in the Rock Creek Alliance case are not the same issues presented here.  Rock Creek Alliance does not decide this case.

The BiOp is candid about the mortality challenges facing these bears.  In the "Status of the Grizzly" section of the BiOp, FWS states that neither population is statistically increasing, though the Selkirk population appears to be in better shape.  The BiOp also states the modeling in 1999 suggested that one more subadult death in the Selkirk could "push the trend into a decline."  FWS AR 1:17.  In the Selkirk Recovery Zone, only one of the four grizzly recovery goals is being met, and the present mortality goal is zero bears due to the small population.  FWS AR 1:38-39.  The BiOp reports that mortality was unusually high in 2002.  FWS AR 1:41-43.  The FWS's general conclusion is that, although the numbers are inconclusive and there is a lot of habitat improvement to make, based on the experience and perception of the researchers and field personnel, the situation in the Selkirk is slightly improving for bears.  FWS AR 1:51.

The picture in the Cabinet-Yaak Ecosystem is worse.  The Cabinet-Yaak population appears to be decreasing, especially due to high mortalities in 1999 and 2000.  FWS AR 1:16-17.  The population is slightly smaller (estimated 30-40 bears) and "[e]ven though the trend estimates are inconclusive, due primarily to recent high levels of grizzly bear mortalities, the Service is concerned about the status of this population."  Id. at 55.  Mortality has not been as high in the Cabinet-Yaak as in the Selkirk in the last twenty-five years or so.  Id. at 56.

-24-

Plaintiffs contend this statistical information is useless, because telling us how many bears have died does not tell us how many more can die before the population fails to recover and goes extinct. However, the law requires FWS to use the best scientific and commercial information available. It is clear from the record in this case that there is not an abundance of firm information about how much mortality grizzly bears can withstand. Further, there is no suggestion from the Plaintiffs that the information they want is available. Fish and Wildlife made its decision based on the best scientific information available. In conjunction with FWS's determination that bears will not die as a result of the Plan Amendments, it is not arbitrary and capricious not to calculate the effects of additional (unlikely) mortality. Additionally, under the standard set forth in ESA § 7(a)(2), the question is whether the Plan Amendments will jeopardize the bears. The bears' current situation is bad, but over time their habitat will improve as the BMUs conform to the Amendments. FWS sufficiently considered grizzly bear mortality in its biological opinion.

3.    Grizzly Bear Recovery

Plaintiffs contend that the record raises substantial doubt about whether grizzly bears will recover. Plaintiffs state that FWS must specifically find that grizzlies affected by the Plan Amendments still have the potential to recover. Plaintiffs draw this requirement from the ESA's implementing CFRs, which define "jeopardize the continued existence of" as actions that would "reduce appreciably the likelihood of both the survival and recovery of the listed species." 50 C.F.R. § 402.02. Plaintiffs claim that the record "raises substantial doubt as to whether there remains a realistic possibility that grizzly bears in the CYE and SE will eventually recover." Plaintiffs also argue that linkages between habitat areas are crucial for recovery and entirely ignored in the BiOp. Even if there are enough bears, without linkages, bears still may not recover over time.

The Government points to the increased core areas

across the Cabinet-Yaak and Selkirk Recovery Zones, the
decreased linear densities outside of the recovery
areas, and restrictions on further losses of core
habitat, and cites the BiOp's conclusion that "overall
core grizzly bear habitat within these Recovery Zones
will increase, and will be provided at quantities
sufficient to support the average female grizzly bear's
home range needs, as indicated by research in these
Recovery Zones." FWS AR 1:130. From FWS's
perspective, the improved conditions support the
conclusion that bears will probably do better under the
Amendments. But FWS does express some uncertainty in
this conclusion. "[D]isplacement and mortality effects
upon grizzly bears resulting from roads and road
densities will likewise decrease with the Recovery
Zones, which *may result* in increased grizzly bear
numbers and distribution within the Recovery Zones."
FWS AR 1:131 (emphasis added).

Again, the question is does the agency action
"reduce appreciably the likelihood of both the survival
and recovery" of the grizzly? 50 C.F.R. § 402.02. The
Ninth Circuit has held that the FWS's duty is to assess
a project's potential to adversely modify critical
habitat's ability to support both survival *and*
recovery. See Gifford Pinchot Task Force v. U.S. Fish
and Wildlife, 378 F.3d 1059, 1069 (9th Cir. 2004).
However, this Court is unaware of any BiOps that have
been held arbitrary and capricious for failing to
discuss recovery adequately where the FWS made a
finding of no jeopardy. As seen through the lens of
ESA § 7(a)(2), the amendments proposed do slightly more
for recovery and survival than the status quo.
Consequently, the FWS saatisfied [sic] its legal
obligation in concluding that the Amendments do not
reduce the likelihood of the survival and recovery of
the grizzly.

\*                    \*                    \*

5.   Best Scientific Data Available

Plaintiffs argue that FWS and the Forest Service

failed in their 16 U.S.C. § 1536(a)(2) duties because they did not "use the best scientific and commercial data available." Plaintiffs dispute FWS's and the Forest Service's reliance on the "Wakkinen Report," which is the grizzly habitat study for the Cabinet-Yaak and Selkirk ecosystems relied on by the Government. Plaintiffs question the validity of this study because it is based on only six bears in what they consider "a highly degraded ecosystem." Plaintiffs argue that "the record in this case simply does not support the agencies' finding that the Wakkinen report's road density and core parameters represent the most scientifically defensible standards for management." Even assuming the Report is the best science available, Plaintiffs contend that the Plan Amendment does not meet the Report's standards. Plaintiffs point out that the agencies have established 2400 acres (about 4 square miles) as the minimum core habitat block size, when Wakinnen [sic] found that ninety per cent of habitat use in the CYE occurred in areas of at least 8 sqare [sic] miles. Plaintiffs also dispute the lack of strict road guidelines outside the recovery zones.

Defendants respond by pointing out that Plaintiffs have not identified any information they ignored or that was available and better than the information they used. Defendants emphasize the fact that Wakinnen's [sic] study is the only one specifically dealing with the Cabinet-Yaak and Selkirk Ecosystems and was subject to peer review. FWS AR 277:2826-28; 333:3210-15; 334:3216-18; 332:3206-08; 133:1483; FS AR 26:9 at 5.

The ESA requires that the biological opinion and agency action be based on "the best scientific and commercial information available." 16 U.S.C. § 1536(a)(2). This court "cannot substitute [its] judgment for that of the Forest Service and Fish & Wildlife but instead must uphold the agency decisions so long as the agencies have considered the relevant factors and articulated a rational connection between the facts found and the choice made." Selkirk Conservation Alliance v. Forsgren, 336 F.3d 944 (9th Cir. 2003) (internal quotation marks and citations omitted). The standard does not require the agency to rely on indisputable or unequivocal evidence. The

Court may conclude that "[w]hile another decisionmaker might have reached a contrary result, the agencies conducted a reasonable evaluation of the relevant information and reached a conclusion that, although disputable, was not arbitrary and capricious." Id. at 956.

As for the first step of this analysis, FWS's reliance on the Wakkinen Report cannot be assailed. There are problems with the study, and it might have been better to have higher population numbers from which to work. These shortcomings are acknowledged by FWS. FWS AR 277:2826-28; 333:3210-15; 334:3216-18; 332:3206-08. However, FWS's preference for a study in the ecosystem at issue is reasonable and should be left to FWS's discretion. While other studies might consider higher numbers of bears, the record shows that this ecosystem has an unusually high road density. There is a rational and articulated reason in the record for basing the Amendment on research in the area to be managed.

Fish and Wildlife, and the Forest Service, considered other sources of information, including the Mace and Manley study of grizzlies in the South Fork of the Flathead River. FS AR 26:9 at 5; FWS 1:44. Plaintiffs do not show which other information would have been more appropriate, but rather attempt to poke holes in the Government's choices. The Court does not have grounds to conclude FWS's information was not the best information available.

Plaintiffs alternatively contend that if Wakinnen [sic] is the best science available, then Defendants' choice to authorize BMUs with less habitat than Wakinnen [sic] recommends cannot have been based on the best information. However, FWS and the Forest Service both explain why some units do not meet the standards required by Wakinnen [sic]. FWS 1:43, 46-47; FS AR 15-43 at 3-10. The Amendments require no permanent loss of core habitat. FWS AR 1:107-11. This dovetails with the reasons for a programmatic amendment. The BMUs have widely diverse characteristics. While most BMUs are 100 square miles, there are smaller ones, such as the thirty square mile Lakeshore BMU on Priest Lake. FS AR 15-43 at 3-10. There are BMUs that consist of

-28-

wilderness areas, BMUs that abut towns or highly used
recreational areas, and BMUs with highways and railroad
tracks. FWS AR 1:61. There are BMUs, such as the two
slender ones that connect the Cabinet and Yaak portions
of the CYE that might be particularly crucial for
genetic and population purposes. FWS AR 1:54. The
programmatic amendments set standards for across the
forest, but their effects on and implementation in
particular BMUs will vary. This was the reason the
Forest Service chose to design the amendments the way
it did.

    Based on review of the administrative record and
discussions within it of the shortcomings of the
scientific information and the lack of availability of
alternate site-specific information, it was not
arbitrary and capricious for Defendants to rely on the
scientific information included in the record.

<u>Alliance for the Wild Rockies v. United States Fish and Wildlife</u>

<u>Service</u>, CV 04-216-M-DWM (August 29, 2006) at pp. 7-21 (footnotes

omitted; emphasis in original).

### 3. Discussion

The Plaintiffs in this case offer two grounds for their

claim that the 2001 and 2004 Biological Opinions violate the ESA.

First, they contend that the Wakkinen study is not the best

available science and that the Fish & Wildlife Service failed to

adequately explain its reliance on the Wakkinen study in light of

the fact that two of the six bears monitored in the study were

killed by humans shortly after the end of the study period. This

argument is similar to the one raised by the <u>Alliance</u> plaintiffs,

but the Plaintiffs here place greater emphasis on the post-study

deaths and other shortcomings in the Wakkinen study. The second

argument alleges that the Fish & Wildlife Service violated the

ESA by failing to establish a minimum core patch size despite the Wakkinen study's finding that ninety-five (95) percent of core habitat use occurs in patches at least four (4) square miles in area.

### a. Reliance on the Wakkinen study

The Plaintiffs argue that the Wakkinen's study's flaws render it unworthy of the agencies' reliance as a source for grizzly bear habitat management direction. Plaintiffs contend that by relying upon the Wakkinen study the Fish & Wildlife Service has violated the ESA by failing to use the best available scientific data and by failing to ensure that the Forest Service's actions do not jeopardize the continued existence of the grizzly bear.

The Plaintiffs identify numerous shortcomings in the Wakkinen study. They emphasize that the authors of the Wakkinen study conceded the possibility that the habitat parameters they measured are not optimal for the bears, but merely reflect the bears' selection of the best habitat available, even if it is not ideal. In attempting to explain the discrepancy between the South Fork study's 19/19/68 habitat parameters and their own study's values of 33/26/55, the Wakkinen authors state, "Perhaps bears in the Selkirk and Yaak Study areas had no areas available to them which would allow for larger core areas or significant areas with lower road densities. Without a comparison of a large area (first order selection) we will not be able to answer that question." FWS AR 413 at 24-25. While left unanswered, the

question is very important in measuring the study's validity.

The study's conclusions are further undermined, according to the Plaintiffs, by the fact that two of the six bears studied were killed by humans shortly after the evaluation period.  FWS AR 413 at 23.  Plaintiffs argue that there is no valid basis for the Fish & Wildlife Service's reliance on the Wakkinen study's findings when the habitat situation upon which the study is based proved lethal to one third of the female bears involved.  Plaintiffs argue there is even more reason to question the study's findings because a third female bear involved in the study reached full adulthood during the last year of the study.  Id. at 23.  This is significant because subadult females tend to have larger home ranges than reproductive adults as they explore different habitat options.  Id.  The Plaintiffs claim the inclusion of this female's habitat use during her subadulthood further corrupts the results of the Wakkinen study, particularly in light of the fact that she used the least core habitat of any bear in the study.  Id. at 21.

Some Fish & Wildlife Service biologists expressed reservations about the Wakkinen's study's findings as a result of these shortcomings.  Two biologists who commented on a draft of the Wakkinen study in 1996 stated:

> We remain concerned that we are studying bears and
> drawing conclusions from their use in an already
> degraded environment.  Are we developing habitat-use
> conclusions from grizzly bears that are just barely
> getting by?  Or are the grizzly bears thriving and
> successfully reproducing in the study areas?  You state
> in the discussion that survival and reproduction

-31-

> success must be considered when selecting animals to
> use as the basis for standards — we support this and
> recommend including additional information on this
> topic.  If the grizzly bears are not thriving in the
> existing environmental baseline, we may need to develop
> open road densities, total road densities, and core
> standards that are more conservative than would be
> indicated by this study.

FWS AR 336 at 3230.  In 1998, when Wakkinen's 33/26/55 standard

was before the Interagency Grizzly Bear Committee's Cabinet-

Yaak/Selkirk Subcommittee as a proposed standard for access

management, a biologist in the Fish & Wildlife Service's Spokane

office questioned the adequacy of the Wakkinen parameters,

stating:

> This office has never concurred with the minimum 55%
> core suggested by the SE/CYE Access Task Group.  The
> best available and most defensible scientific
> information available on the core security needs of
> female grizzly bear comes from the combined data sets:
> SE-CYE, 55% core (n=6) and the NCDE 68% core (n=8),
> arithmetic mean of 61.5% core (n=14).  Accordingly, we
> propose a long-term strategy based on 61.5% core with
> concomitant reductions in open road density and total
> road density.

FWS AR 316 at 3007.

A Telephone Conversation Record of a conference call among

Fish & Wildlife Service biologists on March 22, 2001 suggests

that the authors of the 2004 Biological Opinion initially

disregarded the Wakkinen study in favor of a more protective

standard that they deemed more accurate, but that they were

overruled by superiors within the agency.  The Telephone

Conversation Record states:

> I also reminded Carole that when we first started
> writing this BO [biological opinion], we suggested
> managing for criteria that is greater than the "Waynes"

numbers because of our concern with data size, better
applicable data sets on female home ranges from the
[Northern Continental Divide Ecosystem], etc.  However,
we were told by Helena that any BO requiring standards
in excess of the "Waynes" numbers would not be
supported, and Chris Servheen in fact, stated that he
would go directly to our Regional Director and
recommend that she not support such a BO.

FWS 289 at 2870.[15]

The Plaintiffs argue that the Wakkinen study lacks the
scientific validity necessary to serve as a basis for the Fish &
Wildlife Service's jeopardy determination because it uses a
habitat environment in which one third of the studied bears were
killed by humans, includes information on a subadult female, and
fails to assess whether the bears had any better choices for
habitat.  They also argue that the status quo in the Recovery
Zones is killing bears, and that by failing to require that the
Forest Service dramatically improve upon the status quo the Fish
& Wildlife Service has shirked its duty under the ESA to ensure
that the amendments do not jeopardize the continued existence of
the grizzly.  The argument is logically compelling and would
prevail had Congress given the ESA the teeth necessary to serve
its purpose.

The Fish & Wildlife Service was candid about the Wakkinen
study's flaws in both the 2001 and 2004 Biological Opinions:

In their study, Wakkinen and Kasworm (1997) did not
determine if bears selected home ranges with fewer
roads relative to road densities across the entire
ecosystem . . . .  Therefore, we are unable to conclude

---

[15]The "'Waynes' numbers" refers to the findings of the Wakkinen
study.

whether the 26 percent and 33 percent for total and
open road densities respectively, represents the
optimal selection of habitat by bears, or if these
numbers simply reflect the condition of the environment
from which they have to choose (i.e., do grizzly bears
in the Selkirk or Cabinet-Yaak Ecosystems have the
opportunity to choose areas with less road density?)   .
. . .   An important consideration when interpreting
results of the study conducted by Wakkinen and Kasworm
(1997), in light of the apparent differences in road
densities and core habitats of grizzly bears between
the NCDE and the Selkirk/Cabinet-Yaak Ecosystems, is
the fact that two of the six female bears in the
Selkirk/Cabinet-Yaak study were killed by humans
immediately following the period of monitoring, and a
third female was the subadult offspring of one of the
females in the study.

FWS AR 1 at 40-41; FWS AR 417 at 29 (substantially similar

discussion).  The Federal Defendants say that in addition to

acknowledging these shortcomings, the Fish & Wildlife Service

compensated for them by requiring that there be no net loss of

core habitat in any bear management unit.  In the 2004 Biological

Opinion the Service states:

[D]ue to the limitations of the research data, and
because several [bear management units] may never
achieve the minimum habitat conditions suggested by the
research as necessary to support the average female
grizzly bear's home range within these ecosystems, any
permanent losses of core habitat within any [bear
management unit] may have serious ramifications on the
ultimate recovery of the grizzly bear populations
within the Recovery Zones.

FWS AR 1 at 106.  In light of this passage, the Fish & Wildlife's

Service's requirement of no net loss of core habitat is at least

an effort to address the shaky aspects of the Wakkinen study.

The Federal Defendants disagree with the Plaintiffs'

contention that the limitations of the Wakkinen study make it

unreliable for ESA purposes.  They argue that the fact that two

-34-

of the bears died after the study period does not demonstrate
that the habitat studied is insufficient to support the grizzly
population because it remains the case that every one of the
bears studied survived in the habitat long enough to reproduce
and were chosen for that reason. FS AR 19-9 at 4-29. The
Defendants cite the Wakkinen authors' statement that "survival
and reproductive success must be considered when selecting
animals or results which may be the basis for standards." FWS AR
413 at 25. This statement cuts both ways, however, because it
values both survival *and* reproductive success: although all six
bears lived long enough to reproduce, two did not survive for
very long after the study and neither of the killed females is
known to have replaced herself by producing a female cub that
reached reproductive age. FWS AR 75 1092-1099. These failures
to successfully reproduce undermine the utility of the Wakkinen's
study's bears as the basis for standards. On the other hand, one
of the females monitored was known to have produced six litters
totaling thirteen cubs, including at least three reproductive
females, before she died of natural causes at age 21. FS AR 22-
16 at 18-19; FWS AR 413 at 28; FWS AR 11 at 405, 407; FWS AR 75
at 1093.

The Federal Defendants also claim that the two human-caused
deaths of Wakkinen study bears do not undermine the validity of
the authors' findings because the deaths would not have been
prevented by lower open road density or higher core percentages.
Defendants note that both bears were killed more than five

-35-

hundred (500) meters from roads open to public motorized travel; one (Bear 867) was killed illegally by a hunter walking on a closed gated road and one (Bear 1015) was killed in a self-defense accident in core habitat in Canada.  FWS AR 1092-1093.

The Defendants' argument is misleading with regard to Bear 867, as a road closed by a gate is not sufficiently decommissioned to be considered part of core habitat.  FS AR 19-11 at 6.[16]  Moreover, the gated road counts toward the calculation of total road density, the one habitat parameter not mentioned by the Defendants.  While it is not known to what extent greater protections would have prevented Bear 867's death, there is no question that the death was a product of human-grizzly bear interaction caused by the presence of a gated road in what would otherwise be core habitat.  The death of Bear 1015, by contrast, cannot be attributed to road density or the absence of core habitat.

The Wakkinen study is not the best conceivable scientific information upon which to make access management decisions affecting grizzly habitat.  Like the plaintiffs in <u>Alliance</u>, the Plaintiffs here make the mistake of resting their claim on this fact, which the Federal Defendants readily concede.  The issue is

---

[16]The 2004 Record of Decision states, "Core areas do not include any gated roads but may contain roads that are impassible due to vegetation or constructed barriers."  FS AR 19-11 at 6.  While it is evident from context that "impassible" is intended to mean impassible by motor vehicle, and that most "impassible" roads qualifying for inclusion in core habitat would nonetheless be traversable by foot, the site of Bear 867's death is not considered core habitat.

-36-

whether Wakkinen is the best *available* information, and the
Plaintiffs have not carried their burden to show that it is not.
The Plaintiffs claim the "best available information" is
population trend analysis that suggests that the Cabinet-Yaak and
Selkirk populations are teetering on the brink of decline.  Pl's
Op. Br. at 12.  That information, while perhaps accurate, is not
so superior in reliability to the Wakkinen study to render the
Fish & Wildlife Service's reliance on the study unreasonable.[17]
Moreover, unlike the Wakkinen study, the trend analyses cited by
the Plaintiffs offer no useful guidance with regard to habitat
parameters; they provide a diagnosis but do not suggest a
treatment.  The Wakkinen study, for all its faults, provides
guidance with regard to habitat parameters that can function both
as a benchmark for minimum habitat standards and as a guideline
for access management decisions.

Plaintiffs characterize the Fish & Wildlife Service's
reliance on the Wakkinen study as an instance of high-level
agency officials ignoring the recommendations of the agency's own
biologists.  On that basis they argue that the agency's decisions
are not entitled to deference.  The Plaintiffs cite <u>Defenders of
Wildlife v. Babbitt</u>, 958 F.Supp. 670, 685, in which the court

---

[17]The information relied upon by the Plaintiffs as the "best
available information" is, like the Wakkinen study, subject to some
qualifications.  For example, Plaintiffs cite the Service's
calculations that there is a seventy-five (75) percent chance that the
Cabinet-Yaak population is in decline.  FS AR CD 5-12a at 71.  This
means there is a twenty-five (25) percent chance the population is not
in decline.

wrote, "Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." But here the Fish & Wildlife Service explicitly acknowledged the concerns of these biologists in both the 2001 and 2004 Biological Opinions, and the 2004 Biological Opinion states that the prohibition on net reduction in core habitat is in part an effort to compensate for the shortcomings identified by the biologists. Moreover, the Plaintiffs overlook that one of the two authors of the Wakkinen study is a Fish & Wildlife Service biologist. The Service acknowledged all criticisms and made a choice between conflicting scientific viewpoints among its own biologists.[18] That is a far cry from the situation in <u>Defenders</u>, where the court found that the agency "consistently ignored the analysis of its expert biologists" and "bas[ed] its decision on unsupported conclusory statements as well as facts which are directly contradicted by undisputed evidence in the Administrative Record." <u>Id.</u>

The Plaintiffs have not provided compelling reason for the Court to refuse to defer to the agency's expertise or for the

---

[18]At the hearing on these motions Plaintiffs' counsel argued that there was no evidence of a difference of opinion among Fish & Wildlife Service biologists because Wayne Kasworm, who co-authored the Wakkinen study, was (according to a telephone conversation record of unknown authorship) silent when another biologist stated that the 2004 Biological Opinion would have been more protective of grizzly habitat were it not for the meddling of officials higher up in the agency. Kasworm's apparent silence on that call does not speak as loudly as his decision to sign off on the Wakkinen study's findings after considering peer review comments raising the same concerns at issue here. The record establishes that the Service's biologists held differing opinions as to the minimum habitat needs of te grizzly bear.

Court to reverse its finding in the <u>Alliance</u> case that it was
reasonable for the Fish & Wildlife Service to rely upon the only
habitat parameters study based on bears in the management area.
The concluding paragraph of the <u>Alliance</u> opinion still stands:
"Based on review of the administrative record and discussions
within it of the shortcomings of the scientific information and
the lack of availability of alternate site-specific information,
it was not arbitrary and capricious for Defendants to rely on the
scientific information included in the record." <u>Alliance</u>, CV 04-
216-M-DWM at p. 21.

   Plaintiffs also argue that by relying on the Wakkinen study
and issuing a Biological Opinion that only slightly improves upon
the status quo, the Fish & Wildlife Service has failed to ensure
that the amendments will not jeopardize the continued existence
of the grizzly bear in the Cabinet-Yaak and Selkirk Ecosystems.
The Plaintiffs claim that their argument on this issue is
distinct from the one rejected in the <u>Alliance</u> case because they
do not argue that the Service must recover the bears but rather
claim that the ESA prohibits the Service from "adopt[ing]
standards that threaten grizzly bear extinction." Pl's Op. Br.
at 14. Accordingly, the Plaintiffs assert that it does not
suffice for the Federal Defendants to declare that the amendments
would improve upon current conditions, if only slightly:

      Defendants' grizzly bear plan may marginally improve
      upon the current degraded status quo in some areas, but
      its prescription for retention—and even expansion in
      some areas—of a massive road system in the Cabinet-Yaak
      and Selkirk ecosystems still would jeopardize the

affected bears.  By analogy, a medical treatment plan
that offers a Band-aid to the victim of multiple severe
stab wounds promises a slight improvement on the status
quo, but still jeopardizes the victim's continued
existence.

Id.[19]

Contrary to the Plaintiffs' contention, this argument is
merely a restatement of the argument offered by the Alliance
plaintiffs claiming that the Fish & Wildlife Service must take
steps to recover the bears.  Legally, the Service need only
ensure that a proposed agency action "is not likely to jeopardize
the continued existence" of the grizzly.  16 U.S.C. § 1536(a)(2).
The implementing regulations further define "jeopardize the
continued existence of" to mean "to engage in an action that
reasonably would be expected, directly or indirectly, to reduce
appreciably the likelihood of both the survival and recovery of a
listed species in the wild by reducing the reproduction, numbers,

---

[19]Plaintiffs took a different approach at the hearing, arguing
that the amendments not only failed to improve upon the status quo,
but in fact would degrade the status quo.  In support of this argument
Plaintiffs' counsel stated that twenty-one (21) of the thirty (30)
units would see increases in open motorized road density and thirteen
(13) would see increases in total motorized road density.  This is an
accurate but selective description of the effects of the amendments.
See FWS AR 1 at 7; FS AR 19-11 at 23 (in fact, it appears that open
road density will increase in twenty-two (22) of thirty (30) units,
rather than twenty-one (21) as the Plaintiffs say).  The amendments
will also decrease open road density in four (4) units, decrease total
road density in twelve (12) units, and increase core in eleven (11)
units.  FWS AR 1 at 7.  Moreover, they will raise the number of units
meeting or exceeding the 33/26/55 standard from eight (8) to twenty
(20).  Id.; FS AR 19-11 at 23.  Overall core habitat will increase
from fifty-six (56) percent to fifty-eight (58) percent in the
Cabinet-Yaak and will remain steady at sixty-four (64) percent in the
Selkirk.  FWS AR 1 at 103-104.  This record supports the agencies'
contention that the amendments are a marginal improvement over current
conditions for the bears.

or distribution of that species." 50 C.F.R. § 402.02. Context
makes clear that the reduction that is prohibited by the ESA is
reduction of the current (pre-agency action) likelihood of
survival and recovery. The regulations are explicit in requiring
the Fish & Wildlife Service to ensure only that the planned
action will not make the present situation worse. The Plaintiffs
are wrong when they say, "Improvement of the status quo is not
the standard; avoidance of jeopardy is the operative legal
standard." Pl's Op. Br. at 15. In fact, neither is true. The
standard requires not improvement upon the status quo, but rather
no deterioration of the status quo. To use the Plaintiffs'
analogy, unfortunately the ESA does not require the doctor to
treat his stab wound patient; as the law exists it simply
requires that the doctor not stab him again.[20]

### b. Failure to Require a Minimum Core Patch Size

Plaintiffs argue that the Fish & Wildlife Service violated
the ESA by failing to establish a minimum core patch size before
a patch can be counted toward the core habitat percentage in a

---

[20]A theme has emerged in this Court's ESA rulings: A threatened or
endangered animal population is in poor condition. Despite this
obvious fact, the Forest Service continues to pursue multiple use
management to the detriment of the animals, and the Fish & Wildlife
Service acquiesces in planning documents and projects that, to the
extent they seek at all to help the imperiled species, are aimed with
pinpoint precision toward compliance with the minimum the law requires
and nothing more. This Court is then left with little choice but to
uphold against an Endangered Species Act challenge agency action that
does virtually nothing to help endangered species. Someday it will
become clear that the ESA and its implementing regulations are
insufficient to recover endangered species. Sadly, that realization
will likely come at a steep price. Dentures are a sorry substitute
for teeth in the law.

bear management unit.  In this regard, the Court's tacit agreement with the <u>Alliance</u> plaintiffs' statement that the agencies established 2400 acres (about four [4] square miles) as the minimum core patch size is in error; the Federal Defendants here do not dispute that the Fish & Wildlife Service neglected to establish a minimum.  Plaintiffs contend that the Wakkinen study demonstrates that core patches smaller than four (4) square miles in area receive little use and that the Service's failure to acknowledge this habitat requirement is a failure to consider an important aspect of the problem in violation of the ESA.

The Plaintiffs argue that it is arbitrary and capricious to fail to establish a minimum core patch size when the Wakkinen study showed that about ninety (90) percent of the habitat use by bears in the Cabinet-Yaak and Selkirk Recovery Zones occurred in core areas measuring ten (10) square miles or greater and ninety-five (95) percent of habitat use occurred in areas of four (4) square miles or greater.  FWS AR 413 at 22; FWS AR 331 at 3200.  Plaintiffs note that the agencies adopted a four-square mile minimum in the Northern Continental Divide Ecosystem and that the biologists who commented on the Wakkinen draft stated that "[t]here appears to be enough information to support 4 square miles as a minimum core size" and that such a recommendation would be conservative.  FWS AR 333 at 3232.  The study's authors, however, found that small sample sizes prevented them from identifying a useful minimum core habitat patch size, but noted that "larger blocks of core are likely beneficial to bears" and

-42-

"if a minimum core size occurs, it is likely between [two square miles and eight square miles]." FWS AR 413 at 25-26.

The Federal Defendants argue that no minimum patch size is necessary because the Wakkinen authors did not set a definitive minimum.[21] The Defendants also claim that the Fish & Wildlife Service addressed the grizzly's preference for larger patches of core by requiring no net reduction of core in any bear management unit. The latter argument can be rejected out of hand. A requirement of no net loss of core habitat coupled with "management flexibility" that allows for shifting of core provided there is no resulting net loss does nothing to ensure a minimum core size. A bear management unit could conceivably be carved into dozens of tiny patches while in the aggregate remaining above the unit's minimum core percentage. Such a unit would meet Wakkinen's habitat parameters while providing none of the large blocks of core that the authors say are "likely

---

[21]The Federal Defendants also attempt to argue that the Wakkinen study does not support designation of a minimum core patch size because "[f]or most size categories of core areas, there was no statistically significant difference between the grizzly bears' use of such areas and their availability." Defs' Op. Br. at 14. This ignores the Wakkinen study's observation that "[f]emale use percentages in the Selkirks and the Yaak were less than 50% of expected values for the [zero to two square miles] category" and that use percentages only exceeded availability in the [eight to ten square mile and greater than ten square mile categories]. FWS AR 413 at 21. While the Federal Defendants' counsel found "*no statistical difference* between use and availability overall," Def's Op. Br. at 14 (emphasis in original), the biologists saw enough of a difference to suggest that 'if a minimum size occurs, it is likely between [two and eight square miles]." FWS AR 413 at 23. The Federal Defendants' argument here is not persuasive because it rests on their counsel's interpretation of the biologists' data and is contrary to the biologists' conclusion.

-43-

beneficial" to the bears.  FWS AR at 26.

The Federal Defendants are left with the fact that the Wakkinen study merely hypothesized about a minimum core size and stopped short of identifying one.  In this regard, the Plaintiffs point out an inconsistency.  The Wakkinen study, while too small to yield a useful minimum core patch size, was large enough to serve as the basis for motorized access management decisions across three national forests.  More troubling is the Federal Defendants' failure to cite a single instance of discussion of minimum core patch size in either the 2001 or 2004 Biological Opinions.  The Fish & Wildlife Service completely ignored the question of whether there is a minimum useful core habitat size.

Still, the equivocation by the Wakkinen authors creates some doubt as to whether the Service's failure to address the issue can be fairly characterized as a failure to consider an important aspect of the problem.  It is more accurate to say that the Service failed to act on a suggestion relating to an aspect of the problem that, while not trivial, is not a pressing issue at this stage.  The Plaintiffs identify only two units in which high percentages of core occurring in patches of less than four (4) square miles call into question the effectiveness of the core habitat: Bear Management Unit 6 in the Cabinet-Yaak (fifty-five [55] percent core, one fifth of which is made up of sub-four square mile patches) and the Kalispell-Granite Bear Management Unit in the Selkirk (forty-eight [48] percent core, fourteen [14] percent of which is sub-four square mile patches).  FS 19-11 at

-44-

9; FWS 331 at 3189.  If the Plaintiffs could demonstrate that
small core patches make up a significant portion of the available
core, the Wakkinen authors' theorizing might warrant greater
consideration from the Service.  In the absence of an indication
that small patch sizes are affecting the survival of the grizzly
in these ecosystems, the Service's failure to designate a minimum
patch size is not grounds for setting aside the Biological
Opinions for failure to consider an important aspect of the
problem.

Based on the foregoing, the Federal Defendants are entitled
to summary judgment in their favor and against the Plaintiffs on
the ESA claims (Count I and II).

**C.    NEPA Claim (Count III)**

**1.    Legal Standard**

NEPA is intended to focus the attention of the government
and the public on the likely environmental consequences of a
proposed agency action.  Marsh v. Oregon Natural Resources
Council, 490 U.S. 360, 371 (1989).  The Act "places on the agency
the obligation to consider every significant aspect of the
environmental impact of the proposed action" and "ensures that
the agency will inform the public that it has indeed considered
environmental concerns in its decisionmaking process."  Baltimore
Gas & Electric Co. v. Natural Resources Defense Council, Inc.,
462 U.S. 87, 97 (1983) (citations omitted).

NEPA imposes procedural obligations on government agencies.
"NEPA does not work by mandating that agencies achieve particular

-45-

substantive environmental results." <u>Marsh</u>, 490 U.S. at 371.
NEPA dictates the necessary procedure an agency must follow, but
does not state any requirements relating to the outcome of the
agency's decision making process. <u>Robertson v. Methow Valley
Citizens Council</u>, 490 U.S. 332, 359 (1989).

NEPA requires a federal agency to prepare an environmental
impact statement detailing the environmental impacts of "major
Federal actions significantly affecting the quality of the human
environment." 42 U.S.C. § 4332(2)(C). This obligation includes
the duty to consider "[w]hether the action is related to other
actions with individually insignificant but cumulatively
significant impacts." 40 C.F.R. § 1508.27(b)(7). "If several
actions have a cumulative environmental effect, 'this consequence
must be considered in an [environmental impact statement].'" <u>Blue
Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1214
(9th Cir. 1998) (quoting <u>Neighbors of Cuddy Mountain v. United
States Forest Service</u>, 137 F.3d 1372, 1378 (9th Cir. 1998)).

The environmental impact statement must describe the
environmental impacts of the proposed agency action, any adverse
environmental impacts of the proposed action that cannot be
avoided, and alternatives to the proposed action which were
considered by the agency. <u>Robertson</u>, 490 U.S. at 349. The
scope and nature of the direct, indirect, and cumulative impacts
analysis is a matter committed to the sound discretion of the
agency. <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 413-14 (1976). If
the nature and scope of the analysis is challenged, the reviewing

-46-

court may only examine whether "the agency has taken a 'hard
look' at the environmental consequences." Inland Empire Public
Lands Council v. U.S. Forest Service, 88 F.3d 754, 763 (9th Cir.
1996) (quoting Kleppe, 427 U.S. at 410 n. 21). A court may not
interject itself within the area of discretion of the executive
as to the choice of the action to be taken; only if the agency's
analysis of the environmental impact is "arbitrary and
capricious" or "contrary to the procedures required by law" can
the reviewing court conclude that the agency did not take the
requisite "hard look." Kleppe, 427 U.S. at 410 n. 21; Inland
Empire, 88 F.3d at 763.

**2.   Relevant Excerpt of the Alliance Opinion**

The Plaintiffs in the Alliance case raised a NEPA challenge
to the 2002 Final Environmental Impact Statement and 2004 Record
of Decision similar to the one alleged in Count III here. The
relevant excerpt of the Alliance opinion states:

1.   Scientific Integrity of EIS Analysis

40 C.F.R. § 1502.24 directs agencies to insure the
scientific integrity of their EIS analyses, identify
any methodologies used, and make explicit reference to
sources relied upon. Plaintiffs argue that the EIS
must point out incomplete or weak sources of
information, citing Lands Council v. Powell, 395 F.3d
1019, 1031 (9th Cir. 2005). The Wakkinen report, in
Plaintiffs' view, is just such a weak source, and
Plaintiffs believe the EIS should more fully discuss
the report's shortcomings. Plaintiffs' argument and
quotations of criticisms of the Wakkinen Report
emphasize that Wakkinen's figures reflect the degraded
status quo, with the implication that since the bears
are not doing well now, maintenance of the status quo

-47-

is not an improvement. Defendants reject Plaintiffs'
reliance on Lands Council, arguing that the Wakkinen
Report is not a model, like the WATSED model at issue
in Lands Council, but rather a collection of data
regarding grizzly habitat use in the very area the
agencies are trying to manage through the Plan
Amendments.

The objective, "to insure the scientific integrity
of the analysis," is vague, and the case law does not
provide much guidance about what it means. Generally,
courts have interpreted this phrase to mean that
analysis cannot be based on faulty information or
flawed models. See, e.g., Native Ecosystems Council v.
U.S. Forest Serv., 418 F.3d 953 (9th Cir. 2005).

As a preliminary matter, Defendants are incorrect
that Lands Council does not apply in a case that
involves a collection of data rather than a model.
Lands Council reiterated the NEPA requirement of "up-
front disclosures of relevant shortcomings in the data
or models." 395 F.3d at 1032 (emphasis added). Thus,
the Lands Council reasoning is applicable in this case.

Nevertheless, Lands Council does not dictate a
finding in Plaintiffs' favor on this issue. In Lands
Council, the Forest Service's WATSED model was
inadequate because it did not include some variables
determined to be crucial. Id. at 1031. The bottom
line of that case, however, is that if the agency knows
something is wrong with its model or data, it must
disclose that fact.

Similar to Lands Council, in Earth Island
Institute v. U.S. Forest Service, 351 F.3d 1291 (9th
Cir. 2003), the Ninth Circuit emphasized how important
it is for an agency to disclose the scientific
information upon which it has relied so that the public
may challenge its reliance on that information:

> Failure to provide [scientific] information
> either vitiates a plaintiff's ability to
> challenge an agency action or results in the
> courts second guessing an agency's scientific
> conclusions. However, an agency is entitled
> to wide discretion in assessing the
> scientific evidence, so long as it takes a
> hard look at the issues and responds to

> reasonable opposing viewpoints. Because
> analysis of scientific data requires a high
> level of technical expertise, courts must
> defer to the informed discretion of the
> responsible federal agencies. When
> specialists express conflicting views, an
> agency must have discretion to rely on the
> reasonable opinions of its own experts, even
> if a court may find contrary views more
> persuasive. At the same time, courts must
> independently review the record in order to
> satisfy themselves that the agency has made a
> reasoned decision based on its evaluation of
> the evidence.

Id. at 1301 (internal quotation marks and citations
omitted).

In the end, the FEIS in this case provides enough
information about the shortcomings of the Wakkinen
study to allow someone to perceive its weaknesses and
to challenge the agency's action. The record also
includes information about various criticism's of the
Wakkinen information, such that an interested member of
the public would be able to analyze the study
knowingly. At the same time, the Forest Service
articulated a reasonable explanation for why it relied
on the information. The Forest Service sufficiently
maintained the scientific integrity of the EIS by
making a reasonable decision about the Wakkinen study
and providing the public with sufficient information in
the EIS to understand that there is a deficit of local
grizzly information available to them.

\*               \*               \*

3.    Reasonable Range of Alternatives

NEPA requires agencies to study, develop, and
describe appropriate alternatives to the proposed
action. 42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. §
1502.14. Plaintiffs allege the Forest Service failed
to include an alternative that would "improve habitat
conditions to protect and recover these populations."
All alternatives were based on the Wakkinen
Report's standards of 55% core habitat, 33% open road

-49-

density, and 26% total road density.  The most
protective of the original proposals, Alternative D,
was eventually removed from the final version.
Alternative D would have cleaved to the Wakkinen
Report's maximum habitat security figures, rather than
its averages.  Standards would be set at 72% core
habitat, 17% open road density, and 14% total road
density.  Plaintiffs consider this alternative
"reasonable" and contend it should have been
considered.

Defendants respond that their NEPA obligation is
only to consider reasonable choices, and that
Plaintiffs failed to provide a reasonable option that
was not considered by the Forest Service.  Defendants
claim Alternative E would be more protective in
fourteen of thirty BMUs than the Wakkinen Report would
require.  In addition, Defendants argue that
Alternative D was impossible because it required the
closing of all roads under Forest Service jurisdiction,
and even then, several of the BMUs could not reach the
proposed standard.  Finally, citing <u>Department of
Transportation v. Public Citizen</u>, 541 U.S. 752, 764-65
(2004), Defendants contend that plaintiffs who fail to
raise specific alternatives during the NEPA process
forfeit the objection that the NEPA analysis failed to
consider potential alternatives.

"The existence of a viable but unexamined
alternative renders an environmental impact statement
inadequate."  <u>Morongo Band of Mission Indians v. Fed.
Aviation Admin.</u>, 161 F.3d 569, 575 (9th Cir. 1998)
(quoting <u>Robertson</u>, 35 F.3d at 1307) (internal
quotation marks omitted).  However, the EIS need only
consider reasonable alternatives, not every conceivable
alternative.  <u>See</u> 40 C.F.R. § 1502.14(a).  "The
touchstone for our inquiry is whether an EIS's
selection and discussion of alternatives fosters
informed decision-making and informed public
participation."  <u>California v. Block</u>, 690 F.2d 753, 767
(9th Cir. 1982).  The Ninth Circuit applies a "rule of
reason" to this review, asking "whether an EIS contains
a reasonably thorough discussion of the significant
aspects of the probable environmental consequences."
<u>Natural Res. Def. Council v. U.S. Forest Serv.</u>, 421

F.3d 797, 810 n.27 (9th Cir. 2005) (quoting <u>Churchill</u>
<u>County v. Norton</u>, 276 F.3d 1060, 1071 (9th Cir. 2001)).
     The issue here is whether the former Alternative D
was a reasonable choice that should have been
considered in the FEIS. The Forest Service ran a model
to determine whether Alternative D was feasible and
concluded that there were not enough roads to close in
federal jurisdiction to make Alternative D possible.
FS AR 19-9 at 4-177-78, 4-180.  The FEIS responds to
extensive public comment lobbying for a stricter
standard and for Alternative D.  The FEIS explains why
Alternative D was not feasible and why Alternative E
was a reasonable compromise.  The record demonstrates
that the Forest Service engaged in a reasonably
thorough discussion of Alternative D during the public
comment period and reasonably concluded that
Alternative E was a better selection.  Its choice was
not arbitrary and capricious.


              *                 *                 *


     5.   Risk and Uncertainty of the Chosen
          Alternative


     Plaintiffs contend that the EIS fails to disclose
the high risk of extinction of the grizzly bears and
the scientific uncertainty about whether the chosen
alternative will alleviate this risk.  The small
population of bears may face as high as an 85% chance
of extinction.  Plaintiffs believe the EIS should have
made this clear to the public, who may then have
demanded greater protection for the bears.  Also,
Plaintiffs point to what they consider increasing
grizzly mortality in recent years, since thirteen bears
died in the Cabinet-Yaak in the three years leading up
to the 2002 EIS, yet none of those deaths were
mentioned in the EIS.  FS AR 90:14.  Plaintiffs believe
the EIS should have disclosed that bear biologists
believed that other alternatives were better than
Alternative E for bears.  FS AR 19:11 at 12; FWS AR 231
& 225.
     Defendants point to discussions of these issues in

the EIS at FS AR 19:9 at 3-6, Figure 3-1, 3-8, 1-4, 3-10, 3-18- 3-21, and generally to the proposition that "in determining whether the EIS contains a reasonably thorough discussion, we may not fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies." <u>Friends of Southeast's</u>, 153 F.3d at 1063. Defendants reiterate their goal of contributing to the conservation of grizzly bears and state that road management is only one factor in the process. Defendants also argue that the Forest Service has never represented to the public that Alternative E would lead to grizzly recovery.

This last point is crucial. The FEIS explains that grizzly bears are in trouble and explains that the Plan Amendments will slightly improve their habitat conditions. The FEIS does not state that all problems for the bears will be solved by these Amendments. The FEIS's purpose, to establish road standards, does not encompass doing everything possible to prevent harm to grizzlies. The Forest Service's choice in the FEIS is not arbitrary, given that FWS determined the Amendments do not jeopardize the continued existence of the bears. Having said this, it will be a sad day indeed if these bears become extinct because of a "Grover Norquist" thought processes invading the agency decision-making process.[22]

<u>Alliance</u>, CV 04-216-M-DWM at pp. 25-35.

### 3. Discussion

The Plaintiffs argue that the Forest Service's 2002 Final Environmental Impact Statement violates NEPA in three ways. First, Plaintiffs contend the Forest Service failed to consider a reasonable range of alternatives for access management because it did not consider in detail any alternative that would be more

---

[22] [Footnote 8 in the <u>Alliance</u> opinion] "I don't want to abolish government. I simply want to reduce it to the size where I can drag it into the bathroom and drown it in the bathtub." (Citation omitted.)

protective of grizzly bear habitat than the Wakkinen study's
33/26/55 standard.  Next, the Plaintiffs argue that the Forest
Service failed to investigate further to determine whether there
is any truth to the Wakkinen authors' speculation that perhaps
the habitat use they measured is not indicative of what the
grizzlies need to survive but instead merely reveals the
grizzlies' choice of the best available habitat in a degraded
environment.  Finally, the Plaintiffs say the Forest Service
violated NEPA by failing to supplement its environmental analysis
after learning of human caused grizzly mortalities in 2003.  Each
argument is discussed in turn below.

> **a.    Failure to Consider a More Protective Alternative**

The Plaintiffs argue that the Forest Service violated NEPA
by failing to consider any alternative road management plan that
would be more protective of grizzly bear habitat than the
Wakkinen 33/26/55 standard.  In addition to the chosen
Alternative E, other alternatives considered in detail were
Alternatives A (the legally required "no action" option), B
(continued adherence to the Cabinet-Yaak/Selkirk Subcommittee's
interim rules), and C (33/26/55 standard for every unit made up
of at least seventy-five [75] percent federal land).  FA AR 19-9
at 2-6 to 2-17.  Three alternatives not given detailed study were
Alternatives D (increased security habitat achieved by
implementing a 17/14/72 standard for all units comprised of at
least seventy-five [75] percent federal land), F (maintenance of
current access levels) G (maximum access).  Id. at 2-18.

-53-

The Plaintiffs here say their argument is distinct from the one rejected in Alliance because they do not focus, as the Alliance plaintiffs did, on the Forest Service's failure to develop Alternative D in greater detail.  Instead, the Plaintiffs here argue that the Forest Service violated NEPA by "fail[ing] to consider any alternative that would have established higher minimum security requirements—even an alternative that would not have been as protective as Alternative D."  Pls' Op. Br. at 21 (emphasis in original).  Elsewhere the Plaintiffs make clear that by "higher minimum security requirements" they mean requirements in excess of the Wakkinen study's 33/26/55 standard, stating, "Conspicuously absent from the Forest Service's analysis was any alternative establishing minimum habitat security levels more protective of grizzly bears than those observed in the Wakkinen-Kasworm study."  Id. at 20-21.

The Plaintiffs' argument is based on a mischaracterization of Alternative E.  The Plaintiffs argue as though Alternative E prescribed "one size fits all" adherence to the 33/26/55 standard across all bear management units, and accuse the Forest Service of running afoul of California v. Block, 690 F.2d 753, 767 (9th Cir. 1982), by "'uncritically assum[ing]' that nothing more than the 33/26/55 Wakkinen-Kasworm should be utilized."  This statement is not accurate.  An across-the-board 33/26/55 alternative was presented as Alternative C and was rejected after

detailed consideration.[23] The chosen Alternative E sets individual habitat parameters for each affected bear management unit, including standards that are more protective than the Wakkinen parameters in thirteen (13) of the thirty (30) affected bear management units and equal to the Wakkinen parameters in another seven (7). FS AR 19-11 at 23. The Final Environmental Impact Statement states that the chosen Alternative E "provides an overall higher level of habitat security than Alternative C and therefore should go farther towards insuring that the species will not be jeopardized." FS AR 19-9 at 3-20. The Plaintiffs' statement that the Forest Service did not consider any alternative more protective than 33/26/55 is inaccurate; the Service not only considered a more protective alternative, it adopted that alternative. The argument that the Service should have considered other possible habitat parameters (besides 33/26/55) as potential bases for alternatives is unavailing because it did not use 33/26/55 as the basis for the chosen Alternative E.

If this aspect of the Plaintiffs' NEPA claim is to succeed, it must be because the Service failed to consider an option that would set individual habitat parameter standards for each bear management unit—like Alternative E—but would have been more protective in each unit than Alternative E. There is no "one

---

[23]Of Alternative C the Forest Service said, "Though at minimum levels, it is believed that this alternative would avoid the jeopardy criteria of [ESA] Section 7(a)(2)." FS AR 19-9 at 3-20.

size fits all" standard that is more protective than the Wakkinen study that can feasibly be implemented across all bear management units.[24]  This means that the Plaintiffs are left with no option but to argue that the Forest Service should have considered an alternative setting unit-by-unit standards more protective than those set by Alternative E.  Plaintiffs attempt to do so by identifying nine bear management units in which the Forest Service could conceivably have considered more protective standards than those considered in Alternative E with regard to at least one of the three habitat parameters.

The Federal Defendants respond by claiming that the Plaintiffs' more protective standards, while conceivable, are not practical.  A party challenging a final environmental impact statement for failure to consider all alternatives must "introduce specific, evidentiary facts in support of their contention that the final EIS improperly failed to consider reasonable and viable alternative[s]."  Friends of the Earth v. Coleman, 513 F.2d 295, 298 (9th Cir. 1975).  The Defendants say the Plaintiffs have failed to carry their burden here because their proposed unit-by-unit standards would be infeasible where they would require, for example, the closure of popular arterial

---

[24]Alternative D would have set an across-the-board standard of 17/14/72 for all bear management units and was abandoned as impossible because of the lack of federal jurisdiction to close private, state and county roads as necessary to achieve the standard.  FS AR 19-9 at 4-177 to 4-178.  An across-the-board standard of 19/19/68 (based on the South Fork study in the Northern Continental Divide Ecosystem) is similarly unachievable under the current land ownership distribution, as the Plaintiffs concede.  Pls' Op. Br. at 24-25.

Forest Service roads for social and recreational opportunities in
the Troy, Montana, area, FS AR 1-95 at 77, or the permanent
closure of roads near private timber lands to which the Forest
Service legally must permit access. FS AR 1-95 at 102. These
considerations are non-trivial, the Defendants say, in light of
the Interagency Grizzly Bear Committee's directive in its Task
Force Report, incorporated into the "Purpose and Need" portion of
the 2002 Final Environmental Impact Statement, that road
management and core parameters be established "using the best
biological information and considering social and economic
impacts." FS AR 19-9 at 1-4. A federal agency does not act
unreasonably when it rejects an alternative "on the ground that
it would not meet the purpose and need of the proposed project,"
Friends of the Southeast's Future v. Morrison, 153 F.3d 1059,
1067 (9th Cir. 1998), nor is it required to "consider
alternatives which are infeasible, ineffective, or inconsistent
with the basic policy objectives for the management of the area."
Headwaters v. Bureau of Land Management, 914 F.2d 1174, 1180 (9th
Cir. 1990). The Plaintiffs have identified a conceivable
alternative, but as the Defendants point out, they offer no
citations to the record explaining that their proposed
alternative is reasonable or viable.

More problematic for the Plaintiffs is the fact that their
proposed unconsidered alternative is not that different from
Alternative E. "An agency is required to examine only those
alternatives necessary to permit a reasoned choice." Association

of Public Agency Customers v. Bonneville Power Administration,
126 F.3d 1158, 1185 (9th Cir. 1997). The agency's analysis need
not "include every alternative device and thought conceivable by
the mind of man." Vermont Yankee Nuclear Power Corp. v. Natural
Resources Defense Council, 435 U.S. 519, 551 (1978). "NEPA does
not require a separate analysis of alternatives which are not
significantly distinguishable from alternatives actually
considered, or which have substantially similar consequences."
Headwaters, 914 F.2d at 1181. The Plaintiffs' proposed
alternative cannot meet this standard of separateness to warrant
distinct consideration. In essence, the Plaintiffs say the
Forest Service should have considered a modified Alternative E
with some or all of the habitat parameters changed for nine (9)
of the thirty (30) affected bear management units.

If NEPA requires detailed consideration of an alternative
that tweaks the habitat parameters in less than a third of the
affected units but is otherwise identical to the one chosen,
there is no end to the possibilities that the Forest Service must
consider. The Plaintiffs will always have room to say that the
Service could have considered something more protective of
grizzly habitat. But a more protective "one size fits all"
standard is impossible, and a more protective unit-by-unit
standard is not so different from Alternative E as to require
detailed consideration.

The Plaintiffs have not shown that the Forest Service acted
unreasonably in setting the range of alternatives to be

considered for the proposed access management amendments.
Summary judgment is appropriate in favor of the Defendants and
against the Plaintiffs on this aspect of the NEPA claim (Count
III).

### b. Failure to Address the "Information Gap" in the Wakkinen Study

The authors of the Wakkinen study noted the higher degree of
security found in the South Fork study and offered as one
possible explanation for the discrepancy the notion that perhaps
the bears in the Wakkinen study were not selecting optimal
habitat but were choosing the best habitat available in a
degraded landscape.  FWS AR 413 at 24.  The authors reported that
they could not test this hypothesis "[w]ithout a comparison of a
large area (first order selection)."  Id. at 24-25.  The
Plaintiffs call this a "critical information gap" that the Forest
Service failed to address as required by NEPA.  Pls' Op. Br. at
25.[25]

NEPA's implementing regulations require agencies to rely
upon high quality scientific information and accurate scientific
analysis.  40 C.F.R. § 1500.1(b).  If information that is
relevant to reasonably foreseeable significant adverse impacts of
an action and is essential to a reasoned choice among
alternatives, the action agency should include the information,
if possible, in its environmental impact statement.  40 C.F.R. §

---

[25]Although the Plaintiffs assert that the Court did not consider
this argument in Alliance, the issue is related to those addressed in
the Alliance discussion excerpted on pages 46-47, supra.

1502.22(a). If the information is unavailable because the cost
of obtaining it is too great or the means to obtain it are
unknown, the environmental impact statement must include:

> (1) A statement that such information is incomplete or
> unavailable; (2) a statement of the relevance of the
> incomplete or unavailable information to evaluating
> reasonably foreseeable significant adverse impacts on
> the human environment; (3) a summary of existing
> credible scientific evidence which is relevant to
> evaluating the reasonably foreseeable significant
> adverse impacts on the human environment, and (4) the
> agency's evaluation of such impacts based upon
> theoretical approaches or research methods generally
> accepted in the scientific community. For the purposes
> of this section, "reasonably foreseeable" includes
> impacts which have catastrophic consequences, even if
> their probability of occurrence is low, provided that
> the analysis of the impacts is supported by credible
> scientific evidence, is not based on pure conjecture,
> and is within the rule of reason.

40 C.F.R. § 1502.22(b).

The Plaintiffs say the Forest Service violated NEPA by
failing either to obtain the missing information or to
"acknowledge the information gap and apply theoretical approaches
or research methods generally accepted in the scientific
community to fill the void." Pls' Op. Br. at 28 (internal
quotation marks omitted). The Defendants retort that the Forest
Service fulfilled its duty under NEPA by acknowledging, in
response to public comments, the Wakkinen authors' uncertainty
about the availability of more protective habitat for the studied
bears and by explaining its conclusion that the doubts about
habitat quality left open by the Wakkinen authors are, in the
Service's estimation, assuaged by the fact that every female bear
studied survived long enough to reproduce in the conditions

-60-

studied.  See FS AR 19-9 at 4-29 to 4-30, in which the Forest
Service states, "These 6 bears were chosen because they were
females that had survived long enough to provide sufficient data
for the analysis and had reproduced within the study area."

The claim that the Defendants acknowledged the issue is
suspect.  The record reveals that they did not take a hard look
at the critical information gap in the science they adopted.  The
Defendants fail to offer a single citation to the Final
Environmental Impact Statement in which the Forest Service
discusses the question posed by the Wakkinen authors.  The only
acknowledgment of the issue comes in a response to public comment
referring to "the already seriously degraded condition of the
recovery area."  Id. at 4-29.

On the other hand, the Plaintiffs' characterization of the
Service's obligation under NEPA goes further than the regulations
require.  The Forest Service is not, as the Plaintiffs imply,
obligated to use theoretical approaches or research methods to
learn the answer to the question posed by the Wakkinen authors.
The duty of the agency is to use theories or research methods to
assess the impacts of the proposed action in the absence of an
answer to that question.  40 C.F.R. § 1502.22(a), (b).  The
record shows that the Forest Service used available data to
explore the potential impacts and articulated the basis for its
decision.  This is sufficient to satisfy 40 C.F.R. §
1502.22(b)(3) and (4).

However, the Forest Service entirely failed to meet the

-61-

requirements of 40 C.F.R. § 1502.22(b)(1) and (2), which dictates
that the agency's discussion acknowledge the missing information
and include "a statement of the relevance of the incomplete or
unavailable information to evaluating reasonably foreseeable
significant adverse impacts on the human environment."  The
Federal Defendants have cited nothing in the Final Environmental
Impact Statement purporting to meet these requirements.  The
failure to the Forest Service to attempt any assessment of the
importance of the missing information calls into question the
validity of the Service's conclusions about the impacts of the
proposed action.  The Forest Service cannot simply rely on
Wakkinen as the best scientific information available; it must
acknowledge and discuss any flaws.

     The obligation to disclose and compensate for missing
information is triggered only where the information is "essential
to a reasoned choice among alternatives."  40 C.F.R. §
1502.22(a).  Given the statements of the Wakkinen authors, the
misgivings of other biologists about the range of habitat choices
available to the bears, and the ongoing mortality problems in
these populations, there can be no reasoned choice among
alternatives and no accurate prediction of the impact of the
proposed action until the Forest Service has assessed the
importance of the missing information.  Because of this flaw, the
Final Environmental Impact Statement will be set aside and the
matter remanded to the Forest Service for preparation of a new
environmental impacts analysis that complies with 40 C.F.R. §

1502.22(a) and (b).

### c. Failure to Supplement the Environmental Analysis

On September 21, 2006, the Court granted the Defendants'
motion to supplement the administrative record with a letter from
Fish & Wildlife Service Field Supervisor Mark Wilson to Kootenai
National Forest Supervisor Bob Castaneda dated December 7, 2004.
The letter acknowledges the Forest Service's request for re-
initiation of consultation on the effect of the Rock Creek Mine
project in light of the discovery of the death of a female
grizzly and, presumably, her three cubs in the Cabinet-Yaak
Ecosystem.[26]  The Plaintiffs argue that the Forest Service's
failure to supplement its analysis on the Lolo/Kootenai/Idaho
Panhandle access amendments violates NEPA.

This argument is controlled by the United States Supreme
Court's decision in Norton v. SUWA, 542 U.S. 55 (2004).  Citing
its decision in Marsh, 490 U.S. at 374, the Supreme Court stated
that "supplementation is necessary only if there remains 'major
federal action' to occur, as that term is used in [42 U.S.C.] §
4332(2)(C)."  Norton, 542 U.S. at 73 (internal quotation marks
omitted).  The Court held that "although the *approval* of a land
use plan is a major Federal action requiring an EIS, that action
is completed when the plan is approved.  The land use plan is the
'proposed action' contemplated by the regulation.  There is no

---

[26]The Plaintiffs state that the bears were killed by a human, Pls'
Op. Br. at 28, but the letter does not say how the bears died.  Nor is
it clear from the letter whether the deaths were related to the Forest
Service's management of roads.

ongoing 'major Federal action' that could require supplementation
. . . ." Id. (citation, internal quotation marks omitted;
emphasis in original). The Court contrasted the situation in
Marsh, where supplementation was required under NEPA because the
dam project was ongoing. Id.

Like the land use plan in Norton, the programmatic Forest
Plan amendments at issue here do not require supplemental
environmental analysis once they are adopted. The Record of
Decision states that the amendments "[do] not make site-specific
access management decisions" and that such decisions "will be
proposed through future project-level planning." FS AR 19-11 at
1; see also Id. at 5. The Plaintiffs attempt to distinguish
Norton by stating that the Forest Plan amendments adopted in this
case "contain[] binding prescriptions for road management in
specific [bear management units]," Pls' Reply Br. at 14, but the
Plaintiffs do not cite any portion of the record in support of
their argument. The Forest Plan amendments require that future
actions move toward the new standards and establish incremental
milestones for compliance, FWS AR 1 at 135, but the amendments do
not require that any particular project be done. FS AR 19-11 at
5. Because the plan amendments are the "proposed action," NEPA
does not require a supplemental environmental analysis.

Summary judgment in the Defendants' favor is warranted on
this aspect of the Plaintiffs' NEPA claim (Count III).

## IV. Order

Based on the foregoing, IT IS HEREBY ORDERED that the

-64-

Plaintiffs' motion for summary judgment (Doc. No. 44) is GRANTED, and the Federal Defendants' motion for summary judgment (Doc. No. 46) is DENIED with regard to the Plaintiffs' NEPA claim (Count III) for failure to address the missing information in the Wakkinen study.  The Federal Defendants' motion for summary judgment (Doc. No. 46) is GRANTED, and the Plaintiffs' motion for summary judgment (Doc. No. 44) is DENIED, with respect to all other claims (Counts I, II and III).

IT IS FURTHER ORDERED that the 2002 Final Environmental Impact Statement and 2004 Record of Decision are set aside as contrary to law and that this matter is remanded to the United States Forest Service for preparation of a new environmental analysis that complies with 40 C.F.R. § 1502.22(a) and (b).  Specifically, the analysis must acknowledge that the Wakkinen study's authors were unsure whether the bears they studied had chosen optimal habitat or whether they simply chose the best habitat available from a degraded landscape.  The analysis must assess the relevance and importance of this flaw in the Wakkinen study.  In so doing, the analysis must take into account the misgivings of Fish & Wildlife Service biologists over the 33/26/55 standard, the findings of other studies measuring habitat parameters in other ecosystems, and the state of grizzly bear mortality in the Cabinet-Yaak and Selkirk Recovery Zones.

DATED this ___13th___ day of December, 2006.

DONALD W. MOLLOY, CHIEF JUDGE
UNITED STATES DISTRICT COURT

-65-

Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | [PROPOSED] **ANSWER  OF CABINET RESOURCE GROUP, et al., TO COMPLAINT FOR DECLARATORY AND INJUNCTIVE** |
| Defendants, | ) ) | **RELIEF** |
| and | ) ) | |
| CABINET RESOURCE GROUP 71 ½  Four Corners South Heron, Montana  59844 | ) ) ) | |

GREAT BEAR FOUNDATION          )
802 E. Front Street                    )
Missoula, Montana  59802         )
                                            )

IDAHO CONSERVATION LEAGUE    )
710 N. 6th St.                         )
Boise, Idaho  83702              )
                                            )

SELKIRK CONSERVATION ALLIANCE    )
100 South McKinley, Suite 204       )
Priest River, Idaho  83856         )
                                            )

NATURAL RESOURCES DEFENSE COUNCIL  )
40 West 20th Street              )
New York, New York  10011        )
                                            )

DEFENDERS OF WILDLIFE           )
1130 17th Street NW              )
Washington, DC 20036          )
                                            )
                 Proposed Defendant-Intervenors.)

     The Cabinet Resource Group, Great Bear Foundation, Idaho Conservation League, Selkirk Conservation Alliance, Natural Resources Defense Council and Defenders of Wildlife answer plaintiffs' complaint for declaratory and injunctive relief as follows:

## INTRODUCTION

    1.  Intervenor-Defendants admit that on February 9, 2004, the U.S. Fish and Wildlife Service issued a biological opinion ("2004 Biological Opinion") concerning motorized access management within the Kootenai, Idaho Panhandle, and Lolo National Forests.

    2.  Paragraph 2 purports to describe the contents of the 2004 Biological Opinion, which speaks for itself and provides the best evidence of its contents.  To the extent that an answer is required, Intervenor-Defendants deny the allegations of paragraph 2.

    3.  Intervenor-Defendants deny the allegations of paragraph 3.

    4.  Paragraph 4 contains legal assertions for which no answer is necessary.

5.   Paragraph 5 purports to describe documents that speak for themselves and provide the best evidence of their contents.  Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 5.

6.   Paragraph 6 describes plaintiffs' request for relief, for which no answer is necessary.

## JURISDICTION AND VENUE

7.   Paragraph 7 contains legal assertions for which no answer is necessary.

8.   Paragraph 8 contains legal assertions for which no answer is necessary.

9.   Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 9.

## PARTIES

10.   Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 10.

11.   Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 11.

12.   Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 12.

13.   Intervenor-Defendants deny the allegations of paragraph 13.

14.   The first sentence of paragraph 14 contains legal assertions for which no answer is necessary.  Intervenor-Defendants lack information sufficient to admit or deny the remainder of the allegations of paragraph 14.

15.   Intervenor-Defendants admit the allegations of paragraph 15.

16.   Intervenor-Defendants admit the allegations of paragraph 16.

17.   Intervenor-Defendants admit the allegations of paragraph 17.

18.   Intervenor-Defendants admit the allegations of paragraph 18.

19.   Intervenor-Defendants admit the allegations of paragraph 19.

20.   Intervenor-Defendants admit the allegations of paragraph 20.

## FACTUAL BACKGROUND

21.  Intervenor-Defendants admit the allegations of the first sentence of paragraph 21. The remainder of paragraph 21 purports to describe the contents of a Federal Register notice, which speaks for itself and provides the best evidence of its contents.

22.  Intervenor-Defendants admit the allegations of paragraph 22.

23.  Paragraph 23 purports to describe documents that speak for themselves and provide the best evidence of their contents.

24.  Intervenor-Defendants admit the allegations of paragraph 24.

25.  Paragraph 25 purports to describe the contents of a 1986 memorandum, which speaks for itself and provides the best evidence of its contents.

26.  Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 26.

27.  The first sentence of paragraph 27 states that "the ESA requires the use of the entire listed species when FWS makes its jeopardy determinations," which is a legal assertion for which no answer is necessary. The remainder of paragraph 27 purports to describe "FWS policy" and the contents of a 1986 memorandum, which speak for themselves and provide the best evidence of their contents.

28.  Paragraph 28 purports to describe the contents of a 1986 memorandum, which speaks for itself and provides the best evidence of its contents.

29.  Paragraph 29 purports to describe the contents of a 1986 memorandum, which speaks for itself and provides the best evidence of its contents.

30.  Intervenor-Defendants admit the allegations of paragraph 30.

31.  The first sentence of paragraph 31 purports to describe the contents of documents which speak for themselves and provide the best evidence of their contents.  Intervenor-Defendants admit the allegations of the second sentence paragraph 31.

32.  The first sentence of paragraph 32 purports to describe the contents of a document that speaks for itself and provides the best evidence of its contents. The second sentence of paragraph 32 contains a legal assertion for which no answer is necessary.

33.  Intervenor-Defendants admit the allegations of paragraph 33.

34.  Paragraph 34 purports to describe the contents of the 2004 Biological Opinion, which speaks for itself and provides the best evidence of its contents.

35.  Paragraph 35 purports to describe the contents of the 2004 Biological Opinion, which speaks for itself and provides the best evidence of its contents.

36.  Paragraph 36 purports to describe the contents of the 2004 Biological Opinion, which speaks for itself and provides the best evidence of its contents.

37.  Paragraph 37 purports to describe the requirements of the Endangered Species Act, which is a legal assertion for which no answer is necessary.  The remainder of paragraph 37 purports to describe the contents of the 2004 Biological Opinion, which speaks for itself and provides the best evidence of its contents.

38.  Paragraph 38 purports to describe the contents of the 2004 Biological Opinion, which speaks for itself and provides the best evidence of its contents.

39.  Paragraph 39 purports to describe the contents of the Forest Service's 2004 Record of Decision, which speaks for itself and provides the best evidence of its contents.

40.  Paragraph 40 purports to describe the contents of the Forest Service's 2004 Record of Decision, which speaks for itself and provides the best evidence of its contents.

41.  Intervenor-Defendants deny the allegations of paragraph 41.

42.  Paragraph 42 purports to describe documents which speak for themselves and provide the best evidence of their contents.

43.  Intervenor-Defendants lack information sufficient to admit or deny the allegations of paragraph 43.

44.  Intervenor-Defendants deny the allegations of paragraph 44.

## FIRST CLAIM FOR RELIEF

45. Intervenor-Defendants incorporate by reference their answers to paragraphs 1-44, above.

46. Paragraph 46 contains assertions of law for which no answer is necessary.

47. Paragraph 47 contains assertions of law for which no answer is necessary.

48. Paragraph 48 contains assertions of law for which no answer is necessary.

49. Paragraph 49 contains assertions of law for which no answer is necessary.

50. Paragraph 50 contains assertions of law for which no answer is necessary.

51. Paragraph 51 contains assertions of law for which no answer is necessary.

52. Paragraph 52 contains assertions of law for which no answer is necessary.

53. Paragraph 53 contains assertions of law for which no answer is necessary.

54. Paragraph 54 contains assertions of law for which no answer is necessary.

55. Intervenor-Defendants deny the allegations of paragraph 55.

56. Intervenor-Defendants deny the allegations of paragraph 56.

## SECOND CLAIM FOR RELIEF

57. Intervenor-Defendants incorporate by reference their answers to paragraphs 1-56, above.

58. Paragraph 58 contains assertions of law for which no answer is necessary.

59. Paragraph 59 contains assertions of law for which no answer is necessary.

60. Paragraph 60 contains assertions of law for which no answer is necessary.

61. Paragraph 61 contains assertions of law for which no answer is necessary.

62. Intervenor-Defendants deny the allegations of paragraph 62.

63. Intervenor-Defendants deny the allegations of paragraph 63.

64. Intervenor-Defendants deny the allegations of paragraph 64.

## PRAYER FOR RELIEF

No relief should be granted to plaintiffs and the Complaint should be dismissed.

## AFFIRMATIVE DEFENSES

1.   The complaint, and/or each and every cause of action alleged therein, fails to state a claim for which relief may be granted;

2.   The Court lacks subject matter jurisdiction over each and every one of plaintiffs' causes of action, for reasons including but not limited to the statute of limitations, lack of standing, lack of ripeness, and mootness.

4.   Plaintiffs have failed to exhaust their administrative remedies.

5.   Plaintiffs' claims are barred by the doctrine of laches.

6.   Plaintiffs' complaint, and/or each and every cause of action alleged therein, do not challenge "final agency action" within the meaning of the Administrative Procedure Act.

7.   Venue is not proper in this district or is more appropriate in another district.


DATED this 23rd day of January, 2007.

<div style="margin-left:40%">

Respectfully submitted,

_____/s/ Timothy J. Preso_____
Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 586-9695

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Defendant-Intervenors*

</div>

Timothy J. Preso (D.C. Bar # 456531)
Douglas L. Honnold (D.C. Bar # 468323)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
tpreso@earthjustice.org
dhonnold@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | ) ) **DECLARATION OF CESAR** ) **HERNANDEZ** |
| Defendants, | ) ) |
| and | ) ) |
| CABINET RESOURCE GROUP, et al., | ) ) |
| Proposed Defendant-Intervenors. | ) |

I, Cesar Hernandez, declare as follows:

1.      I am a resident of Heron, Montana.

2.      I am a member of the Board of Directors of the Cabinet Resource Group ("CRG"), an applicant for intervention in the above-captioned case.  CRG is a grassroots environmental organization formed in 1976 when people concerned with the fate of the Kootenai River, the Scotchman's Peak proposed wilderness, the Cabinet Mountains Wilderness, and the Yaak Valley came together to fight for protection of these natural resources in northwest Montana.  Since then, members of CRG have participated in countless struggles to preserve wild places and promote sensible management of our National Forest Lands in northwest Montana. The free flowing Kootenai Falls on the Kootenai River near Libby, Montana and the 39 Inventoried Roadless Areas comprising 643,000 on the Kootenai National Forest are testament to those struggles.

3.      As a member of CRG's board, I monitor administrative processes associated with grizzly bear habitat and threats, work with the media to explain the importance of the Cabinet-Yaak Ecosystem, help to coordinate efforts on grizzly issues among involved grassroots groups in the region, and work with key scientists involved in research regarding the Cabinet-Yaak grizzly population. CRG has initiated and supported a number of studies regarding essential grizzly bear habitat and connective corridors needs in the CYE. It has sponsored numerous public and administrative presentations of this research. CRG is working to have the results of this research incorporated into the current round of forest plan revision on the Kootenai & Idaho Panhandle National Forests.

4.    I personally have hiked, camped, hunted and otherwise enjoyed the Cabinet-Yaak ecosystem on innumerable occasions over the past 34.5 years, often in the company of my family.  I find recreating in the area particularly rewarding because of its rugged beauty, spiritual bounty and the stress relief if provides from the daily endeavor of work.  I have also been involved in sharing the beauty and ecology of the area with others through my work with the Bull River Outdoor Education program, an affiliate of CRG. Those activities are open to the public and include interpretive nature walks, wilderness hikes in summer and tracking surveys and snowshoe hikes in winter.

5.    I have been fortunate enough to personally encounter grizzly bears within the Cabinet-Yaak Recovery Zone on two occasions:  in 1983 within the Cabinet Mountains Wilderness Area in the vicinity of St. Paul Peak which overlies a portion of the orebody of the proposed Rock Creek Mine, and in late spring 1996 near Scotchman's Peak, while horseback riding with my daughter and long-time hunting partner we came upon a grizzly guarding a fresh elk kill it had covered with grass and reeds torn from a nearby lakeshore. My outdoor experience has been greatly enhanced by those encounters, and I expect the federal government to manage the ecosystem in such a way that I will continue to enjoy the possibility of future grizzly bear sightings in the Cabinet-Yaak area.

6.    I have specific future plans to recreate and work in the Cabinet-Yaak Recovery Zone.  As I do every summer, this summer I again intend to go hiking with my family in the area. I intend to look for grizzly bears and signs of bears.  I also intend to hunt elk and deer in the area later in the season, and will assuredly be attuned to the presence of grizzlies.  I undoubtedly intend to recreate Cabinet-Yaak area in future years;

those future experiences will be much less rewarding if bears are eliminated from the ecosystem.

7.    The requested relief in the instant case threatens imminent harm to my interest in observing grizzly bears and signs of grizzly bear presence in the Cabinet-Yaak ecosystem. If the U.S. Fish and Wildlife Service may authorize activities, including extensive road building, in the Cabinet-Yaak ecosystem that would place these isolated populations in jeopardy, the last few grizzlies in the recovery area may be eliminated. This will foil the possibility that I will ever again have the opportunity to observe them in the Cabinet-Yaak area. More importantly, my youngest children (ages 2 and 7) may never have the opportunities I have so enjoyed of seeing these magnificent creatures in their natural element.

8.    CRG is a plaintiff in a lawsuit currently on appeal in the Ninth Circuit Court of Appeals (Cabinet Resource Group, et al. v. U.S. Fish and Wildlife Service, et al., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006)), challenging the same biological opinion at issue in the instant litigation. Before the Ninth Circuit, plaintiffs will argue that the Fish and Wildlife Service unlawfully relied on flawed science to authorize motorized access standards that have been shown to cause jeopardy to the Selkirk and Cabinet-Yaak grizzly bear populations. The present litigation harms CRG's interest in obtaining a meaningful remedy in that separate litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on JAN. 22 , 2007, in POLSON , Montana.

Cesar Hernandez

Cesar Hernandez

3

Timothy J. Preso (D.C. Bar # 456531)
Douglas L. Honnold (D.C. Bar # 468323)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
tpreso@earthjustice.org
dhonnold@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al., )<br><br>Defendants, )<br><br>and )<br><br>CABINET RESOURCE GROUP, et al., )<br><br>Proposed Defendant-Intervenors. ) | Case No. 1:06-CV-01842-RCL<br><br><br><br><br><br>**DECLARATION OF CHARLES JONKEL** |

I, Charles Jonkel, declare as follows:

1.      I am a resident of Missoula, Montana.

2.      I am co-founder, Scientific Advisor, and President of the Great Bear Foundation ("GBF"), an applicant for intervention in the above-captioned case. GBF is a non-profit organization that is dedicated to the preservation of all eight species of wild bears around the world and the diverse ecosystems they require in order to survive. Throughout our twenty-three year history, GBF has been the most effective organization in the world with this special mission and has achieved significant success with bear and ecosystem protection through direct citizen action, advocacy, education, outreach, and research.

3.      As President of GBF, I monitor administrative processes associated with grizzly bear habitat and threats, work with the media to explain the importance of preserving grizzly bear habitat, and work with key scientists involved in research regarding the Cabinet-Yaak and Selkirk grizzly populations.

4.      Over the past 45 years that I have worked with grizzly bears, I have spent many days in the Cabinet-Yaak and Selkirk areas, conducting research, observing, and documenting information on grizzly bears. I initiated the first scientific research on the Cabinet-Yaak grizzly bears, beginning in 1959. Then as now, the recovery of the bears was jeopardized primarily by lack of habitat security. Since that time, I have continually lobbied for increased habitat security for the bears, and the Forest Service has often solicited my input on bear issues. I have also been involved in sharing the beauty and ecology of bears with programs in schools and for private groups in the Cabinet-Yaak and Selkirk areas.

5.      I have also collected historical data on grizzly bears within the Cabinet-Yaak Recovery Zone.  One young male grizzly suffered from a bullet wound through the body cavity, and yet recovered.  An adult female grizzly survived in the Cabinets until she was at least 31 years old – to date the oldest bear on record in Montana.

6.      I have been fortunate enough to personally encounter grizzly bears within the Cabinet-Yaak Recovery Zone on at least a dozen occasions. My outdoor experience has been greatly enhanced by those encounters, and I expect the federal government to manage grizzly bear habitat in such a way that I will continue to enjoy the possibility of future grizzly bear sightings in the Cabinet-Yaak area.

7.      As I have on innumerable occasions over the last 45 years, I will undoubtedly continue to recreate and work in the Cabinet-Yaak and Selkirk Recovery Zones, and on my future visits to the area, I intend to look for grizzly bears and signs of bears.  My future experiences in the area will be much less rewarding if bears are eliminated from the ecosystem.

8.      The requested relief in the instant case threatens imminent harm to my interest in observing grizzly bears and signs of grizzly bear presence in the Cabinet-Yaak ecosystem.  If the U.S. Fish and Wildlife Service may authorize activities, including extensive road building, that would place the Selkirk and Cabinet-Yaak grizzly bear populations in jeopardy, the last few grizzlies in the recovery area may be eliminated. This will foil the possibility that I will ever again have the opportunity to observe and study grizzly bears in these areas.

9.      GBF is a plaintiff in a lawsuit currently on appeal in the Ninth Circuit Court of Appeals (Cabinet Resource Group, et al. v. U.S. Fish and Wildlife Service, et

al., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006)), challenging the same biological opinion at issue in the instant litigation. Before the Ninth Circuit, plaintiffs will argue that the Fish and Wildlife Service unlawfully relied on flawed science to authorize motorized access standards that have been shown to cause jeopardy to the Selkirk and Cabinet-Yaak grizzly bear populations. The present litigation harms GBF's interest in obtaining a meaningful remedy in that separate litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 12, 2007, in Missoula, Montana.

Charles Jonkel, PhD

Timothy J. Preso (D.C. Bar # 456531)
Douglas L. Honnold (D.C. Bar # 468323)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
tpreso@earthjustice.org
dhonnold@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | **DECLARATION OF JONATHAN D. OPPENHEIMER** |
| Defendants, | ) ) | |
| and | ) ) | |
| CABINET RESOURCE GROUP, et al., | ) ) | |
| Proposed Defendant-Intervenors. | ) ) | |

I, Jonathan D. Oppenheimer, declare as follows:

1.      I am a resident of Boise, Idaho.

2.      I am employed as the Conservation Associate for the Idaho Conservation League ("ICL"), an applicant for intervention in the above-captioned case.  I am also a member of the organization.  Over the last three decades, from the effort to preserve the Frank Church-River of No Return Wilderness in Idaho to the current effort to protect grizzly bear habitat in the Cabinet-Yaak and Selkirk ecosystems, ICL has sought to protect Idaho's natural heritage through citizen action, public education, and professional advocacy.  The organization has thousands of members in Idaho, and serves to provide a unified voice for people who want to preserve Idaho's clean water, wilderness and quality of life.

3.      ICL has a long history of involvement in the management and conservation of grizzly bears and their habitat in North Idaho. Through meetings with landowners, including the Forest Service, Bureau of Land Management, Idaho Department of Lands, the media and others, the ICL has worked to raise awareness about habitat conservation and has worked to reduce conflicts between bears and people for over a decade.  ICL has been a plaintiff in past litigation over the listing status and Recovery Plan for the Selkirk grizzly bear population.

4.      Members of the ICL served as representatives on an Idaho Department of Fish and Game (IDFG) sponsored Grizzly Bear Recovery Advisory Committee (GBAC) to act as an interface between IDFG and Bonner and Boundary county communities. Members included business people, community leaders and other interested parties.

1

5.      The ICL was also represented in an IDFG sponsored citizen's group to help direct development associated with the Boundary Creek Wildlife Management Area. This group dealt with all aspects of area wildlife management, including grizzly bears.

6.      Grizzly bear issues have been a component or part of a significant number of meetings between members of ICL and the Forest Service, especially over the management of Trout, Fisher, and Long Canyon Creeks' watersheds and the Selkirk Crest, all important components of grizzly bear management units ("BMUs").

7.      In my capacity as Conservation Associate, I monitor administrative processes associated with grizzly bear habitat and threats, work with the media to explain the importance of the Selkirk and Cabinet-Yaak ecosystems, help to coordinate efforts on grizzly issues among involved grassroots groups in the region, and work with key scientists involved in research regarding the Cabinet-Yaak and Selkirk grizzly bear populations.

8.      I personally have hiked and fished in the Cabinet-Yaak and Selkirk Recovery Zones on several occasions over the past ten years.  I find recreating in the area particularly rewarding because of the natural beauty, solitude and potential to view wildlife, including grizzly bears, in their natural habitat.  I have also personally conducted road inventories in BMUs within Recovery Zones on the Kootenai, Idaho Panhandle, and Colville National Forests, and am well aware of the adverse impacts that roads have on grizzly bears.

9.      While I have never seen a grizzly bear in the Selkirks or Cabinet-Yaak, each time I visit, I do so with the specific hope and desire of observing one of the rare bears in its natural habitat.  On more than one occasion I have encountered bear scat and

tracks, but have not been able to positively determine whether they were left by grizzly or black bears.

10.    I have specific future plans to recreate and work in the Selkirks.  Next summer, I will be visiting the site of an approved timber sale on BLM land within the Boulder BMU. I also plan to visit Long Canyon within the Long-Smith BMU in the Selkirks for the purpose of fising, hiking and enjoyment of public lands. On both occasions, I intend to look for grizzly bears and their sign.  I will undoubtedly continue to recreate in the Selkirks in future years; those future experiences will be much less rewarding if grizzly bears are eliminated from the ecosystem.

11.    The requested relief in the instant case threatens imminent harm to my interest in observing grizzly bears and signs of grizzly bear presence in the Selkirk ecosystem.  If the U.S. Fish and Wildlife Service may authorize activities, including extensive road building, that would place the Selkirk and Cabinet-Yaak grizzly bear populations in jeopardy, the last few grizzlies in the recovery area may be eliminated. This will foil the possibility that I will ever have the opportunity to observe and study grizzly bears in the Selkirks.

12.    ICL is a plaintiff in a lawsuit currently on appeal in the Ninth Circuit Court of Appeals (Cabinet Resource Group, et al. v. U.S. Fish and Wildlife Service, et al., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006)), challenging the same biological opinion at issue in the instant litigation.  Before the Ninth Circuit, plaintiffs will argue that the Fish and Wildlife Service unlawfully relied on flawed science to authorize motorized access standards that have been shown to cause jeopardy to the Selkirk and

Cabinet-Yaak grizzly bear populations. The present litigation harms ICL's interest in obtaining a meaningful remedy in that separate litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 16ᵗʰ day of January, 2007, in Boise, Idaho.

Jonathan Oppenheimer

4

Timothy J. Preso (D.C. Bar # 456531)
Douglas L. Honnold (D.C. Bar # 468323)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
tpreso@earthjustice.org
dhonnold@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, et al., <br><br> Defendants, <br><br> and <br><br> CABINET RESOURCE GROUP, et al., <br><br> Proposed Defendant-Intervenors. | Case No. 1:06-CV-01842-RCL <br><br><br><br><br><br> **DECLARATION OF MARK SPRENGEL** |

I, Mark Sprengel, declare as follows:

1.      I am a resident of Blanchard, Idaho.

2.      I am the Executive Director of the Selkirk Conservation Alliance ("SCA"), an applicant for intervention in the above-captioned case.  SCA is an environmental organization founded in 1987, and is dedicated to the cause of protecting the wild grandeur of the Selkirk Mountains.  Throughout its history, SCA has actively participated in the management of the Selkirk ecosystem through commenting on, appealing, and litigating against proposed activities on the Idaho Panhandle and Colville National Forests that SCA believes will harm the ecosystem, including grizzly bear habitat.

3.      As the Executive Director of SCA, I devote part of my time to monitoring administrative processes associated with grizzly bear habitat and threats, working with the media to explain the importance of the Selkirk ecosystem, helping to coordinate efforts on grizzly issues among involved grassroots groups in the region, and working with key scientists involved in research regarding the Selkirk grizzly population.

4.      I personally have hiked, camped, skied, and otherwise enjoyed the Selkirk ecosystem on innumerable occasions over the past 28 years that I have lived in the area.  I find recreating in the Selkirks particularly rewarding because of its unique ecological attributes including the presence of grizzly bears.

5.      When hiking in the Selkirks, I often intentionally select areas that are prime grizzly habitat with the specific hope and desire of observing one of the rare bears in its natural environs.  Despite hiking literally hundreds of miles in the area, I have never personally observed a grizzly in the Selkirks.  I have, however, encountered bear scat and

tracks, but have not been able to positively determine whether they were left by grizzly or black bears.

6.     I have specific future plans to recreate in the Selkirk Recovery Zone.  This summer, as always, I intend to go hiking in the area, and am hopeful that I will finally be rewarded with the sight of a wild grizzly in the Selkirks.  I will undoubtedly continue to recreate in the Selkirks in future years; those future experiences will be much less rewarding if bears are eliminated from the ecosystem.

7.     The requested relief in the instant case threatens imminent harm to my interest in observing grizzly bears and signs of grizzly bear presence in the Selkirk ecosystem.  If the U.S. Fish and Wildlife Service may authorize activities, including extensive road building, that would place the Selkirk and Cabinet-Yaak grizzly bear populations in jeopardy, the last few grizzlies in the recovery area may be eliminated.  This will foil the possibility that I will ever have the opportunity to observe grizzly bears in the Selkirks.

8.     SCA is a plaintiff in a lawsuit currently on appeal in the Ninth Circuit Court of Appeals (Cabinet Resource Group, et al. v. U.S. Fish and Wildlife Service, et al., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006)), challenging the same biological opinion at issue in the instant litigation.  Before the Ninth Circuit, plaintiffs will argue that the Fish and Wildlife Service unlawfully relied on flawed science to authorize motorized access standards that have been shown to cause jeopardy to the Selkirk and Cabinet-Yaak grizzly bear populations.  The present litigation harms SCA's interest in obtaining a meaningful remedy in that separate litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed

on _1-10-_____, 2007, in _Priest River_____, Idaho.

_Mark Sprengel_

Mark Sprengel

Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, ) ) | |
| vs. ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., ) ) ) | **DECLARATION OF LOUISA WILLCOX** |
| Defendants, ) ) | |
| and ) ) | |
| CABINET RESOURCE GROUP, et al., ) ) | |
| Proposed Defendant-Intervenors. ) | |

I, Louisa Willcox, declare as follows:

1.      I am a resident of Livingston, Montana.

2.      I am a member of, and Director of the Wild Bears Project for, the Natural Resources Defense Council ("NRDC"), an applicant for intervention in the above-captioned case.  NRDC is a national conservation organization that for more than three decades has focused on using law and science to safeguard the Earth: its people, its plants and animals and the natural systems on which all life depends.

3.      NRDC's Wild Bears Project seeks to protect, restore and recover the grizzly bears in the Lower-48 states and adjacent ecosystems in Canada.  We seek to reconnect grizzly bears from Yellowstone to stronger Canadian source populations, so as to ensure their long-term genetic and demographic health.  The Cabinet-Yaak and Selkirk areas, which will be subject to the proposed road standards, are ecological linchpins in this effort to connect Yellowstone bears to Canada.  In my capacity as Director of the Wild Bears Project, I track the administrative processes associated with grizzly bear habitat and mortality issues, work with the media to explain the importance of the Selkirk and Cabinet-Yaak Ecosystems and the threats they face, help to coordinate efforts on grizzly issues among involved grassroots groups in the region, and work with key scientists involved in research regarding the Cabinet-Yaak and Selkirk grizzly populations.

4.      I personally have hiked in the Cabinet-Yaak and Selkirk ecosystems about a dozen times over the past 15 years.  Hiking in wild country, and looking for wildlife and their sign, including that of the grizzly bear, is a major passion of mine.  I find the Cabinet-Yaak and Selkirk ecosystems particularly intriguing because: (1) grizzly bears are so scarce and rarely seen in this ecosystem; (2) vegetation is more lush and quite different from the vegetation existing in the Yellowstone region near my home; and (3) the Cabinet-Yaak and Selkirk ecosystems provide

a vital ecological connection between grizzly bears in the lower-48 states and adjacent ecosystems in Canada; without grizzly bear populations in the Cabinet-Yaak and Selkirk ecosystems, there can be no link between Canadian and American grizzlies in the Northern Rockies.

5.      While I have never seen any of the rare grizzly bears of the Cabinet-Yaak or Selkirk ecosystems, on one of my trips there I did see a tree used by grizzly bears for rubbing, and on another trip in Long Canyon in the Selkirks, I observed some grizzly bear tracks.  These observations turned what would have been ordinary hiking trips into adventures I will never forget.  I will be returning to the area to seek to observe grizzly bears and their sign early in the summer of 2007.

6.      The requested relief in the instant case threatens imminent harm to my interest in observing grizzly bears and signs of grizzly bear presence in the Cabinet-Yaak and Selkirk ecosystems.  If the U.S. Fish and Wildlife Service may authorize activities, including extensive road building, that would place the Selkirk and Cabinet-Yaak grizzly bear populations in jeopardy, the last few grizzlies in the recovery area may be eliminated.  This would make it impossible for me to observe these great bears or their sign in this region.

7.      NRDC is a plaintiff in a lawsuit currently on appeal in the Ninth Circuit Court of Appeals (Cabinet Resource Group, et al. v. U.S. Fish and Wildlife Service, et al., No. 04-236-M-DWM (D. Mont. Dec. 13, 2006)), challenging the same biological opinion at issue in the instant litigation.  Before the Ninth Circuit, plaintiffs will argue that the Fish and Wildlife Service unlawfully relied on flawed science to authorize motorized access standards that have been shown to cause jeopardy to the Selkirk and Cabinet-Yaak grizzly bear populations.  The present litigation harms NRDC's interest in obtaining a meaningful remedy in that separate litigation.

8.     If either or both of the grizzly populations decline further or wink out, the landscape would be, for me, a shadow of its former self, and an incomplete place without its top predator. Just common mountains, hardly special. And myself? Poorer for the loss.


I declare under penalty of perjury that the foregoing is true and correct. Executed on

January 23 _____ 2007, in Livingston _____, Montana.

Louisa Willcox

Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
tpreso@earthjustice.org
dhonnold@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

</div>

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al., )<br><br>Defendants, )<br><br>and )<br><br>CABINET RESOURCE GROUP, et al., )<br><br>Proposed Defendant-Intervenors. ) | Case No. 1:06-CV-01842-RCL<br><br><br><br><br><br><br>**DECLARATION OF MINETTE JOHNSON** |

I, Minette Johnson, declare as follows:

1.      I am a resident of Missoula, Montana.

2.      I have lived in Montana for twelve years.

3.      I am the Regional Representative for Defenders of Wildlife in Missoula, Montana where I have worked since 1995.  As Regional Representative, I am responsible for grizzly bear conservation initiatives throughout the region.  I work with the public and state, tribal, and federal agencies on grizzly bear conservation in the recovery zones identifies in the Grizzly Bear Recovery Plan, including the Cabinet-Yaak Ecosystem.  My work has included creating educational brochures that we have distributed throughout the Cabinet-Yaak help people in co-exist with bears, writing a vision document describing actions needed for recovery in the Cabinet-Yaak, and sponsoring an assessment of the potential for human/bear conflicts related to garbage in Lincoln County which covers most of the Cabinet-Yaak.  I have also drafted a letter supporting state agency efforts to augment the grizzly bear population in the Cabinet-Yaak Ecosystem.

4.      I have enjoyed recreating in and near the Kootenai National Forest, including hiking in 2006, and seek to view grizzly bears, and signs of their presence when visiting the Cabinet-Yaak area.  I also gave a presentation on bears to a group of citizens from the area in Libby in 2006.

5.      I have specific plans to travel to the Kootenai National Forest to oversee the installation of a grizzly bear educational panel and assist Montana Fish, Wildlife and Parks with relocating grizzly bears into the Cabinet-Yaak Ecosystem next year.  I hope to float the Kootenai River at some point.

6.      Defenders of Wildlife ("Defenders"), a non-profit environmental group founded in 1947, is dedicated to the protection and restoration of native wild animals and plants in their natural communities.  Defenders advocates new approaches to wildlife conservation that will prevent species from becoming endangered.  Our programs encourage conservation of entire ecosystems and interconnected habitats while protecting predators, such as grizzly bears and

wolves that serve as "umbrella" species for ecosystem health. Defenders has focused resources on grizzly bear conservation in the northern Rockies for more than 25 years.

7.      Defenders of Wildlife has been involved in the management of the Kootenai National Forest since the late 1970s when we submitted comments on the proposal to open a hard rock mine.  Since then we have provided comments on various mining proposals as well as forest plans, particularly in the context of how they might affect grizzly bears.

8.      Defenders of Wildlife has over 500,000 members and supporters, including more than 1,700 members in Montana, many of whom live near and recreate in the Kootenai National Forest and throughout the Cabinet-Yaak Ecosystem.

9.      In order to encourage tolerance among people for grizzly bear recovery, Defenders of Wildlife pays compensation for all verified livestock losses to grizzly bears.  In 1999 and 2006, we paid compensation for livestock killed near the Kootenai National Forest.

10.     Defenders of Wildlife also works to prevent conflicts between grizzly bears and humans and as a result we have collaborated with private landowner near the Kootenai to erect electric fencing around beeyards to prevent damage by bears.

11.     Defenders of Wildlife and its members would be hurt if Communities for a Great Northwest and co-plaintiffs prevail on their claims in the action at hand.  The claims brought by plaintiffs, if successful, could lead to management of the Kootenai National Forest and other National Forests in ways that harm individual grizzly bears and other wildlife, lead to a decline in grizzly bear and other wildlife populations, and reduce and degrade habitat for grizzly bears and other wildlife that Defenders and its members care passionately about and have worked very hard over the course of many years to recover.  If the last few grizzlies in the recovery area are eliminated it will deprive me and other Defenders members of the opportunity to observe them in the Kootenai Forest and Cabinet-Yaak Ecosystem in their natural element.

12.     We strongly feel that the FWS has correctly interpreted the intent to ESA in making its jeopardy decisions based on potential impacts to the subpopulations of bears.  When the Grizzly Bear Recovery Plan was drafted in 1982 and revised in 1993, it was understood that each of these populations was important to the survival of the species in the lower 48 and that

FWS had to duty to recover the grizzly bear in each of the Recovery Zones, including the Cabinet/Yaak. As such, it is the FWS's duty to assess whether federal actions may jeopardize the specific grizzly bear population in the recovery zone where the action is proposed. Denying Plaintiffs their requested relief thus will protect Defenders of Wildlife's interest in grizzly bears in the Kootenai National Forest as well as on federal lands throughout grizzly bear range, and preserve my ability, and that of our members, to look for and experience the presence of bears in this area in the future.

 I declare under penalty of perjury that the foregoing is true and correct. Executed on this 19th day of January, 2007 in Missoula, Montana.


/s/ Minette Johnson_____

Minette Johnson

Douglas L. Honnold (D.C. Bar # 468323)
Timothy J. Preso (D.C. Bar # 456531)
Jenny K. Harbine
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax:  (406) 586-9695
dhonnold@earthjustice.org
tpreso@earthjustice.org
jharbine@earthjustice.org

Jason Rylander (D.C. Bar # 474995)
Defenders of Wildlife
1130 17th Street NW
Washington, DC 20036
(202) 682-9400
Fax:  (202) 682-1331
jrylander@defenders.org

*Attorneys for Proposed Defendant-Intervenors*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, et al., | ) ) ) | [PROPOSED] **ORDER GRANTING MOTION OF CABINET RESOURCE GROUP, et al., TO INTERVENE** |
| Defendants, | ) ) | |
| and | ) ) | |
| CABINET RESOURCE GROUP 71 ½  Four Corners South Heron, Montana  59844 | ) ) ) | |

```
_____
                                          )
GREAT BEAR FOUNDATION                     )
802 E. Front Street                       )
Missoula, Montana  59802                  )
                                          )
IDAHO CONSERVATION LEAGUE                 )
710 N. 6th St.                            )
Boise, Idaho  83702                       )
                                          )
SELKIRK CONSERVATION ALLIANCE             )
100 South McKinley, Suite 204             )
Priest River, Idaho  83856                )
                                          )
NATURAL RESOURCES DEFENSE COUNCIL )
40 West 20th Street                       )
New York, New York  10011                 )
                                          )
DEFENDERS OF WILDLIFE                     )
1130 17th Street NW                       )
Washington, DC 20036                      )
                                          )
              Proposed Defendant-Intervenors.)
_____
```

Upon consideration of the Motion of Cabinet Resource Group, et al., to intervene,

any opposition thereto, and the entire record of this case, it is hereby

**ORDERED** that the motion is granted.


Dated: _____, 2007          _____

                                           Hon. Royce C. Lamberth
                                           United States District Judge