Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST and MOUNTAIN STATES LEGAL FOUNDATION,<br><br>               Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*<br><br>               Defendants. | Case No. 1:06-CV-01842-RCL<br><br>**PLAINTIFFS' UNOPPOSED MOTION TO FILE A FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COME NOW Plaintiffs, Communities for a Great Northwest and Mountain States Legal Foundation, by and through their attorneys, pursuant to Local Rule of Procedure 15.1, and hereby move to file their First Amended Complaint for Declaratory and Injunctive Relief.  The grounds for this motion are as follows:

1.      On January 29, 2007, after the Parties filed their proposed scheduling order, this Court issued its Scheduling Order.  The Scheduling Order was silent as to the filing of motions to amend the complaint.

2.      Pursuant to the Scheduling Order, Defendants filed the Administrative Record on March 28, 2007.

3.      Based upon its review of the Administrative Record, Plaintiffs now wish to amend their Complaint to add several factual allegations relating to Defendants' "Endangered Species Consultation Handbook."

4.      The granting of this Motion will not prejudice any party and will not affect the deadlines contained within this Court's Scheduling Order.

5.      On April 11, 2007, counsel for Plaintiffs contacted opposing counsel regarding this Motion.  Counsel for Defendants stated that Defendants had no opposition to the granting of this Motion.  Counsel for Applicants in Intervention took no position.

WHEREFORE, Plaintiffs respectfully requests this Court grant this Motion to file this First Amended Complaint for Declaratory and Injunctive Relief.

DATED this 12th day of April 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 12th day of April 2007, I filed the attached Plaintiffs' Unopposed Motion to File a First Amended Complaint for Declaratory and Injunctive Relief and Plaintiffs' Proposed First Amended Complaint for Declaratory and Injunctive Relief electronically through the CM/ECF system, which caused the following to be served by electronic means:

James A. Maysonett, Esq.
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 7397
Washington, D.C. 20044
(202) 305-0216
(202) 305-0275 (facsimile)
james.a.maysonett@usdoj.gov

Timothy J. Preso, Esq.
Douglas L. Honnold, Esq.
Jenny K. Harbine, Esq.
Earthjustice
209 South Willson Avenue
Bozeman, Montana 59715
(406) 586-6999
(406) 586-9695 (facsimile)
tpreso@earthjustice.org

Jason Rylander, Esq.
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (facsimile)
jrylander@defenders.org

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST, and MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) | **PROPOSED ORDER GRANTING PLAINTIFFS'** |
| v. | ) ) | **UNOPPOSED MOTION TO FILE A FIRST AMENDED** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | ) ) ) | |

Upon consideration of Plaintiffs' Unopposed Motion to File a First Amended Complaint

and the record of this case it is hereby

ORDERED that the Motion is GRANTED.

ENTERED this _____ day of _____, 2007.

_____
Royce C. Lamberth
UNITED STATES DISTRICT JUDGE

Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST<br>5957 Champion Road<br>Libby, Montana 59923, and | ) ) ) | Case No. 1:06-CV-01842-RCL |
| MOUNTAIN STATES LEGAL FOUNDATION<br>2596 South Lewis Way<br>Lakewood, Colorado 80227, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF THE<br>INTERIOR<br>1849 C Street, NW<br>Washington, D.C. 20240, | ) ) ) ) ) | |
| UNITED STATES FISH AND WILDLIFE<br>SERVICE<br>1849 C Street, NW<br>Washington, D.C. 20240, | ) ) ) ) ) | |
| DIRK KEMPTHORNE<br>Secretary of the Interior<br>1849 C Street, NW<br>Washington, D.C. 20240, | ) ) ) ) ) | |
| H. DALE HALL<br>Director, U.S. Fish and Wildlife Service<br>1849 C Street, NW<br>Washington, D.C. 20240, | ) ) ) ) ) | |

REN LOHOEFENER                              )
Regional Director, Pacific Region          )
U.S. Fish and Wildlife Service             )
911 NE 11th Avenue                         )
Portland, Oregon 97232, and                )
                                           )
J. MITCH KING                              )
Regional Director, Mountain-Prairie Region )
U.S. Fish and Wildlife Service             )
134 Union Boulevard                        )
Lakewood, Colorado 80228,                  )
                                           )
                    Defendants.            )
                                           )

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, Communities for a Great Northwest ("CGNW") and Mountain States Legal

Foundation ("MSLF"), by and through their attorneys, hereby file this First Amended Complaint

against the above-named Defendants and allege as follows:

## INTRODUCTION

1.    In this action, Plaintiffs seek review of a biological opinion ("BiOp") issued by

the United States Fish and Wildlife Service ("FWS") on February 9, 2004, following

consultation with the United States Forest Service ("Forest Service") under Section 7 of the

Endangered Species Act ("ESA"), 16 U.S.C. § 1536.  The biological opinion (hereinafter "2004

BiOp") addresses the purported effects of motorized access within the Kootenai, Idaho

Panhandle, and Lolo National Forests.

2.    The 2004 BiOp evaluated the purported potential impacts of motorized access on

the Selkirk and Cabinet-Yaak subpopulations of the grizzly bear (*Ursus arctos horribilis*);

however, it did not address those potential impacts on the recovery of the entire, listed species.

3.    Based upon the 2004 BiOp, the Forest Service severely restricted motorized

access on the Kootenai, Idaho Panhandle, and Lolo National Forests.  These access restrictions

limited Plaintiffs' members' access to these national forests, significantly and negatively

impacting their lawful use of the forests.

4.    For this, and other reasons to be identified further in the course of this litigation,

Plaintiffs seek a declaration that the 2004 BiOp violates Section 7 of the ESA and, as such, is

arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C.

§ 706(2)(A).

5.    The 2004 BiOp served as the basis for the Kootenai, Idaho Panhandle, and Lolo

National Forests Land and Resource Management Plans Amendment for Motorized Access

within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones and is incorporated by

reference into the proposed Revised Land and Resource Management Plans for the Kootenai and

Idaho Panhandle National Forests.  Further, the 2004 BiOp has been incorporated into other land

management planning documents beyond those for which it was drafted , including the Quartz-

Cottonwood Road Project Environmental Assessment, *United States Forest Service* (Aug. 2005)

and the Myrtle Creek Healthy Forests Restoration Project Draft Environmental Impact

Statement, *United States Forest Service* (May 2006).  Additionally, it is likely that the 2004

BiOp will also be used as guidance in the environmental planning of the Rising Cougar Project

proposed by the Forest Service in the Idaho Panhandle National Forests.

6.    Therefore, Plaintiffs seek an injunction directing the FWS to withdraw the 2004

BiOp and reinitiate consultation with the Forest Service on a schedule set by this Court.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction, pursuant to 28 U.S.C. § 1331 and 16 U.S.C.

§ 1540(c), because the matter in controversy arises under the laws of the United States, including

but not limited to the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq*.

8.      Venue properly rests in this Court, pursuant to 28 U.S.C. § 1391(e), because Defendants United States Department of Interior, the FWS, Kempthorne, and Hall reside within this District.

9.      Pursuant to 16 U.S.C. § 1540(g)(2)(A)(i), Plaintiffs provided Defendants written notice of the FWS's violation of the ESA by letter dated August 15, 2006, sent certified mail, return receipt requested.  All Defendants received this letter by August 23, 2006.  A copy of this letter is attached hereto as Exhibit 1.

## PARTIES

10.      Plaintiff CGNW is a non-profit, natural resources education and information association headquartered in Libby, Montana.  Its members live throughout the Inland Northwest and engage in activities within the national forests including, fishing, hunting, hiking, camping, timber harvesting, fuelwood gathering, mining, berry picking, sightseeing, finding and enjoying solitude, and wildlife viewing.  Roads, trails, and pathways within national forest lands provide access for CGNW members to engage in these activities.  CGNW and its members have worked with federal land management agencies and local governments to develop management plans for national forests within the Inland Northwest, including the Kootenai and Idaho Panhandle National Forests.  As a result, CGNW and its members have expended tremendous monetary and human resources to ensure the proper management of the national forests affected by the 2004 BiOp.

11.      Plaintiff MSLF is a voluntary, non-profit, public interest legal foundation with its principal place of business in Lakewood, Colorado.  MSLF is dedicated to individual liberty, the

right to own and use property, limited and ethical government, and the free enterprise system.  It

has members who live and work throughout the United States, particularly the American West,

including the States of Washington, Idaho, Montana, and Wyoming.  MSLF and its members are

interested in and affected adversely by the manner in which the ESA is implemented by federal

agencies and the interpretation of that statute by the courts.  MSLF members include ranchers,

miners, oil and gas producers, timbermen, farmers, and property owners who live on and/or earn

a living from the public and private lands that grizzly bears may inhabit, and that are affected by

the 2004 BiOp.

12.     Plaintiffs' members expect the FWS to comply fully with all provisions of the

ESA, including the Section 4 listing procedures and the Section 7 consultation requirements.

13.     The FWS's failure to issue a lawful BiOp based upon the properly listed

population of threatened grizzly bear has adversely affected Plaintiffs' members' recreational

and educational interests.  These adverse affects will continue unless the relief requested is

granted.  These are actual, concrete injuries caused by Defendants' failure to comply with

mandatory duties under the ESA and APA.  Plaintiffs have no adequate remedy at law and the

injuries will be redressed by the relief sought.

14.     Plaintiffs' members spend time in areas adversely affected by the FWS's

violations of the ESA.  Plaintiffs' members intend to continue to use and enjoy on a frequent,

regular, and ongoing basis the lands adversely affected by the agency actions challenged in this

Complaint.

15.     Defendant United States Department of the Interior is the federal administrative

agency charged with the administration of the ESA as it applies to terrestrial and certain aquatic

species of plants and animals, including the grizzly bear.

16.    Defendant FWS is the federal administrative agency within the Department of the Interior responsible for administering the ESA.  The FWS issued the 2004 BiOp challenged herein.

17.    Defendant Dirk Kempthorne is the Secretary of the Interior and is responsible for overseeing the Department of the Interior and the FWS.  Secretary Kempthorne is being sued in his official capacity.

18.    Defendant H. Dale Hall is the Director of the FWS and is responsible for overseeing the administration of the ESA.  Mr. Hall is being sued in his official capacity.

19.    Defendant Ren Lohoefener is the Regional Director for the Pacific Region (Region 1) of the FWS and is responsible for administering the ESA in the states of Washington and Idaho, among others.  Mr. Lohoefener is being sued in his official capacity.

20.    Defendant J. Mitch King is the Regional Director for the Mountain-Prairie Region (Region 6) of the FWS and is responsible for administering the ESA in the states of Montana and Wyoming, among others.  Mr. King is being sued in his official capacity.

## FACTUAL BACKGROUND

21.    In 1975, the FWS listed the grizzly bear as a threatened species in the contiguous 48 states pursuant to Section 4 of the ESA.  40 *Fed. Reg*. 31,734 (July 28, 1975) (codified at 50 C.F.R. § 17.32 (1975), 50 C.F.R. § 17.11 (2005)).  The listing determination identified three ecosystems in which grizzly bear most often occur:  the Selway-Bitterroot Ecosystem, the Bob Marshall Ecosystem, and the Yellowstone Ecosystem.  *Id*. at 31,734–31,735.  Although these three ecosystems were identified, the FWS did not designate them as recovery units or list them as Distinct Population Segments ("DPS").  *Id.*

22.     In 1976, the FWS issued a notice of proposed rulemaking to designate four areas as critical habitat, 41 *Fed. Reg.* 48,757 (Nov. 5, 1976); however, no final regulation designating critical habitat was issued and critical habitat remains undesignated.  50 C.F.R. § 17.11.

23.     In a 1979 memorandum, FWS Director Greenwalt reminded agency personnel:

> [J]eopardy opinions should be rendered only when the proposed activity/action/program, along with cumulative effects, will jeopardize the continued existence of the entire listed species or listed population.  Jeopardy opinions cannot be used for individuals or populations unless the loss of such will jeopardize the listed species or listed population throughout its range.

Memorandum from Director Wallenstrom to Regional Directors 1 (Mar. 3, 1986) (hereinafter "1986 Memorandum") (*quoting* April 26, 1979, memorandum from Director Greenwalt) (emphasis added).

24.     In 1982, a Grizzly Bear Recovery Plan was issued.  U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Jan. 29, 1982).

25.     In 1986, FWS Director Wallenstrom issued a memorandum entitled "Jeopardy Standard Under the Endangered Species Act," which provided guidance to all Regional Directors that subpopulations of nine listed species, including grizzly bear, which were not themselves listed as DPSs, were to be used in making jeopardy determinations instead of the entire listed species or population.  1986 Memorandum.

26.     The FWS did not publish the 1986 Memorandum, did not provide the public notice or opportunity for comment, and did not provide legal justification for its identification of the nine species to be afforded this unprecedented treatment.

27.     Although the ESA requires the use of the entire listed species when the FWS makes its jeopardy determinations and then-existing FWS policy required the same, the 1986 Memorandum cited no authority for its departure from this rule.  Instead, the FWS simply stated "[I]t is our intent to allow a limited exception to the established jeopardy standard to more

adequately protect certain wide-ranging species for which the application of the standard is

problematical." *Id*. at 2.

28.    The 1986 Memorandum continued:

The species must be composed of discrete population segments that can be dealt
with separately when assessing the impact of a given Federal action.  Ideally, the
identification of these segments is supported by a Service document, *i.e.*, separate
recovery plan, recovery objectives that relate to subpopulations, recognition of
separate taxonomic status or geographic isolation, etc.  It would not be required,
however, that the species actually be listed on the basis of such population
categories.

*Id*. at 2–3.

29.    The Memorandum then designated, *inter alia*, the six subpopulations of grizzly

bear identified in the Recovery Plans for this extra-statutory treatment.  *Id.* at 3.

30.    In 1993, the FWS revised its Grizzly Bear Recovery Plan.  Fish & Wildlife Serv.,

*Grizzly Bear Recovery Plan* (Sept. 10, 1993).

31.    Both the 1982 and 1993 Plans identify six subpopulations of grizzly:  the

Yellowstone, the Northern Continental Divide, the Cabinet-Yaak, the Selkirk, the Selway-

Bitterroot, and the North Cascades.  *Id.*  None of these subpopulations has ever been listed as a

DPS under Section 4 of the ESA.

32.    The 1993 Recovery Plan provides that "Grizzly bear populations may be listed,

recovered, and delisted separately."  1993 Recovery Plan at 17.  For any such change, public

notice and comment and publication of a final rule in the Federal Register is required.  *Id*.

33.    In 1998, the FWS, in conjunction with the National Marine Fisheries Service,

issued an "Endangered Species Consultation Handbook" ("Consultation Handbook").  Fish &

Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook*

(Mar. 1998).

34.    The Consultation Handbook was released for public comment on or about

December 21, 1994.  59 *Fed. Reg.* 65,781 (Dec. 21, 1994).  Public comments were accepted until

at least April 7, 1995.  60 *Fed. Reg.* 8729 (Feb. 15, 1995).

35.    On June 10, 1999, the FWS issued a Notice of Availability of the final version of

the Consultation Handbook.  64 *Fed. Reg.* 31,285 (June 10, 1999).  The Notice of Availability

contained no discussion of the use of unlisted subpopulations during Section 7 consultations.

36.    The Consultation Handbook provides:

> In the past, exceptions from applying the jeopardy standard to an entire species
> were granted by memorandum for specific populations or "recovery units" of a
> species.  That process of limiting the exceptions to those populations/recovery
> units listed in a memo is hereby discontinued and all future exceptions will adhere
> to the following guidance.

Consultation Handbook at 4-36.

37.    The Consultation Handbook further provides:

> Jeopardy analyses may be based on an assessment of impacts to distinct
> population segments (DPS) of a species documented per the Services' joint policy
> on DPS (1995) in a final listing rule, or to a DPS as identified in a NMFS
> recovery plan, or to recovery units when those units are documented as necessary
> to both the survival and recovery of the species in a final recovery plan(s), for
> which a notice of availability has been published in the Federal Register.  For
> species which had recovery plan notices published prior to this guidance, an
> addendum to the recovery plan, documenting the need to evaluate jeopardy on
> separate recovery units, can be written, and notice of its availability should be
> published in the Federal Register.

*Id.*

38.    The 1993 Recovery Plan was published prior to the 1998 Consultation Handbook.

39.    The FWS has not published an addendum to the 1993 Recovery Plan

documenting the "need to evaluate jeopardy on separate recovery units," as provided by in the

Consultation Handbook.  Consultation Handbook at 4-36.

40.    Further, the FWS has not published a notice in the Federal Register identifying grizzly bear for this extra-statutory treatment.

41.    In 2004, at the request of the Forest Service, the FWS issued a biological opinion regarding the Forest Service's proposed Forest Plan amendments for motorized access within the Selkirk and Cabinet-Yaak ecosystems.  U.S. Fish & Wildlife Serv., *Biological Opinion on the Proposed Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo National Forests* (Feb. 9, 2004) (the "2004 BiOp").

42.    The 2004 BiOp determined that implementation of the proposed amendments was not likely to jeopardize the continued existence of the grizzly bear, among other federally listed species, and provided an Incidental Take Statement with reasonable and prudent measures and terms and conditions to minimize incidental take of the grizzly bear.  *Id*.

43.    In the 2004 BiOp, the FWS provided individual analyses for the Selkirk and Cabinet-Yaak subpopulations of grizzly bear.  2004 BiOp 32–62.

44.    Moreover, the 2004 BiOp expressly based its jeopardy opinion on the proposed action's potential impact to the Selkirk and Cabinet-Yaak subpopulations, individually.  *Id*. at 125–127.

45.    The FWS did not base the 2004 BiOp on the proposed actions' potential impacts to the species as listed, *i.e.*, to the entire grizzly bear population in the contiguous 48 states, as required by the ESA.

46.    The Consultation Handbook requires, "[w]hen using this type of analysis [*i.e.*, jeopardy opinions based on unlisted subpopulations], include in the biological opinion a description of how the action affects not only the recovery unit's capability, but the relationship

of the recovery unit to both the survival and recovery of the listed species as a whole." Consultation Handbook at 4-26.

47.     The 2004 BiOp did not include a description of "how the action affects not only the recovery unit's capability, but the relationship of the recovery unit to both the survival and recovery of the listed species as a whole."

48.     Likewise, the Incidental Take Statement provided in the 2004 BiOp also provides standards based upon the Selkirk and Cabinet-Yaak subpopulations.

49.     Based upon the 2004 BiOp and its Reasonable and Prudent Alternatives and Incidental Take Statement, the Forest Service imposed severe restrictions on motorized access on the Kootenai, Idaho Panhandle, and Lolo National Forests.  U.S. Forest Serv., *Record of Decision: Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones*, at ROD-12 (Mar. 2004) ("The requirements [of the 2004 BiOp] affect approximately 1.1 million acres of National Forest System lands . . ..").

50.     Among these restrictions were provisions to reduce the total open or restricted use roads by 544 miles, which would close more than 32,000 acres to motorized access.  *Id.* at ROD-22, ROD-39.

51.     These motorized access restrictions have significant and negative affects on Plaintiffs' members' lawful use of these national forests, such as recreation, timber harvesting, grazing, mining, etc.

52.     Moreover, the 2004 BiOp has been extended beyond the project for which it was drafted.  *See, e.g.*, U.S. Forest Serv., *Proposed Land Management Plan: Kootenai National Forest* 3-5 (May 2006); U.S. Forest Serv., *Proposed Land Management Plan: Idaho Panhandle National Forests* 3-6 (May 2006); U.S. Forest Serv., *Draft Environmental Impact Statement:*

*Myrtle Creek Healthy Forests Restoration Act Project* (May 2006); U.S. Forest Serv.,

*Environmental Assessment: Quartz-Cottonwood Road Project* 61 (Aug. 2005).

53.    It is likely that the 2004 BiOp will also serve as guidance in the U.S. Forest

Service's proposed Rising Cougar Project, a project with the dual goals of maintaining and

restoring natural disturbance regimes to a region of the Idaho Panhandle National Forests and

managing motorized access and road densities for the benefit of grizzly bear.

54.    Thus, it is clear that the 2004 BiOp has exceeded the purpose for which it was

drafted, and will continue to be utilized in future Forest Service projects, to the detriment of

Plaintiffs and their members.

## FIRST CLAIM FOR RELIEF
### Violation of Section 7 of the ESA

55.    Plaintiffs incorporate the allegations in paragraphs 1–54 as if fully set forth

herein.

56.    The APA authorizes courts reviewing agency action to hold unlawful and set

aside final agency action, findings, and conclusions that are arbitrary and capricious, an abuse of

discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  Biological opinions

issued pursuant to Section 7 of the ESA are reviewed under this provision of the APA.  *Bennett*

*v. Spear*, 520 U.S. 154, 175 (1997).

57.    The ESA is to "provide a means whereby the ecosystems upon which endangered

species and threatened species depend may be conserved, [and] provide a program for the

conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  To this

end, the ESA requires Defendants protect such species by listing them as either "threatened" or

"endangered."  *Id.* § 1533.

12

58.     In order to effectuate the purposes of the ESA, federal agencies are required to engage in consultation with the FWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . . determined . . . to be critical." 16 U.S.C. § 1536(a)(2). This consultation is known as Section 7 consultation.

59.     The ESA defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). Likewise, a threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

60.     The statutory definition of "species" includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16). Thus, the ESA expressly provides that a DPS may be listed separately; the listed DPS may then constitute a separate species for purposes of Section 7 consultation.

61.     Under Section 7 consultation, a federal agency proposing an action that "may affect" a listed species, including the grizzly bear, must prepare and provide the FWS a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). For those actions that may adversely affect a species, the FWS must review all information provided by the action agency, as well as any other relevant information, to determine whether the proposed action is likely to jeopardize a listed species or destroy or adversely modify its designated critical habitat. 50 C.F.R. § 402.14(h)(3).

62.     At the completion of the Section 7 consultation process, the FWS issues a BiOp that determines if the proposed agency action is likely to jeopardize the species' continued

survival and/or is likely to adversely modify the species' critical habitat.  16 U.S.C.
§ 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

63.    The ESA and its implementing regulations do not provide that jeopardy
determinations may be based upon anything less than the entirety of a listed species.

64.    In fact, FWS regulations expressly provide that jeopardy determinations are to be
based on whether the continued existence of a <u>listed species</u> is likely to be jeopardized.
50 C.F.R. § 402.12(h)(3) (2005) ("The Biological Opinion shall include . . . [t]he Service's
opinion on whether the action is likely to jeopardize the continued existence of a <u>listed species</u>
. . .; or, the action is not likely to jeopardize the continued existence of a <u>listed species</u> . . ..")
(both emphasis added).

65.    The FWS violated the requirements of Section 7 of the ESA and its implementing
regulations by failing to base its jeopardy determination on the entirety of the listed species in its
2004 BiOp.

66.    Therefore, the FWS's 2004 BiOp is (a) arbitrary, capricious, an abuse of
discretion, and otherwise not in accordance with law; (b) contrary to constitutional right, power,
privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of
statutory rights; and/or (d) without observance of procedure required by law.  5 U.S.C.
§§ 701–706.

67.    Plaintiffs have suffered "legal wrong" and were "adversely affected" and/or
"aggrieved" by the FWS's issuance of the 2004 BiOp.

68.    The FWS's issuance of the 2004 BiOp was "final agency action for which there is
no other adequate remedy in a court."

**SECOND CLAIM FOR RELIEF**
**Violation of Section 4 of the ESA**

69.     Plaintiffs incorporate the allegations in paragraphs 1–68 as if fully set forth

herein.

70.     To be afforded protections under the ESA, a species or DPS must be designated,

after public notice and opportunity to comment, as threatened or endangered, in accordance with

Section 4 of the ESA.  16 U.S.C. § 1533.

71.     Section 4 of the ESA requires that the Secretary publish in the Federal Register,

not less than 90 days before the effective date of the final rule, a "general notice and the

complete text" of the proposed rule designating a species as threatened or endangered.  *Id.*

§ 1533(b)(5)(A).

72.     Moreover, the ESA expressly requires the Secretary to follow the procedures

outlined in the APA.  *Id.* § 1533(b)(4) ("Except as provided in paragraphs (5) and (6) of this

subsection [16 U.S.C. § 1533(b)], the provisions of section 553 of Title 5 (relating to rulemaking

procedures), shall apply to any regulation promulgated to carry out the purposes of this

chapter.").

73.     The APA provides:

>      After notice required by this section, the agency shall give interested persons an
> opportunity to participate in the rule making through submission of written data,
> views, or arguments with or without opportunity for oral presentation.  After
> consideration of the relevant matter presented, the agency shall incorporate in the
> rules adopted a concise general statement of their basis and purpose.

5 U.S.C. § 553(c).

74.     Without providing the public notice or an opportunity to comment, and without

following the procedures required by the ESA and the APA, the FWS created *de facto* DPSs for

the grizzly bear when it issued the 1986 Memorandum.  1986 Memorandum at 2–3.

75.     Creation of *de facto* DPSs through issuance of the 1986 Memorandum violated Section 4 of the ESA and its implementing regulations and the APA.

76.     The FWS's unlawful practice of using *de facto* DPSs as the basis for jeopardy opinions was continued with the issuance of the Consultation Handbook.  Consultation Handbook at 4-36.

77.     Accordingly, the FWS's 1986 Memorandum and the 1998 Consultation Handbook are (a) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights; and/or (d) without observance of procedure required by law.  5 U.S.C. §§ 701–706.

78.     As evidenced by the 2004 BiOp, the FWS continues to use *de facto* DPSs of grizzly bear as the basis for its Section 7 consultations.

79.     Plaintiffs have suffered "legal wrong" and were "adversely affected" and/or "aggrieved" by the FWS's continued use of *de facto* DPSs as the basis for Section 7 consultations.

80.     The FWS's issuance of the 2004 BiOp, which was based upon *de facto* DPSs of grizzly bear, was "final agency action for which there is no other adequate remedy in a court."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that the FWS has violated Section 7 of the ESA and its implementing regulations by basing its jeopardy determination on less than the entirety of the listed species of grizzly bear in the 2004 BiOp;

2.      Hold unlawful and set aside the 2004 BiOp, order the FWS to notify the Forest

Service that the 2004 BiOp was held unlawful, and order the FWS to reinitiate consultation with

the Forest Service in order to prepare a lawful BiOp for actions in and around grizzly bear

habitat;

3.      Declare that the FWS has violated Section 4 of the ESA, its implementing

regulations, and the APA by creating *de facto* DPSs without following the procedure required by

the ESA and the APA;

4.      Enjoin Defendants from using unlisted subpopulations of species as a basis for

jeopardy determinations resulting from either formal or informal Section 7 consultation;

5.      Award Plaintiffs their reasonable fees, costs, expenses, and disbursements,

including attorneys' fees, associated with this litigation in accordance with law, including the

Equal Access to Justice Act, 28 U.S.C. § 2412, and the Endangered Species Act, 16 U.S.C.

§ 1540(g)(4);

6.      Award Plaintiffs such further relief as this Court deems just and equitable.

DATED this 12th day of April 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.

/s/ William Perry Pendley
William Perry Pendley, Esq. (D.C. Bar No. 378906)
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)

Attorneys for Plaintiffs

**MOUNTAIN
STATES
LEGAL
FOUNDATION**

2596 South Lewis Way
Lakewood, Colorado 80227
303-292-2021 • FAX 303-292-1980
www.mountainstateslegal.org

August 15, 2006

The Honorable Dirk Kempthorne
Secretary of the Interior
1849 C Street, NW
Washington, D.C. 20240

VIA CERTIFIED MAIL
# 7004 2510 0006 1985 8024
RETURN RECEIPT REQUESTED

Mr. H. Dale Hall
Director
U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, D.C. 20240

VIA CERTIFIED MAIL
# 7004 2510 0006 1985 8031
RETURN RECEIPT REQUESTED

Mr. David B. Allen
Regional Director
U.S. Fish and Wildlife Service, Pacific Region
911 NE 11th Avenue
Portland, Oregon 97232

VIA CERTIFIED MAIL
# 7004 2510 0006 1985 8048
RETURN RECEIPT REQUESTED

Mr. Ralph O. Morgenweck
Regional Director
U.S. Fish and Wildlife Service, Mountain-Prairie Region
134 Union Boulevard
Lakewood, Colorado 80228

VIA CERTIFIED MAIL
# 7004 2510 0006 1985 8055
RETURN RECEIPT REQUESTED

Re:    Notice of Intent to Sue Under 16 U.S.C. § 1540(g)(2)(A);
       *Biological Opinion for the Kootenai, Idaho Panhandle, and Lolo National
       Forests Land and Resource Management Plans Amendment for Motorized
       Access within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones*

Dear Secretary Kempthorne:

    Pursuant to 16 U.S.C. § 1540(g)(2)(A), the Secretary of Interior and the United States
Fish and Wildlife Service (FWS) are hereby notified that the Biological Opinion for the
Kootenai, Idaho Panhandle, and Lolo National Forests Land and Resource Management Plans
Amendment for Motorized Access within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery
Zones (FWS Ref. 1-9-02-F-148) (Feb. 9, 2004) (the "2004 BiOp") violates the Endangered
Species Act (ESA) because the FWS used subpopulations of grizzly bear, which are not listed as



PLAINTIFF'S
EXHIBIT

Secretary Kempthorne
August 15, 2006
Page 2 of 7

threatened or endangered under the Endangered Species Act ("ESA"), as the basis for its
jeopardy determination.

The BiOp served as the basis for the Kootenai, Idaho Panhandle, and Lolo National
Forests Land and Resource Management Plans Amendment for Motorized Access within the
Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones and is incorporated by reference into the
proposed Revised Land and Resource Management Plans for the Kootenai and Idaho Panhandle
National Forests. Further, the BiOp has been incorporated into other land management planning
documents beyond those for which it was specifically drafted, including the Quartz-Cottonwood
Road Project Environmental Assessment, *United States Forest Service* (Aug. 2005) and the
Myrtle Creek Healthy Forests Restoration Project Draft Environmental Impact Statement, *United
States Forest Service* (May 2006). Additionally, it is likely that the BiOp will also be used as
guidance in the environmental planning of the Rising Cougar Project proposed by the Forest
Service in the Idaho Panhandle National Forests.

Because the underlying BiOp is in violation of the ESA, it must be withdrawn and cannot
be utilized as guidance in these or any other projects proposed by the Forest Service or any other
agency. Should the FWS not choose to withdraw the BiOp, Communities for a Great Northwest
and Mountain States Legal Foundation will take legal action not less than 60 days from the date
of your receipt of this letter.

## IDENTITY AND INTEREST OF COMMUNITIES FOR A GREAT NORTHWEST

Communities for a Great Northwest ("CGNW") is a non-profit natural resource education
and information association headquartered in Libby, Montana. Its members live throughout the
Inland Northwest and engage in activities within the national forest lands including, fishing,
hunting, hiking, camping, timber harvesting, fuelwood gathering, mining, berry picking,
sightseeing, finding and enjoying solitude, and wildlife viewing. Roads, trails, and pathways in
national forest lands provide access for CGNW members to engage in these activities. CGNW
and its members have worked with federal land management agencies and local governments to
develop management plans for national forests within the Inland Northwest, including the
Kootenai and Idaho Panhandle National Forests. As a result, CGNW and its members have
expended tremendous monetary and human resources to ensure the proper management of these
national forests.

## IDENTITY AND INTEREST OF MOUNTAIN STATES LEGAL FOUNDATION

Mountain States Legal Foundation ("MSLF") is a voluntary, non-profit, public interest
legal foundation with its principal place of business in Lakewood, Colorado. MSLF is dedicated
to individual liberty, the right to own and use property, limited and ethical government, and the
free enterprise system. It has members who live and work throughout the United States,
particularly the American West, including the States of Washington, Idaho, Montana, and
Wyoming. MSLF and its members are interested in and affected adversely by the manner in
which the ESA is implemented by federal agencies and the construction of that statute by the
courts. MSLF members include ranchers, miners, oil and gas producers, timbermen, farmers,

Secretary Kempthorne
August 15, 2006
Page 3 of 7

and property owners who live on and/or earn a living from the public and private lands that grizzly bear inhabit.

## BACKGROUND

In 1975, the FWS listed the grizzly bear (*Ursus arctos horribilis*) as a threatened species in the contiguous 48 states pursuant to section 4 of the ESA. 40 *Fed. Reg.* 31,734 (July 28, 1975) (codified at 50 C.F.R. § 17.32 (1975), 50 C.F.R. § 17.11 (2005)). The listing determination identified three ecosystems in which grizzly bear most often occur: the Selway-Bitterroot Ecosystem, the Bob Marshall Ecosystem, and the Yellowstone Ecosystem. *Id.* at 31,734–735. Although these three ecosystems were identified, the FWS did not designate them as recovery units or list them as Distinct Population Segments (DPS). *Id.*

In 1976, the FWS issued a notice of proposed rulemaking to designate four areas as critical habitat. 41 *Fed. Reg.* 48,757 (Nov. 5, 1976). However, no final regulation designating critical habitat was issued and critical habitat remains undesignated. 50 C.F.R. § 17.11.

A Grizzly Bear Recovery Plan was developed and issued in 1982; subsequently, it was revised in 1993. Both the 1982 and 1993 Plans identify six subpopulations of grizzly: the Yellowstone, the Northern Continental Divide, the Cabinet-Yaak, the Selkirk, the Selway-Bitterroot, and the North Cascades. However, none of these subpopulations has ever been listed as a Distinct Population Segment under section 4 of the ESA. While the 1982 Recovery Plan only provided recovery criteria for three subpopulations, the Yellowstone, Northern Continental Divide, and Cabinet-Yaak, the 1993 plan revised the recovery criteria to include recovery goals and objectives for all six subpopulations. Further, in 1986, the Interagency Grizzly Bear Committee issued its guidelines in order to provide a unified federal structure for agencies managing public lands in which grizzly bear occur. These guidelines also recognize the six subpopulations identified in the Recovery Plans.

Additionally, the 1993 Recovery Plan provides that "Grizzly bear populations may be listed, recovered, and delisted separately." 1993 Recovery Plan at 17. For any such change, public notice and comment and publication of a final rule in the Federal Register would be required. *Id.* This does not mean that each grizzly bear subpopulation is a properly listed DPS, however. This provision merely acknowledges that the FWS may delist a subpopulation by designating it as a DPS in accordance with section 4 of the ESA and then delisting that properly listed DPS. In fact, although no DPS has ever been designated, this policy has been implemented on several occasions.[1]

---

[1] *E.g.*, U.S. Fish & Wildlife Serv., *Designating the Greater Yellowstone Ecosystem Population of Grizzly Bear as a Distinct Population Segment; Removing the Yellowstone Distinct Population Segment of Grizzly Bear from the Federal List of Endangered and Threatened Wildlife*, 70 *Fed. Reg.* 69,854 (Nov. 17, 2005); U.S. Fish & Wildlife Serv., *12-month Finding on Petitions to Change the Status of the Grizzly Bear Populations in the Selkirk Area of Idaho and Washington and the Cabinet-Yaak Area of Montana and Idaho from Threatened to Endangered*,

Secretary Kempthorne
August 15, 2006
Page 4 of 7

In 1986, FWS Director Wallenstrom issued a memorandum entitled "Jeopardy Standard Under the Endangered Species Act" which provided guidance to all Regional Directors that subpopulations of nine listed species,[2] which were not themselves listed as DPSs, were to be used instead of the entire listed species or population. Memorandum from Director Wallenstrom to Regional Directors (Mar. 3, 1986) (hereinafter "1986 Memorandum"). The FWS did not publish this memorandum, did not provide the public notice or opportunity for comment, and did not provide legal justification for its identification of the nine species to be afforded this unprecedented treatment.

In a 1979 memorandum, former FWS Director Greenwalt reminded agency personnel that "jeopardy opinions should be rendered only when the proposed activity/action/program, along with cumulative effects, will jeopardize the continued existence of the entire listed species or listed population. Jeopardy opinions cannot be used for individuals or populations unless the loss of such will jeopardize the listed species or listed population throughout its range." 1986 Memo 1 (quoting April 26, 1979, memorandum from Director Greenwalt) (emphasis added).

Although the ESA requires the use of the entire listed species when the FWS makes its jeopardy determinations and then-existing FWS policy required the same, the 1986 Memorandum cited no authority for its departure from this rule. Instead, the FWS simply stated: "[I]t is our intent to allow a limited exception to the established jeopardy standard to more adequately protect certain wide-ranging species for which the application of the standard is problematical." Id. at 2. The 1986 Memorandum continued:

The species must be composed of discrete population segments that can be dealt with separately when assessing the impact of a given Federal action. Ideally, the identification of these segments is supported by a Service document, i.e., separate recovery plan, recovery objectives that relate to subpopulations, recognition of separate taxonomic status or geographic isolation, etc. It would not be required,

---

64 Fed. Reg. 26,725 (May 17, 1999); U.S. Fish & Wildlife Serv., Notice of Finding on a Petition to Change the Status of the Grizzly Bear Population in the Northern Continental Divide Ecosystem from Threatened to Endangered, 59 Fed. Reg. 46,611 (Sept. 9, 1994); U.S. Fish & Wildlife Serv., Notice of Finding on a Petition to Delist the Grizzly Bear in the Northern Continental Divide Ecosystem, the Cabinet-Yaak Ecosystem, the Selkirk Ecosystem, and the North Cascades Ecosystem, 58 Fed. Reg. 43,856 (Aug. 18, 1993); U.S. Fish & Wildlife Serv., Findings on Petitions To Change the Status of Grizzly Bear Populations in the Cabinet-Yaak Area of Montana and the Selkirk Mountains of Idaho and Washington from Threatened to Endangered, 58 Fed. Reg. 8250 (Feb. 12, 1993); U.S. Fish & Wildlife Serv., Finding on Petition to Reclassify the Grizzly Bear in the North Cascades Area as Endangered, 55 Fed. Reg. 32,103 (Aug. 7, 1990).

[2] Those species include: bald eagle, peregrine falcon, grizzly bear, red-cockaded woodpecker, brown pelican, sea turtles in United States waters, United States populations of ocelot and jaguarundi, and piping plover. 1986 Memorandum at 3–4.

however, that the species actually be listed on the basis of such population categories.

*Id.* at 2–3. The Memorandum then designated, *inter alia,* the six subpopulations of grizzly bear identified in the Recovery Plans for this extra-statutory treatment.

Section 7 of the ESA requires that each federal agency "shall, in consultation with and with the assistance of the Secretary [of the Interior or of Commerce], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species . . .." 16 U.S.C. § 1536(a)(2). The ESA defines an endangered species as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Likewise, a threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Moreover, the statutory definition of "species" includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). Thus, the ESA expressly provides that a DPS may be listed separately; the listed DPS may then constitute a separate species for purposes of jeopardy determinations.

Nowhere does the ESA or its implementing regulations provide that jeopardy determinations may be made on anything less than the totality of a listed species. In fact, FWS regulations expressly provide that jeopardy determinations are to be based on whether the continued existence of a listed species is likely to be jeopardized. 50 C.F.R. § 402.12(h)(3) (2005) ("The Biological Opinion shall include . . . [t]he Service's opinion on whether the action is likely to jeopardize the continued existence of a <u>listed species</u> . . .; or, the action is not likely to jeopardize the continued existence of a <u>listed species</u> . . ..") (emphasis added). Accordingly, the 1986 Memorandum is in violation of sections 4 and 7 of the ESA and the regulations promulgated thereunder and must be withdrawn.[3]

---

[3] Further, the 1986 Memorandum far exceeds the "interpretive rule" exception to the Administrative Procedure Act's (APA's) requirements of public notice and opportunity to comment; therefore, it is also in violation of the APA. Because the 1986 Memorandum purports to change the legal analysis provided by the FWS in its jeopardy determinations for nine species, the FWS should have provided notice and opportunity for public comment, as required by the APA. 5 U.S.C. § 553. While the APA provides an exception to notice and comment for "interpretive rules," *Id.*, because the 1986 Memorandum effects a change in existing policy, changes the legal regime under which jeopardy determinations are made, and has the force and effect of law, it cannot be an "interpretive rule." *Reno-Sparks Indian Colony v. Envtl. Prot. Agency,* 336 F.3d 899 (9th Cir. 2003); *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners,* 267 F.3d 128 (2d Cir. 2001); *Appalachian Power Co. v. Envtl. Prot. Agency,* 208 F.3d 1015 (D.C. Cir. 2000); *Davidson v. Glickman,* 169 F.3d 996 (5th Cir. 1999). Therefore, the public should have been provided notice and the opportunity to comment, as required by the APA.

## THE 2004 BIOLOGICAL OPINION

At the request of the U.S. Forest Service, the FWS issued a biological opinion regarding the Forest Service's proposed Forest Plan amendments for motorized access within the Selkirk and Cabinet-Yaak ecosystems. U.S. Fish & Wildlife Serv., *Biological Opinion on the Proposed Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo National Forests* (Feb. 9, 2004). The BiOp determined that implementation of the proposed amendments was not likely to jeopardize the continued existence of the grizzly bear, among other federally listed species, and provided an incidental take statement with reasonable and prudent measures and terms and conditions to minimize incidental take of the grizzly bear. *Id.*

In the BiOp, the FWS provided individual analyses for the Selkirk and Cabinet-Yaak subpopulations of grizzly bear. *See, e.g.*, 2004 BiOp 32–62. Moreover, the BiOp expressly based its jeopardy opinion on the proposed action's potential impact to the Selkirk and Cabinet-Yaak subpopulations, individually. *Id.* at 125–127. The FWS did not base the BiOp on the proposed actions' potential impacts to the species as listed, *i.e.*, to the entire grizzly bear population in the contiguous 48 states, as required by the ESA. Likewise, the Incidental Take Statement provided in the BiOp also provides standards based upon the Selkirk and Cabinet-Yaak subpopulations. Therefore, for the reasons outlined in the discussion of the 1986 Memorandum provided above, the BiOp and its attendant Incidental Take Statement are in violation of the ESA and must be withdrawn.

Moreover, the BiOp has been extended beyond the project for which it was drafted; therefore, its withdrawal is necessary to prevent the BiOp from serving as guidance in other federal land management agency planning documents. *See, e.g.*, U.S. Forest Serv., *Proposed Land Management Plan: Kootenai National Forest* 3-5 (May 2006); U.S. Forest Serv., *Proposed Land Management Plan: Idaho Panhandle National Forests* 3-6 (May 2006); U.S. Forest Serv., *Draft Environmental Impact Statement: Myrtle Creek Healthy Forests Restoration Act Project* (May 2006); U.S. Forest Serv., *Environmental Assessment: Quartz-Cottonwood Road Project* 61 (Aug. 2005). Additionally, the BiOp is being used currently as a basis from which to challenge a necessary Forest Service timber project in *Alliance for the Wild Rockies v. Kimbell*, No. 06-CV-192 (E.D. Wash.). Moreover, it is likely that the BiOp will also serve as guidance in the U.S. Forest Service's proposed Rising Cougar Project, a project with the dual goals of maintaining and restoring natural disturbance regimes to a region of the Idaho Panhandle National Forests and managing motorized access and road densities for the benefit of grizzly bear. Thus, it is clear that the BiOp has far exceeded the purpose for which it was drafted, and will continue to be utilized in future Forest Service projects. Therefore, the BiOp must be withdrawn to prevent its continued use.

## CONCLUSION

The use of unlisted subpopulations of grizzly bear to make jeopardy determinations is in violation of sections 4 and 7 of the ESA and the regulations promulgated thereunder. Accordingly, the FWS must withdraw the 2004 BiOp and discontinue the practice of using these

Secretary Kempthorne
August 15, 2006
Page 7 of 7

subpopulations as the basis for jeopardy determinations. Should the FWS opt to not withdraw
the 2004 BiOp and instead continue the use of subpopulations in jeopardy determinations,
Communities for a Great Northwest and Mountain States Legal Foundation will file suit in
federal court seeking declaratory and injunctive relief, as well as costs and attorneys' fees
pursuant to the ESA and the Equal Access to Justice Act.

Sincerely,

MOUNTAIN STATES LEGAL FOUNDATION

Ronald W. Opsahl
Staff Attorney

**Card 1 (top left):**

SENDER: COMPLETE THIS SECTION
- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Hon. Dirk Kempthorne
Sec. Interior
1849 C Street, NW
Washington D.C.
20240

2. Article Number (Transfer from service label)
7004 2510 0006 1985 8024

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

COMPLETE THIS SECTION ON DELIVERY
- A. Signature ☑ Agent ☐ Addressee
- B. Received by (Printed Name)  David C. Shaw  C. Date of Delivery 8/24/06
- D. Is delivery address different from item 1? ☐ Yes ☐ No
- 3. Service Type ☑ Certified Mail ☐ Express Mail ☐ Registered ☐ Return Receipt for Merchandise ☐ Insured Mail ☐ C.O.D.
- 4. Restricted Delivery? (Extra Fee) ☐ Yes

**Card 2 (top right):**

SENDER: COMPLETE THIS SECTION
- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Ralph Morgenweck
Regional Director
USFWS
134 Union Blvd
Lakewood CO
80228

2. Article Number (Transfer from service label)
7004 2510 0006 1985 8055

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

COMPLETE THIS SECTION ON DELIVERY
- A. Signature ☐ Agent ☐ Addressee
- B. Received by (Printed Name) Toni Miller  C. Date of Delivery 8/23/06
- D. Is delivery address different from item 1? ☐ Yes ☐ No
- 3. Service Type ☐ Certified Mail ☐ Express Mail ☐ Registered ☐ Return Receipt for Merchandise ☐ Insured Mail ☐ C.O.D.
- 4. Restricted Delivery? (Extra Fee) ☐ Yes

**Card 3 (bottom left):**

SENDER: COMPLETE THIS SECTION
- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

H. Dale Hall
Director, USFWS
1849 C Street NW
Washington DC
20240

2. Article Number (Transfer from service label)
7004 2510 0006 1985 8031

COMPLETE THIS SECTION ON DELIVERY
- A. Signature ☑ Agent ☐ Addressee
- B. Received by (Printed Name) A. Curry  C. Date of Delivery 8/21/06
- D. Is delivery address different from item 1? ☐ Yes ☐ No
- 3. Service Type ☑ Certified Mail ☐ Express Mail ☐ Registered ☐ Return Receipt for Merchandise ☐ Insured Mail ☐ C.O.D.
- 4. Restricted Delivery? (Extra Fee) ☐ Yes

**Card 4 (bottom right):**

SENDER: COMPLETE THIS SECTION
- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

David Allen
Regional Director
Pacific Region
US FWS
911 NE 11th Avenue
Portland OR 97232

2. Article Number (Transfer from service label)
7004 2510 0006 1985 8048

COMPLETE THIS SECTION ON DELIVERY
- A. Signature ☐ Agent ☐ Addressee
- B. Received by (Printed Name)  C. Date of Delivery 8/10/06
- D. Is delivery address different from item 1? ☐ Yes ☐ No
- 3. Service Type ☑ Certified Mail ☐ Express Mail ☐ Registered ☐ Return Receipt for Merchandise ☐ Insured Mail ☐ C.O.D.
- 4. Restricted Delivery? (Extra Fee) ☐ Yes