Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST and MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) | **MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

COMES NOW, Plaintiffs, by and through their attorneys, hereby move for summary judgment, pursuant to Federal Rules of Civil Procedure Rule 56 and the rules of this Court, because there is no genuine issue as to any material fact and because Plaintiffs are entitled to a judgment as a matter of law. Support for this Motion is in: 1) Plaintiffs' Memorandum of Point and Authorities in Support of Plaintiffs' Motion for Summary Judgment; and 2) Plaintiffs' Statement of Undisputed Facts, both of which are filed concurrently herewith. Plaintiffs reserve the right to submit additional evidence that may be relevant to these issues in further support of this motion or in any further proceeding before this Court.

WHEREFORE, Plaintiffs respectfully request that summary judgment be entered in their favor.

DATED this 13th day of June 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION


/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 13th day of June 2007, I filed the attached Motion for Summary Judgment electronically through the CM/ECF system, which caused the following to be served by electronic means:

Joseph H. Kim, Esq.
James A. Maysonett, Esq.
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 7397
Washington, D.C. 20044
(202) 305-0207
(202) 305-0275 (facsimile)
joseph.kim@usdoj.gov

Timothy J. Preso, Esq.
Douglas L. Honnold, Esq.
Jenny K. Harbine, Esq.
Earthjustice
209 South Willson Avenue
Bozeman, Montana 59715
(406) 586-6999
(406) 586-9695 (facsimile)
tpreso@earthjustice.org

Jason Rylander, Esq.
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (facsimile)
jrylander@defenders.org

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorney for Plaintiffs

Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST and MOUNTAIN STATES LEGAL FOUNDATION, | ) ) ) | Case No. 1:06-CV-01842-RCL |
| Plaintiffs, | ) ) ) | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................. 1

LEGAL BACKGROUND ...................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

SUMMARY OF ARGUMENT ............................................................................... 8

ARGUMENT ................................................................................................... 10

    I.     Scope of Review ........................................................................... 10

    II.    Jurisdiction................................................................................... 11

        A.    Plaintiffs Have Provided Defendants with Notice of Intent to Sue, in Accordance with the Citizen Suits Provision of the ESA.. 11

        B.    Plaintiffs Have Standing to Challenge the 2004 BiOp .......... 11

            1.    Plaintiffs Satisfy Article III's "Case or Controversy" Requirement................................................................... 12

                a.    Plaintiffs Have Suffered an Injury In Fact..... 12

                b.    Plaintiffs' Injuries Are Fairly Traceable to Defendants' Unlawful BiOp and Their Injuries Would Be Redressed by a Favorable Decision in this Case...................................... 14

            2.    Plaintiffs Satisfy the "Zone-of-Interests" Test.......... 15

        C.    Despite the Purported Withdrawal of the 2004 BiOp, This Case Is Not Moot, as the Voluntary Cessation of a Challenged Action Moots a Case Only if it Is Absolutely Clear that the Violation Could Not Reasonably Be Expected to Recur ....................... 16

    III.    The 2004 BiOp Violates Section 7 of the ESA................................. 18

    IV.    The 2004 BiOp Violates Section 4 of the ESA................................. 20

CONCLUSION................................................................................................ 21

CERTIFICATE OF SERVICE ............................................................................... 22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adarand Constructors, Inc. v. Slater*,
528 U.S. 216 (2000) (*per curiam*) ............................................................ 16, 17

*Ass'n of Data Processing Service Orgs., Inc. v. Camp*,
397 U.S. 150 (1970) ................................................................................ 15

\* *Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................ passim

*Cabinet Resources Group v. United States Fish and Wildlife Service*,
No. 04-CV-236-M-DWM (Dec. 13, 2006) ............................................. 8, 18

*Camp v. Pitts*,
411 U.S. 138 (1972) ................................................................................ 10

*City of Mesquite v. Aladdin's Castle, Inc.*,
455 U.S. 283 (1982) ................................................................................ 16

\* *Friends of Earth, Inc. v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000) ................................................................................ 16, 17

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................ 11, 12, 14

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ................................................................................ 15

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................................................................................. 10

*United States v. Concentrated Phosphate Export Ass'n, Inc.*,
393 U.S. 199 (1968) ................................................................................ 17

*United States v. W.T. Grant Co.*,
345 U.S. 629 (1953) ................................................................................ 16

*Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*,
454 U.S. 464 (1982) ................................................................................ 11

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................ 11

*Yerger v. Robertson*,
981 F.2d 460 (9th Cir. 1992) .................................................................. 10

**Page**

**Statutes**

5 U.S.C. §§ 551 *et seq.*................................................................................ 10

5 U.S.C. § 553(c) ....................................................................................... 20

5 U.S.C. § 706 ..................................................................................... 10, 20, 21

5 U.S.C. § 706(2)(A) .................................................................................... 1

16 U.S.C. § 1531(b) .................................................................................... 1

16 U.S.C. § 1532(6) .................................................................................... 2

16 U.S.C. § 1532(16) ................................................................................ 2, 18

16 U.S.C. § 1532(20) .................................................................................. 2

\*  16 U.S.C. § 1533 .................................................................................. 1, 9, 20

16 U.S.C. § 1533(b)(4) .............................................................................. 20

16 U.S.C. § 1533(b)(5)(A) .......................................................................... 20

16 U.S.C. § 1533(c) .................................................................................. 19

\*  16 U.S.C. § 1536 ................................................................................. 1, 9, 18

16 U.S.C. § 1536(a)(2) ............................................................................ 2, 18

16 U.S.C. § 1536(b)(3)(A) .......................................................................... 3

16 U.S.C. § 1540(g)(1)(C) .......................................................................... 15

16 U.S.C. § 1540(g)(2) .............................................................................. 11

**Rules and Regulations**
50 C.F.R. § 17.11 ..................................................................................... 3, 19

50 C.F.R. § 402.14(a) ................................................................................. 2

50 C.F.R. § 402.14(h)(3) ......................................................................... 2, 3, 19

**Other Authorities**
Letter from Paul Bradford, Forest Supervisor, Kootenai National Forest
(Apr. 16, 2007)........................................................................................ 8, 17

Letter from Susan Martin, Supervisor, Upper Columbia Fish and Wildlife Office
(May 17, 2007)........................................................................................ 8, 17

**Page**

\*    Memorandum from Director Greenwalt (Apr. 26, 1979) ........................................... 4

\*    Memorandum from Director Wallenstrom to Regional Directors
(Mar. 3, 1986) ................................................................................... 3, 4, 9

U.S. Fish & Wildlife Serv., *Biological Opinion on the Proposed Forest Plan
Amendments for Motorized Access Management within the Selkirk and Cabinet-
Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo
National Forests* (Feb. 9, 2004) ......................................................... 1, 6, 19, 20

U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Jan. 29, 1982) ................ 3

U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Sept. 10, 1993) .............. 4

\*    U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species
Consultation Handbook (Mar. 1998) ...................................................... passim

U.S. Forest Serv., *Draft Environmental Impact Statement: Myrtle Creek Healthy
Forests Restoration Act Project* (May 2006) .............................................. 8

U.S. Forest Serv., *Environmental Assessment: Quartz-Cottonwood Road Project*
(Aug. 2005) ........................................................................................ 8

U.S. Forest Serv., *Proposed Land Management Plan: Idaho Panhandle National
Forests* (May 2006) ............................................................................... 8

U.S. Forest Serv., *Proposed Land Management Plan: Kootenai National Forest*
(May 2006) ......................................................................................... 7

U.S. Forest Serv., *Record of Decision: Forest Plan Amendments for Motorized
Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery
Zones* (Mar. 2004) ............................................................................... 7

40 *Fed. Reg.* 31,734 (July 28, 1975) .......................................................... 3

41 *Fed. Reg.* 48,757 (Nov. 5, 1976) ........................................................... 3

59 *Fed. Reg.* 65,781 (Dec. 21, 1994) .......................................................... 5

60 *Fed. Reg.* 8729 (Feb. 15, 1995) ............................................................ 5

64 *Fed. Reg.* 31,285 (June 10, 1999) .......................................................... 5

## INTRODUCTION

Plaintiffs, Communities for a Great Northwest ("CGNW") and Mountain States Legal Foundation ("MSLF"), seek judicial review of a biological opinion ("BiOp") issued by the United States Fish and Wildlife Service ("FWS") on February 9, 2004, following consultation with the United States Forest Service ("Forest Service") under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536.  The biological opinion addressed the purported effects of motorized access within the Kootenai, Idaho Panhandle, and Lolo National Forests of Montana and Idaho.  U.S. Fish & Wildlife Serv., *Biological Opinion on the Proposed Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo National Forests* (Feb. 9, 2004) (the "2004 BiOp").  Specifically, the 2004 BiOp evaluated the purported potential impacts of motorized access on the Selkirk and Cabinet-Yaak subpopulations of the grizzly bear (*Ursus arctos horribilis*); however, it did not address the purported potential impacts on the recovery of the listed species as a whole.  Because the 2004 BiOp failed to consider the listed species as a whole, as required by the ESA and the FWS's own internal guidance, Plaintiffs seek a declaration that the 2004 BiOp violates the ESA and, as such, is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## LEGAL BACKGROUND

The ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  To this end, the ESA requires Defendants to protect such species by listing them as either "threatened" or "endangered."  *Id*. § 1533.  In order to effectuate the purposes of the ESA, federal agencies are

required to engage in "consultation" with the FWS to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of habitat of such species . . . determined . . . to be critical." 16 U.S.C. § 1536(a)(2). This consultation is known as "Section 7 consultation."

The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). Likewise, a "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The statutory definition of "species" includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). Thus, the ESA expressly provides that a distinct population segment ("DPS") may be listed as an "endangered species" or "threatened species." Once properly listed, the DPS then constitutes a legally recognized "species" for purposes of Section 7 consultation.

Under Section 7 consultation, a federal agency proposing an action that "may affect" a listed species, including the grizzly bear, must prepare and provide the FWS a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). For those actions that may adversely affect a species, the FWS must review all information provided by the action agency, as well as any other relevant information, to determine whether the proposed action is likely to jeopardize a listed species or destroy or adversely modify its designated critical habitat. 50 C.F.R. § 402.14(h)(3).

At the completion of the Section 7 consultation process, the FWS issues a BiOp that determines if the proposed agency action is likely to jeopardize the species' continued survival

and/or is likely to adversely modify the species' critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

## FACTUAL BACKGROUND

In 1975, the FWS listed the grizzly bear as a threatened species in the contiguous 48 states pursuant to Section 4 of the ESA.  40 *Fed. Reg.* 31,734 (July 28, 1975).  The listing determination identified three ecosystems in which grizzly bear most often occur:  the Selway-Bitterroot Ecosystem, the Bob Marshall Ecosystem, and the Yellowstone Ecosystem.  *Id.* at 31,734–735.  Although these three ecosystems were identified, the FWS did not designate them as recovery units or list the grizzly bear there as DPSs.  *Id.*  In 1976, the FWS issued a notice of proposed rulemaking to designate four areas as critical habitat for the grizzly bear, 41 *Fed. Reg.* 48,757 (Nov. 5, 1976); however, no final regulation designating critical habitat was issued and critical habitat remains undesignated.  50 C.F.R. § 17.11.  In 1982, a Grizzly Bear Recovery Plan was issued.  U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Jan. 29, 1982) (the "1982 Recovery Plan").  The 1982 Recovery Plan identified recovery goals for the Yellowstone, Northern Continental Divide, Cabinet-Yaak, and Selkirk, Selway-Bitterroot, North Cascades subpopulations.  *Id.* at 31–103.  The 1982 Recovery Plan did not identify these subpopulations of grizzly bear as DPSs.

In 1986, FWS Director Wallenstrom issued a memorandum entitled "Jeopardy Standard Under the Endangered Species Act."  Memorandum from Director Wallenstrom to Regional Directors 1 (Mar. 3, 1986) (hereinafter "1986 Memorandum").  The 1986 Memorandum provided guidance to all Regional Directors that subpopulations of grizzly bear, which were not themselves listed as DPSs, were to be used in making jeopardy determinations during Section 7 consultations instead of the listed species as a whole.  *Id.*  The FWS did not publish the 1986

Memorandum, did not provide the public notice or opportunity for comment, and did not provide legal justification for its identification of the nine species to be afforded this unprecedented treatment. Defendants' Answer to Plaintiffs' First Amended Complaint, Doc. No. 32, at ¶ 26; 1986 Memorandum. In fact, the 1986 Memorandum directly conflicted with then-existing agency guidance, which provided:

> [J]eopardy opinions should be rendered only when the proposed activity/action/program, along with cumulative effects, will jeopardize the continued existence of the entire listed species or listed population. <u>Jeopardy opinions cannot be used for individuals or populations unless the loss of such will jeopardize the listed species or listed population throughout its range</u>.

1986 Memorandum at 1 (*quoting* Memorandum from Director Greenwalt (Apr. 26, 1979)) (emphasis added).

Although the ESA requires the use of the entire listed species when the FWS makes its jeopardy determinations, *i.e.*, during Section 7 consultations, and then-existing FWS policy required the same, the 1986 Memorandum cited no authority for its departure from this rule. Instead, the FWS simply stated "[I]t is our intent to allow a limited exception to the established jeopardy standard to more adequately protect certain wide-ranging species for which the application of the standard is problematical." *Id*. at 2. The 1986 Memorandum continued:

> The species must be composed of discrete population segments that can be dealt with separately when assessing the impact of a given Federal action. Ideally, the identification of these segments is supported by a Service document, *i.e.*, separate recovery plan, recovery objectives that relate to subpopulations, recognition of separate taxonomic status or geographic isolation, etc. It would not be required, however, that the species actually be listed on the basis of such population categories.

*Id*. at 2–3. The Memorandum then designated, *inter alia*, the six subpopulations of grizzly bear identified in the Recovery Plans for this extra-statutory treatment. *Id.* at 3.

In 1993, the FWS revised its Grizzly Bear Recovery Plan. U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Sept. 10, 1993). Both the 1982 and 1993 Plans identify and

provide recovery criteria for six subpopulations of grizzly:  the Yellowstone, the Northern

Continental Divide, the Cabinet-Yaak, the Selkirk, the Selway-Bitterroot, and the North

Cascades.  *Id.*  None of these subpopulations, however, has ever been listed as a DPS under

Section 4 of the ESA.  Moreover, the 1993 Recovery Plan expressly provides that "Grizzly bear

populations may be listed, recovered, and delisted separately."  1993 Recovery Plan at 17.  For

any such change, public notice and comment and publication of a final rule in the Federal

Register is required.  *Id*.

In 1998, the FWS, in conjunction with the National Marine Fisheries Service, issued an

"Endangered Species Consultation Handbook" ("Consultation Handbook").  U.S. Fish &

Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook*

(Mar. 1998).  The Consultation Handbook was released for public comment on or about

December 21, 1994.  59 *Fed. Reg.* 65,781 (Dec. 21, 1994).  Public comments were accepted until

at least April 7, 1995.  60 *Fed. Reg.* 8729 (Feb. 15, 1995).  On June 10, 1999, the FWS issued a

Notice of Availability of the final version of the Consultation Handbook.  64 *Fed. Reg.* 31,285

(June 10, 1999).  The Notice of Availability contained no discussion of the use of unlisted

subpopulations during Section 7 consultations.

The Consultation Handbook provides:

> In the past, exceptions from applying the jeopardy standard to an entire species
> were granted by memorandum for specific populations or "recovery units" of a
> species.  That process of limiting the exceptions to those populations/recovery
> units listed in a memo is hereby discontinued and all future exceptions will adhere
> to the following guidance.

Consultation Handbook at 4-36.  As relevant to the instant case, the Consultation Handbook

further provides:

> Jeopardy analyses may be based on an assessment of impacts to distinct
> population segments (DPS) of a species documented per the Services' joint policy
> on DPS (1995) in a final listing rule . . . or to recovery units when those units are

documented as necessary to both the survival and recovery of the species in a final recovery plan(s), for which a notice of availability has been published in the Federal Register.  For species which had recovery plan notices published prior to this guidance, an addendum to the recovery plan, documenting the need to evaluate jeopardy on separate recovery units, can be written, and notice of its availability should be published in the Federal Register.

*Id.*

The FWS has not published an addendum to the 1993 Recovery Plan documenting the "need to evaluate jeopardy on separate recovery units," as provided for in the Consultation Handbook.  *Id.*  Further, the FWS has not published a notice in the Federal Register identifying grizzly bear for this extra-statutory treatment.

In 2004, at the request of the Forest Service, the FWS issued a biological opinion regarding the Forest Service's proposed Forest Plan amendments for motorized access within the Selkirk and Cabinet-Yaak ecosystems.  *See* 2004 BiOp.  The 2004 BiOp determined that implementation of the proposed amendments was not likely to jeopardize the continued existence of the grizzly bear, among other federally listed species, and provided an Incidental Take Statement with reasonable and prudent measures and terms and conditions to minimize incidental take of the grizzly bear.  *Id*.  In the 2004 BiOp, the FWS provided individual analyses for the Selkirk and Cabinet-Yaak subpopulations of grizzly bear.  *Id.* at 32–62.  Moreover, the 2004 BiOp expressly based its jeopardy opinion on the proposed action's potential impact to the Selkirk and Cabinet-Yaak subpopulations, individually.  *Id*. at 125–127.  Thus, the FWS did not base the 2004 BiOp on the proposed actions' potential impacts to the species as listed, *i.e.*, to the entire grizzly bear population in the contiguous 48 states, as required by the ESA.

The Consultation Handbook requires, "[w]hen using this type of analysis [*i.e.*, jeopardy opinions based on unlisted subpopulations], include in the biological opinion a description of how the action affects not only the recovery unit's capability, but the relationship of the recovery

unit to both the survival and recovery of the listed species as a whole." Consultation Handbook at 4-36. The 2004 BiOp did not include a description of "how the action affects not only the recovery unit's capability, but the relationship of the recovery unit to both the survival and recovery of the listed species as a whole." Likewise, the Incidental Take Statement provided in the 2004 BiOp also provides standards based upon the Selkirk and Cabinet-Yaak subpopulations, without any analysis of how the action would relate to the survival and recovery of the species as a whole.

Based upon the 2004 BiOp and its Reasonable and Prudent Alternatives and Incidental Take Statement, the Forest Service imposed severe restrictions on motorized access on the Kootenai, Idaho Panhandle, and Lolo National Forests. U.S. Forest Serv., *Record of Decision: Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones*, at ROD-12 (Mar. 2004) ("The requirements [of the 2004 BiOp] affect approximately 1.1 million acres of National Forest System lands . . ..").  Among these restrictions were provisions to reduce the total open or restricted use roads by 544 miles, which would close more than 32,000 acres to motorized access. *Id.* at ROD-22, ROD-39. These motorized access restrictions have significant and negative affects on Plaintiffs' members' lawful use of these national forests, such as recreation, timber harvesting, grazing, mining, *etc*.

Moreover, the 2004 BiOp has been extended beyond the project for which it was drafted. The 2004 BiOp served as the basis for the Kootenai, Idaho Panhandle, and Lolo National Forests Land and Resource Management Plans Amendment for Motorized Access within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones and is incorporated by reference into the proposed Revised Land and Resource Management Plans for the Kootenai and Idaho Panhandle National Forests. U.S. Forest Serv., *Proposed Land Management Plan: Kootenai National Forest* 3-5

7

(May 2006); U.S. Forest Serv., *Proposed Land Management Plan: Idaho Panhandle National Forests* 3-6 (May 2006). Further, the 2004 BiOp has been incorporated into other land management planning documents beyond those for which it was drafted, including the Quartz-Cottonwood Road Project Environmental Assessment and the Myrtle Creek Healthy Forests Restoration Project Draft Environmental Impact Statement. U.S. Forest Serv., *Draft Environmental Impact Statement: Myrtle Creek Healthy Forests Restoration Act Project* (May 2006); U.S. Forest Serv., *Environmental Assessment: Quartz-Cottonwood Road Project* 61 (Aug. 2005).

On April 16, 2007, the Forest Supervisor of the Kootenai National Forest informed the FWS of his intention to prepare a supplemental environmental analysis in response to the United States District Court for the District of Montana's decision in *Cabinet Resources Group v. United States Fish and Wildlife Service*, No. 04-CV-236-M-DWM (Dec. 13, 2006). Letter from Paul Bradford, Forest Supervisor, Kootenai National Forest (Apr. 16, 2007). Apparently, the Forest Supervisors of the Lolo or Idaho Panhandle National Forests have not joined the Kootenai National Forest's decision to prepare a supplemental environmental analysis. As a result of the letter from the Kootenai Forest Supervisor, on May 17, 2007, the FWS, apparently voluntarily, withdrew the 2004 BiOp, at least inasmuch as the BiOp pertained to the Kootenai National Forest. Letter from Susan Martin, Supervisor, Upper Columbia Fish and Wildlife Office (May 17, 2007).

## SUMMARY OF ARGUMENT

Plaintiffs are challenging the FWS's use of non-listed subpopulations of grizzly bear during consultations pursuant to Section 7 of the ESA. The ESA requires Section 7 consultations to be based on the impacts to the entire listed species, not merely one, informally designated

subpopulation.  16 U.S.C. § 1536.  Moreover, a species may not be listed without a regulation promulgated in accordance with ESA requirements.  *Id.* § 1533.  Thus, if a subpopulation is not listed formally as threatened or endangered, it may not be considered a separate "species" for purposes of the ESA and may not serve as the basis for Section 7 consultations.  *Id.* § 1536.  As a result, the FWS must examine impacts to the entire population of grizzly bear in the contiguous states when rendering jeopardy opinions.

In 1986, the then-Director of the FWS established an informal policy that non-listed subpopulations of grizzly bear, among other species, were to be utilized as the basis for Section 7 consultations.  1986 Memorandum.  The Director did not provide legal justification for this policy, nor did he provide the public notice and an opportunity to comment on the new policy.  *Id.*; Defendants' Answer to Plaintiffs' First Amended Complaint, Doc. No. 32, at ¶ 26.  This policy continued unchecked until 1998, when the FWS issued its Consultation Handbook.  In the Handbook, the FWS stated that the use of non-listed subpopulations during Section 7 consultations was to be discontinued, with limited exceptions.  Consultation Handbook at 4-36.  Despite this guidance, the FWS continues to utilize non-listed populations of grizzly bear during ESA consultations.

In 2004, the FWS issued the 2004 BiOp relating to motorized access in the Lolo, Kootenai, and Idaho Panhandle National Forests.  2004 BiOp.  As its basis for analysis, the 2004 BiOp utilized two non-listed subpopulations of grizzly bear and did not attempt to evaluate the effects of the proposed management plan on the entirety of the listed grizzly bear population.  *Id.* As a result, the 2004 BiOp is in violation of Section 7 of the ESA, because it is based upon populations of bear that were never listed pursuant to Section 4 of the Act.  Accordingly, the 2004 BiOp must be set aside as unlawful.

Further, with the 1986 Memorandum and the 1998 Consultation Handbook, the FWS has continually authorized the practice of using non-listed subpopulations of endangered or threatened species during Section 7 consultations.  The practical effect of this policy is to create *de facto* DPSs of endangered or threatened species without observance of the rulemaking requirements of the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*. Thus, this policy violates Section 4 of the ESA, which requires that DPSs be designated only after public notice and an opportunity to comment and then by issuing a rule in the Federal Register.  Accordingly, this Court should enjoin Defendants from utilizing any non-listed subpopulation of an endangered or threatened species during its Section 7 consultations.

## ARGUMENT

### I.     Scope of Review.

Because the ESA does not provide its own standard of review, biological opinions issued pursuant to Section 7 are reviewed under the provisions of the APA.  *Bennett v. Spear*, 520 U.S. 154, 175 (1997).  The APA authorizes courts reviewing agency action to hold unlawful and set aside final agency action, findings, and conclusions that are (a) arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory rights; and/or (d) without observance of procedure required by law.  5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1972).  In reviewing agency action, this Court examines whether the agency considered all relevant factors and articulated a rational connection between the facts found and the choice made.  *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Yerger v. Robertson*, 981 F.2d 460, 463 (9th Cir. 1992).

II.    **Jurisdiction.**

A.    **Plaintiffs Have Provided Defendants with Notice of Intent to Sue, in Accordance with the Citizen Suits Provision of the ESA.**

The ESA requires, before any action be commenced, that prospective plaintiffs provide the Secretary of the Interior and any alleged violator of the ESA written notice of their intent to sue.  16 U.S.C. § 1540(g)(2).  This notice is required at least 60 days prior to the commencement of any action.  *Id.*  Here, Plaintiffs provided the statutorily required written notice of intent to sue by letter dated August 15, 2006, and sent via certified mail.  Plaintiffs' First Amended Complaint, Doc. No. 31, at ¶ 9.  All Defendants received this notice by August 23, 2006.  *Id.* After the expiration of the 60th day, Plaintiffs initiated the instant action on October 25, 2006.  *Id.*  Thus, Plaintiffs have satisfied the ESA's jurisdictional requirement of providing 60 days notice of intent to sue.  *See* 16 U.S.C. § 1540(g)(2).

B.    **Plaintiffs Have Standing to Challenge the 2004 BiOp.**

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To satisfy the "case or controversy" requirement of Article III, which is the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992).  In addition to the immutable requirements of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing."  *Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474–475 (1982).  "Like their constitutional counterparts, these judicially self-imposed limits on the exercise of federal jurisdiction are founded in concern about the proper—and properly

limited—role of the courts in a democratic society; but, unlike their constitutional counterparts, they can be modified or abrogated by Congress." *Bennett*, 520 U.S. at 162 (internal quotations and citations omitted). Among these prudential requirements is the doctrine that a "plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Id.*

> 1.    **Plaintiffs Satisfy Article III's "Case or Controversy" Requirement.**
>
> > a.    **Plaintiffs Have Suffered an Injury In Fact.**

The first "irreducible" element of standing is that of injury in fact. *Defenders of Wildlife*, 504 U.S. at 560. To show an injury in fact, a plaintiff "must set forth, by affidavit or other evidence specific facts," which for the purposes of the summary judgment will be taken to be true, that establish "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560–561. Through the declarations filed herewith, Plaintiffs have satisfied both prongs of the injury in fact test.

Plaintiff CGNW is a non-profit, natural resources education and information association headquartered in Libby, Montana. Plaintiffs' Statement of Undisputed Facts ("PSOF") ¶ 40. Its members live throughout the Inland Northwest and engage in both recreational and economic activities within the national forests including, fishing, hunting, hiking, camping, timber harvesting, fuelwood gathering, mining, berry picking, sightseeing, finding and enjoying solitude, and wildlife viewing. *Id.* ¶ 41. Roads, trails, and pathways within national forest lands provide access for CGNW members to engage in these activities. *Id.* ¶ 42. Moreover, CGNW and its members have worked with federal land management agencies and local governments to develop management plans for national forests within the Inland Northwest, including the Kootenai and Idaho Panhandle National Forests. *Id.* ¶ 43. As a result, CGNW and its members

have expended tremendous monetary and human resources to ensure the proper management of the national forests affected by the 2004 BiOp. *Id.* ¶ 44.

Plaintiff MSLF is a voluntary, non-profit, public interest legal foundation with its principal place of business in Lakewood, Colorado. *Id.* ¶ 45. MSLF is dedicated to individual liberty, the right to own and use property, limited and ethical government, and the free enterprise system. *Id.* ¶ 46. It has members who live and work throughout the United States, particularly the American West, including the States of Washington, Idaho, Montana, and Wyoming. *Id.* ¶ 47. MSLF and its members are interested in and adversely affected by the manner in which the ESA is implemented by federal agencies and the interpretation of that statute by the courts. *Id.* ¶ 48. MSLF members include ranchers, miners, oil and gas producers, timbermen, farmers, and property owners who live on and/or earn a living from the public and private lands that grizzly bears may inhabit, and that are affected by the 2004 BiOp and the Forest Service's subsequent implementation of its road access plan. *Id.* ¶ 49.

Plaintiffs' members spend time in areas adversely affected by the FWS's violations of the ESA. *Id.* ¶ 50. Plaintiffs' members intend to continue to use and enjoy, in both their economic and recreational pursuits, on a frequent, regular, and ongoing basis the lands adversely affected by the agency actions challenged in this suit. *Id.* ¶ 51. Moreover, Plaintiffs' members expect the FWS to comply fully with all provisions of the ESA, including the Section 4 listing procedures and the Section 7 consultation requirements. *Id.* ¶ 52. Thus, the FWS's failure to issue a lawful BiOp based upon the properly listed population of threatened grizzly bear has adversely affected Plaintiffs' members' recreational and educational interests. *Id.* ¶ 53. These adverse affects will continue unless the relief requested is granted. *Id.* ¶ 54. These are actual, concrete injuries

caused by Defendants' failure to comply with mandatory duties under the ESA and APA. *Id.* ¶ 55.

> **b.**    **Plaintiffs' Injuries Are Fairly Traceable to Defendants' Unlawful BiOp and Their Injuries Would Be Redressed by a Favorable Decision in this Case.**

In addition to an injury in fact, a plaintiff must also show a causal connection between the injury and the conduct complained of—that is, the injury must be "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560 (internal quotation and citation omitted). Further, a plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–561 (internal quotation omitted). Here, Plaintiffs met both remaining requirements for standing.

In *Bennett*, a case that challenged a BiOp issued pursuant to Section 7 of the ESA, the Supreme Court noted, "while the Service's Biological Opinion theoretically serves an 'advisory function,' in reality it has a powerful coercive effect on the action agency." *Bennett*, 502 U.S. at 169. Moreover, "[a] Biological Opinion of the sort rendered here alters the legal regime to which the action agency is subject." *Id.* at 169. "The Service itself is, to put it mildly, keenly aware of the virtually determinative effect of its biological opinions." *Id.* at 170. Although the Government argued that it was the action agency's actions, not those of the FWS, that would cause the *Bennett* plaintiffs' injuries, the Court held that, because of the highly determinative effect of a BiOp, the injuries claimed were fairly traceable to the FWS's issuance of the BiOp, and would be redressed should the BiOp be set aside. *Id.* at 169–171.

In the instant case, Plaintiffs' injuries to their economic and recreational interests are fairly traceable to FWS's issuance of the 2004 BiOp and the FWS's continued use of non-listed subpopulations of grizzly bear during Section 7 consultation. *See id.* Accordingly, a favorable

outcome in this case, in which the Court sets aside the 2004 BiOp and enjoins Defendants from

using non-listed subpopulations during consultations, would redress Plaintiffs' injuries. Thus,

the elements of causation and redressability are satisfied and Plaintiffs have standing to pursue

their claims.

### 2.    Plaintiffs Satisfy the "Zone-of-Interests" Test.

To satisfy the "zone-of-interests" test, a plaintiff must show that the interest he seeks to

protect is "arguably within the zone of interests to be protected or regulated by the statute or

constitutional guarantee in question." *Ass'n of Data Processing Service Orgs., Inc. v. Camp*,

397 U.S. 150, 153 (1970). With the Citizen Suits provision of the ESA, 16 U.S.C.

§ 1540(g)(1)(C), however, Congress abrogated the zone-of-interests test insofar as a violation of

Section 4 of the ESA is alleged. *Bennett*, 520 U.S. at 172. Although *Bennett* held the test

abrogated when a violation of Section 4 is alleged, the test must still be met to support challenges

to Section 7 of the ESA, 16 U.S.C. § 1536, when those challenges are made under the auspices

of the APA. *Bennett*, 520 U.S. at 174. Thus, Plaintiffs in this case must satisfy the zone-of-

interests test to pursue their Section 7 claim; this test does not apply to their Section 4 claim.

In determining whether a plaintiff has standing under the zone-of-interests test to bring an

APA claim, the Court looks "not to the terms of the ESA's citizen suit provision, but to the

substantive provisions of the ESA, the alleged violations of which serve as the gravamen of the

complaint." *Id.* at 175 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990)).

"Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of

the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in

question (here, species preservation), but by reference to the particular provision of law upon

which the plaintiff relies." *Id.* at 175–176 (quoting *Data Processing*, 397 U.S. at 153).

15

Plaintiffs have concrete recreational interests in the lands that are regulated by the 2004 BiOp. PSOF ¶ 55. Moreover, Plaintiffs have significant economic interests in those lands. PSOF ¶¶ 41, 49, 51. In *Bennett*, the Supreme Court held that, while the ESA's primary objective is species preservation, "another objective (if not indeed the primary one) is to avoid the needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett*, 520 U.S. at 176–177 (referring to the zone of interests of Section 7 of the ESA, specifically). Thus, the Court held that injuries to economic interests plainly fell within the zone of interests of the ESA. *Id.* Accordingly, as illustrated above, Plaintiffs have shown that their economic and recreational interests fall within the zone of interests of Section 7 of the ESA.

> **C.     Despite the Purported Withdrawal of the 2004 BiOp, This Case Is Not Moot, as the Voluntary Cessation of a Challenged Action Moots a Case Only if it Is Absolutely Clear that the Violation Could Not Reasonably Be Expected to Recur.**

A defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the legality of the practice. *Friends of Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000); *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221–222 (2000) (*per curiam*); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot[,] . . . [because a] controversy . . . remain[s] to be settled in such circumstances, . . . *e.g.*, a dispute over the legality of the challenged practices."). "If it did, courts would be compelled to leave the defendant free to return to its old ways." *Laidlaw Envtl. Servs.*, 528 U.S. at 189. "Thus, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent." *Id.* Indeed, "[v]oluntary cessation of challenged

conduct moots a case . . . only if it is '*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Adarand*, 528 U.S. at 222 (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968) (emphasis in original). Moreover, the "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again *lies with the party asserting mootness*." *Adarand*, 528 U.S. at 222 (citing *Laidlaw Envtl. Servs.*, 528 U.S. at 189; *Concentrated Phosphate*, 393 U.S. at 203) (internal quotation omitted) (emphasis in original).

There are no assurances that the FWS could give that would meet its heavy burden to show that the use of non-listed subpopulations of grizzly bear during Section 7 consultations would not continue. Since their listing, the FWS has continuously and routinely utilized subpopulations as the basis for its Section 7 consultations. Between 1986 and 1998, this practice continued under the "authority" of the 1986 Memorandum issued by FWS Director Wallenstrom. Despite the apparent "discontinuation" of this policy in the 1998 Consultation Handbook, the FWS continued utilizing non-listed subpopulations of grizzly bear. *See* Consultation Handbook 4-36. As the 2004 BiOp demonstrates, it is clear that this policy continues today.

Moreover, the FWS only withdrew the 2004 BiOp in response to the Forest Service's notice that it would reinitiate consultation during its preparation of a supplemental environmental analysis, which, itself, was in response to an adverse court ruling in the District of Montana. Bradford Letter, *supra*; Martin Letter, *supra*. The apparent reason for the Forest Service's decision to supplement its environmental analysis was not a purported defect in the 2004 BiOp, rather it was because of a flaw in the Forest Service's National Environmental Policy Act ("NEPA") analysis. Bradford Letter, *supra*. Thus, there are no indications that the instant challenge to the BiOp played any role whatsoever in the FWS's decision to withdraw the BiOp.

17

In fact, there are no indications that the result of this "new" consultation would be any less restrictive upon Plaintiffs' access. To the contrary, it is a virtual certainty that the reissued BiOp will be at least as restrictive, if not more so, as the reason for withdrawal was a lawsuit that challenged the BiOp was not protective enough. *See*, *Cabinet Resources Group v. United States Fish and Wildlife Service*, No. 04-CV-236-M-DWM, Order (Dec. 13, 2006). In a case such as this, where the challenged action was voluntarily withdrawn, not in response to the instant challenge but in response to a completely different lawsuit that shares no claims with the instant suit, the FWS's withdrawal cannot moot Plaintiffs' suit.

Additionally, there are no indications that the other National Forests for which the BiOp was prepared, *i.e.*, the Lolo and Idaho Panhandle National Forests, intend to reinitiate consultation. Thus, the 2004 BiOp was not withdrawn as far as it applies to these forests. Accordingly, even if the voluntarily withdrawal of the BiOp for the Kootenai National Forest rendered Plaintiffs' challenges moot, it cannot moot their case insofar as it challenges the application of the 2004 BiOp to the Lolo and Idaho Panhandle National Forests.

## III.    The 2004 BiOp Violates Section 7 of the ESA.

The ESA and its implementing regulations provide that jeopardy determinations may only be based upon a listed species. Section 7 of the ESA requires that Federal agency action not "jeopardize the continued existence of any endangered <u>species</u> or threatened <u>species</u>." 16 U.S.C. § 1536(a)(2) (emphasis added). The ESA defines "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). The definition of "species" does not include subpopulations as units to be treated separately. *Id.* Likewise, Section 7 does not include subpopulations as units to be afforded separate treatment, unless those units are designated as DPSs. *Id.* § 1536. Moreover, FWS regulations expressly provide that jeopardy determinations

are to be based on whether the continued existence of a listed <u>species</u> is likely to be jeopardized.

50 C.F.R. § 402.12(h)(3) ("The Biological Opinion shall include . . . [t]he Service's opinion on

whether the action is likely to jeopardize the continued existence of a listed <u>species</u> . . .; or, the

action is not likely to jeopardize the continued existence of a listed <u>species</u> . . ..") (both emphasis

added).

　　　Pursuant to the ESA, all endangered or threatened species are to be placed upon the list of

endangered or threatened species published in FWS regulations.  50 C.F.R. 17.11.  All "species"

of endangered or threatened wildlife and plants, as that term is defined by the ESA, are listed in

this regulation.  16 U.S.C. § 1533(c).  The list of endangered or threatened wildlife and plants

includes two "species" of grizzly bear:  (1) the contiguous United States, except were listed as an

experimental population are listed as "threatened"; and (2) a population that resides in portions

of Idaho and Montana are listed as "experimental."  50 C.F.R. § 17.11.  No other "species" of

grizzly bear are listed.  *Id.*[1]

　　　The 2004 BiOp evaluated the potential effects of the Forest Service's proposed Forest

Plan amendments for motorized access upon the Selkirk and Cabinet-Yaak sub-populations of

grizzly bear only and did not consider any impact to the entirety of the listed "species," *i.e.*, the

grizzly bear in the contiguous United States.  2004 BiOp at 32–63, 100–112, 122–124, 125–127,

128–132, 133–140.  Thus, the FWS violated the requirements of Section 7 of the ESA and its

implementing regulations by failing to base its jeopardy determination on the listed "species" in

its 2004 BiOp.  Therefore, the FWS's 2004 BiOp must be set aside as (a) arbitrary, capricious, an

abuse of discretion, and otherwise not in accordance with law; (b) contrary to constitutional

right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or

---

[1] The list contains, as an endangered species, the Mexican grizzly bear.  50 C.F.R. § 17.11.  That "species," however, only exists in Mexico and is not relevant to the case at bar.

limitations, or short of statutory rights; and/or (d) without observance of procedure required by law.  5 U.S.C. § 706.

**IV.     The 2004 BiOp Violates Section 4 of the Endangered Species Act.**

To be afforded protections under the ESA, a "species," including a DPS, must be designated, after public notice and opportunity to comment, as threatened or endangered, in accordance with Section 4 of the ESA.  16 U.S.C. § 1533.  Section 4 requires that the Secretary publish in the Federal Register, not less than 90 days before the effective date of the final rule, a "general notice and the complete text" of the proposed rule designating a species as threatened or endangered.  *Id.* § 1533(b)(5)(A).  Moreover, the ESA expressly requires the Secretary to follow the procedures outlined in the APA.  *Id.* § 1533(b)(4) ("Except as provided in paragraphs (5) and (6) of this subsection [16 U.S.C. § 1533(b)], the provisions of section 553 of Title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.").

The APA provides:

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

5 U.S.C. § 553(c).

Without providing the public notice or an opportunity to comment, and without following the procedures required by the ESA or the APA, the FWS created *de facto* DPSs for the grizzly bear when it issued the 1986 Memorandum.  1986 Memorandum at 2–3.  This creation of these *de facto* DPSs through issuance of the 1986 Memorandum violated Section 4 of the ESA and its implementing regulations and the APA.  Moreover, the FWS's unlawful practice of using these *de facto* DPSs as the basis for jeopardy opinions was continued with the issuance of the

20

Consultation Handbook.  Consultation Handbook at 4-36.  Accordingly, the FWS's 1986

Memorandum and the 1998 Consultation Handbook must be set aside as (a) arbitrary, capricious,

an abuse of discretion, and otherwise not in accordance with law; (b) contrary to constitutional

right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or

limitations, or short of statutory rights; and/or (d) without observance of procedure required by

law.  5 U.S.C. § 706.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request this Court grant their Motion for

Summary Judgment.

DATED this 13th day of June 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION


/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)

Attorneys for Plaintiffs

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 13th day of June 2007, I filed the attached Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment electronically through the CM/ECF system, which caused the following to be served by electronic means:

Joseph H. Kim, Esq.
James A. Maysonett, Esq.
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 7397
Washington, D.C. 20044
(202) 305-0207
(202) 305-0275 (facsimile)
joseph.kim@usdoj.gov

Timothy J. Preso, Esq.
Douglas L. Honnold, Esq.
Jenny K. Harbine, Esq.
Earthjustice
209 South Willson Avenue
Bozeman, Montana 59715
(406) 586-6999
(406) 586-9695 (facsimile)
tpreso@earthjustice.org

Jason Rylander, Esq.
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (facsimile)
jrylander@defenders.org

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorney for Plaintiffs

Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMUNITIES FOR A GREAT NORTHWEST and MOUNTAIN STATES LEGAL FOUNDATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*<br><br>    Defendants. | Case No. 1:06-CV-01842-RCL<br><br>**PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS** |

Plaintiffs, by and through their attorneys, pursuant to LCvR 56.1, respectfully submit the following Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment.

1.    In 1975, the FWS listed the grizzly bear as a threatened species in the contiguous 48 states pursuant to Section 4 of the Endangered Species Act ("ESA").  40 *Fed. Reg.* 31,734 (July 28, 1975).

2.    The listing determination identified three ecosystems in which grizzly bear most often occur:  the Selway-Bitterroot Ecosystem, the Bob Marshall Ecosystem, and the Yellowstone Ecosystem.  *Id*. at 31,734–735.

3.      The FWS did not designate these three ecosystems as recovery units or list the grizzly bear there as Distinct Population Segments ("DPSs"), as that term is defined in the ESA. *Id*.

4.      In 1976, the FWS issued a notice of proposed rulemaking to designate four areas as critical habitat for the grizzly bear, 41 *Fed. Reg*. 48,757 (Nov. 5, 1976); however, no final regulation designating critical habitat was issued and critical habitat remains undesignated. 50 C.F.R. § 17.11.

5.      In 1982, a Grizzly Bear Recovery Plan was issued.  U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Jan. 29, 1982) (the "1982 Recovery Plan") (attached hereto as Exhibit 1).

6.      The 1982 Recovery Plan identified recovery goals for the Yellowstone, Northern Continental Divide, Cabinet-Yaak, and Selkirk, Selway-Bitterroot, North Cascades subpopulations.  *Id.* at 31–103.

7.      The 1982 Recovery Plan did not identify these subpopulations of grizzly bear as DPSs.

8.      In 1986, FWS Director Wallenstrom issued a memorandum entitled "Jeopardy Standard Under the Endangered Species Act."  Memorandum from Director Wallenstrom to Regional Directors 1 (Mar. 3, 1986) (hereinafter "1986 Memorandum") (attached hereto as Exhibit 2).

9.      The 1986 Memorandum provided guidance to all Regional Directors that, instead of the listed species as a whole, subpopulations of grizzly bear, which were not themselves listed as DPSs, were to be used in making jeopardy determinations during interagency consultation pursuant to Section 7 of the ESA ("Section 7 consultation").  *Id.*

10.    The FWS did not publish the 1986 Memorandum, did not provide the public notice or opportunity for comment, and did not provide legal justification for its identification of the nine species to be afforded this unprecedented treatment.  Defendants' Answer to Plaintiffs' First Amended Complaint, Doc. No. 32, at ¶ 26.

11.    The 1986 Memorandum directly conflicted with then-existing agency guidance, which provided:

> [J]eopardy opinions should be rendered only when the proposed activity/action/program, along with cumulative effects, will jeopardize the continued existence of the entire listed species or listed population.  Jeopardy opinions cannot be used for individuals or populations unless the loss of such will jeopardize the listed species or listed population throughout its range.

1986 Memorandum at 1 (*quoting* Memorandum from Director Greenwalt (Apr. 26, 1979)) (emphasis added).

12.    The 1986 Memorandum provided "[I]t is our intent to allow a limited exception to the established jeopardy standard to more adequately protect certain wide-ranging species for which the application of the standard is problematical."  *Id*. at 2.

13.    The 1986 Memorandum continued:

> The species must be composed of discrete population segments that can be dealt with separately when assessing the impact of a given Federal action.  Ideally, the identification of these segments is supported by a Service document, *i.e.*, separate recovery plan, recovery objectives that relate to subpopulations, recognition of separate taxonomic status or geographic isolation, etc.  It would not be required, however, that the species actually be listed on the basis of such population categories.

*Id*. at 2–3.

14.    The Memorandum designated, *inter alia*, six subpopulations of grizzly bear to server as the basis of analysis during Section 7 consultations.  *Id.* at 3.

3

15.     In 1993, the FWS revised its Grizzly Bear Recovery Plan.  U.S. Fish & Wildlife Serv., *Grizzly Bear Recovery Plan* (Sept. 10, 1993) (A.R. Doc. No. 398) (attached hereto as Exhibit 3).

16.     The 1993 Recovery Plan identifies and provides recovery criteria for six subpopulations of grizzly:  the Yellowstone, the Northern Continental Divide, the Cabinet-Yaak, the Selkirk, the Selway-Bitterroot, and the North Cascades.  *Id.*

17.     None of these subpopulations has ever been listed as a DPS under Section 4 of the ESA.  Defendants' Answer to Plaintiffs' First Amended Complaint ¶ 31.

18.     The 1993 Recovery Plan provides that "Grizzly bear populations may be listed, recovered, and delisted separately."  1993 Recovery Plan at 17.

19.     For any such change, public notice and comment and publication of a final rule in the Federal Register is required.  *Id*.

20.     In 1998, the FWS, in conjunction with the National Marine Fisheries Service, issued an "Endangered Species Consultation Handbook" ("Consultation Handbook").  U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* (Mar. 1998) (A.R. Doc. No. 417) (attached hereto as Exhibit 4).

21.     The Consultation Handbook was released for public comment on or about December 21, 1994.  59 *Fed. Reg.* 65,781 (Dec. 21, 1994).  Public comments were accepted until at least April 7, 1995.  60 *Fed. Reg.* 8729 (Feb. 15, 1995).

22.     On June 10, 1999, the FWS issued a Notice of Availability of the final version of the Consultation Handbook.  64 *Fed. Reg.* 31,285 (June 10, 1999).  The Notice of Availability contained no discussion of the use of unlisted subpopulations during Section 7 consultations.

23.     The Consultation Handbook provides:

In the past, exceptions from applying the jeopardy standard to an entire species were granted by memorandum for specific populations or "recovery units" of a species. That process of limiting the exceptions to those populations/recovery units listed in a memo is hereby discontinued and all future exceptions will adhere to the following guidance.

Consultation Handbook at 4-36.

24.     The Consultation Handbook further provides:

Jeopardy analyses may be based on an assessment of impacts to distinct population segments (DPS) of a species documented per the Services' joint policy on DPS (1995) in a final listing rule . . . or to recovery units when those units are documented as necessary to both the survival and recovery of the species in a final recovery plan(s), for which a notice of availability has been published in the Federal Register. For species which had recovery plan notices published prior to this guidance, an addendum to the recovery plan, documenting the need to evaluate jeopardy on separate recovery units, can be written, and notice of its availability should be published in the Federal Register.

*Id.*

25.     The FWS has not published an addendum to the 1993 Recovery Plan documenting the "need to evaluate jeopardy on separate recovery units," as provided for in the Consultation Handbook. *Id.*

26.     The FWS has not published a notice in the Federal Register providing that subpopulations of grizzly bear are to serve as the basis for Section 7 consultation.

27.     In 2004, at the request of the Forest Service, the FWS issued a biological opinion regarding the Forest Service's proposed Forest Plan amendments for motorized access within the Selkirk and Cabinet-Yaak ecosystems. U.S. Fish & Wildlife Serv., *Biological Opinion on the Proposed Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo National Forests* (Feb. 9, 2004) (the "2004 BiOp") (A.R. Doc. No. 001) (attached hereto as Exhibit 5).

28.    The 2004 BiOp determined that implementation of the proposed amendments was not likely to jeopardize the continued existence of the grizzly bear, among other federally listed species, and provided an Incidental Take Statement with reasonable and prudent measures and terms and conditions to minimize incidental take of the grizzly bear.  *Id*.

29.    In the 2004 BiOp, the FWS provided individual analyses for the Selkirk and Cabinet-Yaak subpopulations of grizzly bear.  *Id*. at 32–62.

30.    The 2004 BiOp expressly based its jeopardy opinion on the proposed action's potential impact to the Selkirk and Cabinet-Yaak subpopulations, individually.  *Id*. at 125–127.

31.    The FWS did not base the 2004 BiOp on the proposed actions' potential impacts to the species as listed, *i.e.*, to the entire grizzly bear population in the contiguous 48 states, as required by the ESA.

32.    The Consultation Handbook requires, "[w]hen using this type of analysis [*i.e.*, jeopardy opinions based on unlisted subpopulations], include in the biological opinion a description of how the action affects not only the recovery unit's capability, but the relationship of the recovery unit to both the survival and recovery of the listed species as a whole." Consultation Handbook at 4-26.

33.    The 2004 BiOp did not include a description of "how the action affects not only the recovery unit's capability, but the relationship of the recovery unit to both the survival and recovery of the listed species as a whole."

34.    Likewise, the Incidental Take Statement provided in the 2004 BiOp also provides standards based upon the Selkirk and Cabinet-Yaak subpopulations, without any analysis of how the action would relate to the survival and recovery of the species as a whole.

35.     Based upon the 2004 BiOp and its Reasonable and Prudent Alternatives and Incidental Take Statement, the Forest Service imposed severe restrictions on motorized access on the Kootenai, Idaho Panhandle, and Lolo National Forests.  U.S. Forest Serv., *Record of Decision: Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones*, at ROD-12 (Mar. 2004) ("The requirements [of the 2004 BiOp] affect approximately 1.1 million acres of National Forest System lands . . ..").

36.     Among these restrictions were provisions to reduce the total open or restricted use roads by 544 miles, which would close more than 32,000 acres to motorized access.  *Id.* at ROD-22, ROD-39.

37.     The 2004 BiOp has been extended beyond the project for which it was drafted. The 2004 BiOp served as the basis for the Kootenai, Idaho Panhandle, and Lolo National Forests Land and Resource Management Plans Amendment for Motorized Access within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones and is incorporated by reference into the proposed Revised Land and Resource Management Plans for the Kootenai and Idaho Panhandle National Forests.  U.S. Forest Serv., *Proposed Land Management Plan: Kootenai National Forest* 3-5 (May 2006); U.S. Forest Serv., *Proposed Land Management Plan: Idaho Panhandle National Forests* 3-6 (May 2006).  Further, the 2004 BiOp has been incorporated into other land management planning documents beyond those for which it was drafted, including the Quartz-Cottonwood Road Project Environmental Assessment and the Myrtle Creek Healthy Forests Restoration Project Draft Environmental Impact Statement.  U.S. Forest Serv., *Draft Environmental Impact Statement: Myrtle Creek Healthy Forests Restoration Act Project* (May 2006); U.S. Forest Serv., *Environmental Assessment: Quartz-Cottonwood Road Project* 61 (Aug. 2005).

38.     On April 16, 2007, the Forest Supervisor of the Kootenai National Forest informed the FWS of his intention to prepare a supplemental environmental analysis in response to the United States District Court for the District of Montana's decision in *Cabinet Resources Group v. United States Fish and Wildlife Service*, No. 04-CV-236-M-DWM (Dec. 13, 2006). Letter from Paul Bradford, Forest Supervisor, Kootenai National Forest (Apr. 16, 2007).

39.     On May 17, 2007, the FWS, apparently voluntarily, withdrew the 2004 BiOp, at least inasmuch as the BiOp pertained to the Kootenai National Forest.  Letter from Susan Martin, Supervisor, Upper Columbia Fish and Wildlife Office (May 17, 2007).

40.     Plaintiff Communities for a Great Northwest ("CGNW") is a non-profit, natural resources education and information association headquartered in Libby, Montana.  Declaration of Bruce Vincent ¶ 1 (attached hereto as Exhibit 6).

41.     CGNW's members live throughout the Inland Northwest and engage in both recreational and economic activities within the national forests including, fishing, hunting, hiking, camping, timber harvesting, fuelwood gathering, mining, berry picking, sightseeing, finding and enjoying solitude, and wildlife viewing.  Vincent Decl. at ¶ 2; Declaration of Charles Woods ¶¶ 4, 6 (attached hereto as Exhibit 7).

42.     Roads, trails, and pathways within national forest lands provide access for CGNW members to engage in these activities.  Vincent Decl. at ¶ 3; Woods Decl. at ¶ 4.

43.     CGNW and its members have worked with federal land management agencies and local governments to develop management plans for national forests within the Inland Northwest, including the Kootenai and Idaho Panhandle National Forests.  Vincent Decl. at ¶ 4; Woods Decl. at ¶ 3.

44.    CGNW and its members have expended tremendous monetary and human resources to ensure the proper management of the national forests affected by the 2004 BiOp. Vincent Decl. at ¶ 4; Woods Decl. at ¶ 3.

45.    Plaintiff Mountain States Legal Foundation ("MSLF") is a voluntary, non-profit, public interest legal foundation with its principal place of business in Lakewood, Colorado. Declaration of William Perry Pendley ¶ 1 (attached hereto as Exhibit 8).

46.    MSLF is dedicated to individual liberty, the right to own and use property, limited and ethical government, and the free enterprise system.  Pendley Decl. at ¶ 2.

47.    MSLF has members who live and work throughout the United States, particularly the American West, including the States of Washington, Idaho, Montana, and Wyoming. Pendley Decl. at ¶ 3; Woods Decl. at ¶¶ 1–2.

48.    MSLF and its members are interested in and affected adversely by the manner in which the ESA is implemented by federal agencies and the interpretation of that statute by the courts.  Pendley Decl. at ¶ 4.

49.    MSLF members include ranchers, miners, oil and gas producers, timbermen, farmers, and property owners who live on and/or earn a living from the public and private lands that grizzly bears may inhabit, and that are affected by the 2004 BiOp and the Forest Service's subsequent implementation of its road access plan.  Pendley Decl. at ¶ 5; Woods Decl. at ¶¶ 4, 6.

50.    Plaintiffs' members spend time in areas adversely affected by the FWS's violations of the ESA.  Vincent Decl. at ¶ 5; Pendley Decl. at ¶ 6; Woods Decl. at ¶¶ 4–6.

51.    Plaintiffs' members intend to continue to use and enjoy, in both their economic and recreational pursuits, on a frequent, regular, and ongoing basis the lands adversely affected

by the agency actions challenged in this suit.  Vincent Decl. at ¶ 6; Pendley Decl. at ¶ 7; Woods

Decl. at ¶ 4.

52.     Moreover, Plaintiffs' members expect the FWS to comply fully with all

provisions of the ESA, including the Section 4 listing procedures and the Section 7 consultation

requirements.  Vincent Decl. at ¶ 7; Pendley Decl. at ¶ 8.

53.     The FWS's failure to issue a lawful BiOp based upon the properly listed

population of threatened grizzly bear has adversely affected Plaintiffs' members' recreational

and educational interests.  Vincent Decl. at ¶ 7; Pendley Decl. at ¶ 8; Woods Decl. at ¶¶ 5–9.

54.     These adverse affects will continue unless the relief requested is granted.  Vincent

Decl. at ¶ 7; Pendley Decl. at ¶ 8; Woods Decl. at ¶ 9.

55.     These are actual, concrete injuries caused by Defendants' failure to comply with

mandatory duties under the ESA and APA.  Vincent Decl. at ¶ 7; Pendley Decl. at ¶ 8.

DATED this 13th day of June 2007.

Respectfully Submitted By:

MOUNTAIN STATES LEGAL FOUNDATION

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
William Perry Pendley, Esq. (D.C. Bar No. 378906)
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)

Attorneys for Plaintiffs

## INDEX OF EXHIBITS

Exhibit          Description

1.               U.S. Fish & Wildlife Serv., Grizzly Bear Recovery Plan (Jan. 29, 1982)

                 [Excerpts].

2.               Memorandum from Director Wallenstrom to Regional Directors 1 (Mar. 3, 1986).

3.               U.S. Fish & Wildlife Serv., Grizzly Bear Recovery Plan (Sept. 10, 1993) (A.R.

                 Doc. No. 398) [Excerpts].

4.               U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., Endangered Species

                 Consultation Handbook (Mar. 1998) (A.R. Doc. No. 417) [Excerpts].

5.               U.S. Fish & Wildlife Serv., Biological Opinion on the Proposed Forest Plan

                 Amendments for Motorized Access Management within the Selkirk and Cabinet-

                 Yaak Grizzly Bear Recovery Zones for the Kootenai, Idaho Panhandle, and Lolo

                 National Forests (Feb. 9, 2004) (the "2004 BiOp") (A.R. Doc. No. 001).

6.               Declaration of Bruce Vincent.

7.               Declaration of Charles Woods.

8.               Declaration of William Perry Pendley.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 13th day of June 2007, I filed the attached Plaintiffs'
Statement of Undisputed Facts electronically through the CM/ECF system, which caused the
following to be served by electronic means:

Joseph H. Kim, Esq.
James A. Maysonett, Esq.
Wildlife and Marine Resources Section
Benjamin Franklin Station, P.O. Box 7397
Washington, D.C. 20044
(202) 305-0207
(202) 305-0275 (facsimile)
joseph.kim@usdoj.gov

Timothy J. Preso, Esq.
Douglas L. Honnold, Esq.
Jenny K. Harbine, Esq.
Earthjustice
209 South Willson Avenue
Bozeman, Montana 59715
(406) 586-6999
(406) 586-9695 (facsimile)
tpreso@earthjustice.org

Jason Rylander, Esq.
Defenders of Wildlife
1130 17th Street NW
Washington, D.C. 20036
(202) 682-9400
(202) 682-1331 (facsimile)
jrylander@defenders.org

/s/ Ronald W. Opsahl
Ronald W. Opsahl, Esq.
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
(303) 292-1980 (facsimile)
ropsahl@mountainstateslegal.com

Attorney for Plaintiffs