well as land management activities have contributed to creating an unstable channel and lack of habitat complexity in the mainstem Lightning Creek (PBTTAT 1998b). The mainstem Lightning Creek is braided and has a high width-to-depth ratio (PBTTAT 1998b). Lightning Creek's road density is moderate at 1.1 mi/mi$^2$ and the ECA is 11 percent (meeting notes April 1-2, 2003). However, Cacek (1989 as cited in USFS 2002a) found that road and clearcutting activities resulted in 58 percent of the landslides and 75 percent of the total landslide volume within the basin.

East Fork Lightning Creek is the only "High" priority PBTTAT index stream in this watershed; however, spawning also occurs in a reduced capacity in other tributaries to Lightning Creek. Redd counts were conducted between 1983-1988 and 1992-2002 on Porcupine, Savage, Char, Wellington and Rattle Creeks. Those 5 streams averaged 92 redds (range 40-149) over the 5-year period of 1983-1988; however, those same 5 streams average 40 redds (range 21-171) over an 11-year period from 1992-2002; this represents a drop of 230 percent in the average number of redds for these 5 tributaries. East Fork Lightning Creek has seen similar drops. During the 8-year period between 1983-1990 bull trout redds averaged average 67 redds/year (range 8-132); however, during the 11-year period of 1992-2002 (sample wasn't conducted in 1991) the average number of redds dropped to 38 redds/year (range 3-64), a drop of 176 percent. East Fork Lightning Creek had 958 redds from 1983-2002 which was 8 of the redds in Lake Pend Oreille tributaries (Avista 2003b). Densities of bull trout were estimated in 1997 at 0.0061-0.0091 fish/ft. in the East Fork Lightning Creek (PBTTAT 1998b). Based upon Rieman and McIntyre's (1993) use of redd counts to estimate probability of persistence, the East Fork Lightning Creek has a low probability of persistence of 48 percent for the next 100 years.

Major threats to bull trout are excess bedload and the associated loss of pool habitat and channel complexity. Additionally, the lack of large woody debris and intermittent flow patterns also limit bull trout production. PBTTAT (1998b) concluded that roads are the major threat to the Lightning Creek watershed due to poor road construction (location and design) and the natural proneness of the watershed to mass-wasting events. The mainstem Lightning Creek, Porcupine Creek and the East Fork Lightning Creek are in the Scotchman BMU which is currently failing to meet standards and therefore may have activities associated with the proposed action occur within these watersheds. The remainder of the watershed is within the North Lightning BMU which is currently meeting standards (TMRD and Core) and therefore activities associated with the proposed action are not expected to occur within this watershed.

Bull Trout Status in Grouse Creek (170102140204)

Grouse Creek is a tributary to the Pack River and it drains a watershed of 32,352 acres (PBTTAT 1998b). The Forest Service manages the upper half of the watershed (USFS 2003). Approximately 46 percent of this watershed lies within the "Sensitive Snow Zone" which is the elevational range (2,500-4,500 feet) where rain-on-snow events are frequent resulting in flooding events (meeting notes April 1-2, 2003). This has resulted in channel braiding, infrequent pool habitat types and a higher width-depth ratio than was prior to the extensive logging and railroad activities in the early part of the 1900s; approximately 70 percent of the watershed had been

000101

cleared or burned by 1934 (PBTTAT 1998b). Riparian logging in the early 1900s reduced the potential for large woody debris recruitment and therefore pieces of large woody debris are limited in Grouse Creek (PBTTAT 1998b). The Forest Service rated this watershed as "Highly Degraded" (USFS 2003).

Grouse Creek is a "High" priority index stream for bull trout redd counts and has been surveyed every year since 1983 (PBTTAT 1998b). Over that 20-year period, Grouse Creek has totaled 736 redds and averaged 37 redds/year (range 0-108). The total number of redds in Grouse Creek accounts for 6 percent of the redds in Lake Pend Oreille tributaries over that period (Avista 2003b). Between 1983-1992, bull trout redds averaged 40 redds/year (range 2-108) in Grouse Creek; however, in the past 10-year period, 1993-2002, that average has dropped to 33 redds/year (range 0-77) (Avista 2003b).

Major threats and limiting factors to the bull trout persistence in Grouse Creek are: excessive bedload from past harvest activities, loss of habitat complexity through the denudation of large woody debris input, and unstable channels (PBTTAT 1998b). Due to these threats, the unstable channels, the lack of pool habitat and large woody debris and the high level of bedload, this watershed is FAR for an integration of the habitat and species indicators (USFS 2003). Specifically, with a road density of 1.6 mi/mi$^2$, including a riparian road density of 1.9 mi/mi$^2$, and a high ECA of 28 percent this watershed has been heavily impacted in the past and suffers from "legacy effects" (effects from a previous action lasting decades into the future) (USFS 2003, meeting notes April 1-2, 2003).

*Bull Trout Status in the Priest River Subbasin (Priest River and Priest Lake) (17010215)*

The Priest River watershed (633,600 acres) is generally north-south flowing and has its headwaters in British Columbia, Canada. It is divided into two three distinct watersheds; the Upper Priest Lake (UPL) (1701021501) watershed, the Lower Priest Lake (LPL) (1701021502) watershed and the Priest River (1701021504) below the LPL. A 2.7 mile long low gradient predominantly run-type reach called the Thorofare connects the lower and the upper Priest Lakes.

The UPL watershed drains an area approximately 131,800 acres and consists of 4 major tributaries: Upper Priest River, Hughes Creek, Trapper Creek, and Caribou Creek. Trapper and Caribou Creeks are almost exclusively owned by the state of Idaho. This watershed is dominated by the Pacific coast type climate which provides an average of 32 inches of rain at the lake elevation and an average of 60 inches on the peaks of the Selkirk Mountains (PBTTAT 1998c). The climate and soil composition is similar to the Kootenai River Subbasin.

Bull trout are now considered "functionally non-existent" in the LPL watershed and almost all the known spawning of bull trout occurs in the UPL watershed (Fredricks et al. 1999). In 2001, 7 redds were found in the Middle Fork East River watershed which is a tributary to the Priest River 15-20 river miles below the outlet of Priest Lake; this watershed is almost entirely on State Lands (USFS 2003). Survey information for other streams in the lower Priest River are either

000102

unavailable or surveys haven't been conducted. Bull trout in the Priest River system are predominantly adfluvial; with the exception of the East River, no resident populations have been identified (PBTTAT 1998c). Due to the low redd counts, bull trout seem to be at a high risk of extinction in this basin (PBTTAT 1998c).

## Bull Trout Status in the Upper Priest Lake Watershed (1701021502)

This watershed's focal point is the UPL which has a surface area of 1,388 acres. The lake serves primarily as rearing habitat for bull trout. UPL is a shallow lake with a mean depth of approximately 42.7 feet and a maximum depth of 105 feet(Fredericks et al. 1999). PBTTAT (1998c) called the UPL population of bull trout the strongest in the Priest River Basin. An estimated 100 adults are in the UPL and mainly spawn in Trapper Creek and upper Priest River and its tributaries (PBTTAT 1998c). Trapper Creek redd counts have averaged 3.2 redds/year (range 0-8) for the period of 1993-2001 (IDFG unpublished data).

Lake trout were first discovered in UPL in 1985. Fredricks and Venard (2000) using gill nets during the early summer and early fall months of 1998 captured 912 lake trout with an average size of 17.3 inches (range 7.1-35.4 in.) and 46 bull trout (no size or range reported) which resulted in a 5:100 bull trout to lake trout ratio for the UPL. Additional limited gill netting in 1999 resulted in a bull to lake trout ratio of 4.7:100. They estimated the lake trout population of UPL was between 480-1,000 fish and the bull trout population at 93 fish (95 percent CI range 43-209 fish). Additionally, they documented lake and bull trout migration between the LPL and the UPL. Based on historical anecdotal information, bull trout were present in almost all the large accessible tributaries of the UPL and upper Priest River (PBTTAT 1998c).

## Bull Trout Status in Upper Priest River (1701021501)

This watershed of 49,600 acres has its headwaters in British Columbia and in the U.S. is almost exclusively managed by the Forest Service (95 percent ownership) (PBTTAT 1998c). There is a natural barrier falls located approximately ½ mile south of the international border. This watershed has seen relatively low amounts of land management activities and was rated "High" for importance to bull trout. Redd counts have been conducted in the mainstem the Upper Priest River in four different reaches. Bull trout have averaged 27 redds/year in the Upper Priest River during the period of 1996-2001; previous redd surveys were intermittent and incomplete (IDFG unpublished data).

The Forest Service has developed ECAs and road densities for four 6th code HUCs in the Upper Priest River watershed as well as two tributary streams (Table 15). The upper Priest River upstream of the confluence of Malcolm Creek is roadless; however, a natural barrier falls exist approximately ½ mile upstream of the confluence. The Forest Service does not believe habitat to be a limiting factor in this watershed based on personal observations (Shanda Dekome, pers comm.). Habitat conditions could serve as reference conditions for a typical "C" type channel (USFS 2003). Tributaries to Upper Priest River have been surveyed for bull trout and no significant numbers have been found with the exception of Hughes Creek and its tributary, Gold

98

Creek. Hughes Creek has seen relatively little land management actions with a low ECA and moderate road density (Table 15). However, in the 1940s Hughes Creek through Hughes Meadow was channelized and currently provides very little habitat and cover for the three miles of channelization. Redd surveys in Hughes Creek between 1992-2001 have averaged 4.7 redds/year (range 1-9). Gold Creek redd surveys have averaged 3.2 redd/year (range 0-9) over the same period (IDFG unpublished data).

Limiting factors for this watershed are the presence of lake trout in the UPL as well as brook trout hybridization (PBTTAT 1998c, Fredericks and Venard 2000). Roads also provide a moderate-high limiting factor in several tributaries to upper Priest Lake and River due to creation of passage barriers as well as sources of sediment (PBTTAT 1998c). The sediment indicators were FAR for Gold Creek and the Upper Priest River immediately upstream of the lake (USFS 2003).

Table 15. Land Management in key watershed of Upper Priest Lake Watershed. (meeting notes April1-2, 2003).

| 6th Code HUC | Name | Area (mi$^2$) | Road Density | Crossing/mi | ECAs |
|---|---|---|---|---|---|
| 170102150101 | Upper Priest River abv Malcolm Creek | 28 | 0.0 | 0.0 | 0% |
| 170102150102 | Upper Priest River abv Upper Priest Lake | 52 | 1.7 | 0.6 | 11% |
| 170102150104 | Hughes Creek abv Gold Creek | 27 | 1.2 | 0.3 | 4% |
| 170102150105 | Gold Creek | 21 | 4.4 | 1.2 | 16% |

## Bull Trout Status in the Lower Priest Lake Watershed (1701021502)

Bull trout are "functionally non-existent" in this watershed predominantly due to the presence of lake trout in Priest Lake (Fredericks and Venard 2000). The eastern half of this watershed is owned exclusively by the State of Idaho.

The decline of bull trout in Priest Lake is coupled with the increase of lake trout. Between 1956-1978 anglers reported catching an average of 1,200-2,300 bull trout annually. By 1986, anglers caught no bull trout during the same annual period. Lake trout, however, replaced the bull trout. Lake trout catch by anglers average less than 300 fish/year for the period between 1956-1970. In 1978, lake trout harvest was estimated at 5,700 fish and by 1994 around 14,000 lake trout were caught. This dramatic increase is probably due to the introduction of *Mysis relicta* (mysis shrimp) in 1965. Habitat deterioration, overharvest, and interaction with lake trout have all contributed to the significant decline of bull trout in this watershed (Fredericks et al. 1999). Historically, bull trout were present in Granite Creek, Kalispell Creek, Beaver Creek and Lion Creek as well as several face drainages of Priest Lake. Based on limited surveys in the 1990s by IDFG and the Forest Service, bull trout were absent in Kalispell Creek, Granite Creek, and Beaver Creek; Lion Creek wasn't surveyed (PBTTAT 1998c).

Kalispell Creek and Granite Creek are likely the best available habitat for bull trout from Priest Lake (USFS 2003). Kalispell Creek has residential development at its mouth as does Granite Creek. A habitat survey in 2002, shows Granite Creek as a wide and shallow creek with an average width to depth ratio of 38 percent. Pool habitat accounts for only 17 percent of all

000104

available habitat types with riffle habitat making up the remainder. Road density is high at 2.9 $mi/mi^2$ and the ECA is moderate at 12 percent. Sediment ratios were unavailable; however, the Forest Service determined that sediment indicators were FA and not a limiting factor (meeting notes April 1-2, 2003).

Kalispell Creek also has a high road density level of 3.5 $mi/mi^2$ and a moderate ECA of 11 percent. A habitat survey in 2002 found no signs of mass-wasting areas or failed culverts. Additionally, the survey determined that the overall dominant substrate was gravel. Fish habitat was "good" and unidentified fish were observed in the middle portion of. Fish surveys failed to find any bull trout in Kalispell Creek but did find brook trout. (Weidich 2002, meeting notes April 1-2, 2003).

Bull trout presence in this watershed is known to occur due to limited bull trout migration from the UPL (Fredericks et al. 2000). Due to lack of sufficient surveys within the tributaries and the lake itself, coupled with an anticipated very low level of bull trout, population dynamics are difficult to develop. More information is necessary for this watershed to adequately characterize the bull trout status.

## IV.    Effects of the action

Under section 7(a)(2) of the Act, "effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, with the effects of other activities interrelated or interdependent with that action. Indirect effects are those caused by the proposed action and are later in time, but still are reasonably certain to occur (50 CFR 402.02). The effects of the action are added to the environmental baseline to determine the future baseline and to form the basis for the determination in this opinion. Should the Federal action result in a jeopardy situation and/or adverse modification conclusion, the Service may propose reasonable and prudent alternatives that the Federal agency can take to avoid violation of section 7(a)(2). The impacts discussed below are the result of direct and indirect impacts of implementing the proposed project.

### A.    Grizzly Bear

As previously referenced, the effect of roads upon grizzly bear behavior and habitat use has been well documented in the scientific literature. Several authors have documented grizzly bear avoidance of roads and the resulting displacement from adjacent habitat (Aune and Stivers 1985, McLellan and Mace 1985, Kasworm and Manley 1988, McLellan and Shackleton 1988, Aune and Kasworm 1989, Frederick 1991, and Wakkinen and Kasworm 1997). Research indicates that grizzly bears tend to avoid closed roads as well as open roads (Mace et al. 1999, Mace et al. 1996, and Mace and Manley 1993, Wakkinen and Kasworm 1997). Mace and Manley (1993) documented displacement of grizzly bears from closed roads, and found that grizzly bear use of areas declined as total road densities (open and closed roads) exceeded 2 $mi/mi^2$ and open road densities exceeded 1 $mi/mi^2$. Mace et al. (1996) found that grizzly bears are able to utilize roaded habitats, but that spatial avoidance increases and survival decreases as traffic levels and road densities increase. Wakkinen and Kasworm (1997) found that areas with total road

100

densities greater than 2 mi/mi$^2$ and/or open road densities greater than 1 mi/mi$^2$ were used less than expected (avoided) by grizzly bears. A number of studies have indicated that female grizzlies with cubs tend to avoid roads (Mace et al. 1996, and Zager 1980 In: USFWS 1993). The occurrence of roads and the associated human disturbance within high quality bear habitats can also influence indirect mortality risk by disrupting efficient foraging strategies resulting in nutritional stress, restricting reproduction and dispersal, and potentially reducing carrying capacity (Mattson et al. 1987 In: Frederick 1991, and Aune and Stivers 1985 In: Frederick 1991). Nutritional demands of female bears with cubs is triple that of other bears, making their access to nutritional food sources and uninterrupted feeding essential during spring and fall (Jonkel 1982 In: Frederick 1991).

The current LRMPs for each of the Forests do not specifically require the Forests to manage for core habitat, or open or total motorized route densities within individual BMUs of the SRZ and CYRZ. However, pursuant to the aforementioned biological opinions issued to each of the Forests, the Forests manage for grizzly bear habitat parameters, which were identified through research conducted within these Ecosystems pursuant to IGBC direction. Based on this research, thresholds (standards) for core habitat, and open and total motorized route densities were established. Within individual BMUs with ≥75 percent federal ownership, the Forests are to: 1) attain 55 percent core habitat; 2) have ≤ 33 percent of each BMU with open motorized route densities exceeding 1 mi/mi$^2$; and 3) have ≤ 26 percent of each BMU with total motorized route densities exceeding 2 mi/mi$^2$. These standards are to be applied and achieved universally throughout each Recovery Zone within each individual BMU. However, with current land ownership constraints (e.g., quantity of nonfederal land base within each BMU, and public, county, and private roads) within some BMUs of these Ecosystems, achieving one, some, or all of the universally applied standards within each individual BMU is not pragmatically possible. Also, some BMUs that are comprised of a mix of nonfederal and federal ownerships currently exceed (are better than) the standards. But absent an independent long-term management agreement with the nonfederal landowners, maintaining the current levels of core habitat, and densities of open and total motorized routes solely on federal land within the BMUs would be impossible.

Given the reality of these constraints, the Forests, in conjunction with grizzly bear researchers familiar with each Ecosystem and the Service, analyzed the inherent capability for individual BMUs to achieve or maintain maximum levels of core habitat, and the lowest open and total motorized route densities. Constraints accounted and deducted for, as they were considered to affect an individual BMUs ability to achieve specific levels of core habitat, and total and open motorized route densities included: 1) non-federal land, including corporate timber land, and private land contained within towns and municipalities; 2) public, county, and private roads; 3) some forest roads that function as "through" roads, and therefore, could not be closed without significantly increasing public travel distances between destination points, and popular recreational destinations; and 4) historically and culturally popular recreational destinations (e.g., campgrounds, concentrated fishing locations, etc.) with high human use.

101

000106

Pursuant to IGBC recommendation, all Forests containing lands within ecosystems with grizzly bear populations classified their lands into management situations (IGBC 1987). Management situation designations are intended to distinguish areas where differing grizzly bear habitat and human use conditions occur and define appropriate management strategies for each. Many of the above identified constraints are located within areas identified as Management Situation (MS)-3. The guidelines for MS-1, MS-2, and MS-3 are as follows (from IGBC Guidelines):

1.      The MS-1 lands are those that contain grizzly population centers and/or habitat that is needed for the survival and recovery of the species. In those areas, the needs of the grizzly bear will be given priority over other management considerations. Land uses which can affect grizzly bears and/or their habitat will be made compatible with grizzly bear needs, or such uses will be disallowed or eliminated. Grizzly bear/human conflicts will be resolved in favor of grizzly bears unless the bear involved is determined to be a nuisance.

2.      The MS-2 lands are those areas that lack distinct grizzly population centers. Highly suitable habitat generally does not occur, but grizzly bears may occasionally be present, and the need for this habitat for survival of the grizzly bear is more uncertain. The status of such areas is subject to review. Management will at least maintain those habitat conditions that resulted in the area being classified as MS-2.

3.      The MS-3 lands are where grizzly bears may occur infrequently, and human developments such as campgrounds or resorts may result in conditions that make grizzly bear presence untenable for humans and/or grizzly bears. Management focus is on human-bear conflict minimization rather than habitat maintenance and protection, and grizzly bear presence will be actively discouraged.

Additionally, to allow the Forest Service greater flexibility to implement vegetation management activities within the Recovery Zones, some BMUs that currently have ≥55 percent core habitat are proposed for establishment of core habitat standards lower (percentage quantity) than the existing conditions within those BMUs, after deducting for the above discussed constraints. Vegetation management activities consisting of silvicultural prescriptions (commercial timber harvests, commercial and non-commercial thinning, etc.) that open up the forest canopy and/or understory can be beneficial to grizzly bears by improving foraging opportunities through increasing the distribution and quantity of berry-producing shrubs. The additional flexibility and proposed decreases in core habitat are based on the degree to which an individual BMU currently exceeds 55 percent core habitat, but range between 1 to 7 percent. The proposed decrease would also not result in any BMU, currently exceeding 55 percent core habitat, having a core habitat standard established at less than 55 percent.

The Forests also propose to implement a standard requiring core habitat to remain or be fixed in place for at least 10 years. This requirement is based on the premise that it takes about 10 years for a female grizzly bear to replace herself (i.e., generation time). Assuming a female grizzly

102

bear initially breeds at approximately 4.5 years of age, and produces litters with a 50:50 sex ratio with 50 percent survival of young, she would be able to produce 2 litters in a 10 year period with one female surviving to reproductive age (USFWS 1993). Additionally, maintaining undisturbed and secure habitat in place for this length of time provides an area of known security to grizzly bears, which they can utilize for foraging, breeding, and sheltering, should activities within other areas of their home range disrupt their normal activities. Disruption of normal grizzly bear behavior can result in displacement of grizzly bears from preferred habitat, such as wet low elevation meadows in the spring. Providing areas that grizzly bears are familiar with and can rely on to be free of disturbance minimizes the effects of displacement from other areas of their home range that may occur as a result of human activities.

It is important that core areas contain all seasonal habitats to the extent possible and available within each BMU. Within the Recovery Zones, even though rigorous seasonal habitat analysis has not been completed, it is generally believed that spring habitats are not as abundant or widely distributed and available to grizzly bears as are habitats providing summer and fall foraging opportunities. For this reason, it is particularly important to ensure that spring habitats are, to the extent possible, proportionally represented within core areas. Unfortunately, while spring habitats are distributed throughout the Recovery Zones, they generally occur in low-lying valley areas within proximity to human developments and activities. Consequently, spring habitats are often unavailable to grizzly bears and, thus are generally not currently well represented proportionally within core habitat areas.

Currently, 14 of 22 BMUs (64 percent) within the CYRZ contain ≥55 percent core habitat. Core habitat within the CYRZ overall currently equates to about 932,343 acres (56 percent) (Table 10). The proposed Amendment will eventually result in 20 of 22 (91 percent) BMUs with ≥55 percent core habitat, increasing core habitat overall within the CYRZ by 11,170 acres to 943, 513 acres (57 percent of the CYRZ in core habitat). Within the SRZ, currently 5 of 10 BMUs (50 percent) contain ≥55 percent core habitat, and core habitat overall within the SRZ currently equates to 326,930 acres (64 percent) (Table 5). The proposed Amendment will eventually result in 7 of 10 BMUs (70 percent) with ≥55 percent core habitat, increasing core habitat overall within the SRZ by 1,184 acres to 328,114 acres (64 percent of the SRZ in core habitat).

As identified previously, the intent of this strategy, and hence the Forests' proposed Amendment, is to identify and establish the highest reasonable grizzly bear habitat standards for management within each individual BMU, while providing the Forests some flexibility for vegetation management. Also, as noted previously, this amendment does not identify specific roads to close to achieve these standards. Therefore, to establish the amount of core habitat achievable in each individual BMU, the Forests ran various scenarios using the constraints identified above to estimate the potential for achieving core habitat within each individual BMU. Thus, the proposed standards for core habitat were based on these "what if" scenarios. However, subsequent to publishing the FEIS, and pursuant to additional review and discussions between the Service and the KNF, the KNF ran additional scenarios taking into consideration the intent of

103

000108

Alternative E of the FEIS (the Forests preferred alternative and the action under consultation) and recent land management changes in BMUs 3, 5, 10, and 13.

The Forest's proposed standard for core habitat in BMU 3 is 55 percent. Currently, BMU 3 is at 62 percent core habitat (Table 10). The KNF agreed that all necessary management flexibility could be provided by establishing the core habitat standard for BMU 3 at 59 percent. The proposed standard for core habitat in BMU 5 is 58 percent. Currently, BMU 5 is 63 percent core habitat (Table 10). The KNF agreed that all necessary management flexibility could be provided by establishing the core habitat standard for BMU 5 at 60 percent. The proposed standard for core habitat in BMU 13 is 55 percent. Currently, BMU 13 is at 62 percent core habitat (Table 10). The KNF and IPNF agreed that all necessary management flexibility could be provided by establishing the core habitat standard for BMU 13 at 60 percent.

Relative to BMU 10, currently core habitat is at 49 percent, but the proposed standard is 48 percent. Pursuant to the scenarios, the KNF determined that the maximum core habitat that could be achieved in this BMU was 48 percent. However, due to recent land management changes within the BMU, core habitat has been raised to 49 percent. Additionally, new scenarios indicate that a maximum of 54 percent core habitat can be achieved in this BMU. Thus, the KNF proposes to establish core habitat at 51 percent in this BMU, providing the Forest with approximately 3 percent management flexibility. However, the Service advised the KNF that, given the importance of this BMU at maintaining connectivity between the Yaak (northern portion of the CYRZ) and the Cabinets (southern portion of the CYRZ), and the fact that it may not be able to achieve the quantity of core habitat required to support the average female grizzly bear, we believe that the KNF's management flexibility should be limited to the lower portion of the range at 2 percent. Additionally, because this BMU has 95 percent federal ownership, establishing core habitat at 52 percent should allow the KNF to create additional opportunities for flexibility if necessary. Thus, the minimum core habitat standard for BMU 10 would be established at 52 percent. However, as long as this BMU remains below 55 percent core habitat, its functional effectiveness with regard to providing all seasonal habitat components and habitat security for grizzly bears will be compromised.

Through these modifications to the proposed Amendment, the number of BMUs within the CYRZ eventually containing ≥55 percent core habitat will not increase over that which was proposed in Alternative E of the FEIS (i.e., 20 of 22 BMUs). However, overall the amount of core habitat within the CYRZ will be increased to 954,854 acres (58 percent of the CYRZ in core habitat).

The Amendment also addresses the rather unique situation in two BMUs (Grouse and Lakeshore), and proposes to establish core habitat standards, on federal land only, below 55 percent. The Grouse BMU, within the CYRZ, is managed by the IPNF and currently has approximately 32 percent core habitat. However, the BMU is only comprised of about 54 percent federal ownership; the other majority landowners are IDL and Forest Capital. Therefore, it would be impossible for the IPNF to achieve 55 percent core on its ownership

000109

alone. Accounting for the constraints identified earlier, the IPNF estimated that the maximum core habitat that could be achieved in this BMU on federal lands only was 39 percent. However, this would give the IPNF no flexibility to implement vegetation management activities within the BMU. Thus, the decision was made to establish the standard at 37 percent core habitat, providing the IPNF reasonable flexibility to conduct vegetation management activities, if necessary. Similar to BMU #10 on the KNF, the functional effectiveness of the Grouse BMU will continue to be compromised as long as it remains below 55 percent core habitat.

The Lakeshore BMU, within the SRZ, is also managed by the IPNF. As previously discussed, this BMU is extremely small (approximately 30 mi$^2$ and has only 86 percent federal ownership). Due to these factors, the Service recognizes that the full range of management opportunities provided by other BMUs of larger size is not available within this BMU, and that achieving 55 percent core habitat would be very difficult, if not impossible. While the Lakeshore BMU was established primarily to provide a buffer between high human use areas along Priest Lake and adjacent BMUs to the west (primarily the Kalispell-Granite BMU), it contains very important seasonal grizzly bear habitats, such as wet meadows (e.g., the 900 acre Bismark Meadows), riparian stream bottoms, blue huckleberry (*Vaccinium globulare*) and big huckleberry (*Vaccinium membranaceum*) shrubfields, and graminoid parks. Therefore, it is an important part of the SRZ. Relative to the Bismark Meadows area, grizzly bears are routinely documented using this area for foraging annually each spring from May through July. The area also provides summer and fall foraging opportunities for grizzly bears. Given the small size of this BMU and the important grizzly bear habitat it contains, the Service has recommended that its boundaries be realigned in the future with other BMUs to achieve a BMU that more closely approximates the average home range of female grizzly bears in the SRZ (i.e., approximately 100 mi$^2$).

The Recovery Plan established BMUs to, among other things, provide for grizzly bear population expansion and adequate grizzly bear distribution throughout these Recovery Zones. Adequate distribution of grizzly bears, especially family groups, throughout the Recovery Zones is an indicator of the quality and effectiveness of habitat, and is important for the stability and recovery of grizzly bears. Adequately distributed reproductive females are important due to the tendency of female offspring to occupy habitat within or near their mother's homerange. Therefore, any permanent losses of core habitat within individual BMUs of the SRZ and CYRZ may compromise these Recovery Zones' overall ability to support an expanding, adequately distributed grizzly bear population.

The proposed Amendment would allow some decreases in core habitat over existing conditions within some BMUs that currently contain greater than 55 percent core habitat. Research conducted by Wakkinen and Kasworm (1997) indicated that the average adult female grizzly bear's home range was comprised of 55 percent core habitat. However, as noted previously, this research is based on a very limited data set, incorporated habitat use of a subadult female grizzly bear, and one of the research females was killed immediately following the study period. Additionally, several BMUs within the SRZ (IDL, LeClerc, Lakeshore) and the CYRZ (Grouse, #10) may never achieve 55 percent core habitat. The IDL area is managed entirely by the IDL

000110

(approximately 8 percent of the SRZ), which, other than the prohibitions against causing incidental take of grizzly bears, currently has no legal requirements to manage for core habitat. The LeClerc BMU, managed by the CNF, contains less than 75 percent federal ownership, and is managed pursuant to a Conservation Agreement between the Service, Stimson Lumber Company, and the CNF (USFWS 2001c). The Conservation Agreement does not require the attainment of 55 percent core habitat within the LeClerc BMU. Similar to the Lakeshore and Grouse BMUs, described previously, achieving 55 percent core habitat within these BMUs would be extremely difficult. Therefore, due to the limitations of the research data, and because several BMUs may never achieve the minimum habitat conditions suggested by the research as necessary to support the average female grizzly bear's home range within these ecosystems, any permanent losses of core habitat within any BMU may have serious ramifications on the ultimate recovery of the grizzly bear populations within the Recovery Zones. However, it is reasonable to allow the Forests some flexibility to implement vegetation management activities through temporary and peripheral incursions into grizzly bear core habitat. Such temporary incursions are reasonable, provided they do not reduce core habitat below the established standards, and occur only once per 10-year time-frame per each individual BMU.

The proposed Amendment (including the changes discussed above for BMUs 3, 5, 10, and 13) will result in minor overall increases in core habitat within these Recovery Zones. Overall quantity of core habitat within each of the Recovery Zones will eventually equate to approximately 58 percent in the CYRZ and 64 percent in the SRZ. However, not all BMUs within these Recovery Zones will individually achieve or provide 55 percent core grizzly bear habitat. Adequate quantities of core habitat located within and distributed amongst each BMU is essential to ensure the ability of family groups to fully occupy and be distributed throughout each Recovery Zone.

A similar assessment as that discussed above for core habitat was conducted for open and total motorized route densities within individual BMUs. Currently, within the CYRZ, 7 of 22 BMUs (32 percent) have open motorized route densities exceeding 1 mi/mi$^2$ in greater than 33 percent of the BMU, and 10 of 22 BMUs (45 percent) have total motorized route densities exceeding 2 miles/mi$^2$ in greater than 26 percent of the BMU (Table 10). Under the proposed Amendment, the number of BMUs exceeding 33 percent of the BMU with an open motorized route density > 1 mi/mi$^2$ will not change (i.e., 7 of 22 BMUs), while the number of BMUs exceeding 26 percent of the BMU with a total motorized route density >2 mi/mi$^2$ will decrease to 6 of 22 BMUs (27 percent) (Table 10).

A total of nine different BMUs will not meet either the OMRD and/or TMRD that research has suggested is acceptable (i.e., ≤ 33 percent of the BMU with an OMRD exceeding 1 mi/mi$^2$, ≤ 26 percent of the BMU with a TMRD exceeding 2 mi/mi$^2$) (Wakkinen and Kasworm 1997). However, 7 of the 9 BMUs currently have or are proposed to achieve ≥ 55 percent core habitat. Three of the 9 BMUs currently contain substantially more than 55 percent core habitat. Maintenance of good quality core grizzly bear habitat within these BMUs helps to ameliorate the relatively high OMRD and TMRD that may continue impacting the habitat conditions and

106

grizzly bears within these BMUs. One of the BMUs that will not meet either the OMRD or TMRD research numbers is the Grouse BMU. Conditions within the Grouse BMU, which make it extremely difficult to manage for grizzly bear habitat, have been previously described.

Two BMUs (North Lightening and Scotchman) in the CYRZ are proposed for an open road density standard allowing up to 35 percent of the BMU to exceed an open road density of >1mi/mi$^2$, but the standard for total road density will be established at the research levels requiring less than 26 percent of the BMU to exceed total road densities of 2 mi/mi$^2$. Both these BMUs are on the southern periphery of the CYRZ and have large blocks of core habitat (greater than 60 percent of the BMUs) that is connected to core habitat in adjacent BMUs to the east. Also, with regard to the Scotchman BMU, most of the roads are located in the southern quarter of the BMU and are associated with non-federal lands. Thus, grizzly bears would most likely avoid the area of concentrated roads, and utilize the large blocks of core habitat during the course of their home range movements. Relative to the North Lightening BMU, the open road density is due primarily to two major public routes (North Lightening and Trestle Creek Roads) and the configuration and topography of the BMU, which requires a winding road course across the BMU. Similar to the Scotchman BMU, this BMU also has large blocks of core habitat that grizzly bears would most likely utilize during home range movements while minimizing potential encounters with humans. The Service believes the open road density standards within these BMUs would support a grizzly bear's home range needs, and are therefore, acceptable.

Currently within the SRZ, 2 of 10 BMUs (20 percent) have open motorized route densities exceeding 1 mi/mi$^2$ in greater than 33 of the BMU, and 4 of 10 BMUs (40 percent) have total road densities exceeding 2 mi/mi$^2$ in greater than 26 of the BMU (Table 5). The proposed Amendment will result in only the Lakeshore BMU exceeding the research-based open and total road densities (except for the LeClerc BMU which is not part of the Amendment). As discussed previously, due to its small size, achieving 33 percent and 26 percent open and total road densities, respectively, within the Lakeshore BMU may not be possible.

Similar to the discussions with the KNF regarding core habitat, the Service had discussions with the IPNF regarding the Amendment's proposed OMRD standard for the Blue-Grass BMU and the intent of Alternative E of the FEIS. The Forests' proposed OMRD standard for the Blue-Grass BMU is 33 percent. Currently the OMRD is at 27 percent (Table 5). Thus, subsequent to publishing the FEIS, and pursuant to additional review by the Service, the IPNF reanalyzed the open road density status within the Blue-Grass BMU. Upon reassessment, the Service and IPNF agreed to establish the OMRD standard for the Blue-Grass BMU at 31 percent (Martin, pers. comm. 2004).

Additionally, subsequent to publishing the FEIS, the IPNF obtained new information pertaining to the TMRD status within the Myrtle BMU. In the FEIS, based upon mapping information existing at the time, the extent of the BMU with TMRD exceeding 2 mi/mi$^2$ was thought to be 19 percent. Thus, to provide the IPNF with management flexibility, while maintaining the TMRD well below research thresholds, the standard was proposed to be established at 22 percent (Table

000112

1). However, based on data obtained from more recent and accurate mapping information, the extent of the BMU with the TMRD exceeding 2 mi/mi$^2$ is actually currently at 21 percent (Lyndaker, pers. comm. 2004). Therefore, the IPNF requested to establish the TMRD standard at 24 percent, retaining the same range of 3 percent management flexibility above existing conditions. The Service and IPNF agreed to establish the TMRD standard for the Myrtle BMU at 24 percent, providing the IPNF with 3 percent management flexibility above existing conditions, while maintaining TMRD levels below the research threshold of 26 percent (Martin, pers. Comm. 2004).

Several BMUs will require reductions in currently open and restricted roads to achieve the proposed standards for OMRD, TMRD, and core habitat. The proposed Amendment does not specify which roads within individual BMUs will be further restricted or closed to achieve the standards, and neither does it indicate by what method the roads will be restricted or closed. For example, under the current IGBC definition of core habitat, it is acceptable to have a road within core habitat, as long as access to the road is effectively prevented by a barrier, earthen berm, vegetation, etc. (IGBC 1998a). The IGBC guidelines do not require the hydrologic stabilization of a road upon closure. Consequently, several roads on the Forests have been either closed with earthen berms or barriers, or restricted with gates, and have now vegetated in. Thus, these roads are considered to provide core habitat for grizzly bears. However, the roads are not hydrologically stable (e.g., culverts have not been pulled and, thus, represent potential road failure and erosional points). Therefore, to prevent degradation of the watershed, the Forests may need to reaccess these roads within core habitat to put them into a hydrologically stable condition for long-term storage or decommission them entirely. This access, while important and necessary to prevent erosional impacts to watersheds, does represent a potential source of short term disturbance to grizzly bears in areas which they may have learned to rely on as secure and free of disturbance. Thus, re-entering closed roads in core habitat to perform hydrologic stabilization work on the road prism may reduce the ability of the area to function as core habitat for grizzly bears. As stated previously, secure areas free of disturbance are important for minimizing the potential effects of displacing grizzly bears from other portions of their home range/BMU that are impacted by human activities. Therefore, to provide functional core grizzly bear habitat and prevent the need for reaccess at a later date, roads should be hydrologically stabilized immediately upon closure.

In addition to controlling access into grizzly bear habitat, providing sufficient levels of effective grizzly bear habitat is an important element affecting grizzly bear protection and recovery. Currently, based on work conducted by Christensen and Madel (1982), within each individual BMU, the IPNF and KNF LRMP's require management for secure habitat (i.e., effective grizzly bear habitat) at 70 mi$^2$ and 70 percent, respectively. While the LNF's LRMP does not specifically require management for secure habitat, it does require management for displacement habitat (essentially defined in the LNF's LRMP as areas free of disturbance within BMUs in which grizzly bears can seek to avoid other areas within the BMUs impacted by human activities). Habitat effectiveness (security) is defined as the amount of secure grizzly bear habitat (habitat at least one quarter mile from open roads, developments, and high levels of

108

000113

human activity) remaining within BMUs after impacted areas are subtracted from the total habitat in the BMUs.

The proposed Amendment will not contain language specifically providing for or addressing grizzly bear habitat effectiveness in the Forests' individual LRMPs. In lieu of specific requirements for providing effective grizzly bear habitat, the Amendment proposes to establish standards addressing total and open motorized route densities. Motorized access routes are one of the factors affecting grizzly bear habitat security (probably one of the most important), and motorized access route management is, therefore, a very effective tool to achieve grizzly bear habitat security. Thus, establishing standards controlling the densities of open and total motorized routes within BMUs will contribute to providing effective grizzly bear habitat, partially off-setting the proposed Amendment's lack of specifically requiring management for effective grizzly bear habitat.

Other factors beyond motorized access management, such as mining, livestock grazing, logging, and recreation can affect the effectiveness of grizzly bear habitat as well. The Service's 1999 finding concluded that human intrusion into grizzly bear habitat is one of the factors contributing to the risk of grizzly bear extinction in the SRZ and CYRZ (USDI 1999a). Christensen and Madel (1982) determined that grizzly bears can be displaced from habitat impacted by high levels of human activity, such as mining, sustained helicopter flights, and high use recreational areas (i.e., campgrounds), and therefore, activities of this type must be considered when managing for effective grizzly bear habitat. A 1987 compendium of scientific research on grizzly bears documented that the bears avoid, and can be displaced from, areas impacted by point-source disturbances including, but not limited to, mining, hydrocarbon exploration and development, helicopter flights, and recreational developments and activity (IGBC 1987). Thus, without addressing and controlling the impacts of point source disturbances (e.g., mining, helicopter logging, etc.) within BMUs of these Recovery Zones, the proposed Amendment could allow the occurrence of adverse effects, and potentially take of grizzly bears to occur through displacement, and habitat loss and alteration.

As identified previously, grizzly bears currently occupy several areas outside of, but adjacent to the Recovery Zones within these Ecosystems (Figure 1), and the current Forests' LRMPs do not specifically require management for grizzly bears or their habitat that are located outside of the Recovery Zones. Additionally, the Forests' proposed Amendment only addresses grizzly bear habitat access management within the Recovery Zones. This is primarily due to the fact that when the Forests began the process of re-assessing grizzly bear management within the Recovery Zones, they were unaware of grizzly bear occupancy in areas adjacent to the Recovery Zones. However, the Forests' LRMPs may provide some benefits to grizzly bears occurring outside the Recovery Zones through standards pertaining to the management for other species and their habitats (such as elk, and sensitive and indicator species). Some of these standards control the type and intensity of activities, including road management, that may occur within these species habitats. However, standards addressing management for these other species, while providing some benefits to grizzly bears occurring outside the Recovery Zones, may not be

109

000114

directly translatable to providing the type of habitat that research has suggested grizzly bears require to support their home ranges, and to reduce the occurrence of human-related mortality because they do not require roads to be managed in a manner conducive to grizzly bear habitat needs.

Current access management standards, relative to the effects of activities upon grizzly bears and the potential for causing incidental take of grizzly bears within the Recovery Zones, are based on research using a Geographic Information System moving windows analysis technique. A moving windows analysis is a spatial analysis of road density distribution, and research has suggested that increasing densities of both open and restricted roads have corresponding increased effects upon grizzly bear behavior and habitat use within their home range. Due to computer data limitations, the Forests are currently unable to conduct a moving windows analysis in the areas of grizzly bear occupancy outside of the Recovery Zones. The Forests did provide an analysis of linear road densities within these areas (Tables 6 and 11).

Linear open and total road densities within the areas occupied by grizzly bears outside of the Recovery Zones appear to be well above the thresholds, established pursuant to moving windows analysis, at which adverse affects to bears are likely to occur. However, linear road density information is not comparable to moving windows analysis, and as such, it is inappropriate to infer that the referenced linear road densities equate to moving windows road densities, through which thresholds for adverse affects have been established. Therefore, in addition to linear road density information submitted for areas outside of the Recovery Zones, the Forests also provided linear road density road information for BMUs within the Recovery Zones. This information was provided to determine if there was a correlation between linear and moving windows analyses within the Recovery Zones for extrapolation to the areas of grizzly bear occupancy outside of the Recovery Zones. We were unable to establish a relationship between linear road densities and moving windows road densities. Therefore, relative to the current moving window standards upon which thresholds for "adverse effect" and incidental take have been established, the Service is unable to definitively analyze the potential effects of the proposed Amendment upon grizzly bears residing in the areas outside of but adjacent to the Recovery Zones.

Within these areas, however, grizzly bears, including females, have been frequently documented. Some of these grizzly bears may have home ranges located entirely outside of the Recovery Zones, while others may utilize habitats both within and outside of the Recovery Zones. Female grizzly bears with young have been documented within these areas, however, the fate of the offspring and whether or not they have been recruited into the breeding population is not known. There have been no known or reported human-related grizzly bear mortalities within these areas. Thus, the presence of grizzly bears in these areas indicates that some bears have apparently acclimated to the conditions within them, and at least in the short-term, seem able to find and secure the resources necessary for their needs while avoiding human encounters resulting in mortality.

110

Without a moving windows analysis, it cannot be definitively demonstrated that adverse effects to grizzly bears may be occurring under the existing conditions in the identified areas of grizzly bear occupancy outside of the Recovery Zones within these Ecosystems. Notwithstanding the above, it is reasonable to conclude that adverse effects to grizzly bears are likely for the following reasons. Research indicates that increasing road densities and the use of roads affects grizzly bear behavior and habitat use, resulting in displacement or habituation of grizzly bears (McLellan and Shackleton 1988, Mace and Manley 1993, Service 1993, Mace et al. 1996, Mace et al. 1999, Service 1993, Wakkinen and Kasworm 1997). Increasing road densities and road use are also likely to increase the chance of grizzly bear encounters with humans, leading to increased stress levels of the animal (USFWS 1993). Displacement from habitat and/or increased stress levels may be especially problematic for female grizzly bears attempting to reproduce by causing decreased nutritional status, which may result in reabsorption of fetuses, etc. (Mattson et al. 1987 In: Frederick 1991, and Aune and Stivers 1985 In: Frederick 1991). Thus, given the fact that the Forests have not specifically managed for grizzly bear habitat relative to road densities outside of the Recovery Zones, and recognizing the considerable difficulty in managing for and achieving grizzly bear habitat parameters relative to road densities within the Recovery Zones, road densities in many areas outside of the Recovery Zones are most likely high, and are likely to be causing adverse effects to grizzly bears. The available research information referenced above suggests that these adverse effects due to road density are most likely to cause significant habitat modification or degradation that results in the injury (increased stress levels) of grizzly bears. The research also suggests the potential for these adverse affects due to road densities to result in significant habitat modification or degradation that results in the death (reabsorption of fetuses) of grizzly bears.

Finally, the Forests' LRMPs do not currently contain standards specifically addressing proper food storage in grizzly bear habitat to help reduce the potential for human-bear conflicts. Although sanitation is outside the scope of the proposed Amendment, and as such is not addressed by it, due to reinitiation of consultation on the Forests' LRMPs to address effects to bears occurring outside the Recovery Zones, the Service considers the issue of sanitation and its effect upon grizzly bears relevant to this biological opinion. Sanitation was also previously addressed in the Service's 2001 Biological Opinion. Attraction of grizzly bears to improperly stored food and garbage is identified by the Recovery Plan as one of the principal causes of grizzly bear mortality. At least one bear mortality in the CYRZ can be directly attributed to bear attraction/habituation by improper food storage. Additionally, a grizzly bear in the Selkirks had to be relocated as a result of attraction to improperly stored food (this bear was subsequently illegally killed by a hunter). Most recently, in May of 2003, a subadult male grizzly bear in the CYRZ had to be captured and relocated due to repeated entrances into a non-bear resistant dumpster located on federal land. Numerous black bears in both Ecosystems have been removed or killed as a result of human conflicts stemming from improper food storage.

Currently, however, the Forests are developing sanitation programs. In 2002, pursuant to guidance from the IGBC, the KNF and IPNF convened an Information and Education Workgroup to begin developing a comprehensive sanitation program that will include a food

111

storage order on public land. The IGBC has recommended that all Forests within grizzly bear recovery areas implement food storage orders to help reduce bear habituation to humans and to minimize the potential for bear/human conflicts. These programs will include, among other things, public education, and the development and implementation of food storage orders on national forest system lands within the Recovery Zones. The Service is participating in the development of these sanitation programs, and believes appropriate progress is being made to address sanitation related issues on the Forests.

### B.    Canada Lynx

Several LAUs coincide within the boundaries of the SRZ and CYRZ. The activities proposed to be undertaken by the Amendment are essentially to reduce open and total road densities, primarily forest roads, within the SRZ and CYRZ. The proposed Amendment will not result in increases of temporary unsuitable lynx habitat, or affect the quantity, composition, or distribution of lynx habitat within LAUs, including foraging and denning habitat.

Currently, there is little information on the effect of forest roads on lynx or its prey (Apps 2000, McKelvey et al. 2000c). Preliminary information suggests that lynx do not avoid roads, (Ruggiero et al. 2000a), except at high traffic volumes (Apps 2000). High traffic volumes are normally associated with highways. Forest roads typically do not receive use levels that would be considered high (i.e., >2,000 vehicle per day). Forest roads may reduce lynx habitat and increase fragmentation through the removal of cover. On the other hand, however, these roads may provide good snowshoe hare habitat where they are well vegetated along the roadside, and lynx may use the roadbed for travel and foraging (Koehler and Brittell 1990). However, reducing the overall availability and density of forest roads may result in net, long-term benefits to lynx through decreasing habitat fragmentation and disturbance, especially related to winter snow-compacting activities.

Forest roads may also be used by winter recreationists (e.g., snowmobilers, etc.), resulting in compacted snowtrails. Compacted snowtrails may facilitate access of competing carnivores, such as mountain lions (*Felis concolor*), coyotes (*Canis latrans*), and bobcats (*Lynx rufus*) into lynx habitat. The LCAS addresses the role that the compaction of snow trails, for recreational activities, may play in facilitating interspecific competition of these species with lynx, at least during the winter. For example, it is speculated that bobcats (*Lynx rufus*) and coyotes (*Canis latrans*) may utilize compacted snow trails during the winter to access high elevation lynx habitat that would normally be inaccessible to them during this time, and compete with lynx for an already naturally fragmented and limited preybase of snowshoe hares. However, the information indicating to what extent these species utilize these avenues to access lynx habitat during the winter, and to what degree such access enables them to exploit snowshoe hares and compete with lynx is purely anecdotal at this point.

Preliminary research information suggests that these compacted snow trails may facilitate access by other species into higher elevation habitats during some portions of the winter when they would normally be excluded due to snow conditions. However, these potential competitors

000117

likely are not able to efficiently negotiate the deep snow off compacted trails, which may limit their ability to capture snowshoe hares. Thus, these other species may not be able to appreciably impact the snowshoe hare base over extensive areas. Additionally, due to natural climatic conditions that may occur several times over the course of a winter, snow density conditions are such that these other species are able to naturally access higher elevation habitats for limited periods of time.

Therefore, currently it is unknown to what extent compacted snow trails may facilitate increased interspecific winter forage competition with lynx in higher elevation habitats. However, given the uncertainty in this area, and the need to act conservatively erring on the side of the listed species, the LCAS incorporated a standard requiring no net increase in groomed or designated over-the-snow routes and snowmobile play areas within individual LAUs, unless the designation serves to consolidate unregulated use and improves lynx habitat through a net reduction of compacted snow areas. Additionally, to facilitate an evaluation of the extent to which compacted snow trails may affect lynx, the LCAS requires the mapping and monitoring of all snow compacting activities within lynx habitat, such as snowmobiling, snowshoeing, cross-country skiing, and dog sledding.

The proposed Amendment will not result in an increase in designated or groomed over-the-snow routes or snowmobile play areas within LAUs. The proposed amendment will, however, reduce the availability and density of roads potentially available for use by snowmobilers, cross-country skiers, etc. Therefore, to the extent that compacted snow surfaces may facilitate interspecific competition with lynx, reducing the availability and density of such surfaces for compaction may be beneficial to lynx.

Activities associated with closing/restricting roads, may cause some short-term disturbance and displacement of lynx. However, such disturbance and displacement are expected to have very minor effects upon lynx behavior or habitat use. While rigorous scientific studies to elicit the effects of disturbance upon lynx behavior have not been undertaken, anecdotal information suggests that lynx are quite tolerant of humans and disturbance (Rudiger et al. 2000). Given that lynx seem somewhat tolerant of human activities, the effects of short-term disturbances associated with closing and/or restricting roads would be discountable and would not be measurable.

## C.    Bull Trout

The rule listing the entire coterminous population of bull trout determined that each DPS, due to its isolation from the other DPSs, would serve as interim recovery units for the purposes of consultation and recovery planning. The Services' *Endangered Species Consultation Handbook* (USFWS and NMFS 1998) allows for a jeopardy analyses for actions under formal consultation to be done at the DPS level as opposed to the entire coterminous United States range of this species. Therefore, this action has been analyzed within the Columbia River bull trout DPS.

000118

For purposes of consultation under section 7 of the Act, the "action area" is defined by 50 CFR 402.02 as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." Although the specific actions which might potentially affect the covered species are restricted to National Forest System lands within the grizzly bear Recovery Zones on the KNF, LNF, and IPNF, the effects of the action on these species may extend beyond this area. Effects considered are only applicable to those watersheds where bull trout may or are known to be present. Bear Management Units 15 and 16 encompass the Yaak River on the KNF and are unoccupied by bull trout. If bull trout presence is unknown, it is assumed that, if connectivity is available with a known sub-population of bull trout, they are present.

The Forest Service determined that the proposed action, to set road density standards within the grizzly bear Recovery Zones, may affect and is likely to adversely affect bull trout. Therefore, an analysis of these effects to bull trout from the implementation of the actions necessary to meet the proposed standards is required throughout the action area. This analysis has focused on those BMUs in the Recovery Zones not currently meeting core or TMRD standards. Bear Management Units which are not currently meeting core or TMRD standards (based on 2002 road density analyses) and are therefore being analyzed in this opinion are: 3, 8, 9, 11, 15-17, 22, Boulder, Grouse, Scotchman, Blue-Grass, Kalispell-Granite, and Sullivan-Hughes.

The Forest Service indicated that those BMUs meeting proposed standards will not have actions associated with the proposed action; therefore those BMUs will not be addressed in this consultation (USFS 2002a). Future projects within these BMUs meeting proposed standards, regardless of the nature of the project, will need to have a separate analysis conducted by the Forest Service to determine if there may be effects to bull trout. It is also expected that should the Forest Service determine that a future project may affect bull trout, or its designated critical habitat, or other listed species, they will consult with the Service on those potential effects.

*Direct and Indirect Effects*

Direct effects encompass the direct or immediate effects of the project on the species or its habitat. Indirect effects are those that are caused by the proposed project and are later in time, but are still reasonably certain to occur. Future actions with federal agency involvement, not mentioned in this biological opinion, and which potentially impact bull trout are not covered under this document but are subject to separate section 7 of the Act analysis and review.

The proposed action sets standards for road densities within BMUs. Standards are proposed for core habitat as well as TMRD and OMRD within each BMU. Techniques to increase the percentage of core habitat in a given BMU generally involve reclaiming/obliterating a road whereas methods to reduce the amount of a BMU's TMRD include restriction of vehicular access using a gate or berm or possibly reclaiming or obliterating the road. Actions that may impact bull trout and/or its proposed critical habitat that are associated with meeting the proposed habitat security standards for each BMU may include road reclamation and/or obliteration or placement of roads into a restricted access status using a barrier (e.g. gate or

114

000119

berm) to vehicular traffic. Road reclamation or obliteration can include recontouring the road prism and associated culvert removals "in such a manner so as to no longer function as a road" (USFS 2002c). Methods which may be implemented to achieve this include: recontouring the road prism to the original slope, placement of forest debris, planting vegetation including shrubs and/or trees and obliterating/barriering the road entrance. Restricted access to a road, whether annually or seasonally, requires effective physical obstruction of the opening but still allows vehicular traffic during certain times of the year or under an administrative access. Placing a gate or berm on a road to limit vehicular traffic to administrative use only will not result in any additional adverse affects to bull trout due to standards currently in place requiring those roads to be maintained to standards already established with the LRMPs for the Forests. Alternative E in the FEIS (USFS 2002c) proposes to have between 337-514 miles of road reclaimed or obliterated as well as having 18-26 miles of road restricted to vehicular traffic by the placement of a gate or a berm. Tables 3-29 and 3-30 of the FEIS (USFS 2002c) show the estimated road status changes by BMU; however, specific actions and locations are not available due to the programmatic nature of this opinion and will be consulted on during a step-down consultation approach.

A temporary increase in sediment inputs from culvert removal, streambank and streambed restoration activities may directly and indirectly affect bull trout. The effects from the roads themselves which may cause increased sediment input were consulted on when bull trout were listed (USFWS 1999) and are not part of the proposed action. Additionally, road maintenance activities on the KNF and LNF were consulted on under a programmatic biological opinion (USFWS 2002c) and are also not part of the proposed action. The Forest Service has detailed best management practices designed to minimize these impacts contained within the Forest Service's Handbook and Manuals.

*Sedimentation*

A temporary increase in sediment may result from the construction methods for removing culverts and roadbed material, streambank stabilization techniques, and streambed restoration activities during road reclamation/obliteration activities. Additionally, a large volume of sediment can be introduced into the systems from un-maintained culverts and roads. The Forest Service is not proposing to leave any roads un-maintained; however, creation of core habitat precludes vehicular traffic for administrative use, including maintenance actions, and therefore roads within core areas may not have maintenance actions associated with them. Implementation of these proposed standards may reduce the long term threat from culverts and roads by removing the risk of road prism failure and restoring the natural hydrology patterns to road crossings.

Burns (1970, as cited in MBTSG 1998) reported that surface erosion from roadbeds and drainage ditches can be a primary source of sediment in streams, depending upon the soil types. Watersheds having a high density of roads commonly have increased sedimentation and peak flows (Luce 1997). Mass movement of landforms and road failures are often the primary means of sediment delivery to stream systems, and can be compounded by insufficient culvert sizes or poorly maintained culverts jamming up with debris (MBTSG 1998). Everest et al. (1987 as cited

115

in MBTSG 1998) reported that forest roads can substantially increase the mass soil movement frequency.

The deposition of fine sediments in salmonid spawning and rearing habitat increases mortality of bull trout embryos, alevins, and fry (Shepard et al. 1984, Pratt 1984, Fraley and Shepard 1989, Rieman and McIntyre 1993). Increased sediment levels in spawning gravels lower the survival rate of bull trout eggs to the emergence stage (Weaver and Fraley 1993). Increases in sediment levels to certain thresholds (more than 30 percent of materials less than 6.4 mm) result in embeddedness that is associated with sharp declines in juvenile bull trout densities and embryo survival to emergence (Shepard et al. 1984).

Increased embeddedness from sedimentation also results in decreased aquatic insect production and diversity. Juvenile bull trout feed primarily on aquatic macroinvertebrates, and the distribution of aquatic macroinvertebrates inhabiting running water environments is highly dependent on substrate particle size (Cummins and Lauff 1968). Increased levels of deposited sediment reduce the quantity of the food base for bull trout resulting in slower growth rates, higher mortality, and reduced fecundity of bull trout. Sedimentation could also reduce the amount of rearing habitat available to juvenile and sub-adult bull trout, as well as adult bull trout, by decreasing the availability and quality of the necessary pool habitat and the interstitial spaces.

The Forests have stated that the "greatest long-term risk to bull trout would result from barriered roads that are not hydrologically neutral prior to closure" (USFS 2002a, p. 42). Additionally, the lack of maintenance of forest roads is the number one cause of road failures and subsequent sediment introduction to stream channels (USFS 2002a). This lack of maintenance may result in culverts becoming plugged with debris, increasing the likelihood of the road prism being eroded into the stream channel. Removal of culverts from active stream channels significantly reduces the amount of sediment that may be introduced to the stream channel should the culverts become plugged and the road prism be eroded into the channel. The Flathead National Forest (USFS 1999) has estimated that sediment input into an active channel from culvert removal is based upon the burial depth of the culvert and ranges from 3.1 yds$^3$ to 8.4 yds$^3$ (culvert burial depths of 4.1 ft to 15.8 ft, respectively). They estimated the amount of sediment from an eroded road prism above a blocked culvert to range from 5 yds$^3$ to 136.3 yds$^3$ (culvert burial depths of 4.1 ft to 15.8ft, respectively). The topography and geology of the Flathead National Forest is more sensitive to erosive forces than those portions of the action area in the Kootenai River basin and the Priest Lake Basin, and is similar to those found in the lower Clark Fork River watershed.

The Forest Service will be adhering to their's, the State of Montana's, and the State of Idaho's best management practices to further reduce any sediment from construction activities. Techniques for the removal of culverts and the subsequent streambank and streambed restoration actions are detailed in the Forest Service's Handbooks and Manuals. The Forests have proposed no additional minimization measures due to the programmatic nature of this action and will consult on future individual actions in a step-down approach.

116

The proposed action may result in short-term increase of sediment from both construction activities and any overland flow from the disturbed roadbed. It is expected that during and after construction an unspecified amount of sediment will be delivered into the stream channel where bull trout may be present. The amount of sediment delivered into each watershed is difficult to quantify due to the unknown nature of the future actions, and the variance of factors such as topography, hydrology, geology, and scope of activities within a drainage, which all affect the sediment load of a given stream. Due to this difficulty, the exact effects and the degree of impact is indeterminate but, the full range of adverse impacts to bull trout from lethal to discountable may occur, depending upon the circumstances and the life stage affected.

The temporal nature of the effects range from short-term effects to long-term potentially stabilizing effects. The short-term increase in sedimentation from road closure activities ranging from total road obliteration, including the associated culvert removals, to partial obliteration or removal of the ability to drive on a given road, is difficult to establish. It is expected to last 1-3 years following road closure activities and depends on level of closure, soils types, precipitation patterns, success of re-vegetation efforts and other variables. The long-term nature of the effects could range from road failures and a heavy increase in sediments from those roads in core habitat areas that do not have proper maintenance or drainage structures, to stabilizing effects from the removal of the road network and associated stream crossings in a given watershed. The Service estimates that upon removal of a culvert and the associated restoration efforts such as vegetative plantings, adverse effects from sediment delivery will be minimized after a period of 3-5 years while the vegetation establishes and secures the soil from erosive forces.

Appendix B shows the known bull trout occupied watersheds in BMUs which fail to meet either the proposed standards for TMRD or the proposed standard for percentage of core habitat. It also shows the miles of road within a given 6th code HUC. Appendix B shows the estimated miles of road to be restricted or reclaimed/obliterated for each BMU not currently meeting standards and which contain bull trout watersheds. This data allows for an approximation of the level of effects that may occur within a BMU, and, coupled with information in Appendix B, an estimation can be generated of the level of effects to bull trout within a given BMU. The following discussion uses data in Appendix B for analyses of the potential level impacts to bull trout within specific watersheds.

Upper Kootenai River Subbasin

Within this subbasin, three BMUs are not currently meeting either TMRD or core habitat standards as proposed (BMUs 11, 16, and 17). The Forest Service has indicated that 1-2 percent (2-5 miles) of all the road miles within BMU 11 (254 miles) will be reclaimed or obliterated. This BMU has 4.7 percent (12 miles) of its road miles within watersheds containing bull trout. It is unknown which roads will be reclaimed or obliterated; however, it is anticipated that bull trout occupied watersheds within BMU 11 will receive very low impacts to bull trout due to the low level of road reclamation activities, and the low road miles found within bull trout watersheds.

117

000122

The Forest Service is estimating that for BMU 16, 14-20 percent (64-96 miles) of its 469 miles of road will be reclaimed or obliterated. This BMU has 2.6 percent (12 miles) of its road miles within the solitary bull trout watershed (Young Creek). Bull trout infrequently use the upper portions of Young Creek where BMU 16 intersects this watershed, and, due to the low road miles found within the Young Creek watershed, it is anticipated that impacts to bull trout will again be very low.

Additionally, BMU 17 has 11 (3.6 percent) of its 307 road miles within bull trout watersheds. The Forest Service estimated that 30-40 miles of road (10-13 percent) will need to be reclaimed or obliterated to meet the proposed standards. The headwaters of Pipe Creek (1 road mile) and East Fork Pipe Creek (10 road miles) are located within this BMU. While road densities are high (3.2 $mi/mi^2$) within East Fork Pipe Creek watershed (FUR for road density indicator), they are mainly outside of the BMU. The sediment indicator and the substrate embeddedness are both FA (USFS 2002a). It is anticipated that due to the low road miles within bull trout watersheds, and the low road miles to be reclaimed or obliterated, that effects to bull trout within BMU 17 will be minimal.

## Lower Kootenai River Subbasin

Within this subbasin there are 6 BMUs which are not currently meeting either TMRD or core habitat standards as proposed (3, 9, 11, Boulder, Grouse, and Blue-Grass). Within BMU 3, the Forest Service has indicated that 3-9 percent (10-30 miles) of the roads within the BMU (320 miles) will be reclaimed and/or obliterated. However, this BMU has over 92 percent of its roads (297 miles) contained within watersheds which have bull trout. Therefore, it is likely that the impacts associated with the 10-30 miles road reclamation and obliteration within this BMU will occur within bull trout watersheds (Stanley, Keeler and Lake Creeks). These watersheds are all FUR for the integration of the species and habitat indicators in the Framework (USFS 2002a). However, the Forest Service indicated that the road density and disturbance history indicators were FAR for the Lake Creek watershed (USFS 2002a). This action is likely to increase the amount of sediment in those watersheds where activities occur in the short-term; however, the long-term effects should result in a reduction of sediment in those watersheds due to the stabilizing nature of the activities. It is unknown which roads will be reclaimed or obliterated, however it is anticipated that bull trout occupied watersheds within BMU 3 will receive low amounts of impacts to bull trout due to the relatively low level of road reclamations activities and the low road miles found within bull trout watersheds.

Within BMUs 9 and 11, impacts are expected to be minimal due to the low amount of roads anticipated to be reclaimed or obliterated, coupled with the amount of roads within the BMU found in bull trout occupied watersheds. Approximately 1-4 percent (5-15 miles) of the roads within BMU 9 are anticipated to be reclaimed or obliterated, and of the 358 miles of road within this BMU, 37 percent of the roads (129 miles) are found within bull trout occupied watersheds (Lower Lake Creek and Callahan Creek). Lower Lake Creek and Callahan Creek were FAR for the road density indicators, and Callahan Creek was FUR for the disturbance history indicator. For BMU 11, 1-2 percent (2-5 miles) of the BMU's 254 miles are expected to be reclaimed or

118

000123

obliterated. However, only 2 miles of the BMU's 254 miles are found within bull trout occupied watersheds (Lower Yaak River) within this subbasin. The lower Yaak River is currently FAR for road densities and FUR for disturbance history indicators (USFS 2002a). This action is likely to increase the amount of sediment in those watersheds where activities occur in the short-term; however, the long-term effects should result in a reduction of sediment in those watersheds due to the stabilizing nature of the activities. It is unknown which roads will be reclaimed or obliterated; however, it is anticipated that bull trout occupied watersheds within BMUs 9 and 11 will receive very low impacts to bull trout due to the low amount of road reclamation activities, and the low road miles found within bull trout watersheds.

It is anticipated that the Boulder BMU (number 18) may receive greater impacts associated with the proposed action due to the higher amount of roads anticipated to be reclaimed or obliterated; 11-14 percent (20-25 miles) of the BMU's 183 miles are expected to be reclaimed and/or obliterated. Of the BMU's 183 miles, 179 miles are found within bull trout occupied watersheds (Boulder Creek). However, the Forest Service indicated that it is unknown whether bull trout occupy the upper Boulder Creek, and bull trout have only been found in the lower 1-2 miles of the watershed. Even though it is unknown which watersheds will have activities, the impacts to bull trout are expected to be minor due to the sediment indicator FA, the low level of disturbance (ECA is 6 percent), and moderate road density (1.5 mi/mi$^2$).

The Forest Service expects to reclaim or obliterate 4 percent (10-12 miles) of the 271 miles of road found within the Blue-Grass BMU. There are 231 miles of road (85 percent) found within suspected bull trout occupied watersheds. As described in the "Environmental Baseline" portion of this biological opinion, bull trout have been reported in the Boundary Creek watershed in the past; however, recent surveys in the 1990s failed to find any bull trout. Currently, the road density within the Boundary Creek watershed is moderate at 2.3 mi/mi$^2$, with the riparian road density being lower at 1.3 mi/mi$^2$. Road-stream crossings at 1.0 crossings/mi are also low. Therefore, it is anticipated that impacts within this watershed will be minimal due to the low amount of riparian roads and crossings, the small amount of anticipated activities, and the very low, if any, numbers of bull trout within this watershed.

Lower Clark Fork Subbasin

There are two BMUs which currently are failing to meet the road density standards as defined by the proposed action (BMUs 8 and 22). The Forest Service anticipates reclaiming or obliterating less than ½ mile of road within this BMU. There are currently 214 miles of road within this BMU, of which 197 miles are in watersheds occupied by bull trout. Vermillion River is the primary bull trout watershed within this BMU and has known bull trout spawning locations below the Vermillion Falls. This watershed is currently FA for the sediment indicator; however, it is FUR for the integration of the habitat and population indicators in the Framework. This is due to past riparian harvesting and intermittent base flows. Based upon the very low amount of activities anticipated from the proposed action and the current FA determination for the sediment indicator, it is anticipated that the impacts to this watershed will be minimal.

119

The Forest Service anticipates reclaiming or obliterating between 15-18 percent (126-153 miles) of roads within BMU 22. Of the 853 miles of road within the BMU, 127 miles within the BMU are located on the private lands of Plum Creek. Approximately 521 miles of roads within the BMU are found within bull trout occupied watersheds (Fishtrap Creek and Thompson River drainages predominantly); it is unknown how many of the roads on Plum Creek lands are located in bull trout occupied watersheds. Within this watershed, the Thompson River serves predominantly as a migratory corridor with some rearing in the mainstem and its tributaries. The majority of spawning activities occur in Fishtrap Creek and West Fork Thompson River drainages. There are 169 miles of road within the Fishtrap Creek watershed and 44 miles within the West Fork Thompson River watershed. Fishtrap Creek is currently FUR for the sediment and road density indicators from the Framework. Additionally, the West Fork Thompson River is FAR for road density and an integration of the species and habitat indicators. It is unknown which roads will be reclaimed or obliterated. However, it is anticipated that bull trout occupied watersheds within BMU 22 will receive moderate impacts to the species due to the high level of overlap between bull trout occupied watersheds and watersheds with high road densities. Additionally, due to past forest management actions, Fishtrap Creek is already in a degraded condition. However, bull trout primarily use the Fishtrap Creek watershed as spawning habitat within this BMU, indicating that while legacy effects may have impacted the successful recruitment of bull trout within Fishtrap Creek, additional impacts of the short-term nature are not likely to extirpate bull trout from this watershed. However, the long term effects from the stabilization of this watershed may increase bull trout recruitment levels within the Fishtrap Creek watershed, specifically, and generally within the Thompson River drainage.

Lake Pend Oreille Subbasin

There are two BMUs which currently are failing to meet the road density standards as defined by the proposed action (Scotchman and Grouse BMUs). Within the Grouse BMU (number 19), the Forest Service anticipates reclaiming or obliterating 6-8 percent (20-25 miles) of the 315 miles of road within the BMU. However only 54 percent of the BMU is under Forest Service jurisdiction and only 142 miles of road are on the IPNF. Closing 20-25 miles of road on the IPNF would mean that 14-18 percent of the roads on the Forest within the Grouse BMU may be reclaimed or obliterated. Currently, only TMRD is failing to meet proposed standards within the Grouse BMU. All roads within the BMU lie within bull trout occupied watersheds. Grouse Creek is the primary bull trout stream within this BMU and has known bull trout spawning. This watershed is currently FAR for an integration of the species and habitat indicators in the Framework. Specifically, the road densities are moderate at 1.6 mi/mi$^2$ (within IPNF lands) with a higher riparian road density of 1.9 mi/mi$^2$ and a high ECA of 28 percent predominantly due to legacy harvest activities. Therefore, due to the narrow scope of the impacts which may occur only on National Forest System lands, the utilization of this watershed by spawning bull trout, and the past legacy effects, impacts from the proposed action on local populations may be moderate.

The Forest Service expects to reclaim or obliterate 2 percent (2-3 miles) of the 133 miles of road within the Scotchman BMU. All the miles of road within this BMU occur in bull trout occupied watersheds (Lightning Creek predominantly). The Lightning Creek watershed has been heavily

120

impacted from natural mass-wasting events as well as land management activities, creating an unstable channel and lack of habitat complexity in the mainstem Lightning Creek (PBTTAT 1998b). The mainstem Lightning Creek is braided and has a high width to depth ratio (PBTTAT 1998b). Lightning Creek's road density is moderate at 1.1 mi/mi$^2$ and the ECA is 11 percent (meeting notes April 1-2, 2003). Even though this watershed has been heavily impacted due to natural and man caused events, it is anticipated that effects to bull trout from the proposed action will be minimal due to the low amount of activities expected to occur within this BMU to meet the proposed standards.

Priest Lake Subbasin

There are two BMUs which currently fail to meet the standards proposed by the Forest Service (Kalispell-Granite and Sullivan-Hughes). The Forest Service anticipates reclaiming or obliterating 7-8 percent (30-35 miles) of the 460 miles of road within the Kalispell-Granite BMU. There are 417 miles (90 percent) of road found within bull trout occupied watersheds (Kalispell and Granite Creeks, predominantly) within this BMU. The Kalispell Creek watershed has a high road density of 3.5 mi/mi$^2$ and a moderate ECA of 11 percent, leading to determinations of FUR and FAR for the road density and disturbance history, respectively, using the parameters in the Framework. Additionally, a fisheries survey in 2002 failed to find any bull trout; however, a habitat evaluation of the fish habitat in 2002 found "good" habitat (Weidich 2002). The Granite Creek watershed also has high road densities (2.9 mi/mi$^2$) and a moderate ECA of 12 percent, leading to a FUR and a FAR determination, respectively, using parameters in the Framework. This action is likely to increase the amount of sediment in those watersheds where activities occur in the short-term. It is unknown which roads will be reclaimed or obliterated within this BMU. However, it is anticipated that suspected bull trout occupied watersheds within the Kalispell-Granite BMU will receive a low level of impacts to bull trout due to the small amount of road reclamations activities, the "good" habitat conditions, and the failure to find bull trout during several surveys in the 1990s and 2002.

The Forest Service anticipates reclaiming or obliterating 7-10 percent ( 20-27 miles) of the 275 miles of road within the Sullivan-Hughes BMU. Roads within bull trout occupied watersheds account for 53 percent (147 miles) of the roads within this BMU. The majority of the roads (78 miles) within bull trout occupied watersheds are found within the Hughes Creek drainage. Hughes Creek above its confluence with its tributary Gold Creek, is FAR for both road density and disturbance history as defined by the parameters in the Framework. Gold Creek however, is FUR for road density and FAR for disturbance history. Bull trout are known to spawn in the Hughes Creek drainage including the Gold Creek drainage. Should activities occur within the Hughes Creek watershed, particularly Gold Creek, impacts to bull trout may be moderate due to the presence of spawning bull trout, the relative high amount of reclaimed or obliterated roads per bull trout occupied watersheds, and the high level of impacts the Gold Creek drainage has already seen.

000126

<u>Summary of Direct and Indirect Effects Analysis</u>

Short-term adverse effects may occur during road reclamation/obliteration activities on both perennial and intermittent streams. Sediment disturbing activities such as culvert removal and the associated streambank recontouring, along with the disturbance of the road prism itself, may result in adverse effects to both spawning and rearing bull trout from both direct mortality as well as loss of habitat. Migratory bull trout may become disoriented should they encounter a large pulse of sediment. Additionally, feeding rates may be retarded due to sediment inputs into rearing habitat. Short-term impacts are estimated to last between 3-5 years. This duration is related to the period of successful re-establishment of vegetation. State and Federal BMP's call for re-vegetation efforts for streambed restoration projects associated with road crossings. These short-term effects may occur throughout the action area in those BMU's not currently meeting TMRD and/or core habitat standards. Effects associated with gating or berming a road to restrict but not eliminate vehicular traffic have already been analyzed as part of the consultation on the Forest LRMP's, and are not considered effects for this proposed action.

It is anticipated that the implementation of proposed standards may result in positive impacts for bull trout after project completion over the long-term. This project should reduce the long-term sediment input by restoring the stream channel to a naturally functioning condition, and potentially providing additional bull trout habitat availability, as well as re-vegetating the streambank and establishing a healthy riparian zone. Additionally, by reducing the road densities in key bull trout watersheds, threats posed by road failures will be removed. By removing the culverts, the risk of a road failure, resulting in a large volume of substrate material (amount varies with conditions) entering the systems, is greatly reduced.

## V.    **Cumulative effects**

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

### A.    **Grizzly Bear**

<u>Selkirk Ecosystem</u>

Approximately 56 percent of the SRZ is outside of Federal ownership; 47 percent lies within British Columbia, and nine percent is under State or private land ownership within the U.S. State or private lands comprise 20 percent of the U.S. portion of the Selkirk Ecosystem. Most of the State (IDL) and private land within the SRZ is managed for timber production and is therefore subject to ongoing road construction and periodically high levels of human activity. The same is true for much of the British Columbia portion of the SRZ. These lands are not subject to the same management standards as Federal lands within the SRZ. Ongoing land management activities and associated road construction are reasonably certain to occur

000127

throughout these lands for the foreseeable future, resulting in increasing road densities and habitat fragmentation in a significant portion of the SRZ. For example, Stimson Lumber Company is proposing to access several sections of their land within the LeClerc BMU to harvest timber. This access will include the construction of approximately 17 miles of new roads, resulting in a decrease in core habitat and an increase in total road densities; open road densities will remain the same. Additionally, the IDL owns and manages a significant portion of the land base within the SRZ (approximately 8 percent), and as indicated above, much of it is managed for timber production. Road construction and management of the existing road base, associated with timber management, is likely to continue on IDL lands within this ecosystem. However, recently the IDL has begun the process of developing a Habitat Conservation Plan, which will incorporate measures to ensure adequate protection and maintenance of grizzly bear habitat through addressing the effects of its land management activities upon this species.

Since 1982 there have been a total of 40 known grizzly bear mortalities in the SRZ. Of the total mortalities, 20 (50 percent) were related to guns. Of the gun related mortalities, 11 (55 percent) were hunting related (mistaken identities, self-defense, etc.). Six of the gun-related mortalities are currently under investigation. Hunting is expected to continue in this Ecosystem.

Additionally, human population growth is expected to occur in or near the areas of identified grizzly bear occupancy within the Selkirk Ecosystem adjacent to the SRZ. Human population growth may result in various levels of effects to grizzly bears and their habitat, which can be mitigated, depending on: where and how such growth occurs; implementation of proper sanitation measures; dissemination of adequate materials providing public education information on living in grizzly bear habitat and support for dealing with nuisance bears; and adequate hunter and recreational education information regarding grizzly bear conservation needs.

Cabinet-Yaak Ecosystem

The majority (90 percent) of the CYRZ is under Federal ownership, with only 10 percent comprised of State and private lands. Activities occurring on State and private lands in the CYRZ would be similar to those described above for the Selkirk Ecosystem. Similar to the Selkirk Ecosystem, mortality, especially recent mortality, is impacting the recovery of this population. Since 1982 there have been a total of 28 known grizzly bear mortalities. Of the total mortalities, 11 (39 percent) were related to guns. Of the gun related mortalities, nine (82 percent) were hunting related ( mistaken identities, self-defense, etc.). Two of the gun-related mortalities are currently under investigation. Hunting is expected to continue in this ecosystem.

Human population growth is expected to continue within this Recovery Zone, as well as in or near the areas of identified grizzly bear occupancy adjacent to the Recovery Zone. Human population growth may result in various levels of effects to grizzly bears and their habitat, which can be mitigated, depending on: where and how such growth occurs; implementation of proper sanitation measures; dissemination of adequate materials providing public education information

000128

on living in grizzly bear habitat and support for dealing with nuisance bears; and adequate hunter and recreational education information regarding grizzly bear conservation needs.

### B.    Canada lynx

State owned lands, corporate timber lands, and private inholdings within the boundaries of these Forests will continue to be developed. Thus, impacts to Canada lynx resulting from road management (including, but not limited to, construction, reconstruction, and maintenance), timber harvest, recreation, etc. are likely to continue. All forms of recreational pressures are increasing on these Forests, and could result in fragmentation, degradation, and loss of lynx habitat. However, increasing winter recreation (snowmobiling, helicopter and cross-country skiing), may be particularly problematic in that it may not only cause harassment and displacement of lynx, but may also facilitate access into higher elevation habitats by predators of, and competitors with lynx. Road construction, which facilitates increased winter recreational access into lynx habitat, will exacerbate the recreational pressures on lynx and its habitat. However, when building temporary roads within lynx habitat, not allowing or designating such roads as new winter recreational routes would minimize the effects of human use and activities associated with these roads in lynx habitat.

### C.    Bull Trout

Cumulative effects on bull trout range from illegal harvest activities to development on private lands. Commercial and residential development may further lead to fragmentation of bull trout habitat and sub-populations, degrade water quality and degrade fish habitat. Development is reasonably certain to occur along the major rivers and lakes in this analysis area, particularly the Pend Oreille and Priest Lakes. Timber harvest and the associated activities on Idaho State lands bordering the upper and lower Priest Lakes will impact the water quality and fish habitat of those watersheds on the east side of the upper and lower Priest Lakes. Additionally, timber harvest and the associated activities can occur on private lands within the analysis area. The Plum Creek Timber Company HCP activities are currently being implemented to provide minimization measures to protect and conserve bull trout, predominantly in the Thompson River watershed and the Middle Kootenai River subbasin. The Montana Department of Natural Resources and Conservation is currently developing an HCP with the intention of minimizing impacts to listed species from their land management actions. Their activities are predominantly located in the lower Clark Fork River subbasin. Stimson Lumber Company has developed and is implementing an HCP on their lands in the vicinity of Troy, Montana. Their minimization measures and implementing conditions mirror those of the Plum Creek Timber Company HCP.

Additionally, the seven watershed councils in Montana, and the Pack River watershed council in Idaho may be implementing restoration plans in their respective watersheds which may result in short-term effects to bull trout with the long-term goal of watershed stabilization. Avista is currently pursuing a program which is restoring fisheries habitat as well as acquiring key riparian lands with the intention of protecting the habitat values. Additionally, they are implementing a plan to provide for both upstream and downstream bull trout passage. Their activities are limited

000129

to the lower Clark Fork River and Lake Pend Oreille. Pennsylvania Power and Lighting is currently analyzing the feasibility of upgrading their existing fish ladder at the Thompson Falls Hydroelectric Dam, with the intention of improving and restoring fish passage past that dam. Both MFWP and IDFG conduct bull trout surveys and limited restoration projects throughout the action area, which may result in additional impacts to the species.

## VI.    Conclusion

### A.    Grizzly Bear

After reviewing: the current status of the grizzly bear, environmental baseline, effects of the proposed Amendment, effects of the implementation of the current LRMPs, and cumulative effects; it is the Service's biological opinion that implementing the proposed Amendment (within the Recovery Zones) and current LRMPs (outside the Recovery Zones) are not likely to jeopardize the continued existence of the grizzly bear within the SRZ and CYRZ. No critical habitat has been designated for this species, therefore, none will be affected.

We base our conclusion on the fact that overall core grizzly bear habitat within these Recovery Zones will increase, and will be provided at quantities sufficient to support the average female grizzly bear's home range needs, as indicated by research in these Recovery Zones. By 2013, within the SRZ, 70 percent of the BMUs (7 of 10 BMUs) will equal or exceed 55 percent core habitat, and overall core habitat within the SRZ will equate to about 64 percent of the landbase within the SRZ. By 2013, within the CYRZ, 91 percent of the BMUs (20 of 22 BMUs) will equal or exceed 55 percent core habitat, and overall core habitat within the CYRZ will equate to about 58 percent of the landbase within the CYRZ. Additionally, several BMUs within these Recovery Zones will provide substantially more than 55 percent core habitat. Those BMUs that will not achieve 55 percent core habitat are either very small in size (i.e., Lakeshore BMU), or contain less than 75 percent federal ownership (i.e., LeClerc, Grouse, and IDL BMUs), with the exception of BMU 10, which has 95 percent federal ownership. Additionally, within the SRZ, of the BMUs affected by the proposed Amendment, all but one (Lakeshore BMU) will achieve OMRD and TMRD standards that research, conducted within these Recovery Zones, suggests the average female grizzly bear can tolerate within her home range. Within the CYRZ, 68 percent of the BMUs will achieve OMRD standards and TMRD standards suggested necessary by research. Similar to core habitat, several BMUs within the SRZ and CYRZ will substantially exceed (be better than) the research thresholds for OMRD and TMRD.

Relative to grizzly bears that may be occupying areas adjacent to these Recovery Zones within these Ecosystems, the Service is unaware of any human-related grizzly bear mortalities, including subadult or adult females, that have occurred in these areas. The proposed Amendment, or the continued implementation of the Forests' LRMPs, is not expected to increase the risk of grizzly bear mortality within these areas. However, it is not known if adult grizzly bears, which may exist in these areas, are able to successfully recruit offspring into the breeding population, or if such offspring are able to establish home ranges within these areas.

000130

Furthermore, grizzly bear densities are low within the Recovery Zones, and are likely lower in the delineated areas adjacent to them. Thus, grizzly bears, especially females with young, have opportunities to find areas and avoid direct competition or confrontations with other grizzly bears, including large, dominant male grizzly bears. The ability to avoid confrontations with other grizzly bears reduces the possibility that large dominant male grizzly bears may encounter and kill either young subadult females or females with young.

Some level of indirect take, in the form of displacement effects, may be occurring within the areas of identified grizzly bear occupancy outside of the Recovery Zones due to the existing road densities. Existing road densities may translate to incidental take of grizzly bears through habitat impacts and stress, which, for example, may lead to reduced reproductive fitness of adult female grizzly bears through reabsorption of fetuses and mortality of offspring. However, it is very difficult to document or establish whether this type of incidental take is occurring or what the level might be, and therefore, the effect upon the grizzly bear population is largely unknown.

In its May 12, 1999 administrative finding, the Service concluded that the SRZ and CYRZ are not discrete from one another, but are discrete from the NCDE (USDI 1999a). However, the Service is currently analyzing new genetic information collected from grizzly bears located between the NCDE and CYRZ to better determine how interrelated and connected these populations are (Servheen pers.comm. 2003). Results of this analysis may shed additional light on the discreteness, or lack thereof, between the NCDE and CYRZ. Until a more thorough analysis of the SRZ, CYRZ, and NCDE is completed relative to habitat quality and size, the importance of the grizzly bears and/or adjacent areas of delineated grizzly bear occupancy to the ultimate stability and recovery of the grizzly bear populations within the Recovery Zones will not be fully understood. In the short-term, retaining the reproductive potential of adult female grizzly bears within these adjacent areas by maintaining the existing environmental conditions, which some bears seem able to tolerate, may enable them to contribute demographically and genetically to the CYRZ and SRZ grizzly bear populations in the long-term. If it is ultimately determined that these areas and/or grizzly bears within them are important for the recovery of the grizzly bear populations within these Recovery Zones, appropriate management strategies can be incorporated into LRMPs.

In conclusion, within the Recovery Zones, core habitat will increase and road densities will decrease with implementation of the proposed Amendment. Thus, displacement and mortality effects upon grizzly bears resulting from roads and road densities will likewise decrease within the Recovery Zones, which may result in increased grizzly bear numbers and distribution within the Recovery Zones. Relative to the areas of identified grizzly bear occupancy outside the Recovery Zones, due primarily to the higher total and open road densities that will be allowed for in these areas, they are not expected to support the number or densities of grizzly bears that it is possible to achieve within the Recovery Zones. However, mortality risk to grizzly bears residing within the areas of identified grizzly bear occupancy outside of the Recovery Zones is also not expected to increase. Additionally, habitat improvements resulting in increased grizzly bear numbers and distribution that will be gained within the Recovery Zones through

000131

implementation of the proposed Amendment are sufficient to preclude jeopardy to the SRZ and CYRZ grizzly bear populations. Furthermore, if new information dictating a change in management philosophy either within or outside the Recovery Zones arises, such new information could be incorporated into grizzly bear habitat management through a variety of mechanisms, including LRMP amendment and/or future section 7 consultation.

### B.    Canada Lynx

After reviewing the current status of the Canada lynx, environmental baseline, effects of the proposed Amendment, and cumulative effects, it is the Service's biological opinion that the proposed Amendment is not likely to jeopardize the continued existence of the Canada lynx. No critical habitat has been designated for this species, therefore, none will be affected.

Our conclusion is based upon the fact that the quantity, composition, and distribution of lynx habitat, including denning and foraging habitat, within LAUs will not be decreased as a result of activities implemented under the proposed Amendment. The proposed Amendment will not result in an increase in designated or groomed over-the-snow routes or snowmobile play areas within LAUs. It will, however, result in reduced density and availability of forest roads for snow-compacting activities. Additionally, reducing the density and availability of roads within lynx habitat should serve somewhat to reduce the fragmentation of lynx habitat and disturbance to lynx. Finally, pursuant to the CA and LCAS, the Forests have mapped all designated and groomed over-the-snow routes within LAUs, and must evaluate the extent to which all snow compacting activities, such as snowmobiling, snowshoeing, cross-country skiing, and dog sledding within LAUs affect lynx.

### C.    Bull Trout

After reviewing the current status of the species, the environmental baseline for the action area, the effects of the proposed action and the cumulative effects, it is the Service's biological opinion that the action, as proposed, is not likely to jeopardize the continued existence of bull trout in the Columbia River DPS. No critical habitat has been designated for this species, therefore, none will be affected.

We base our conclusions primarily on the fact that within many occupied bull trout watersheds within several BMUs of the Recovery Zones, low levels of road reclamation activities will occur due to the low levels of roads within the watersheds. Also, pursuant to the Forests current LRMPs, they are required to implement best management practices that are designed to reduce the potential for both short- and long-terms adverse effects to occur to bull trout as a result of conducting road related actions. Additionally, prior to implementing individual road related actions, which have the potential to affect bull trout in watersheds occupied by the species, the Forests will be required to consult with the Service. During such consultations, additional measures, such as timing constraints, can be incorporated into the proposed action to further minimize the potential for short-term adverse effects to occur to bull trout. Finally, removing road prisms and/or reducing road densities within bull trout occupied watersheds should result in

000132

long-term beneficial effects to the species through the stabilizing effects of such actions. Thus, the proposed Amendment should reduce the long-term threat to bull trout from culverts and roads by removing/reducing the risk of road prism failures, and restoring the natural hydrology patterns to road crossings.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act, and Federal regulations pursuant to section 4(d) of the Act, prohibit the take of endangered and threatened species, respectively without special exemption. Take is defined as harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by the Service as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with this Incidental Take Statement.

The measures described below are non-discretionary upon the agency, and must also be undertaken by the agency so that they become binding conditions of any grant or permit issued by the Forests, as appropriate, for the exemption in section 7(o)(2) to apply. The Forests have a continuing duty to regulate the activity covered by this incidental take statement. If the Forests (1) fail to assume and implement the terms and conditions; (2) fail to require any entity or individual, contracted to implement the action or any part of the action, to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit, grant, or contract document; and/or (3) fail to retain oversight to ensure compliance with these terms and conditions, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, the Forests must report the progress of implementing the action and mitigation measures to the Service as specified in the incidental take statement [50 CFR, Part 402.14(i)(3)].

## I.     Amount or Extent of Take

### A.     Grizzly Bear

The proposed Amendment will establish grizzly bear habitat management standards for all 22 BMUs in the CYRZ and 8 of 10 BMUs in the SRZ. Of the two BMUs in the SRZ not addressed by the proposed Amendment, one is managed entirely by the IDL and the other (i.e., LeClerc) is primarily managed by the CNF. The proposed standards for 7 of 10 BMUs in the SRZ and 20 of 22 BMUs in the CYRZ will meet or exceed (be better than) the parameters for core habitat, OMRD, and TMRD that research, conducted within these Recovery Zones, suggests provide

000133

conditions necessary to support the home range use and habitat needs (except for seasonal habitat considerations) of an average adult female grizzly bear. The grizzly bear habitat parameters identified through research specific to these Ecosystems are as follows: 1) the home ranges were comprised of an average 55 percent core habitat; 2) the amount of area having a TMRD greater than 2 mi/mi$^2$ averaged 26 percent; and 3) the amount of area having an OMRD greater than 1 mi/mi$^2$ averaged 33 percent.

As previously described in the accompanying Biological Opinion, the effect of roads upon grizzly bear behavior and habitat use has been well documented in the scientific literature. Several authors have documented grizzly bear avoidance of roads and the resulting displacement from adjacent habitat (Aune and Stivers 1985, McLellan and Mace 1985, Kasworm and Manley 1988, McLellan and Shackleton 1988, Aune and Kasworm 1989, Frederick 1991, and Wakkinen and Kasworm 1997). Research indicates that grizzly bears tend to avoid closed roads as well as open roads (Mace et al. 1999, Mace et al. 1996, and Mace and Manley 1993, Wakkinen and Kasworm 1997). Mace and Manley (1993) documented displacement of grizzly bears from closed roads, and found that grizzly bear use of areas declined as total road densities (open and closed roads) exceeded 2 mi/mi$^2$ and open road densities exceeded 1 mi/mi$^2$. Mace et al. (1996) found that grizzly bears are able to utilize roaded habitats, but that spatial avoidance increases and survival decreases as traffic levels and road densities increase. Wakkinen and Kasworm (1997) found that areas with total road densities greater than 2 mi/mi$^2$ and/or open road densities greater than 1 mi/mi$^2$ were used less than expected (avoided) by grizzly bears. A number of studies have indicated that female grizzlies with cubs tend to avoid roads (Mace et al. 1996, and Zager 1980 In: USFWS 1993). The occurrence of roads and the associated human disturbance within high quality bear habitats can also influence indirect mortality risk by disrupting efficient foraging strategies resulting in nutritional stress, restricting reproduction and dispersal, and potentially reducing carrying capacity (Mattson et al. 1987 In: Frederick 1991, and Aune and Stivers 1985 In: Frederick 1991). Nutritional demands of female bears with cubs is triple that of other bears, making their access to nutritional food sources and uninterrupted feeding essential during spring and fall (Jonkel 1982 In: Frederick 1991).

It is the Service's opinion that, within those BMUs achieving the research parameters, incidental take of grizzly bears is unlikely to occur. Conversely, it is also the Service's opinion that incidental take of grizzly bears is likely to occur within individual BMUs when one or more of the parameters established through the research addressing core habitat, OMRD, or TMRD are not achieved. Additionally, it is the Service's opinion that incidental take of grizzly bears is likely to occur through any permanent loss of core habitat from existing conditions within any individual BMU currently exceeding (being better than) the research parameters. It is also the Service's opinion that repeated point source disturbances, such as helicopter logging within core habitat, mining operations, etc., may result in incidental take of grizzly bears (Christensen and Madel 1982, USFWS 1993). Currently several BMUs within both the SRZ and CYRZ do not provide the above referenced habitat conditions suggested by research as necessary to support an average adult female grizzly bear's home range. Further, 2 of 10 BMUs in the SRZ (LeClerc and Lakeshore) and 2 of 22 BMUs (Grouse and #10) in the CYRZ may never be capable of

129

providing the conditions that research has suggested the average adult female grizzly bear requires to support her home range. Therefore, for three of the BMUs the proposed Amendment will establish grizzly bear habitat management standards at levels that may not be capable of providing the full suite of home range needs of the average adult female grizzly bear (standards are not proposed for the LeClerc BMU as it is primarily managed by the CNF). Thus, for these three BMUs, incidental take may be a persistent long-term condition. It is the Service's opinion that incidental take of grizzly bears is likely to occur in the form of harm (displacement) through significant habitat modification or degradation which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering.

Additionally, it is our opinion that some level of incidental take of grizzly bears is occurring in the identified areas of grizzly bear occupancy outside of but adjacent to the SRZ and CYRZ. We base our opinion on the fact that: 1) linear open road densities exceed 1 mi/mi$^2$ in these areas; and 2) the Forests have not specifically managed for grizzly bear habitat relative to road densities outside of the Recovery Zones. Thus, given these facts, in conjunction with the above cited research pertaining to the effects of roads on grizzly bear behavior and habitat use, we believe road densities are most likely high in these areas, and are likely to be causing incidental take of grizzly bears. Similar to the incidental take likely occurring within BMUs, the Service anticipates that the incidental take of grizzly bears in the occupied areas outside of the Recovery Zones will be in the form of harm (displacement) through significant habitat modification or degradation which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering.

Therefore, it is the Service's opinion that the existing high road densities and insufficient core habitat within several BMUs of SRZ and CYRZ, and the adjacently occupied areas outside of the Recovery Zones result in significant habitat modification or degradation, which causes actual injury to grizzly bears by significantly disrupting normal behavioral patterns, including breeding, feeding, or sheltering. Further, it is the Service's biological judgment that incidental take of grizzly bears, in the form of harm (displacement), will continue to occur within individual BMUs as long as: 1) open road densities exceed one mi/mi$^2$ in over 33 percent of a BMU; 2) total road densities exceed two mi/mi$^2$ in over 26 percent of a BMU, and/or 3) core habitat makes up less than 55 percent of a BMU.

However, the Service anticipates that the level of incidental take of grizzly bears will be low and will primarily occur indirectly as a result of displacement due to high road densities within some BMUs and areas of adjacent occupancy. We expect this incidental take to occur as impairment of the normal breeding and feeding behavior of grizzly bears, which would impair potential levels of reproductive success. We do not expect adult or subadult grizzly bear mortality as a result of the displacement.

Currently, the Service is unaware of scientific or commercial information that could be used to quantify the exact level of incidental take of grizzly bears as a result of such impacts to or degradation of their habitat, disturbance, or displacement. Reduced reproductive success of

130

females as a result of displacement effects could include grizzly bear cub mortality and/or reabsorption of fetuses. However, this type of mortality usually cannot be documented. Grizzly bear offspring (cubs, sub-adults) also have naturally high mortality rates. Therefore, the anticipated level of incidental take of grizzly bears as a result of the implementation of the proposed Amendment, or the continued implementation of the Forests LRMPs, is numerically 'unquantifiable'. In these instances, we use the surrogate parameters addressing levels of core habitat, OMRD, and TMRD within individual BMUs as measures of incidental take of grizzly bears.

It is also the Service's opinion that, within the Recovery Zones, decreasing core habitat and/or increasing TMRD or OMRD beyond the standards contained in Table 16 will exceed the amount of incidental take analyzed and exempted by this biological opinion. Further, it is also the Service's opinion that, for the adjacent areas of grizzly bear occupancy outside of the Recovery Zones, increases in linear open road densities and/or permanent increases in linear total road densities beyond the standards contained in Table 17 will exceed the amount of incidental take analyzed and exempted by this biological opinion.

Furthermore, it is the Service's biological opinion that the lack of sanitation requirements within the CYRZ and SRZ may contribute to mortality of grizzly bears through management removal and other human-caused mortality. In at least one case, past management action consisting of capturing and relocating a food-conditioned grizzly bear occurred as a result of improper storage of attractants on federal land within Recovery Zones. Until a comprehensive sanitation program is implemented on the Forests within the CYRZ and SRZ, the potential for grizzly bears to have access and become habituated to improperly stored food items on federal land will persist. Thus, the potential for incidental take of grizzly bears through management actions as a result of habituated and food conditioned bears will remain.

The Service anticipates that up to one grizzly bear may be incidentally taken due to sanitation related issues. The incidental take may occur in the form of harassment through capture and relocation. Currently, however, the Forests are developing sanitation programs. In 2002, pursuant to guidance from the IGBC, the KNF and IPNF convened an Information and Education Workgroup to begin developing a comprehensive sanitation program that will include a food storage order on public land. The IGBC has recommended that all Forests within grizzly bear recovery areas implement food storage orders to help reduce bear habituation to humans and to minimize the potential for bear/human conflicts. These programs will include, among other things, public education, and the development and implementation of food storage orders on national forest system lands within the Recovery Zones. The Service is participating in the development of these sanitation programs, and believes appropriate progress is being made to address sanitation related issues on the Forests.

Informing the public, agency personnel, contractors, and permittees about the importance of proper food storage is imperative to minimize the potential for such conflicts and ensure human safety. The KNF and IPNF have been active in this effort. Education, combined with

000136

implementation and enforcement of a food storage order, is an effective way to minimize the potential for grizzly bear mortalities resulting from such attractants.

### B.    Canada Lynx

No incidental take is anticipated. Therefore, no reasonable and prudent measures or terms and conditions are required to minimize take.

### C.    Bull Trout

This incidental take statement addresses impacts to the Columbia River DPS from the establishment of road density standards within the Recovery Zones on the KNF, IPNF, and LNF. The Service is unable to anticipate all possible circumstances related to the implementation of activities necessary to meet the standards, including programmatic actions or individual actions which may be developed in the future. Therefore, the Service is unable to issue an all-encompassing incidental take statement or a comprehensive list of reasonable and prudent measures. Even though the Service anticipates a low amount of take will occur due to these activities, the best scientific and commercial data available are not sufficient to allow the Service to estimate a specific amount of incidental take of bull trout. While the Service has determined that the level of anticipated take associated with the activities necessary to meet the road density standards are not likely to jeopardize the Columbia River DPS, the Service is not authorizing through this biological opinion incidental take of bull trout for any specific actions carried out by the Forests to meet these road density standards.

The Service is able, however, to offer technical assistance measures that the Forests may utilize when implementing future actions to meet road density standards within the BMUs. These measures should reduce the overall level of incidental take, which may result from the implementation of such future actions. Two key elements of the future evaluation of proposed actions are: 1) suitable measures to minimize the level of incidental take are developed integral to the proposed action; and 2) the necessary information is presented that the Service will need to identify specific measures and their associated terms and conditions for the individual actions and the watershed scale activities implemented by the Forests to meet road density standards.

Incidental take, if any, will be authorized at the site specific action level. Site-specific biological opinions may tier to, and incorporate by reference, the analysis and technical assistance contained in this biological opinion. The following measures may become mandatory when and where determined appropriate through formal consultation, and prescribed by the Service in a site-specific biological opinion.

1.    The Forests should assure consistent implementation of measures and standards specified in the Aquatic Conservation strategies as indicated in the *1998 Biological Opinion for the Effects to Bull Trout from the Continued Implementation of Land and Resource Management Plans and Resource Management Plans as Amended by the Interim Strategies for Managing Fish-producing Watersheds in Eastern Oregon and Washington,*

132

000137

*Idaho, Western Montana and portions of Nevada (INFISH), and the Interim Strategy for Managing Anadromous Fish-producing Watershed in Eastern Oregon and Washington, Idaho and portions of California (PACFISH).*

2.    The Forests should ensure that the "Section 7" watershed baselines are updated according to the INFISH Biological Opinion's Reasonable and Prudent Measure #2 (USFWS 1998). These baselines should be updated after every project requiring consultation which may affect them until the LRMP for each Forest is revised, or another analysis methodology is developed in conjunction with the Service.

3.    The Forests should assume bull trout are present in a given watershed, unless site-specific information indicates otherwise. The Forests should informally consult with the Service to: determine the effects of proposed actions upon bull trout prior to initiating formal consultation; and ensure that the necessary site specific information and technical data is adequate and provided to the Service in the baseline and effects analysis for individual project biological assessments.

4.    The Forests should ensure that all road features, particularly stream crossings on roads, in newly created grizzly bear core habitat be hydrologically neutral (as defined in subsequent project level consultations with the Service) and capable of passing at least a 100-year flood event with minimal erosion. Should the Forests decide to leave a culvert on a road in newly created core habitat, then that crossing should be capable of passing a 100-year event.

5.    The Forests should minimize sediment input to the maximum extent practicable from culvert removals and subsequent streambed and streambank restoration activities by following all appropriate best management practices.

6.    The Forests should, where practicable, time any culvert removals to coincide with low flow on perennial streams or no flow on intermittent streams to minimize sediment impacts to bull trout spawning activities and bull trout spawning and rearing habitat.

## II.    Effect of the Take

### A.    Grizzly Bear

In the accompanying biological opinion, the Service determined that this level of anticipated incidental take is not likely to result in jeopardy to the grizzly bear. Some low level of indirect incidental take may occur as a result of displacement of grizzly bears from essential habitat. Such take is unquantifiable. In cases where the amount of take is unquantifiable, the Service uses surrogate parameters to measure the impact of the take on the species, and provide the threshold at which the anticipated level of incidental take is likely to occur. Based on research related to the displacement of grizzly bears from roads and roaded habitat (Mace and Manley 1993, Mace et al. 1996, Wakkinen and Kasworm 1997), the Service uses surrogate measures of

133

000138

core habitat, OMRD, and TMRD to establish the levels of incidental take, and the thresholds at which incidental take is likely to occur. Currently, several BMUs within the SRZ and CYRZ contain substantially more core habitat than research indicates is required to support an average adult female grizzly bear home range. Similarly, several BMUs within the SRZ and CYRZ contain substantially lower OMRDs and TMRDs than research indicates the average adult female grizzly bear can tolerate within her home range. Given the current grizzly bear population levels and distribution, BMUs providing conditions substantially better than the research parameters offer ample opportunities and areas for grizzly bear displacement, moderating the displacement effects of those BMUs with low levels of core habitat and/or high road densities. Additionally, the proposed Amendment will result in several BMUs of the SRZ and CYRZ that substantially exceed (are better than) the research parameters for core habitat, OMRD, and TMRD, which are indicated as necessary habitat conditions to support the home range of an average adult female grizzly bear.

The areas of grizzly bear occupancy located outside of the Recovery Zones will most likely support fewer numbers and densities of grizzly bears. However, there is an increased possibility of achieving higher grizzly bear densities within the Recovery Zones through increases in core habitat and reductions in road densities resulting from implementation of the proposed Amendment. This will offset the lower densities of grizzly bears that may occur in areas outside the Recovery Zones.

## III.    Reasonable and Prudent Measures

The Service believes the following reasonable and prudent measures are necessary and appropriate to minimize impacts of incidental take of grizzly bears:

### A.    Grizzly Bear

1.    Ensure that management activities and the associated transportation network maintain or create sufficient core area, maintain or reduce OMRD to acceptable levels, and maintain or reduce TMRD to acceptable levels within individual BMUs of the SRZ and CYRZ.

2.    Reduce the potential for mortality and displacement of grizzly bears from occupied habitat in the mapped areas of grizzly bear occupancy outside of but adjacent to the CYRZ and SRZ (Figure 3).

## IV.    Terms and Conditions

In order to be exempt from the prohibitions of section 9 of the Act, the Forests must comply with the following terms and conditions, which implement the reasonable and prudent measures (RPM) described above and outline the required reporting/monitoring requirements. These terms and conditions are non-discretionary.

000139

A.    **Grizzly Bear**

1.    The following terms and conditions implement RPM A.1:

A.    Table 16 contains the standards for all BMUs. Since funding or unplanned circumstances may affect completion by the dates identified below, the Forests shall meet with the Service annually to discuss progress made towards achieving the established standards for each BMU. For those individual BMUs currently deficient in core habitat, or exceeding (being worse than) the OMRD or TMRD standard, all standards as contained in Table 16 will be achieved in 35 percent of the BMUs by 12/31/2009, in 70 percent of the BMUs by 12/31/2011, and by 12/31/2013, all BMUs must equal or be better than the standards. While this provides some flexibility for the Forests to decide when and in which BMUs to improve conditions, emphasis should be given to achieving the identified standards by order of BMU importance (i.e., Priority 1 BMUs, followed by Priority 2 BMUs, followed by Priority 3 BMUs).

Table 16:  Bear management unit standards.

| BMU | BMU Priority | Maximum Percent OMRD >1mi/mi$^2$ | Maximum Percent TMRD >2mi/mi$^2$ | Minimum Percent Core |
|---|---|---|---|---|
| 1 | 2 | 15 | 15 | 80 |
| 2 | 2 | 20 | 18 | 75 |
| 3 | 3 | 33 | 26 | 59 |
| 4 | 2 | 36 | 26 | 63 |
| 5 | 1 | 30 | 23 | 60 |
| 6 | 1 | 34 | 32 | 55 |
| 7 | 2 | 26 | 23 | 63 |
| 8 | 3 | 32 | 20 | 55 |
| 9 | 2 | 33 | 26 | 55 |
| 10 | 2 | 44 | 34 | 52 |
| 11 | 1 | 33 | 26 | 55 |
| 12 | 1 | 45 | 31 | 55 |
| 13 (Keno) | 1 | 33 | 26 | 60 |
| 14 (Northwest Peaks) | 1 | 33 | 26 | 55 |
| 15 | 1 | 33 | 26 | 55 |
| 16 | 1 | 33 | 26 | 55 |
| 17 | 2 | 33 | 26 | 55 |

135

000140

Table 16 (cont.):  Bear management unit standards.

| BMU | BMU Priority | Maximum Percent OMRD >1mi/mi$^2$ | Maximum Percent TMRD >2mi/mi$^2$ | Minimum Percent Core |
|---|---|---|---|---|
| 18 (Boulder) | 3 | 33 | 29 | 55 |
| 19 (Grouse) | 3 | 59 | 55 | 37 |
| 20 (N. Lightening) | 1 | 35 | 26 | 61 |
| 21 (Scotchman) | 2 | 35 | 26 | 62 |
| 22 | 3 | 33 | 35 | 55 |
| Blue-Grass | 1 | 31 | 26 | 55 |
| Long-Smith | 1 | 25 | 15 | 67 |
| Kalispell-Granite | 1 | 33 | 26 | 55 |
| Lakeshore | 3 | 82 | 56 | 20 |
| Salmo-Priest | 2 | 33 | 26 | 64 |
| Sullivan-Hughes | 1 | 23 | 18 | 61 |
| Myrtle | 2 | 33 | 22 | 56 |
| Ball-Trout | 2 | 20 | 13 | 69 |

B.    For all BMUs:

i.    Core habitat must remain in place for at least 10 years to be functionally effective for grizzly bears.  Therefore, except for emergencies or other unforeseen circumstances consulted on with the Service, newly created core habitat shall not be entered for at least 10 years after creation.

ii.    Core habitat within BMUs shall not be impacted (i.e., shifted, moved, etc.) by activities more frequently than once every 10 years, unless the activity is to decommission/stabilize an existing closed road (as described in 1.B.iii).

iii.    The Forest Service may enter core habitat within a BMU more frequently than once per 10-year time frame for the sole purpose of completing road decommissioning/stabilization activities resulting in long term improvements in core habitat.  However, the effects of such additional entries will be analyzed pursuant to project level consultation and additional measures to minimize potential effects to grizzly bears may be required.  Furthermore, such activities may only impact individual blocks

136

000141

of core habitat within a BMU once per 10-year time-frame per individual BMU.

iv.     Except as described under 1.B.iii. and 1.C., impacts to or losses of existing core habitat within individual BMUs shall be compensated for with in-kind replacement of core habitat concurrently with or prior to incurring the impacts to or loss of the existing core habitat. Such in-kind replacement of core habitat will be created within the BMU in which the impact to or loss of core habitat will occur, and will remain in place for at least 10 years.

C.  For those BMUs exceeding the standards for core habitat (being better than):

i.      No permanent net losses of core habitat shall occur within any individual BMU.

ii.     Temporary reductions of core habitat may only occur under the following conditions:

a.  Temporary reductions of core habitat within individual BMUs shall not decrease core habitat below the minimum core habitat standard within any individual BMU, without compensation as described in 1.B.iv.

b.  Activities resulting in temporary reductions of core habitat shall be compressed in time so that no more than 3 consecutive years of the 10-year time-span are impacted within individual BMUs. However, the effects of such activities will be analyzed pursuant to project level consultation and additional measures to minimize potential effects to grizzly bears may be required.

c.  Temporary reductions of core habitat shall only occur once (i.e., one action/project) per 10-year time-frame per individual BMU, unless the activity is to decommission/stabilize an existing closed road (as described in 1.C.ii.d).

d.  The Forests may enter core habitat within a BMU more frequently than once per 10-year time frame for the sole purpose of completing road decommissioning/stabilization activities resulting in long term improvements in core habitat. However, the effects of such additional entries will be analyzed pursuant to project level consultation and additional measures to minimize potential effects to grizzly bears may be required. Furthermore, such activities may only impact individual

137

000142

blocks of core habitat within a BMU once per 10-year time-frame per individual BMU.

D.   Roads closed to create core habitat will be put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years. Until such closed roads are placed in the above described condition, they will not be considered as contributing to core habitat.

E.   Road use associated with completing administrative activities shall not exceed 57 vehicle round trips per active bear year per road, and shall be apportioned as follows: ≤19 round trips in spring (April 1 thru June 15); ≤23 round trips in summer (June 16 thru September 15); and ≤15 round trips in fall (September 16 thru November 15).

F.   The Forests shall submit annual reports to the Service, due January 15 each year, detailing the progress made toward achieving and maintaining the standards for core habitat, and OMRD and TMRD within the Recovery Zones.

2.   The following terms and conditions implement RPM A.2:

A.   The Forests shall ensure no increases in linear open road (i.e., non-gated roads open to public use) densities on National Forest System Lands in any individual area of grizzly bear occupancy, above the baseline conditions identified in Table 17 (below). However, roads created, opened or reconstructed to facilitate land management activities may be opened to the public, immediately following completion of all harvest activities requiring use of the road, to allow personal firewood gathering for 30 consecutive days during either the month of July or August.

B.   The Forests shall ensure no permanent increases in linear total road densities, above the baseline conditions identified in Table 17 (below). Temporary increases in linear total road densities are acceptable under the following conditions:

   i.    Newly constructed roads will be effectively gated and will be restricted with a CFR closure clarifying they are not open for public use.

   ii.   Roads closed to meet the no net increase in linear total road densities shall: 1) be closed immediately upon completion of activities requiring use of the road; 2) be effectively closed with a berm, guardrail or other effective measure; and 3) put in a condition such that a need for motorized access for maintenance is not anticipated for at least 10 years.

138

000143

iii.  Upon completion of a land management project, linear total road densities will return to the baseline levels contained in Table 17.

Table 17: Grizzly Bear Occupancy Areas adjacent to the CYRZ and SRZ; size and 2002 road density status.

| Area | Total Size ($mi^2$) | Area on National Forest Lands Only ($mi^2$) | Linear Total Road Density on National Forest Lands Only ($mi/mi^2$) | Linear Open Road Density on National Forest Lands Only ($mi/mi^2$) |
|---|---|---|---|---|
| Priest | 107 | 101 | 7.8 | 5.0 |
| Pack River | 35 | 32 | 2.6 | 0.6 |
| Troy | 68 | 8 | 2.6 | 1.2 |
| Clark Fork | 442 | 317 | 2.6 | 0.9 |
| Cabinet | 150 | 84 | 3.9 | 2.2 |
| West | 326 | 299 | 3.0 | 1.3 |
| Tobacco | 802 | 503 | 3.3 | 1.8 |
| Libby[1] | 290 | 144 | 3.4 | 1.9 |
| Fisher | 559 | 196 | 2.7 | 1.0 |
| Deer Ridge | 64 | 57 | 4.2 | 1.6 |

[1]Libby and Fisher Areas are outside the projected grizzly distribution area in the short term, but are included in this analysis to complete the process for lands associated with the CYRZ, per verbal agreement with the Service (September 26, 2002).

D.  Timber harvest activities that will occur within multiple watersheds shall be scheduled such that disturbance of grizzly bears resulting from road use is minimized. The appropriate scale for scheduling harvest activities will be determined pursuant to project level consultation.

E.  The Forests shall submit annual reports to the Service, due January 15 each year, summarizing actions taken to comply with terms and conditions implementing RPM A.2.

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed Amendment, and continued implementation of the LRMPs. If the terms and conditions implementing the RPMs are not adhered to, this may indicate that the level of exempted take has been exceeded. The Service retains the discretion to determine whether this is the case and

000144

reinitiation of consultation is required. The Forests must immediately provide and explanation of the causes of the taking and review with the Service the need for possible modification of the RPMs.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. The Service recommends that:

1. The Forests continue working with the IGBC to develop and implement a Food Storage Order, by December 31, 2005, to reduce the potential for grizzly bear/human conflicts. It would be prudent to implement such an order within the administrative boundaries of each Forest. Improperly stored food and garbage leads to food conditioned and habituated grizzly bears that generally result in their direct mortality or management removal. Attraction of grizzly bears to improperly stored food and garbage is identified by the Recovery Plan as one of the principal causes of grizzly bear mortality, and has been the ultimate reason for several mortalities of grizzly bears within the CYRZ and SRZ.

2. The Forests install grizzly bear information signs at major access points advising the public of grizzly bear presence, proper sanitation/food storage techniques, and providing information on distinguishing characteristics between grizzly bears and black bears.

3. The IPNF, in coordination with the Service and the Colville NF, evaluate for reconfiguration the BMUs that border the two Forests. Specifically, evaluate the appropriateness of reconfiguring the Salmo Priest, Sullivan-Hughes, Kalispell-Granite, and Lakeshore BMUs to more closely approximate the home range size of female grizzly bears within this Ecosystem (i.e., approximately 100 mi$^2$).

4. The Forests develop, in coordination with the Service and the IGBC, a strategy addressing point source disturbances (e.g., helicopter logging, mining, etc.).

5. The Forests work cooperatively with the Service to identify linkage areas that may be important in providing landscape connectivity within and between geographic areas, across all land ownerships for grizzly bears and Canada lynx.

6. The Forests conduct a moving windows analysis in the areas of grizzly bear occupancy outside of but adjacent to the Recovery Zones to better assess the potential effects of road densities upon grizzly bears in these areas.

000145

7.  Within linkage areas, the Forests provide for landscape connectivity by participating in the development and implementation of a management plan to protect and restore habitat connectivity within these areas on federal lands.

8.  The Forests plan recreational development, and manage recreational and operational uses to provide for grizzly bear and Canada lynx movement, and to maintain effectiveness of grizzly bear and Canada lynx habitat.

9.  The Forests identify and prioritize roads for reclamation or seasonal restrictions within watersheds exceeding $> 2$ mi/mi$^2$ of open road density to improve habitat quality and/or security for grizzly bears, Canada lynx, and bull trout, as well as other listed and non-listed fish and wildlife species.

10. The Forests continue to monitor, inventory, investigate and document the bull trout populations and spawning activities throughout the entire action area.

11. The Forests continue to reduce sediment inputs from roads and reduce road density throughout the action area to further minimize risk and impacts from sedimentation to bull trout.

12. The Forests identify those watersheds containing bull trout where the road density exceeds the "Functioning Appropriately" standards set forth in the Framework and attempt to bring those watersheds into agreement with that standard.

13. The Forests rip the road base within the RHCA for all decommissioned roads to facilitate water infiltration rates and reduce surface flow and erosion within watersheds containing bull trout habitat, wherever appropriate.

14. Upon finalization of the Bull Trout Recovery Plan, the Forests review and implement all necessary and appropriate recovery objectives that pertain to meeting road density standards or other relevant standards.

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the proposed Amendment, and the reinitiated formal consultation on the continued implementation of the LRMPs for grizzly bears outside of the Recovery Zones. As provided in 50 CFR, Part 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical

141

habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

000147

## LITERATURE CITED

Adams, A.W. 1963. The lynx explosion. North Dakota Outdoors. 26:20-24.

Adams, S.B. 1994. Bull trout distribution and habitat use in the Weiser River drainage, Idaho. M.S. Thesis. University of Idaho, Moscow, Idaho.

Agee, J.K. 2000. Disturbance ecology of North American boreal forests and associated northern mixed/subalpine Forests. Pages 39-82 *In* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires. (Tech. Eds.) Ecology and Conservation of Lynx in the United States. Univ. of Colorado. Boulder, CO. 480pp.

Allan, J.H. 1980. Life history notes on the dolly varden char (*Salvelinus malma*) in the Upper Clearwater River, Alberta. Manuscript Report. Energy and Natural Resources, Fish and Wildlife Division. Red Deer, AB. 58 pp.

Apps. C.D. 2000. Space-use, diet, demographics, and topographic associations of lynx in the southern Canadian Rocky Mountains: a study. Pages 351-371 *In* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires. (Tech. Eds.) Ecology and Conservation of Lynx in the United States. Univ. of Colorado. Boulder, CO. 480pp.

Aubry, K.B., G. Koehler, and J.R. Squires. 2000. Ecology of Canada lynx in southern boreal forests. Pages 373-396 *In* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires. (Tech. Eds.) Ecology and Conservation of Lynx in the United States. Univ. of Colorado. Boulder, CO. 480pp.

Aune, K. and W. Kasworm. 1989. Final Report East Front Grizzly Bear Study. Montana Department of Fish, Wildlife, and Parks. Helena, Montana. 332pp.

Aune, K. and T. Stivers. 1985. Ecological Studies of the Grizzly Bear in the Pine Butte Preserve. Montana Dept. of Fish, Wildlife and Parks. 154pp

Avista Corporation. 2002a. Native fish abundance studies: Fisheries survey of the Vermillion River Drainage, Montana-2001 Final Report Fish Passage/Native Salmonid Restoration Program. Prepared by Sean Moran.

_____. 2002b. Draft Thompson River Fishery Investigations Progress Report-2000/2001: Montana tributary habitat acquisition and recreational fishery enhancement program, Appendix B. Prepared by Brad Liermann and Laura Katzman.

_____. 2002c. Downstream juvenile bull trout transport program Annual progress report-2001; Fish passage/Native salmonid Program, Appendix C. Prepared for Avista Corporation, Noxon, Montana.

000148

_____. 2003a. 2002 Annual Report: Implementation of PM&E Measures. Prepared for Avista Corporation, Noxon, Montana.

_____. 2003b. Lake Pend Oreille/Clark Fork River fishery research and monitoring: 1999-2001 progress report. *In Press*. Prepared by Chris Downs, R. Jakubowski, & S. Moran. Spokane, Washington.

Bailey, T.N. 1974. Social organization in a bobcat population. Journal of Wildlife Management 38:435-446.

Bailey, T.N., E.E. Bangs, and M.F. Porter. 1986. An apparent overexploited lynx population on the Kenai peninsula, Alaska. Journal of Wildlife Management 50:279-290.

Berrie, P.M. 1974. Ecology and status of the lynx in interior Alaska. Pages 4-41 in R.L. Eaton, ed. The world's cats. Volume 1. World Wildlife Safari, Winston, Oregon.

Bittner, S.L., and O.J. Rongstad. 1982. Snowshoe hare and allies in J.A. Chapman and G.A. Feldhamer, eds. Wild mammals of North America biology, management and economics. Johns Hopkins University Press, Baltimore, Maryland.

Bjornn, T.C. and D.W. Reiser. 1991. Habitat requirements of salmonids in streams: influences of forest and rangeland management on salmonid fishes and their habitats. W.R. Meehan, ed., American Fisheries Society Special Publication 19:83-138.

Bonde, T.J.H. and R.M. Bush. 1982. Limnological investigations: Lake Koocanusa, Montana: Part I. pre-impoundment study, 1967-72. U.S. Army Corps of Engineers, Seattle District, Seattle, WA.

Brainerd, S.M. 1985. Reproductive ecology of bobcats and lynx in western Montana. MS. Thesis, University of Montana, Missoula.

Brand, C.J. and L.B. Keith. 1979. Lynx demographics during a snowshoe hare decline in Alberta. J. Wildl. Manage. 43(4): 827-849.

Brand, C.J., L.B. Kieth, and C.A. Fisher. 1976. Lynx responses to changing snowshoe hare densities in central Alberta. Journal of Wildlife Management 40:416-428.

Brocke, R. K.A. Gustafson, and A.R. Major. 1990. Restoration of the lynx in New York: biopolitical lessons. Trans. North American Wildlife and Natural Resources Conf. 55:590-598.

000149

Brown, L.G. 1992. On the zoogeography and life history of Washington native char Dolly Varden (*Salvelinus malma*) and bull trout (*Salvelinus confluentus*). Washington Department of Wildlife, Fisheries Management Division Report. Olympia, Washington.

Buckman, R.C., W.E. Hosford and P.A. Dupee. 1992. Malheur river bull trout investigations. Pages 45-57 *in*: Howell, P.J. and D.V. Buchanan, eds., Proceedings of the Gearhart Mountain bull trout workshop. Oregon Chapter of the American Fisheries Society, Corvallis, Oregon.

Burt, W.H. 1954. The mammals of Michigan. Univ. Of Michigan Press, Ann Arbor.

Buskirk, S.W., K.B. Aubry, and C.J. Krebs. 2000a. Habitat fragmentation and interspecific competition: implications for lynx conservation. Pages 83-100 *In* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires. (Tech. Eds.) Ecology and Conservation of Lynx in the United States. Univ. of Colorado. Boulder, CO. 480pp.

Buskirk, S.W., L.F. Ruggiero, K.B. Aubry, D.E. Pearson, J.R. Squires, and K.S. McKelvey. 2000b. Comparative ecology of lynx in North America. Pages 397-417 *In* Ruggiero, L.F., K.B. Aubry, S.W. Buskirk, G.M. Koehler, C.J. Krebs, K.S. McKelvey, and J.R. Squires. (Tech. Eds.) Ecology and Conservation of Lynx in the United States. Univ. of Colorado. Boulder, CO. 480pp.

Carbon, L.N., and D. Patriquin. 1983. Observations on home range sizes, movements and social organization of lynx, *Lynx canadensis*, in Riding Mountain National Park, Manitoba. Canadian Field Naturalist 97:262-267.

Cavender, T.M.1978. Taxonomy and Distribution of the Bull Trout, *Salvelinus confluentus* (Suckley), from the American Northwest. California Fish and Game 64:139-174. (As referenced in USDI 1998).

Chadwick Ecological Consultants. 2000. Fisheries survey of the Bull River Drainage. Prepared for Avista Corporation. Spokane, Washington.

Chisholm, I., M.E. Hensler, B. Hansen, and D. Skaar. 1989. Quantification of Libby Reservoir levels needed to maintain or enhance reservoir fisheries. Montana Dept. of Fish, Wildlife and Parks; Prepared for the Bonneville Power Administration, Portland, OR.

Christensen, A.G., and M.J. Madel. 1982. Cumulative effects analysis process, grizzly bear habitat component mapping. Kootenai National Forest.

Clancy, C.G. 1993. Statewide fisheries investigations: Bitterroot Forest inventory. Montana Fish, Wildlife, and Parks, Job Completion Report, Project F-46-R-4-Ij, Helena, Montana.

000150